MARK D. ROSENBAUM (SBN 59940)
Email: mrosenbaum@aclu-sc.org
CATHERINE E. LHAMON (SBN 192751)
Email: clhamon@aclu-sc.org
PETER BIBRING (SBN 223981)
Email: pbibring@aclu-sc.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, California  90017
Tel:  (213) 977-9500
Fax:  (213) 977-5297

ERWIN CHEMERINSKY, of counsel
University of California, Irvine
School of Law
4500 Berkeley Place
Irvine, California  92697-8000
Tel:  (949) 824-0066

Attorneys for Community Intervenors

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. CV 00-11769 GAF (RCx) |
| Plaintiff, | ) STATUS REPORT OF COMMUNITY INTERVENORS RE EXTENSION OF THE CONSENT DECREE |
| vs. | ) |
| CITY OF LOS ANGELES, et al., | ) |
| Defendant, | ) [Filed concurrently with: Declarations in Support of Status Report of Community Intervenors] |
| MICHAEL GARCIA, et al., | ) |
| Intervenors. | ) |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. Standards for Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B. LAPD's Continued Failure to Comply with the Consent
Decree's Nondiscrimination Provisions Demands Continued Court
Oversight . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    1. *The Evidence Suggests that Racial Disparities in
Policing by LAPD Continue and, in Some Circumstances,
are Widening* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    2. *LAPD's Failure to Engage the Unjustified Racial Disparities
Falls Short of Compliance With the Decree* . . . . . . . . . . . . . . . . . . . . 7

    3. *The Recent Harvard Report Commissioned by the LAPD
Provides Additional Evidence of Ongoing Racial Disparities* . . . . 10

C. The Department Has Not Complied with TEAMS II Decree
Provisions For the Two-Year Period Required for Dissolution
of the Decree . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

D. LAPD Shows Troubling Noncompliance With Basic Reform
Provisions of the Consent Decree . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    1. *LAPD Remains Noncompliant in Various Aspects
of the Management of Gang Units* . . . . . . . . . . . . . . . . . . . . . . . . . 14

    2. *LAPD Has Not Achieved Compliance In Other Areas
Basic to Reform* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

E. Other Incidents Suggest The Need For Ongoing Oversight
and Reform . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION AND REQUESTED COURSE OF ACTION . . . . . . . . . . . . . . 23

i

1

# TABLE OF AUTHORITIES

2

**STATE CASES**

3
**Page(s)**

4
*Minnesota v. Mustafaa Naji Fort*,
    660 N.W.2d 415 (Minn. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
5

*State v. Carty*,
6
    790 A.2d 903 (N.J. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

7
*State v. Quino*,
    840 P.2d 358 (Haw. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## INTRODUCTION

Community Intervenors hereby submit this Status Report regarding the Consent Decree ("CD" or the "Decree") entered in this action and currently due to expire on June 15, 2009.[1]

The Department has operated under the Decree for eight years — a long time in the realm of litigation or public policy.  During that time, the LAPD has indisputably made commendable progress under the terms of the Decree and the guidance of this Court, for which it deserves recognition.  By virtue of the length of the Decree and the extent of the changes made, there is strong temptation to call the project completed.  But this temptation must be tempered by the fact that there remains much to do — substantial noncompliance remains in areas that lie at the very heart of the Decree's reforms, including, as set forth below, nondiscrimination, implementation of protocols for the use of the early warning system, the management and supervision of gang units, and various provisions for management and supervision in other areas susceptible to abuse.

In light of the remaining areas of noncompliance, Community Intervenors request that the Court extend the decree for a further three years.  Following the practice established during the extension period, active monitoring should only be required in those areas where compliance has not yet been attained, or core provisions of the decree.  In order to better transition to a post-decree status where the Office of the Inspector General will be the entity responsible for independent oversight of the LAPD, the Court should consider assigning primary responsibility for compliance monitoring to that office, subject to review and audit by the Monitor, who should retain an active role.

---

[1] Community Intervenors received the Joint Motion and Memorandum In Support Thereof To Terminate the Original Consent Decree And To Transition Full Oversight Authority To The City Defendants upon its e-filing on June 1, 2009 at 12:04 p.m.  Community Intervenors anticipate filing a short response to this motion on Tuesday, June 2, 2009.

The Court must evaluate the extension of the decree not just on the progress made, but on the work left to be done.  The ultimate goal of this Decree lies not in its process, but in the outcome of a reformed LAPD.  And one lesson clear from the reports and commissions that have written the history of reform in the Los Angeles Police Department is that the things left undone in one push to reform become the problems that spark the next set of controversies. The LAPD has made commendable progress under the Decree, but it would be a unwarranted risk to extinguish the most effective device at accomplishing police reform in Los Angeles before the job is complete.

## DISCUSSION

**A.      Standards for Compliance**

In order to assure the change spurred by the Decree is not transitory, but enduring, Paragraph 179 places the burden on the City to prove extended compliance in order for the Decree to end:

> [T]he burden shall be on the City to demonstrate that it has substantially complied with *each* of the provisions of the Agreement and maintained substantial compliance for at least two years.  For the purposes of this paragraph, 'substantial compliance' means there has been performance of the material terms of this Agreement Materiality shall be determined by reference to the overall objectives of this Agreement. . . .  if the Court finds that the City has not maintained substantial compliance for at least two years, the Court *shall* extend the term of this Agreement until such time as the City has been in substantial compliance with this Agreement for a period of two years . . . .

CD ¶ 179 (emphasis added).

**B.      LAPD's Continued Failure to Comply with the Consent Decree's Nondiscrimination Provisions Demands Continued Court Oversight**

Of all the longstanding problems with the LAPD's culture at which the Consent Decree takes aim, none has been as entrenched or as toxic as that of racial discrimination, which has incited incidents throughout the LAPD's history – and

2

1   the history of Los Angeles – from the Watts Riots to the Rodney King beating.

2          In attempting to correct these longstanding concerns of racially biased

3   enforcement, Section H of the Consent Decree, entitled  "Non-Discrimination

4   Policy and Motor Vehicle and Pedestrian Stops," first requires that the Department

5   bar bias in law enforcement activities, requiring that all stops be supported by

6   probable cause or reasonable suspicion and barring LAPD officers from "us[ing]

7   race, color, ethnicity, or national origin (to any extent or degree) in conducting

8   stops or detentions, or activities following stops or detentions, except when

9   engaging in appropriate suspect-specific activity to identify a particular person or

10  group." CD ¶¶ 102, 103.  "The Consent Decree directs the LAPD to enforce these

11  policies and mandates data collection with the ultimate goal of determining

12  whether racially biased stops are being made."  IM Report dated Feb. 17, 2009, at

13  24; CD ¶¶ 104, 105.

14         As set forth below, the evidence from the LAPD's own data strongly

15  indicates that large racial disparities persist in the rates at which LAPD officers

16  stop African Americans and Latinos, require them to exit cars, frisk them, search

17  them, ask for consensual searches, and arrest them.  The steps that the LAPD has

18  taken, while often good policy, do not address the problem.

19     **1.**    ***The Evidence Suggests that Racial Disparities in Policing by LAPD***
           ***Continue and, in Some Circumstances, are Widening***

20

21      Last October, the ACLU released a report by Yale law professor and

22  economist Ian Ayres, entitled "A Study of Racially Disparate Outcomes n the Los

23  Angeles Police Department." (hereinafter "Ayres Report'). In his Report, Ayres re-

24  analyzed detailed data on a year's worth of LAPD stops from June 2003 to July

25  2004, that an earlier report prepared by the Analysis Group for LAPD in 2006 had

26  examined, concluding that "[a]lthough some divisions/bureaus have statistically

27  significant racial disparities for some outcomes and some races, when evaluated

28  across all outcomes, there is no consistent pattern of race effects across divisions

3

1  or races." Analysis Group , *LAPD Pedestrian and Motor Vehicle Stop Data*
2  *Analyses*, at 4 (July 2006).  The Report's authors ultimately concluded that they
3  could not "draw definitive conclusions about the existence or non-existence of
4  racial profiling by the LAPD." Analysis Group at 5.

5       In re-examining the Analysis Group's findings, Prof. Ayres concluded that,
6  even after controlling for local crime rates, poverty rates, population demographics
7  and a host of other factors, African Americans and Hispanics[2] are stopped at
8  significantly higher rates than whites, are more than twice as likely to be ordered
9  out of their vehicles, and are substantially more likely to be frisked, asked for a
10 consensual search, searched without consent or arrested.  Prof. Ayres also
11 examined the "hit rate" for frisks and consensual searches (the rate at which the
12 searches uncovered evidence of crime), and found that although African
13 Americans and Hispanics are searched significantly more often, the searches are
14 significantly less likely to yield evidence of a crime.  Based on these and other
15 analyses, Prof. Ayres concluded that "[t]he results of this study raise grave
16 concerns that African Americans and Hispanics are over-stopped, over-frisked,
17 over-searched, and over-arrested."  Ayres Report at 27.

18      The LAPD responded to Prof. Ayres' study in January 2009 with a report to
19 the Police Commission entitled, "The Prevention of Biased Policing. " In February
20 2009, the Department released a letter from the Analysis Group responding to
21 Prof. Ayres' critique of their study.  In his declaration accompanying this filing,
22 Prof. Ayres answers the criticisms raised point by point.  In so doing, Prof. Ayres
23 explains how LAPD's response falls far short of the professionally acceptable
24 standards in the field of behavioral economics and quantitative analysis.
25 Declaration of Ian Ayres ("Ayres Dec.") ¶¶ 8, 10–18.  Many of its criticisms
26 misunderstand the nature of his analysis, do not address the bulk of Ayres'

27

28      [2] Because LAPD's system of data collection uses the racial category
    "Hispanic," Community Intervenors use that term when discussing the data.

4

1  calculations, or are simply irrelevant to the quantitative analysis of racial
2  disparities that Ayres undertook. *Id.* The letter from the Analysis Group sets forth
3  a defense of its work, but does not impugn or even examine Ayres' analysis in any
4  way, and does not address the calculations he conducted that go beyond the scope
5  of their 2006 report. *Id.* ¶ 8, 19–24.

6  Community Intervenors view the Department's Response as profoundly
7  disappointing.  While some disagreement as to methodology is to be expected, the
8  Department's criticisms amount to superficial attacks and factual misstatements
9  that fail to engage the Ayres Report at a standard professionally accepted in the
10  area of statistical analysis.  The Department Response is doubly disappointing in
11  that it fails even to undertake a meaningful consideration of any actions
12  recommended by either the ACLU or Prof. Ayres other than those it had already
13  undertaken prior to the release of the report.  Indeed, following the presentation,
14  Chief Bratton himself publicly said that the Ayres Report was "of no value."[3]

15  While the LAPD has thus far refused to provide recent detailed data for
16  Prof. Ayres to examine, the raw field data posted biannually on LAPD's website
17  indicates greater disparities during the second half of 2008 than during the same
18  period from 2003, when the data on which Prof. Ayres' study was based was
19  collected.  For example:

20  •       While African Americans were stopped at 3.58 times the rate of
21       whites in July to December 2003, that disparity increased to 3.88 times the
        rate of whites in the same period in 2008.  The disparity in the Hispanic
22       stop-rate also increased from 1.43 times that of whites in July - December
23       2003 to 1.61 times that of whites in the latter half of 2008.[4] *See* Ayres Dec.

24  _____

25  [3] Joel Rubin, *LAPD rejects study finding racial profiling by officers*, L.A.
   Times  (Jan. 14, 2009) (attached as Exh. B to the Declaration of Peter Bibring
26  (hereinafter "Bibring Dec.")).

27  [4] The disparities for 2003 listed here are raw disparities, and so differ from
   those given in the Ayres Report, which are disparities not explained by other
28  factors, as calculated by Prof. Ayres' regression analyses.  The Ayres Report also

¶ 27.

•      The disparity in requests for drivers to exit their vehicles has grown for both African Americans and Hispanics.  African American drivers stopped by LAPD were 2.41 times more likely than white drivers to be asked to exit their vehicle in July – December 2003, but that increased to 3.49 times more likely in July – December 2008.  Hispanic drivers were 2.37 times more likely to be asked to exit in 2003, and 3.68 times more likely in 2008.  *Id.*

•      African Americans stopped by LAPD in July - December 2003 were 3.37 times more likely to be frisked, compared to 3.79 times more likely during the same period in 2008.  Hispanics in the 2003 time period were 2.67 times more likely to be frisked, compared to 3.02 times more likely in 2008.  *Id.*

•      African Americans stopped by LAPD were 3.20 times more likely to be asked for a consensual search, compared to 3.76 times more likely in 2008.  Hispanics were 2.43 times more likely in 2003, compared to 2.98 times more likely in 2008.  *Id.*

•      While African Americans stopped by LAPD were 3.25 times more likely to be searched in July - December 2003, that disparity rose slightly to 3.31 times more likely in the same period from 2008.  Hispanics in 2003 were 2.55 times more likely to be searched, but in 2008 were 2.80 times more likely.  *Id.*

•      While the arrest rate for African Americans showed a slightly decreased disparity – from 1.84 times more likely to be arrested in July - December 2003 to 1.73 times more likely in 2008 – the arrest rate disparity for Hispanics increased from 1.62 times that of whites in the 2003 period to 1.72 times that of whites in the 2008 period.  *Id.*

Ordinarily, such raw data might conceivably be explained by legitimate police

included data from January through June of 2004.

6

concerns, such as differences in ethnic demographic and local crime rates where the stops occurred.  Here, however, the disparities can be closely compared with the raw disparities in the same period in 2003 that Prof. Ayres found, after extensive analysis, to be unjustified — and they are, with only one exception, greater in 2008 than in 2003.  This strongly suggests that the unjustified racial disparities Prof. Ayres found not only persist today, but have likely worsened.  *See* Ayres Dec. ¶¶ 9, 27.

### 2. *LAPD's Failure to Engage the Unjustified Racial Disparities Falls Short of Compliance With the Decree*

For the bulk of the Consent Decree's duration, the LAPD's position on racially biased policing has been somewhat conflicted.  On the one hand, Chief Bratton and Department officials have consistently spoken out against biased policing, the Department has implemented training that addresses racial bias (most notably in an eight-hour training held at the Museum of Tolerance), and the Department has made an effort to diversify its force at both the officer and supervisor level.  *See Prevention of Biased Policing*, LAPD Report to the Police Commission dated January 9, 2009 (attached as Exh. A to Bibring Dec.).  On the other hand, Department has consistently rejected the notion that its policing has an unjustified disproportionate impact on communities of color even in the face of data to the contrary and community concern, with the result that the Department has refused to take more aggressive steps to curtail bias, or even to examine data to assess the extent of the problem.

In recent months, the Department has addressed the issue more directly.  In its report, *The Prevention of Biased Policing*, the Department describes a number of measures ostensibly taken to address racial profiling.  *See* Bibring Dec., Exh A at 0002–0003, 0013-0021. While all of the actions listed are commendable practices, many of them take at best indirect aim at racial profiling, and none of them justify allowing the Decree to expire when unexplained racial disparities

persist.  The fact that the Department is taking some worthy action does not excuse its failure to fix an enduring problem.

Intervenors briefly address each of the Department's actions in this area:

* *A robust nondiscrimination policy.*  Intervenors agree that the Department has adopted a strong nondiscrimination policy, but its key provisions are in fact required under Consent Decree ¶ 102.

* *Recruitment and Promotion of a Diverse Selection of Officers.*  While the Department should be commended on its efforts to ensure that its sworn officers reflect the City's varied culture and experience, it is a mistake to assume that nonwhite officers do not engage in racial profiling.  Indeed, Prof. Ayres' analysis showed that while black or Latino officers tended to show reduced disparities when dealing with subject of their own race, statistically significant disparities remained even in same-race interactions.  Ayres Report at 18–19.

* *Vetting during the hiring process to exclude anyone showing racial bias or other bias against a protected classification.*  This is a commendable practice, but the persistent, significant racial disparities suggest it is insufficient.  The fact that the Department is taking some action does not excuse its failure to fix the problem.

* *Training on tolerance, respect and racial profiling, both for recruits in the Academy and for officers on an ongoing basis.*  Again, giving attention to these issues is commendable.  But the persistent, significant racial disparities suggest the Department's training, or training alone, is insufficient.   Moreover, the Department has rejected Prof. Ayres suggestion that officers be given the Implicit Association Test ("IAT," a psychological test designed to measure unconscious bias) in order to validate the LAPD training's effectiveness in reducing unconscious bias.

* *Continuing collection of stop data.*    Although the Department highlights

this as an action they have taken to address biased policing, it is in fact required under the consent decree. Moreover, the data is of little value until analyzed, and the Department continues to refuse to perform such analysis.

* *Installation of in-car video.* The adoption of in-car video camera systems will be helpful in deterring and monitoring certain kinds of abuse and resolving complaints, including in some instances complaints of racial profiling. However, in-car cameras do not readily capture discriminatory patterns in enforcement activity so are not a substitute for data collection and analysis.

* *Improvements in racial profiling investigations.* Reports by the Inspector General in early 2007 and early 2008 that together show that out of about 1200 complaints of racial profiling over a five year period, the Department had not sustained a single one, and the of the quality investigations has "historically been less than adequate."[5] Report of the Independent Monitor (hereinafter "Monitor's Report") dated Feb. 17, 2009, at 25. In response to this finding, the Internal Affairs Group has adopted racial profiling investigation protocols to improve the quality of those investigations. While it is important to investigate complaints of profiling thoroughly, the improvement of these complaint investigations may not be sufficient to address what data suggest is a systemic problem of racial disparities.

* *Broadening "racial profiling" to "biased policing" that bars discrimination on the basis of race, religion, gender, ethnicity, sexual orientation, sexual identity, disability, and age.* While commendable, the attention given to other forms of discrimination does not address the demonstrable racial disparities.

---

[5] Patrick McGreevy, *LAPD Probes of Alleged Profiling to Be Reviewed*, L.A. Times, B-4 (Jan. 31, 2007) (attached as Exh. C to Bibring Dec.); Rachel Uranga, *Bratton to Review Profiling Findings*, The Daily News (Apr. 30, 2008) (attached as Exh. D to Bibring Dec.).

1   \* *Alternative dispute resolution for complaints of biased policing.*  This is a
2   laudable effort that may lead to improved police-community relations, at
3   least for those who go through the complaint process, but does not address
4   the cause of persistent racial disparities.

5   \* *Utilization of the TEAMS II Risk Management System.*  While the
6   TEAMS II system provides a promising tool for identifying certain kinds of
7   problem behavior in officers at the early stages, it does not address racial
8   disparities in the officers' enforcement patterns.  The Department has
9   consistently rejected the ACLU's recommendations that an early warning
10   system be expanded to address racial disparities.

11   In sum, while many of these practices are worthwhile, they do not constitute an
12   adequate response to the strong evidence of unjustified racial disparity and, as the
13   Monitor  compliance, fall short of compliance with the Decree.

14   **3.**   ***The Recent Harvard Report Commissioned by the LAPD Provides***
     ***Additional Evidence of Ongoing Racial Disparities***

15   The recently released report, *Policing Los Angeles Under A Consent*
16   *Decree: The Dynamics of Change at the LAPD*,[6] performed by researchers at
17   Harvard's Kennedy School and commissioned by Chief Bratton, contains several
18   pieces of troubling information.  First, the researchers found in use of force data
19   "[a] troubling pattern in the use of force . . . that African Americans, and to a
20   lesser extent Hispanics, are subjects of the use of such force out of proportion to
21   their share of involuntary contacts with the LAPD."  *Policing Los Angeles*, at 37.

22   Second, in reviewing attitudes toward the LAPD, while researchers found
23   overall improvements in public opinion about the LAPD, they noted a "worrying
24   trend: a lower level of confidence among African-American respondents."  For

26

27   [6] Christopher Stone, Todd Foglesong, and Christine M Cole, *Policing Los Angeles Under A Consent Decree: The Dynamics of Change at the LAPD*, Harvard University Kennedy School (May 2009) (hereinafter "*Policing Los Angeles*") (selected pages attached as Exh. E to Bibring Dec.).

28

1    example, when asked whether LAPD treats all racial and ethnic groups fairly,

2    African Americans gave a positive response only about 40% of the time, and 23

3    percent of African American respondents replied "almost never." *See id*., at 49, 50

4    (Fig. 33). When asked to describe the relations between LAPD and their

5    communities, 22 percent (more than one in five) described them as negative and

6    10 percent described them as very negative. *Id*. at 52.  The study observed a

7    "pattern . . . observed across most questions, suggesting that in a portion of

8    African-American communities, relations with the LAPD remain tense." *Id.* at 50.

9                              *          *          *

10   In its February 17, 2009 Report, the Monitor reviewed the above actions

11   taken by the department and concluded that "[t]he Department has not achieved

12   substantial compliance with paragraphs 103–105."  IM Report dated Feb. 17,

13   2009, at 24.  The LAPD's responses listed above are all worthwhile efforts, but

14   without ongoing analysis of the data and aggressive steps to limit disparities —

15   such as reducing the racial disparities evident in consent searches by informing

16   subjects they can refuse consent or adopting a policy of requiring reasonable

17   suspicion for a consent search[7]— they fall short of compliance.  In the fact of this

18   noncompliance, and the persistent and unjustified racial disparities in police

19   action, the nondiscrimination provisions alone justify extension of the decree for

20   another three years.

21

22

23           [7] Several departments and jurisdictions have limited the use of consent
     searches out of concern over racial profiling and other abuses.  For example, the
24   California Highway Patrol instituted a policy requiring reasonable suspicion for
     consent searches.  Maura Dolan and John M. Glionna, *CHP Settles Lawsuit Over*
25   *Claims of Racial Profiling*, L.A. Times, at A-1 (Feb. 28, 2003) (requiring
     reasonable suspicion for consent searches by CHP) (attached as Exh. F to Bibring
26   Dec.).  Several state supreme courts have held that consensual searches in the
     absence of reasonable suspicion of criminal wrongdoing violate state
27   constitutional protections. *See Minnesota v. Mustafaa Naji Fort*, 660 N.W.2d 415,
     419 (Minn. 2003); *State v. Carty*, 790 A.2d 903, 905 (N.J. 2002); *State v. Quino*,
28   840 P.2d 358, 364-65 (Haw. 1992).

**C.    The Department Has Not Complied with TEAMS II Decree Provisions For the Two-Year Period Required for Dissolution of the Decree**

The Department has made substantial progress during the extension period on implementation of the TEAMS II early warning system — having brought the Use of Force System, Complaint Management System and Risk Management Information System (including the use of action items for identified problem patterns) into full use during that time.

While the Monitor declared the TEAMS II system sufficiently installed to justify compliance with paragraph 39 (regarding the existence of an early warning system) by June 30, 2007, *see* Monitor's Report dated Aug. 15, 2007, at 6–7, compliance with many aspects of the Decree's requirements of TEAMS II has been achieved only during the last two years: in particular, the Monitor in its February 2008 report examined the implementation of protocols for proper use of TEAMS II and found the Department noncompliant with those protocols it evaluated.  Indeed, only its most recent report in February 2009 report did the Monitor finally find the Department in compliance with requirements that protocols be followed requiring that: supervisors regularly review and analyze TEAMS II information of officers and subordinate managers under their command, CD ¶ 47(a, c); that the discovery of at-risk behavior in such a review result in intensive review of the officer's performance, CD ¶ 47(b); that the incidents triggering a TEAMS II review be clearly stated, CD ¶ 47(d); that protocols for the follow-up of supervisory actions be clearly stated, CD ¶ 47(e); that TEAMS II information be used as one source of information to determine when to audit a unit or group of officers, CD ¶ 47(f); and that actions taken as the result of information from TEAMS II be made on the basis of all relevant information, not just TEAMS II data, CD ¶ 47(h).  *See* Monitor's Report dated Feb. 17, 2009, at 4–13.   Moreover, the Department remains in noncompliance with provisions requiring that supervisors' use of TEAMS II be addressed in

12

annual performance evaluations, CD ¶ 47(i); that actions taken as the result of TEAMS II information be documented, CD¶ 47(l), and that supervisors promptly review the TEAMS II report of an officer newly transferred to their command, CD ¶ 47(m).  *See* Monitor's Report dated Feb. 17, 2009, at 12–13; Monitor's Report dated Nov. 17, 2008, at 6–7, 8–10.

The requirement of two years of sustained compliance is intended to ensure that compliance is enduring.  In the context of TEAMS II and the protocols, some extended period of compliance is necessary to ensure that the early warning system that constitutes the backbone of the Consent Decree continues to be used for the purposes required by the Decree and is internalized by supervisors, and that any adjustments made by the Department do not undercut the purposes of the Decree.  As the Monitor indicated as recently as its latest report that the City is still in the process of assessing and adjusting the RMIS peer groups and thresholds for generating automated action items — a crucial part of the system.  *See* Monitor's Report dated Feb. 17, 2009, at 4.

The fact that the Department has been nominally compliant with proper use of TEAMS II for six months, rather than two years as contemplated by Paragraph 179, and that the system automation and use protocols by LAPD officers are still being adjusted, justify extension of the Decree to ensure that effective use of TEAMS II continues and becomes established practice in the Department.

**D.   LAPD Shows Troubling Noncompliance With Basic Reform Provisions of the Consent Decree**

Outside the provisions governing nondiscrimination and TEAMS II, the Department remains noncompliant in other areas including the supervision of gang units, search and arrest procedures, and supervisory review of charges of interfering with or assaulting an officer.  These areas of noncompliance are troubling for two reasons.  First, they are fundamental to reform.  These provisions safeguard against basic abuses of excessive force and fabrication of grounds for

arrest and search — the kind of abuses which, when discovered to abound in Rampart's CRASH division, gave significant impetus to this Consent Decree.

Second, most provisions are as straightforward to execute as requiring supervisors to review certain forms — compliance does not require overcoming technical obstacles, as the TEAMS II system or racial profiling analysis might. Given the relative simplicity of compliance with many terms, the fact that the compliance remains as low as the 85% range for many provisions is troubling. If one in six supervisors fails to comply with these requirements now, on the eve of extension — when Department is presumably on its best behavior — the prospect that these practices will endure should the Decree be lifted is not strong.

### 1.    *LAPD Remains Noncompliant in Various Aspects of the Management of Gang Units*

Similarly, over the past year, the Monitor has noted that the Department "continues to struggle" to achieve compliance with all requirements on management of gang units and, as recently as its last quarterly report, expressed "continu[ing] . . . concerns regarding supervisory oversight" of gang units. Monitor's Report dated Aug. 15, 2008, at *iii*; Monitor's Report dated Feb. 17, 2009, at *v*. As of the Monitor's most recent evaluations, the Monitor found that with the respect to the following requirements on management and supervision of gang units, the department remained noncompliant:

- The limitations on the tour of duty in gang units, due to inadequate documentation of officers under extension. Monitor's Report dated Aug. 15, 2008, at 31–32; CD ¶ 106(e).

- The daily activities of gang unit supervisors to establish a daily field presence and an active role in unit supervision, and the role of Area managers in ensuring proper supervision, oversight, and control over these units, due to low compliance in the *Arrest, Booking, Charging Audit* with post-incident supervisory oversight (65%), low compliance in

14

the *Search Warrant Audit* with supervision of the application/affidavit (82%) supervisory oversight (9%) and CO analysis (9%); 73% compliance with post-incident supervisory oversight for Non-Categorical Uses of Force; 76% compliance with the evaluation of GED work product for arrest reports; 64% compliance with the evaluation of GED work product for search warrants; and 63% compliance with procedures for the selection process for GED assignments. *See* Monitor's Report dated Aug. 15, 2008, at 32–35; CD ¶ 106(f, g).

- Oversight by Bureau Gang Coordinators, due to failures of those personnel during their inspections to identify a variety of concerns subsequently seen by the Monitor. *See* Monitor's Report dated Aug. 15, 2008, at 35–37; CD ¶ 106(h).

- Selection process for Gang Unit personnel, CD ¶ 107(b), due to only 63% of personnel having the required written application, oral interview, use of TEAMS II reports and annual evaluations. *See* Monitor's Report dated Aug. 15, 2008, at 38–39.

- Auditing of the Gang Units' work product for indicia of untruthfulness or other forms of misconduct under CD ¶ 131a. *See* Monitor's Report dated Aug. 15, 2008, at 38–43.

Additionally, the Department achieved compliance with various provisions only as for the Monitor's last quarterly report, including the requirements that gang officers remain subject to existing procedures for detention, transportation, arrest and booking. *See* Monitor's Report dated Feb. 17, 2009, at 28–29; CD ¶ 106(e)(i).

## 2. *LAPD Has Not Achieved Compliance In Other Areas Basic to Reform*

LAPD remains in noncompliance, or has not been in compliance for the required two-year period, in several other areas that are basic to the elimination of

excessive force and wrongful search and arrest:

Review of Charges of Resisting Arrest/Interfering with An Officer:  The Monitor's most recent report found the Department noncompliant with ¶ 70(b) of the Decree — a paragraph that requires that a supervisor evaluate each incident in which a person is charged with interference with a police officer, resisting arrest, or assault on a police officer to see if any concern is evident regarding training, policy, or tactics.  CD ¶ 70(b).  This requirement reflects the ease with which such charges may be manufactured to justify an arrest or use of force on an individual who was in actuality committing no crime.  The minimal degree of supervisory oversight required by this provision provides a fundamental protection against basic police abuse – the fabrication of charges and unlawful use of force – of the kind that prompted this decree when discovered in Rampart Division's CRASH units.  But the Monitor, in its most recent report, found the LAPD noncompliant with this provision after an audit conducted by the Department found only 88% of such booking forms compliant.  *See* Monitor's Report dated Feb. 17, 2009, at 18.  Indeed, the Monitor noted that the same audit found an even lower rate of compliance (at 84%) with ¶ 70(a), which requires supervisors to review booking and arrest forms "for 'canned' language, inconsistent information, lack or articulation of the legal basis for the action or other indicia that the information on the forms is not authentic or correct." *Id.* at 18 n.27; CD ¶ 70(a).

Warrant Applications Audit: The Monitor noted in its report of August 15, 2008, that the Department had not been in compliance with these provisions for the preceding two years and remained noncompliant with underlying substantive paragraphs, and that despite its determination of compliance, the Monitor identified significant concerns with the audit and substantive concerns with the warrants that the Department's audit failed to address.  *See* Monitor's Report dated Aug. 15, 2008, at 49–50.

Search and Arrest Procedures: The Monitor's review determined that search

and arrest warrants showed only 80% were sufficiently free of inconsistent information, 61% complied with standards for appropriateness, legality, and conformance with LAPD procedures, only 84% showed required review of the affidavit by a supervisor, and only 39% showed the required post-incident supervisory review. *See* Monitor's Report dated May. 15, 2008, at 13–15. Furthermore, more than one in ten warrant packages failed to comply with requirements regarding completeness and accuracy of the warrant tracking log. *Id.* at 15–16. As a result, the Department remains in non-compliance with the requirements of Paragraphs 71 and 72. *Id*.

These provisions governing the supervision of gang units, search and arrest procedures, and supervisory review of charges of interfering with or assaulting an officer are fundamental, and the Department's continued noncompliance provides little hope these practices would endure were the Decree to be lifted now.

**E.     Other Incidents Suggest The Need For Ongoing Oversight and Reform**

Over the course of the extension, other incidents outside the four corners of the consent decree have indicated the need for ongoing oversight and reform. While these matters would not justify extension were LAPD compliant with all terms, in the absence of full compliance, the Court should consider them in weighing an extension of the consent decree against dissolution or some more limited form of relief.

Changes to LAPD's Disciplinary Program.   In the past two years, there have been two significant developments with LAPD's discipline system: the approval of new procedures with respect to Categorical Uses of Force, and an increased emphasis by the Professional Standards Bureau on available disciplinary action outside formal complaints, and the revelation to the Police Commission of discipline "insurance" program run by the Police Protective League ("PPL").

On June 22, 2008, the Police Commission approved revisions proposed by the Department to the review of Categorical Uses of Force . Under these changes,

17

where these serious uses of force result in an administrative disapproval, the

discipline would no longer result automatically in a disciplinary complaint.  In

commenting on these changes, the Monitor summarized:

> The Monitor believes that, if implemented and executed properly, these changes in policy stand to enhance analysis of CUOFs, thereby promoting beneficial training and, thus, limiting the number of avoidable CUOFs in the future. Yet, there is the danger that without the imposition of appropriate discipline in cases of clearly negligent conduct, a significant tool in promoting the utmost of care in adherence to Department policies, procedures and regulations may be removed. Put simply, meaningful penalties in appropriate cases have traditionally been recognized as having the ability to reduce negligence.

Monitor's Report dated Aug. 15, 2008, at 4.

The LAPD has introduced another set of changes to the use of discipline by

division supervisors:  In a series of articles beginning in 2007, LAPD's

Professional Standards Bureau ("PSB") has been emphasizing that the default

course of discipline — a form 1.28 complaint followed by appropriate suspension

— need not be followed.  In a newsletter in November 2007, the PSB points out to

supervisors that form 1.28 complaints need not be used for every failure to qualify

for firearms usage, suggesting alternative resolutions such as allowing the officer

to qualify on his or her own time and with personal ammunition.[8]  A second

suggests that many disciplinary violations may be addressed with a "Notice to

Correct" in lieu of an internal form 1.28 complaint that leads to a prolonged

formal investigation, adjudication, and imposition of penalty.[9]  Finally, a

newsletter from March 2008 suggests that official reprimands may be more useful

than suspension for sustained complaints.[10]

---

[8] PSB *Strategies* Newsletter, "FTQ: Always a 1.28?" (Nov. 2007) (attached as Exh. G to Bibring Dec.).

[9] PSB *Strategies* Newsletter, "NTC: Better than a 1.28?" (Jan. 2008) (attached as Exh. H to Bibring Dec.).

[10] PSB *Strategies* Newsletter, "Reconceive the Reprimand" (March 2008) (attached as Exh. I to Bibring Dec.).

In its newsletters, the PSB reasons that alternative processes and penalties could be used strategically to correct behavior and teach officers to think, in a more effective manner than the deterrent value of progressive discipline. As Deputy Chief Mark Perez described in an article, "In the developing LAPD strategic model, the question is not, 'How heavy should the penalty be?' but 'What is the employee development solution?'"[11]

Community Intervenors do not question the laudable goals of developing officer judgment and correcting misconduct.  But there are notable trade-offs with this approach that should be examined by the Monitor and Court as they play out during the strategy's deployment.  First, as with the changes to adjudication of Categorical Use of Force incidents, the LAPD's new approach de-emphasizes use of punishment through suspensions for misconduct.  The PSB notes that this does not *necessarily* lead only to more lenient discipline — for example, the newsletters suggest that use of a Notice to Correct or Official Reprimand may allow a supervisor to move immediately to severe suspensions on a second offence.  However, as the Monitor noted with respect to changes in CUOF discipline, the flexibility and discretion could allow supervisors interested in insulating their officers from punishment to be more lenient, and could create uneven standards of discipline across the department.

More importantly, the use of a "Notice to Correct" in lieu of an internal complaint also interferes with the recording and auditing of discipline that has been so integral to prior reform efforts.   This is true for several reasons: First, neither Comment Cards nor Notices to Correct entail a formal investigation with factual findings, but instead rely on the supervising officer's account of the facts

---

[11] Mark R. Perez and Albert A. Pearsall III, *Police Discipline and Community Policing: New Models*, Community Policing Dispatch, U.S. Department of Justice Office of Community Oriented Policing Services (August 2008), *available at* http://www.cops.usdoj.gov/html/dispatch/August_2008/new_model.htm (attached as Exh. J to Bibring Dec.).

in the Notice.  This makes it difficult for an auditing body to determine whether the factual analysis was complete and whether the use of a Notice to Correct or Comment Card instead of a formal complaint was justified.  Moreover, at present, while the Office of the Inspector General audits internal complaints and the discipline imposed, no system of audits exists for Notices to Correct or Comment Cards.  Unless this changes, neither the Department nor the Police Commission will have any way of knowing whether Notices to Correct are being used in lieu of formal complaints appropriately, for minor misconduct, or improperly, for more serious issues.  Furthermore, it is Community Intervenors' understanding that while the TEAMS II report on LAPD officers includes information relating to 1.28 complaints, it does not include information on Notices to Correct.  This puts a Notice to Correct outside the early warning system and raises questions about how NTCs can be used effectively with officers who change assignments.

PPL's Discipline Insurance Program: Another issue arising in the area of discipline was the revelation of the Police Protective League's discipline "insurance" policy, which reimburses officers for unpaid leave imposed as a sanction for misconduct.[12]  As the Monitor noted, this program has the effect that "any discipline in the form of loss of pay or suspension actually incurred is reimbursed, thereby creating paid time off for the offending officer."  Monitor's Report dated Aug. 15, 2008, at 4.  Beyond its practical effects in impairing the proper functioning of the discipline system, the fact that, according to the *Los Angeles Times*, more than 7,000 LAPD officers pay additional monthly fees to participate in the program signals a deep disconnect between the Department's stated policies and procedures and the conduct and beliefs of its officers.[13]  This

[12]  See Joel Rubin, *"What LAPD takes, union returns,"* L.A. Times (May 21, 2008)  (attached as Exh. K to Bibring Dec.).

[13]  Joel Rubin, "*Officer payment program criticized,"* L.A. Times (May 23, 2008) (attached as Exh. L to Bibring Dec.).

disconnect must be eliminated for the Consent Decree's reforms to take permanent root.   The Department cannot continue to simply rely on punishments that are not effectively carried out and a disciplinary system that is openly flouted.   Any valid concerns about improper or arbitrary discipline must be addressed so that the Police Protective League will discontinue the insurance program, or, if they prove unwilling to do so, alternative punishments can be employed in lieu of unpaid leave.

    MacArthur Park Investigation: While the Monitor has previously commented on the obstacles the Board of Rights system poses to accountability and maintenance of uniform discipline, the investigations into the 2007 MacArthur Park incident demonstrate the issue.   This incident is well-known to the Court — during a rally in MacArthur at which the majority of 6,000 to 7,000 marchers assembled, in the Department's own account, LAPD Metro officers, responding to a disturbance caused by a small group of protestors, cleared MacArthur Park using "146 less-lethal impact munitions and over 100 uses of the baton. As a result, 246 individuals claimed injury . . . ."  LAPD Report, *An Examination of May Day 2007*, at 7, 9 (Oct. 9, 2007).  The Department's report repeatedly emphasizes that officers and commanders in Metro division believed, contrary to clear Department policy, that force could be used to effect compliance with a dispersal order, even if people were "merely standing in front of the officers, failing to respond to direction."  *Id.* at 46.  Nor could the Department find any "apparent explanation for why individuals clearly holding television cameras and microphones would have been pushed or why their cameras would have been tossed aside by officers."  *Id.*

    In previous filings, Community Intervenors have expressed concern that the investigations have not targeted how the officers came to believe that force could be used on peaceful demonstrators for failing, in an officer's view, to comply with a dispersal order quickly enough.  *See generally* Community Intervenors' Status

1   Report re May Day 2007 Investigations (filed May 1, 2008).

2        More than a year after the incident, the Department completed its internal

3   investigation, and Chief Bratton announced his intent to seek discipline against 11

4   officers and to terminate four.[14]  According to oral updates by Chief Perez to the

5   police commission, however, the first two Board of Rights hearings (in which

6   termination was sought in one and suspension in the other) resulted in findings of

7   not-guilty on multiple charges, and, instead of the penalties sought, an official

8   reprimand in one case and a five-day suspension in the other.

9        Community Intervenors remain troubled both by the decision not to

10  investigate *why* officers who engaged in such blatantly wrongful use of force

11  seemed to believe it was authorized, and by the fact that, after deciding to focus on

12  misconduct by the officers on the scene, the LAPD will apparently impose

13  minimal discipline for such a large-scale and blatant violation of civil rights and

14  department policy.  The Monitor has previously expressed concern that the Board

15  of Rights interferes with an effective system of discipline, *see, e.g.*, Monitor's

16  Report dated Aug. 15, 2008, at 4, as have previous expert reviews of the LAPD.[15]

17  Community Intervenors share the concern that the LAPD continues to operate

18  without efforts to reform such a widely criticized disciplinary system.

19                    **CONCLUSION AND REQUESTED COURSE OF ACTION**

20        Despite the commendable progress made by LAPD during the first

21  extension period, substantial remaining issues require the decree be extended if its

22  goals are to be accomplished and its reforms allowed to take root.  Community

23

24        [14] Joel Rubin, *11 LAPD officers face discipline in May Day melee* (Sept. 17,
    2008) (attached as Exh. N to Bibring Dec.).
25

26        [15] *See Rampart Reconsidered: The Search for Reform Seven Years Later,*
    64–65, 68 (2006) (attached in pertinent part as Exh.O to Bibring Dec. and
27  available at *http://www.lapdonline.org/police_commission*) (criticizing Board of
    Rights system that led to no discipline in two-thirds of cases related to Rampart
28  CRASH corruption and recommending that the Board of Rights system be
    replaced).

Intervenors respectfully submit that the Consent Decree should be extended for another three-year period.[16]

This extension need not be overly burdensome to the Department. Following the practice established by the Monitor during the first extension period, active monitoring need be conducted only in those areas where compliance has not yet been attained, or core provisions of the decree like complaint investigation. In order to transition to time after expiration of the Decree when Office of the Inspector General responsible for independent oversight of the LAPD, the Court should consider assigning primary responsibility for compliance monitoring to that IG's Office. The Monitor should continue its involvement through reviewing the Inspector General's work and providing global review and guidance. The Monitor serves as the eyes and ears of the Court and enables the Court to conduct active oversight that is still required. Moreover, during the past eight years, it has accrued valuable knowledge about the Department and the obstacles to fully implementing the Decree. This knowledge should not be lost before the Decree is lifted.


Dated: June 1, 2009                     RESPECTFULLY SUBMITTED,

                                        ACLU FOUNDATION OF
                                              SOUTHERN CALIFORNIA


                                        ___/s/_____
                                        Peter Bibring

                                        Attorneys for Community Intervenors

_____

[16] In extending the Decree three years ago, the Court determined that the decree did not contemplate partial extension. Community Intervenors agree. In the event that the Court is inclined to revisit that holding, Community Intervenors further note that extending the decree without active monitoring of areas in which compliance has been achieved does not burden the Department more than partial extension, and allows the Court to revisit other areas should substantial backsliding occur.