Kroll, Inc.
Office of the Independent Monitor
of the Los Angeles Police Department
777 S. Figueroa Street, Suite 2400
Los Angeles, California 90017
Telephone: (213) 443-6090
Facsimile: (213) 443-6050

1166 Avenue of the Americas
New York, New York 10036
Telephone: (212) 833-3228
Facsimile: (212) 980-3743



lapdmonitor @ kroll.com

Independent Monitor of the Los Angeles Police Department

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. CV00-11769-GAF (RCx) |
| | ) | |
| Plaintiff, | ) | FINAL REPORT |
| | ) | |
| v. | ) | The Honorable Gary A. Feess, |
| | ) | United States District Judge |
| | ) | |
| CITY OF LOS ANGELES, CALIFORNIA, | ) | |
| BOARD OF POLICE COMMISSIONERS OF | ) | |
| THE CITY OF LOS ANGELES, AND THE | ) | |
| LOS ANGELES POLICE DEPARTMENT, | ) | |
| | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |

FILED
CLERK, U.S. DISTRICT COURT
JUN 11 2009
3:13
CENTRAL DISTRICT OF CALIFORNIA
BY MHD DEPUTY

Office of the Independent Monitor: Final Report
**June 11, 2009**

# Report Contents

I.   INTRODUCTION.................................................................................................... 1

   A.  HISTORY ......................................................................................................... 2

   B.  INVOLVED ENTITIES....................................................................................... 3

      The U.S. Department of Justice ..................................................................... 3

      The City of Los Angeles ................................................................................. 4

      The Board of Police Commissioners ............................................................. 4

      The LAPD ....................................................................................................... 5

      The Office of the Inspector General ............................................................. 5

      The Office of the Independent Monitor ....................................................... 6

      The United States District Court.................................................................... 6

   C.  CONSTITUTIONAL AND EFFECTIVE POLICING ............................................. 7

   D.  A CHRONOLOGY OF SIGNIFICANT EVENTS ................................................. 7

   E.  OVERVIEW OF COMPLIANCE ASSESSMENTS AND RECOMMENDATIONS TO
      THE COURT..................................................................................................... 7

II.  OVERVIEW OF COMPLIANCE ASSESSMENTS AND RECOMMENDATIONS TO
    THE COURT .......................................................................................................... 8

   A.  MANAGEMENT AND SUPERVISORY MEASURES TO PROMOTE CIVIL RIGHTS
      INTEGRITY ...................................................................................................... 8

      1.  TEAMS II [Computer Information System].......................................... 8

      2.  Performance Evaluation System ........................................................ 16

   B.  INCIDENTS, PROCEDURES, DOCUMENTATION, INVESTIGATION AND REVIEW.......................19

      1.  Use of Force......................................................................................... 19

      2.  Search and Arrest Procedures ............................................................ 30

      3.  Initiation of Complaints ..................................................................... 38

      4.  Conduct of Investigations .................................................................. 43

      5.  Adjudicating Investigations................................................................ 53

      6.  Disciplinary and Non-Disciplinary Action.......................................... 57

      7.  Internal Affairs Group ........................................................................ 63

      8.  Non-Discrimination Policy and Motor Vehicle and Pedestrian Stops ................... 69

   C.  MANAGEMENT OF GANG UNITS .................................................................76

   D.  CONFIDENTIAL INFORMANTS.....................................................................84

# Report Contents (continued)

E.  DEVELOPMENT OF PROGRAM FOR RESPONDING TO PERSONS WITH MENTAL ILLNESS ............................................................................................89

F.  TRAINING..........................................................................................93

   1.  FTO Program ............................................................................ 93

   2.  Training Content ...................................................................... 97

   3.  Supervisory Training ............................................................. 100

G.  INTERNAL AND EXTERNAL OVERSIGHT/MONITORING ..........................103

   1.  Ethics Enforcement Section Integrity Audits............................ 103

   2.  Audit Division Oversight ........................................................ 107

   3.  Inspector General Reviews and Audits ................................... 124

   4.  Police Commission Oversight ................................................. 129

   5.  Financial Disclosure ............................................................... 135

   6.  General.................................................................................. 136

H.  COMMUNITY OUTREACH AND PUBLIC INFORMATION ..........................138

III.  CONCLUSION ......................................................................................143

ACKNOWLEDGMENTS ...................................................................................145

Office of the Independent Monitor: Final Report
**June 11, 2009**

# Appendices

**Appendix A:** *The Department of Justice's May 8, 2000 Notice of Investigation Letter to the City of Los Angeles*

**Appendix B:** *The Department of Justice's Civil Complaint*

**Appendix C:** *Consent Decree, United States of America, Plaintiff v. City of Los Angeles, California, Board of Police Commissioners of the City of Los Angeles, and the Los Angeles Police Department, Defendants; C.A. No. CV-11769 GAF*

**Appendix D:** *"Final Report Card" Summarizing the Monitor's Quarterly Evaluations of Compliance with the Consent Decree*

**Appendix E:** *Constitutional and Effective Policing: Crime Statistics*

**Appendix F:** *Timeline of Significant Events*

**Appendix G:** *Monitoring Team Members' Biographies*

# I.   Introduction

In the decade leading up to June 2001, the Los Angeles Police Department (LAPD) was troubled. Its reputation was blighted by headlines of corruption, excessive use of force, bias and arrogance.  The LAPD seemed to be governed by itself, for its own purposes only peripherally related to the community it was sworn to protect.  Over the past eight years, on these pages we have reported on the progress, imperfect at times, that the LAPD and the City of Los Angeles have made in instituting various reforms aimed at restoring not only constitutional policing but also the integrity and reputation of the LAPD.  We are pleased to report that the LAPD has substantially complied with the requirements of the Consent Decree.  We believe the changes institutionalized during the past eight years have made the LAPD better: at fighting crime, at reaching out to the community, in training its officers, in its use of force, in internal and external oversight, and in effectively and objectively evaluating each of the sworn members of LAPD. More specifically, the LAPD has become the national and international policing standard for activities that range from audits to handling of the mentally ill to many aspects of training to risk assessments of police officers and more.

These past eight years have clearly shown that with the right impetus, with goodwill and with a good plan, institutional reformation can be, and in Los Angeles has been, achieved.  Most importantly, the past eight years have shown that constitutional policing can effectively coexist with and, indeed, foster the primary role of the police: ensuring the public safety.  This report constitutes our final report and recommendation that the City of Los Angeles be found in substantial compliance with the Consent Decree.[1]  However, we recommend the termination of the Consent Decree with a caveat.  The process and institutions that have been created must be nurtured and strengthened by the City family in the years to come.  Benign neglect will endanger the hard-won progress that the LAPD has made.  We hope the Transition Agreement,[2] which is crucial to completing the work in the areas of the Department's early warning system,

---

[1] This recommendation is made pursuant to the definition of substantial compliance contained in paragraph 179 of the Consent Decree: "'substantial compliance' means there has been performance of the material terms of this Agreement.  Materiality shall be determined by reference to the overall objectives of this Agreement.  Non-compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure to maintain substantial compliance."

[2]  A Transition Agreement (TA), which covers those aspects of the Consent Decree for which the City and DOJ have agreed to continued judicial jurisdiction, has been filed with the Court.  The TA is subject to the Court's review and potential modification.  The TA as submitted specifically covers the areas of Financial Disclosure, TEAMS II and Biased Policing and calls for oversight and reporting on these areas to be provided by the Office of the Inspector General.

biased policing and financial disclosure, also gives further time for proactive leadership to focus on how to continue to maintain and grow the reform of LAPD.

# A.   History

In June 2001, the Office of the Independent Monitor of the Los Angeles Police Department was established by order of the Honorable Gary Feess of the U.S. District Court for the Central District of California. The position was created pursuant to a Consent Decree that settled a civil suit brought against the City of Los Angeles by the U.S. Department of Justice (DOJ). The lawsuit sought to obtain injunctive and declaratory relief to eliminate the pattern or practice of misconduct by the LAPD found during an intensive DOJ investigation engendered by, among other events, the Rodney King beating and the Rampart scandal.[3]

Specifically, that investigation found that LAPD was at that time engaged in a pattern or practice of excessive force, false arrests and unreasonable searches and seizures in violation of the Fourth and Fourteenth Amendments to the Constitution.[4] It also found serious deficiencies in LAPD policies and procedures for training, supervising, investigating and disciplining police officers, all of which fostered and perpetuated officer misconduct. In addition, it found that the LAPD had failed to implement a comprehensive risk management system that would identify "at risk" officers; that the Department was not responding properly to citizen complaints of officer misconduct; and that neither the Police Commission nor the Inspector General (IG) had the resources required to provide meaningful oversight of the LAPD. Equally important, especially to the question of how things could be fixed, the investigation found that the majority of LAPD officers were "ethical, hardworking, and responsible individuals, who [had] not, themselves, violated the constitutional rights of the persons they serve[d] and protect[ed]."[5]

The 90-page Consent Decree contained specific provisions directed at correcting the identified deficiencies and created the position of Independent Monitor to act as an agent of the Court and charged the Independent Monitor with overseeing and reporting on the City's implementation of the reforms required by the Consent Decree.

---

[3] 42 USC 14141 authorizes the Attorney General to conduct investigations, and if warranted file civil litigation, to eliminate a "pattern or practice of conduct by law enforcement officers…that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States. The Attorney General has delegated this authority to the Special Litigation Section of the Civil Rights Division of the US Department of Justice."

[4] A copy of the DOJ's May 8, 2000 letter to the City of Los Angeles outlining the findings of its investigation (hereinafter referred to as the DOJ's *May 2000 Letter Report*), the civil complaint and the Consent Decree appear as Appendices A, B and C, respectively.

[5] Page 2 of the DOJ's *May 2000 Letter Report*

Monitoring commenced in July 2001 and was scheduled for an initial period of five years.  In May 2006, the Consent Decree was extended for an additional three-year period.[6]  Over the past eight years, the Monitor issued 30 quarterly reports[7] covering the progression of the LAPD's compliance with the Consent Decree's mandated reforms.  That progression now culminates in our declaration of substantial compliance with the Decree.  More importantly, the Monitor believes that the Department, with the local civilian oversight provided by the Board of Police Commissioners and the Office of Inspector General (OIG) as laid out in the City Charter, will ensure that the reforms that have been achieved to date and embedded in the Department as best practices will be able to endure.  That being said, while the Monitor is confident in the ability of the Department to maintain the reforms achieved, there are circumstances which could threaten the reforms that have been achieved.  These risks are discussed in greater detail in our Conclusion, below.

This final report recounts the significant events of the Consent Decree period, including the crime reduction achieved during that time, and details the basis for our conclusions.

# B.    Involved Entities

We have arrived at this point through the involvement of a number of different entities working together to reform the Department.  The hard work and dedication of the many individuals working for those entities has led to this success.  A brief review of those entities is in order.

## The U.S. Department of Justice

As noted above, the Special Litigation Section of the Civil Rights Division of the U.S. Department of Justice was the catalyst for reform when it instituted the investigation and subsequent litigation which gave rise to the Consent Decree.  The DOJ, through staff attorneys of the Special Litigation Section, was a constant participant throughout the term of the Consent Decree, attending monthly Monitor status meetings, conducting targeted inquires and generally

---

[6] At the inception of the three-year extension and again two years into the extension period, certain paragraphs of the Consent Decree for which substantial compliance had been achieved were deemed "inactive," with the ability of the Monitor to resume active monitoring if there were any indications of slippage with respect to compliance in those particular paragraphs.

[7] These quarterly reports can be found at http://kroll.com/about/library/lapd/.  A "Report Card" showing the compliance findings for each quarter is included as Appendix D.

ensuring that the LAPD and City were meeting their obligations of reform as mandated by the Decree.[8]

## The City of Los Angeles

With more than 3.8 million residents, the City of Los Angeles is the nation's second largest city and the largest city against which litigation alleging police misconduct has been brought by DOJ.[9]  The Consent Decree was negotiated in the latter part of 2000 under Mayor Richard Riordan and was approved by the City Council in November of that year.  Both of Mayor Riordan's successors, James Hahn and Antonio Villaraigosa, have continued the City's full support of the Consent Decree and its objectives.  In addition to the Office of the Mayor, the Office of the City Attorney and the Office of the Chief Legislative Analyst, which represented the City Council, were full participants.  Like the Mayor's Office, each agency was fully supportive of the reform process.

## The Board of Police Commissioners

The Board of Police Commissioners consists of five civilian members appointed by the Mayor. The Police Commission serves as the head of the Los Angeles Police Department.  While only one member of the Commission has remained over the entire period of the Consent Decree, in its role as head of the LAPD, the Commission has consistently been committed to ensuring that the Department met its obligations of reform.  The Commission, and the civilian oversight that it provides, is a pillar upon which the success of the Department's compliance with the Consent Decree has rested.  Going forward, the Commission will play a critical role in ensuring against any slippage in the reforms that have been achieved.  The composition of the current Commission is ideally suited for this role.  It is composed of four prominent attorneys and an icon of the civil rights movement in Los Angeles, is supported by a uniquely qualified and extremely competent Executive Director and has exhibited independence and steadfastness in its commitment to reform.  Yet, it is clear that true reform cannot rest on the personalities of political appointees, but rather must be fully ingrained in the system.  We will have more to say about that below.

---

[8] For a full description of the Special Litigation Section's jurisdiction and activities see
http://www.usdoj.gov/crt/activity.php#spl

[9] Among other cities that have been the subject of Consent Decrees or Memoranda of Understanding are Detroit, Washington, D.C., Cincinnati and Pittsburgh.

## The LAPD

The LAPD serves a city of nearly four million people with an authorized force of approximately 9,300 sworn officers, 3,000 civilian employees and an annual budget exceeding $1 billion. The LAPD responds to over 900,000 calls for service each year. Today's LAPD is significantly different from the Department that the Monitor found at the beginning of the Consent Decree. The Department at that time was demoralized and badly battered by scandal, with a disciplinary system that was largely regarded as both unfair and ineffective. The Department was suffering from what the March 2000 LAPD Board of Inquiry Report to the Police Commission, Rampart Area Corruption Incident (hereinafter referred to as the March 2000 BOI Report), termed "mediocrity." It was this mediocrity that the Board of Inquiry (BOI) found had bred the lack of integrity leading to the Rampart scandal, an observation undoubtedly applicable to the problems that the DOJ found during its investigation. From the onset, the Department took its responsibilities under the Consent Decree seriously. Shortly after the approval of the Decree by the Mayor and City Council in November 2000, a Consent Decree Task Force was established. This task force became the Consent Decree Bureau and oversaw the establishment of the Audit Division (AD) mandated by the Decree. It was, however, under the leadership of a new Chief, William J. Bratton, who had served as a policing expert on the Monitoring team prior to his appointment in October 2002, that reform truly began its institutionalization throughout the Department. Chief Bratton raised the level of visibility and dedication to the Decree by appointing as a Deputy Chief equivalent a former member of the Board of Police Commissioners and former criminal defense attorney, Gerald Chaleff, to head the Consent Decree Bureau, which was charged with implementation of the Consent Decree provisions. Since his appointment, and notwithstanding occasional setbacks, Chief Bratton has been a staunch supporter of the Decree, repeatedly indicating that the Decree's mandates were nothing more than best policing practices and that the Decree's provisions were "the baseline for, and not the ultimate standard, by which the Department's commitment to excellence w[ould] be ultimately measured."

## The Office of the Inspector General

The creation of the OIG was a major reform recommendation of the 1991 *Report of the Independent Commission on the Los Angeles Police Department* (hereinafter referred to as the *Christopher Commission Report*), which was charged in July 1991 with examining the structure and operation of the LAPD in the wake of the Rodney King beating. The OIG was established as an arm of the Police Commission in 1996 and through a series of City Charter amendments now has subpoena power and authority to investigate any matter pertinent to the Police Department. The Consent Decree placed specific mandates on the OIG, most notably in the areas of audits, uses of force and the complaint process. The OIG discharged these mandates well and has acted as a full partner throughout the period of the Consent Decree. Indeed, with the continual improvement over the life of the Consent Decree, the OIG has garnered a national

reputation and is viewed as a model for other cities to emulate. It is anticipated that by working together with the Police Commission, the OIG will take the lead role in ensuring that the reforms achieved under the Consent Decree are maintained and built upon.

## The Office of the Independent Monitor

As noted above, the Office of the Independent Monitor was created by the Consent Decree itself. In May 2001, Michael Cherkasky and Kroll Inc. were appointed as the Independent Monitor by the Honorable Gary Feess. Mr. Cherkasky was designated as the Primary Monitory and Jeff Schlanger as the Deputy Primary Monitor. In addition to Mr. Cherkasky and Mr. Schlanger, the monitoring group consisted of professionals covering a range of disciplines, including policing, audit and technology. The monitoring group, which varied in composition over the years, was organized into teams corresponding to the various sections of the Consent Decree. Each team had a liaison in the LAPD Consent Decree Bureau and worked closely with them in obtaining necessary data and access in order to determine the degree of compliance with the individual mandates of their assigned sections.

The Office of the Independent Monitor issued 30 quarterly reports over the past eight years. In each of these, the Monitor reported on pre-designated Consent Decree mandates, examining the progress of compliance with those mandates. After the initial five-year term of the Consent Decree, the Monitor discontinued active monitoring of those mandates with which the LAPD had achieved substantial compliance. Similarly, two years into the extension period, active monitoring of those remaining mandates with which the LAPD had achieved substantial compliance was discontinued.[10] Details of the progression of compliance for the various categories of Consent Decree reform appear in Section II of this report, below.

## The United States District Court

The Honorable Gary Feess of the United States District Court for the Central District of California has presided over this matter for the entire time it has been pending.

---

[10] A full listing of those mandates, the quarters in which they were examined and an indication of whether substantial compliance with the mandates had been achieved in that quarter is contained in Appendix D hereto.

## C.    Constitutional and Effective Policing

One of the more notable aspects of the achievement of substantial compliance with the Consent Decree is the reduction in crime that has been realized over the same time period.  The drop in homicides is indicative of drops that have been experienced in other serious felonies. Homicides have, in fact, dropped from 647 in 2002 to 381 in 2008.  This trend is continuing into 2009, with a further 30% year-over-year drop through mid-May.  While cause and effect can, perhaps, be argued, what is clear is that with proper management, constitutional policing and effective policing can go hand in hand.[11]

## D.    A Chronology of Significant Events

There have been many significant events over the term of the Consent Decree.   We have included a chronology of those events in Appendix F to this report.

## E.    Overview of Compliance Assessments and Recommendations to the Court

As detailed in the section-by-section analysis contained in Section II of this report, below, we believe that overall substantial compliance with the Consent Decree has been achieved.[12]  As such, and subject to the terms of the Transition Agreement, we recommend to the Court that the Consent Decree be terminated.   We offer our thanks and appreciation to all who have contributed to this substantial effort and made our recommendation possible.   We have acknowledged those individuals most centrally involved in the Acknowledgements section at the end of this report.

---

[11] Appendix E contains crime statistics for homicide, rape, aggravated assault and robbery.  Substantial reductions in each of these crime categories were achieved over the period of the Consent Decree.  In addition, a recent study performed by the Harvard Kennedy School (Policing Los Angeles Under a Consent Decree:  The Dynamics of Change of the LAPD, Program in Criminal Justice Policy and Management; The Harvard Kennedy School) contains analyses of trends of both crime statistics and social attitudes over the years of the Consent Decree.  It should be noted, however, that neither the Monitor nor the DOJ was interviewed or consulted in the preparation of the Harvard Kennedy School Report.

[12] In addition to the paragraphs of the Consent Decree covered by the Transition Agreement, there remain a few paragraphs of the Consent Decree which have not achieved the >94% compliance rate that was the goal of full compliance.  For the most part, those paragraphs which have not reached this level were administrative in nature, and the Department has made significant strides toward compliance over the life of the Consent Decree.

# II.   Overview of Compliance Assessments and Recommendations to the Court

## A.   Management and Supervisory Measures to Promote Civil Rights Integrity

### 1.   TEAMS II [Computer Information System]

The Consent Decree was, inter alia, intended to set standards of conduct for LAPD officers.  It was understood by all parties that accumulating good information that accurately and quickly identified those officers at risk for failing to meet those standards was critical for the successful implementation of the Decree.  At the same time, there was explicit recognition that the system in use by the LAPD at the time was inadequate for the task of attempting to identify potentially at-risk officers.  The *March 2000 BOI Report* recognized the need for an Early Warning System similar to that which had, at times, been deployed in certain major city jurisdictions, including Boston, Denver and Miami-Dade.  Both the BOI and the Christopher Commission called for a system that would track officer activities such as personnel complaints, use of force (UOF) incidents and vehicle accidents in order to identify potential problem officers.  TEAMS II became a critical success factor for the Decree and one of the most difficult to implement.

**Consent Decree Solutions**

The Consent Decree required the City to establish a database, known as the Training, Evaluation and Management System II (TEAMS II), containing relevant information about its officers, supervisors and managers, to be utilized to promote professionalism and best policing practices and to identify and address potentially at-risk behavior.[13]

The Consent Decree also required the Department to prepare and implement a plan for inputting historical data into TEAMS II, including relevant numerical and descriptive information

---

[13] TEAMS II was required to contain information related to all lethal and nonlethal uses of force, canine bites, officer-involved shootings, injuries and deaths reviewed by the LAPD Use of Force Review Board (UOFRB), pursuits, collisions, complaints, discipline, commendations, arrest reports, crime reports, citations, claims and lawsuits, assignment, rank and performance evaluation information training, and actions taken pursuant to a review of TEAMS II information, including non-disciplinary actions.

about each item and incident.  TEAMS II was required to utilize common control numbers for cross-referencing single incidents from multiple documents, and the City was required to prepare a design document and develop and implement a protocol for using TEAMS II.

The Department was required to enter information in TEAMS II in a timely, accurate and complete manner, to maintain the data in a secure and confidential manner; and to utilize that data pursuant to a protocol that would enable the detection of patterns that would indicate potentially at-risk behavior.[14]

The Consent Decree included a specific timeline for the development and implementation of TEAMS II, as well as a requirement that the LAPD designate a unit responsible for developing, implementing and coordinating LAPD-wide risk assessments.

## Overall Achievements of the LAPD

The TEAMS II risk management system was one of the bigger challenges required by the Consent Decree.  Los Angeles, like most American cities, had dozens of legacy information systems that were outdated, unreliable and did not communicate with each other.  Over the initial five-year term of the Decree and its three-year extension, the LAPD dedicated countless hours and resources to successfully develop TEAMS II.  Its development and implementation is certainly among the City and Department's greatest achievements.

TEAMS II was designed as a tool for line supervision across the Department that would promote risk management as a top priority for every supervisor and Commanding Officer (CO) in the Department.  The system combines risk-oriented data (uses of force, complaints, etc.) with operational data (arrests, traffic stops, citations, etc.) and is designed to automatically notify supervisory personnel when officers in their command deviate significantly from the norms of their sworn peers.  TEAMS II has begun to facilitate a significant change in management practices.  It is now incorporated into the LAPD Manual and in the daily business practices of a variety of areas, including promotions, pay-grade advancements, selections to specialized units such as GED, annual performance evaluations, transfers to new commands, daily use by the OIG, reviews by the Risk Management Executive Committee (RMEC) and all UOF and complaint investigations.

The system's success within the Department, and the accompanying recognition from both law enforcement agencies and academia, sets TEAMS II as a model for law enforcement agencies.  In fact, the Department is now looked to as a leader in the Early Warning System arena, and

---

[14] The City was required to maintain all personally identifiable information about an officer during their employment with the LAPD and for at least three years thereafter, and information necessary for aggregate statistical analysis must be maintained indefinitely.

departments such as Chicago, Detroit and New South Wales, Australia, are looking to the LAPD for guidance in this area.[15]

In order to meet Consent Decree requirements regarding the system, the City developed and deployed five new systems: the Complaint Management System (CMS), the Use of Force System (UOFS), the STOP database, the Risk Management Information System (RMIS) and the Deployment Planning System (DPS). The RMIS gathers data from the new systems, as well as numerous legacy systems, in order to produce relevant information for risk management analysis. The deployment of these systems was completed in the first quarter of 2007. While the timelines set by the Consent Decree were not met, it was always the position of the Monitor that it was more important to implement a well-designed system than one that resulted from haste. As described above, the system has proved that the time taken was worthwhile.

### Consent Decree Compliance[16]

The City submitted the first draft of the RMIS Requirements/Design Document to the DOJ in October 2001. That document began a dialogue between the City and the Department of Justice regarding the overall functionality of the system, as well as specific data elements and electronic documents necessary to conduct valuable behavior risk assessment. Numerous matrices and revised drafts of the design document were shared between the two parties and with the Monitor. As a result of this process, approval of the RMIS Requirements/Design Document was given by the DOJ in January 2003.

The Consent Decree also required a Data Input Plan for inputting historical data into TEAMS II. The Data Input Plan was written and approved by all parties in the third quarter of 2003 and included an appendix that described data elements and time periods to be included and the amount, type and scope of historical data, as required. Such historical data was imported into TEAMS II over the course of the last few years for all categories, including complaints, UOF, traffic collisions, vehicle pursuits, arrests, claims and lawsuits, and training.

All five TEAMS II systems were completed and rolled out Department-wide in early 2007. At that time, the Monitor began its assessment of the substantive paragraphs of the Consent Decree related to TEAMS II and found that TEAMS II access to all entities was appropriate and that the TEAMS II policy outlining access was approved and distributed as required by the

---

[15] While other departments in the country have "early warning systems" in place, most are manual processes that involve reviewing reports on a monthly or quarterly basis. None are as automated or up-to-date as TEAMS II, which is updated nightly and includes daily reviews of officers.

[16] Some aspects of TEAMS II are subject to the provisions of the Transition Agreement.

Consent Decree. During the third quarter of 2007, the Monitor determined that the presence and accuracy rates for required data elements were in compliance with Decree requirements.

During the first quarter of 2007, the Monitor also attended training sessions for RMIS and the UOFS, and reviewed standard RMIS monthly reports, as well as different ad hoc queries, in order to ensure that TEAMS II has the capability to search and retrieve the information required. The Monitor found relevant and descriptive information about various items and incidents included in TEAMS II, and relevant scanned copies of certain documents were available in RMIS, the UOFS and other systems.

Additionally, the Monitor reviewed 34 different monthly reports produced by RMIS, including four individual summary and comparison reports, 15 different summary and comparison reports for units and/or workgroups and 15 different incident reports.[17] The Monitor determined that these reports met the Consent Decree requirement that TEAMS II have the capability to search and retrieve numerical counts, percentages and other statistical analyses for individual employees, LAPD units, groups of officers, incidents or items and groups of incidents or items. Currently, the TEAMS II staff can run ad hoc queries upon request until such time as RMIS allows these ad hoc reports to be created in its system.

The Consent Decree also required that a common control number be used to link information about a single incident in TEAMS II. The Monitor reviewed working papers for incidents that are associated with other incidents from other source systems that feed the RMIS database and are cross-referenced in RMIS. The TEAMS II staff and Monitor verified that the cross-references that were in the source systems still existed and were working in RMIS.

During the third quarter of 2007, the Monitor conducted a review of some of the TEAMS II protocols[18] by reviewing TEAMS II action items triggered during this time and found some overall issues regarding inconsistencies. Based on this review, the Department began to

---

[17] These reports include comparisons of individuals and groups to various incidents or items for a particular date range selected, including but not limited to the number of uses of force to stops and arrests, the number of complaints to stops and arrests and the number of claims and lawsuits to stops and arrests, as well as information on each of the individual incidents.

[18] The Monitor reviewed whether supervisors regularly review and analyze all relevant information in TEAMS II about officers under their supervision to detect any pattern that may indicate that an officer, group of officers or LAPD unit may be engaging in at-risk behavior; whether appropriate managers and supervisors undertake a more intensive review of the officer's performance when at-risk behavior may be occurring based on a review and analysis; whether LAPD managers regularly review and analyze relevant information in TEAMS II about subordinate managers and supervisors in their command regarding the subordinate's ability to manage adherence to policy and to address at-risk behavior; and whether there was routine and timely documentation in TEAMS II of actions taken as a result of reviews of TEAMS II information.

remediate some of these issues by providing a Departmental Notice[19] and informal training to the command staff and all supervisors for further guidance on what constitutes appropriate review of action items and how to properly document such a review.  The Monitor reviewed TEAMS II action items again in the third quarter of 2008 and found that all of action items were reviewed by supervisors on a regular basis and analyzed and that these action items were initiated when required.  The Monitor found that 91%, of the action items reviewed were in compliance with the requirements to conduct a further review when at-risk behavior may be occurring.  Of those non-compliant action items, some supervisors or managers did not conduct thorough enough reviews of work histories, did not consider any specific incidents within the work histories and did not document the justification for their dispositions.[20]

The Monitor concluded that all action items were being reviewed and analyzed for adherence to policy and addressing potentially at-risk behavior on every review level by the appropriate managers and supervisors.  The Monitor also found that managers were providing both direction and feedback for their subordinates' review and analysis of these action items and their adherence to policy and addressing at-risk behavior.  The Monitor, however, did find that 14% of the action items reviewed took more than the maximum allowed time of 60 days for the completion of action item review.  This deficiency was successfully addressed during the third quarter of 2008.

The Monitor also reviewed the same action items selected from the third quarter 2008 in order to assess compliance with additional requirements.[21] The Monitor found that the protocols appropriately provide the guidelines required for the numbers and types of incidents requiring a TEAMS II review.  The Monitor also found that the protocols appropriately indicate the guidelines required for the follow-up managerial or supervisory actions, including non-disciplinary actions, to be taken based on reviews of the information in TEAMS II.  The Monitor conducted a further review of those action items with dispositions other than "no action" and found that those action items with dispositions other than "no action" were appropriately dealt

---

[19] Notice titled, "Use of Complaint Information When Responding to RMIS Action Items," November 18, 2008

[20] In the remaining, the supervisors only considered the specific incidents or categories that were triggered, rather than reviewing the employees' entire work histories within that evaluation period and documenting the justification for their dispositions.

[21] The requirements tested included the guidelines for numbers and types of incidents requiring a TEAMS II review by supervisors and managers and the frequency of these reviews; the follow-up managerial or supervisory actions (including non-disciplinary actions) to be taken based on reviews of the information in TEAMS II; the use of TEAMS II information as one source of information in determining when to undertake an audit of an LAPD unit or group of officers; and  whether specific actions taken as a result of information from TEAMS II are based on all relevant and appropriate information, and not solely on the number or percentages of incidents in any category recorded in TEAMS II.

with 100% of the time, including resolutions of training, modified or non-field duties, informal meeting and complaints.

The Consent Decree also required that each officer be able to regularly review all personally identifiable data in order to ensure the accuracy of data. The Monitor found these provisions related to access were being met. The Monitor also reviewed a list of requests for corrections to TEAMS II and found the Department in full compliance with requirements related to correcting data errors.

During the third quarter of 2008, the Monitor reviewed the results of an organizational assessment TEAMS II staff conducted in March 2008. In that assessment, TEAMS II staff reviewed total Department-wide action items for the second quarter of 2008 and determined that Central Area Narcotics appeared to be statistically higher than the average of other specialized units for RMIS thresholds.[22] TEAMS II staff, in conjunction with the Risk Analysis Section (RAS), presented this finding to the LAPD RMEC. Through the review process, it was determined that Central Area Narcotics had a low number of stops due to the Narcotics Task Force's use of a Department-approved exception to completing Field Data Reports (FDRs), as stated in the LAPD Manual and Department policy. Additionally, it was determined that supervisors were becoming directly involved in uses of force, rather than serving in a supervisory capacity.[23]

As a result of these findings, the LAPD changed procedures to ensure that FDRs would be required from the Narcotics Task Force, and discussed with supervisors the importance of acting as a supervisor to an incident if possible, rather than getting directly involved in the UOF. TEAMS II staff and RAS continue to look at other specialized units, including gangs, vice and patrol, in each new organizational assessment and will explore alternative ways to review and assess the implementation of protocols regarding organizational assessments. In the organizational assessment conducted in the fourth quarter of 2008, the TEAMS II staff reviewed total Department-wide action items for the third quarter of 2008 and determined that some South Bureau gang units appeared to be higher than the average of other specialized units for RMIS thresholds.[24] TEAMS II staff, in conjunction with RAS, presented this finding to RMEC and it was determined that one Area had a high number of UOF but all were appropriately triggered. These organizational performance assessments are exactly the kind of data-based reviews

---

[22] These specific action items referenced here are triggered when comparing the number of stops to the number of complaints and UOF. In this instance, Central Area Narcotics had a higher number of complaints and UOF when compared to the number of stops.

[23] This leads to a higher number of UOF incidents, compared to other Areas, if supervisors are also counted as involved officers in these UOF.

[24] These specific action items referenced here are triggered when comparing the number of UOF and complaints to the number of arrests.

envisioned by the Consent Decree and clearly have the potential of identifying problems in their early stages.

The Consent Decree also required that managers' and supervisors' performance in implementing the provisions of the TEAMS II protocol be taken into account in those individuals' annual performance evaluations. Additionally, whenever any officer transfers into a new Division or Area, the CO of the new division or Area was required to promptly assure a review of the transferred officer's TEAMS II record. The Department decided to develop system-generated action items to address these requirements in order to ease the burden on supervisors and ensure that such requirements are completed in a timely manner. Both types of system-generated action items were deployed Department-wide by June 2008. These action items allowed direct links to not only TEAMS II reports, but also to the Transfer Evaluation Report (TER) forms required for transfers and the performance evaluation forms for annual reviews.

Regarding system-generated action items for annual performance evaluations, the Monitor found that 87% of them were completed within the Department's 60-day requirement from the date of the supervisors' or managers' anniversary date, and 53% of them included assessments of the supervisors' or managers' performance in implementing the provisions of the TEAMS II protocol in their annual performance evaluations. Based on these results, the Monitor concluded that the requirements had not been fully addressed in these annual performance evaluations, nor were the action items related to these annual performance evaluations being completed in a timely manner.[25] To ensure that the implementation of the provisions of the TEAMS II protocol is assessed when evaluating supervisors or managers, TEAMS II has included instructions in the Performance Evaluations Report (PER) to prompt the reviewer to provide a response to this requirement. The Monitor also reviewed system-generated action items for transfers that had been completed in the third quarter of 2008 and found that the Department was not fully meeting the requirements regarding timeliness of the review, supervisory approval, adequate reviews and timely TEAMS II reports.

Requirements to train managers and supervisors, consistent with their authority, to use TEAMS II to address potentially at-risk behavior and to implement the TEAMS II protocol were met in the first quarter of 2007. The Monitor conducted this review again in the second quarter of 2008 and found that all supervisors who were required to do so had taken the RMIS TEAMS II training.

---

[25] The Department indicated that these new TEAMS II requirements for the annual performance evaluations will be emphasized in the supervisors' upcoming training courses and in ongoing COMPSTAT meetings in order to ensure that these provisions are adhered to for future reviews.

The Consent Decree also required the City to maintain all personally identifiable information about an officer included in TEAMS II. During the second quarter of 2007, the Monitor reviewed a time period for three separate Deployment Periods (DPs), including all terminated employees' events, comparing such events to a current organizational summary report, and found that the employee events were included in the current data.

The Consent Decree required that LAPD designate a unit within Human Resources Bureau that would be responsible for developing, implementing and coordinating LAPD-wide risk assessments, the operation of TEAMS II and provide assistance to managers and supervisors using TEAMS II to perform the tasks required in the protocol. The Monitor reviewed these requirements over the course of the Consent Decree and reported in the second quarter of 2007 that the RAS within Risk Management Group (RMG) was providing the Department with assistance in connection with TEAMS II, including providing a help desk for LAPD personnel to call when guidance is needed on how to evaluate risk and write a proper narrative to support any conclusions made based on that evaluation.

Lastly, the Consent Decree required that Force Investigation Division (FID) and Internal Affairs Group (IAG) investigators conducting investigations have access to all information contained in TEAMS II, where such information is relevant and appropriate to such investigations. In the second quarter of 2008, the Monitor reviewed working papers provided by the TEAMS II staff regarding their review of pertinent Departmental policy, the TEAMS II Access Control Matrix and TEAMS II User Access Profiles for all FID and IAG investigators and found that all FID and IAG investigators had appropriate access, as required.

The Monitor commends the Department for the significant improvement made during the term of the Decree, which was especially notable from the 2007 evaluation to the 2008 evaluation. As a result of the TEAMS II staff providing new policy, further training and appropriate guidance to the Department, the reviews of action items by managers and supervisors have seen significant improvement in both the required analysis and the appropriate documentation.

## Recommendations

The Monitor commends the City, LAPD and specifically TEAMS II staff for their significant achievements in developing and implementing TEAMS II. After a slow start, the LAPD TEAMS II staff have, in the last three years, performed extraordinarily. What remains to be done is to ensure that the TEAMS II system continues to be institutionalized as part of the operations of LAPD. Because of the centrality of TEAMS to reform and the fact that it has not been fully operational for two years, teams will be subject to the terms of the Transition Agreement. Additionally, the Monitor offers the following recommendations to the LAPD, TEAMS II staff, AD and the OIG in connection with utilizing this system and proactively monitoring officers for potential at-risk behavior.

- The Department must promote greater compliance with the timeliness of evaluations generally.

- TEAMS II staff, the Department, AD and the OIG need to continue to carefully review and analyze action items by supervisors, managers and command staff to ensure that supervisors and managers are monitoring and identifying patterns of behavior for potentially at-risk officers.  Reviews should be conducted of the documentation of analyses, the justifications for the dispositions of their reviews of these action items and the timeliness of the action.

- These entities should also continue to utilize TEAMS II to conduct their own audits and reviews of individual officers, units and Areas; such audits and reviews should include organizational assessments.

- The City and the Department should continue to monitor peer groups and thresholds to ensure that they are appropriate given the current status of the Department.  These peer groups will change as the Department does.  In addition, ongoing reviews of action items should be conducted to ensure they remain appropriate.

- The Department, AD and the OIG should attempt to utilize TEAMS II to its fullest capacity. New and powerful ways to use this robust system will hopefully be developed going forward.

## 2.    Performance Evaluation System

One of the major findings of the *March 2000 BOI Report* was the failure of LAPD to meaningfully evaluate both its officers and its supervisors.  The BOI found that "personnel [were] not being evaluated honestly or accurately – virtually all evaluations would be ranked as excellent or outstanding" and that "because an average evaluation is viewed as poor, those personnel who are evaluated accurately are penalized by the system."  The BOI recommended that the LAPD "restore integrity to [the] performance evaluation system so that it [could] be relied upon as a true measure of performance."

Similarly, the DOJ's investigation found that the LAPD "failed to utilize properly other supervision and risk management tools, including meaningful personnel evaluations...and assessments of officers' history and performance when undertaking actions such as promotions and sensitive assignments."

## Consent Decree Solutions

The Consent Decree required the LAPD to "develop and implement a plan that ensures that annual personnel performance evaluations are prepared for all LAPD sworn employees that accurately reflect the quality of each sworn employee's performance, including with respect to:

a.  civil rights integrity and the employee's community policing efforts (commensurate with the employee's duties and responsibilities);

b.  managers' and supervisors' performance in addressing at-risk behavior, including the responses to Complaint Form 1.28 investigations;

c.  managers' and supervisors' response to and review of CUOF and Non-Categorical Use of Force (NCUOF) incidents, review of arrest, booking, and charging (ABC) decisions, and review of requests for warrants and affidavits to support warrant applications; and

d.  managers' and supervisors' performance in preventing retaliation.

The Decree also required the plan to "include provisions to add factors described in subparts a-d, above, to employees' job descriptions, where applicable."

## Overall Achievements of the LAPD

At the inception of the Consent Decree, the requirements for the use of personnel evaluations were contained in Special Order No. 6, *Evaluation Procedure for Officers of the Rank of Lieutenant and Below – Revised*, originally issued on March 10, 1995. In 2004, a revised set of rules was promulgated by the Department.[26] The order included a revised evaluation form in which additional categories of evaluation were added.[27] Additionally, a section was added for details on training provided to the evaluated employee, particularly related to specialized assignments the employee might hold.

In May 2005, the LAPD issued an Office of Support Services Notice titled "Revised Dates for Completing Performance Evaluations for Lieutenants and Below." This notice revised the schedule for completion of performance evaluations by supervisors, requiring all sworn officers to be evaluated during the month in which they were appointed to their current rank, rather than completing all evaluations during the same month for a specific rank.

CRID completed the *Supervisory Performance Evaluations Audit* during the quarter ending June 30, 2008, and the audit was approved by the Police Commission on July 8, 2008. The audit

---

[26] Special Order No. 47, *Performance Evaluation Procedures for Lieutenants and Below – Revised*, November 13, 2004.

[27] Specifically, the categories: "sets example of police integrity," "effective supervisory oversight," and "effective administrative investigations" were added.

found the Department in non-compliance with the requirements of subparagraphs 54a-d, as well as those of subparagraphs 62a and b, 70c, and 108i.  The audit also found that many evaluations were either not completed on a timely basis or not completed at all.

The Department made significant improvements in the Department's performance evaluations process when it issued Special Order No. 44, *Activation of Standards Based Assessment – Lieutenants and Below*, dated November 25, 2008.  The new Standards Based Assessment (SBA) focuses on supervisors providing an objective assessment of subordinates and uses documentation other than supervisors' subjective assessments to assess employee performance.  The standards provided for officers to be rated as follows in the different subject areas:

- Greatly Exceeds Standards

- Meets or Sometimes Exceeds Standards

- Needs Improvement

The SBA requires documentation such as commendations and comment cards, which are, under these new guidelines, required to be attached to the completed rating form to support ratings of "Greatly Exceeds Standards" or "Needs Improvement."   Additionally, COs are required to validate ratings other than "Meets or Sometimes Exceeds Standards" in order to ensure that ratings are not "inflated."   The SBA will allow decision-makers to more easily distinguish candidates for promotion and selection to coveted positions.  Although there has been no assessment of post-SBA compliance, the Monitor is confident that the implementation of the SBA combined with the oversight of AD, OIG and Police Commission will ensure that the Department continues to improve its performance evaluation system.


**Consent Decree Compliance**

The Monitor first assessed paragraph 54 during the quarter ending June 30, 2007.  As part of the methodology changes that took effect in the fall of 2006, the Monitor included the following subparagraphs in its paragraph 54 assessment:

- 62c: Supervisor Conduct at Search Warrant Services or Categorical Use of Force (CUOF) Incidents

- 70c: Watch Commander Approval of All Booking Recommendations

- 108i: Quality of Supervisory Oversight Regarding Use of Confidential Informants (CIs)

- 116: Competency of Field Training Officers (FTOs) in Successfully Completing and Implementing FTO Training

The Monitor found the Department in non-compliance with paragraph 54, as the performance evaluation rating form and related instruction and training were being developed and not yet completed.

The Monitor again found the LAPD in non-compliance with paragraph 54 during the quarter ending September 30, 2008, based on its review of CRID's *Supervisory Performance Evaluations Audit*.

As described above, the Department issued Special Order No. 44, *Activation of Standards Based Assessment – Lieutenants and Below*, dated November 25, 2008, which addresses the requirements of subparagraphs 62c, 70c, 108i and paragraph 116. The Monitor noted that the SBA provides much-needed enhancements of the Department's performance appraisal process; however, the Monitor withheld a determination of compliance with paragraph 54 during the quarter ending December 31, 2008, pending the Department's implementation of the SBA.

The Monitor is confident that the implementation of the SBA, combined with the oversight of AD, the OIG and the Police Commission, will ensure that the Department continues to improve its performance evaluation system consistent with best policing practice and with the requirements of the Consent Decree.

**Recommendations**

The LAPD has made great strides in improving its performance evaluation system, and the Monitor is confident that the Department will continue to make improvements to its system. The Monitor offers the following recommendations:

- The LAPD should assess the SBA after it has been implemented for one year in order to gauge its effectiveness in the selection of officers to coveted positions such as Gang Enforcement Detail (GED) officers and FTOs.

- The Department should continue to audit compliance with the mandates of subparagraphs 62c, 70c, 108i and paragraph 116.

# B.   Incidents, Procedures, Documentation, Investigation and Review

## 1.   Use of Force

During the course of its investigation of the LAPD, the DOJ found evidence of a pattern or practice of police misconduct and civil rights violations. DOJ allegations included the improper use of force and insufficient investigation into use of force incidents. The DOJ concluded the

LAPD's pattern or practice of police misconduct included, among other things, the unconstitutional use of force by LAPD officers. Also cited were "serious deficiencies" in training and supervision of officers.  In reaching its conclusion, the DOJ reviewed LAPD policy statements, reports on officer-involved shooting (OIS) incidents in which nonlethal force was used, misconduct complaint files in which serious misconduct was alleged, information on civil suits filed against the LAPD and its officers, information on criminal charges filed against LAPD officers, information relating to police training and reports and memoranda prepared by the LAPD, the Board of Police Commissioners and the OIG.  These allegations were deeply troubling to all who read of them and were at the heart of DOJ complaint.  It has been the remediation of these deficiencies toward which much of the oversight effort has been directed.  It is the LAPD's turnaround and notable success in this area that may be the single most encouraging aspect of the last eight years.

## Consent Decree Solutions

In an effort to address the conclusions reached by the DOJ, the parties agreed on a number of administrative requirements surrounding CUOF incidents.  These administrative paragraphs, collectively known as paragraphs 55 through 69 of the Consent Decree, defined required policies and responsibilities for officers, investigators, supervisors, the OIG and the Police Commission with respect to uses of force, whether lethal or nonlethal.[28]  The specific requirements follow.

*Establishment of an Investigation Division, Notification and Incident Response*

The LAPD was required to develop appropriate policy to address notification of and response to CUOF incidents.  In particular, UOF paragraphs 55 through 61 of the Consent Decree required:

- Creation of a unit (FID), whose main responsibility was to conduct administrative investigations of CUOF incidents, including those formerly conducted by the Robbery Homicide Division (RHD) or the Detectives Headquarters Division (DHD).  All CUOF investigations were to be conducted by the FID and the FID was required to be assigned to a unit that reported directly to the CO of Operations Headquarters Bureau (OHB). Investigators assigned to the FID were to be Detectives, Sergeants or other officers of supervisory rank.[29]  The CO of the unit could not have direct line supervision for any LAPD

---

[28] For purposes of the Consent Decree, lethal uses of force, known as CUOF, are defined as those uses of force involving an OIS, Neck Restraint, Head Strike with an Impact Weapon, Canine Bite requiring hospitalization, In-Custody Death (ICD) and a Law Enforcement Related Injury (LERI) requiring hospitalization.  All other uses of force are nonlethal and classified as Non-Categorical Uses of Force (NCUOF).

[29] A supervisor is defined as sworn personnel at the rank of Sergeant I, Detective II or above.

geographic bureau. Finally, all investigators assigned to the unit were to be trained in conducting administrative investigations as specified in paragraph 80 of the Consent Decree;

- Immediate notification to the Chief of Police, the FID, the Police Commission and the OIG whenever there was a CUOF, and prompt "roll out" of FID investigators to all CUOF incidents 24 hours a day. The senior responding FID supervisor was to have overall command of the crime scene and investigation at the scene where multiple units were present to investigate a CUOF;

- A separate criminal investigation of a CUOF where the facts so warranted, which could not be conducted by the OHB Unit;

- Continued notification to the Los Angeles District Attorney's Office (DAO) whenever an LAPD officer, on or off-duty, shot and injured any person during the scope and course of employment, and whenever an individual died while in the custody or control of an LAPD officer or the LAPD, and a use of force by the officer may have been a proximate cause of the death;

- A request of the appropriate bargaining unit(s) for a provision in its collective bargaining agreement that when more than one officer fires a weapon in a single OIS incident, then each officer should be represented by a different attorney during the investigation and subsequent proceedings;

- Immediate separation of all officers involved in or witness to an OIS until such time the officer(s) provide a statement to an investigator.[30]

*Supervisory Oversight of CUOF Incidents and Search Warrants*

In response to its concerns of insufficient supervision, particularly with supervisory oversight for CUOF incidents and the service of search warrants, the Consent Decree required the LAPD, within a seven-day time period, to review a supervisor's response to either situation and conclude on the appropriateness. The review was to be considered for each supervisor's annual performance evaluation. Recognizing the seriousness and potential impact of a CUOF, the Consent Decree required the referral of certain officers to the LAPD's Behavioral Science Services (BSS) Unit for an evaluation prior to being returned to the field.

In line with requiring a review of supervisor response to a CUOF, at the conclusion of a CUOF investigation, an LAPD manager was required to consider an involved officer's work history,

---

[30] LAPD protocol is to permit a very limited public safety statement to the supervisor first to arrive at the scene. This statement is limited in scope to allow the supervisor sufficient information to address the situation, whether static or dynamic. The formal statement provided by an officer may be compelled should the officer decline a voluntary statement.

including information contained in the TEAMS II system, for any disciplinary or non-disciplinary recommendations.[31] Again, in concert with other required reviews, consideration of an officer's history, although administrative in appearance, is an important function – it is data that if collected and digested properly can and will provide insight into trends requiring attention.

*Other CUOF Administrative Requirements and Continued Practices*

To ensure the timely and accurate reporting of uses of force, the Consent Decree required self-reporting of uses of force without delay utilizing a UOF form with prescribed data fields to capture the type(s) of force used, to identify the impact area of force and to specifically identify fractures and dislocations. Officers were also required to include use of a bean bag shot gun as a type of force.

In its investigation of the LAPD, the DOJ identified several preexisting best practices implemented by the LAPD:

- Continued Police Commission review of completed CUOF incident investigations;

- Continued reporting of all NCUOF to a supervisor to conduct a timely supervisory investigation of the incident;

- Continued UOFRB review of all CUOF incidents; and

- Continued Chain of Command (COC) review of NCUOF within 14 days of the incident absent any investigation deficiencies.

With regard to Commission review of CUOF investigations, the Consent Decree mandated that an investigation had to be presented to the Commission at least 60 days prior to the running of any applicable statute of limitations.

## Overall Achievements of the LAPD

In December 2001, the LAPD issued Special Order No. 39, *Critical Incident Investigation Division – Established*. This Special Order established and defined the Critical Incident Investigation Division (CIID), which was the unit responsible for conducting administrative CUOF incident investigations, and set the basic parameters of who should attend these administrative investigations. It also established the requirement to separate officers involved in the incident, assigned responsibility with respect to the duty to assess Supervisorial Response to a CUOF and provided direction for the directed referral to the BSS Unit for certain involved and witness

---

[31] Prior to the Consent Decree, the LAPD had established the UOFRB and a use of force review policy that, among other things, considered officer CUOF history.

officers to a CUOF. Once this Special Order was established, the Department rather quickly came into compliance with the requirements for OHB to attend all CUOF incidents, notify the Chief, Police Commission and OIG, notify the DAO and cooperate with the District Attorney (DA) on scene and ensure officers were separated.[32]

The LAPD subsequently issued Special Order No. 35, *Duty to Assess a Supervisor's Response to a Categorical Use of Force*, in August 2003 to address the LAPD's lagging compliance with assessing a supervisor's response within the seven-day mandated period. However, the Department continued to struggle to achieve compliance throughout the remainder of the Consent Decree and the subsequent extension.

Between 2002 and 2006 the Department took additional steps to ensure that it remained in compliance with these administrative requirements, including improving their notification system and improving the time frame with which they reported the findings to the OIG and Police Commission.

As a result of findings identified and reported by the Monitor, specifically deficiencies reported by the Monitor related to the overall sufficiency of CUOF investigations and the LAPD's internal review of the CIID, the Department issued Special Order No. 8, *Force Investigation Division – Established*, in March 2006, which deactivated the CIID and established FID. The FID continues to operate under the direction of the Commanding Officer of Professional Standards Bureau (PSB).[33] Specific Department accomplishments related to the FID and its operations during the term of the Decree are described in detail below, and include:

- The LAPD appropriately established, defined selection criteria for,[34] staffed and trained those investigators assigned to the FID, and CUOF incident investigations were appropriately assigned to and managed by FID investigators.

- At the onset of the Consent Decree, the LAPD established a systematic process to address the notification and dispatching of investigators to CUOF incidents. To address continuing struggles with its response times, and in response to the Monitor's recommendation, during 2004 the LAPD enhanced its notification process, equipping necessary personnel with

---

[32] The LAPD subsequently issued Special Order No. 15, *Revision to Special Order No. 39 – CIID Investigations,* dated April 10, 2002. This Special Order provided additional guidance requested by the Board of Commissioners to ensure the proper review of a CUOF investigated by the IAG. It also provided additional guidance for officer referrals to the BSS Unit.

[33] The CO of the CIID and its successor, the FID, never maintained geographical responsibility during the duration of the Consent Decree. As such, the LAPD was in compliance with this requirement throughout the term of the Consent Decree.

[34] The LAPD issued Special Order No. 30, *Selection and Assignment to Critical Incident Investigation Division*, in September 2003.

BlackBerry devices enabling the Department Command Post (DCP) to make electronic notifications.

- The LAPD successfully implemented a process whereby officers either involved in, or directly a witness to an OIS, were separated and remained separated pending providing a statement to an investigator.[35]  In May 2003, the LAPD issued Special Order No. 19, *Obtaining a Public Safety Statement and Separating Officer Following a Categorical Use of Force Incident – Established*.  This Special Order provided guidance to officers and supervisors on the appropriate line of questioning for obtaining a public safety statement[36] at an OIS incident scene.  It also expanded LAPD policy to require all officers involved in or witness to any CUOF to remain separated prior to providing a statement to an investigator.  The Monitor commends the Department's adoption of this policy.

For virtually all uses of force reviewed by the Monitor, whether CUOF or NCUOF, the incidents were self-reported. At the onset of the Consent Decree, the LAPD enhanced preexisting use of force forms to capture the additional information required pursuant to the Consent Decree, and the forms were utilized throughout its duration.

With regard to NCUOF, although not a requirement of the Consent Decree, the LAPD recognized the importance of the supervisor's role in the investigation and precluded a supervisor involved in or witness to a use of force from completing the subsequent investigation.

Lastly, the LAPD enhanced FID investigative resources and self-imposed a more robust CUOF investigation completion schedule in an effort to provide completed investigations to the Commission well in advance of the mandated 60-day period.

**Consent Decree Compliance**

As indicated earlier, this particular section of the Consent Decree includes a number of administrative requirements relative to the Department's response to and investigation of uses of force.  To the Department's credit, very early on it built upon preexisting policy and procedure in an attempt to address these requirements.  First, the LAPD issued Special Order No. 39, and the Department relatively quickly came into compliance with a number of basic policy requirements in this area, including the requirements for OHB to attend all CUOF incidents; notify the Chief, Police Commission and OIG; notify the DAO and cooperate with the

---

[35] In certain incidents the Monitor recognized the logistical burden of transporting a large number of officers and looked to see whether involved officers were separated until questioned.

[36] A public safety statement is elicited by the first responding supervisor from all officers and witnesses to an OIS in order to secure the Area and prevent any further injury.

DA on scene; and ensure officers were separated.[37]  The Department first came into compliance with some of these paragraphs in June 2002, and by December 2002, the Department had achieved compliance with many of the administrative requirements surrounding CUOF incidents.   As described below, the exceptions to achieving compliance with these administrative provisions of the Consent Decree are the supervisory oversight requirements relative to the review of supervisor response to CUOF incidents, and the confidential psychological evaluation of officers in deadly CUOF incidents.  By September 2008, the LAPD had not achieved compliance with these provisions.

Regarding the formulation and responsibilities of the FID, in 2006, the Monitor identified certain UOF paragraphs wherein the LAPD was deemed to be in substantial compliance and were rendered inactive for the purposes of monitoring.   Of significance, the Monitor noted the following:

- As described above, the LAPD appropriately established, defined selection criteria, staffed and trained those investigators assigned to the FID.  Training observed by the Monitor and deemed sufficient included "Assimilation Training" and Supervisory and Detective training. Evidence of attendance was adequately documented.  It was the practice of the Monitor to review all completed CUOF incident investigations, wherein the Monitor noted all were assigned to and managed by FID investigators.

- At the onset of the Consent Decree, although the LAPD established a systematic process to address the notification and dispatching of investigators to CUOF incidents, the Department struggled with its response times.  Timely notification was dependent on the DCP's ability to contact and brief the long list of individuals with a need to know while continuing to meet its other responsibilities.  In response to the Monitor's recommendation, during 2004 the LAPD enhanced its notification process, equipping necessary personnel with BlackBerry devices enabling the DCP to make electronic notifications.  Over the course of time, the FID timely dispatched adequate personnel in response to notification of a CUOF. Simultaneously, the LAPD adequately addressed notification to the Chief of Police, the Police Commission, the OIG and the DAO,[38] with few exceptions.  Also at the onset of the Consent Decree and throughout its duration, the LAPD provided for cooperation with DAO personnel responding to a CUOF incident.

- In July 2002, the LAPD proposed meeting with the Los Angeles Protective League and the Command Officers Association to discuss providing officers with separate legal representation when more than one officer is involved in an OIS incident.   Both organizations declined discussing the matter any further with the LAPD, and throughout the

---

[37] Consent Decree paragraphs 56, 58-60

[38] Notification to the District Attorney's Office was a pre-Consent Decree requirement and practice of the LAPD.

term of the Consent Decree, officers regularly were represented by the same attorney(s) when involved in an OIS.

- With the exception of one reporting period, the LAPD successfully implemented a process whereby officers either involved in or directly a witness to an OIS were separated and remained separated pending providing a statement to an investigator.

Through continued interviews, observations and review of CUOF investigations, the Monitor reaffirmed the LAPD's continued adherence to the paragraphs establishing and defining the FID. Where plausible, the Monitor alternatively placed reliance on certain *Categorical Use of Force Systems Audit Reports* and related working papers prepared by the LAPD's AD.  Prior to placing reliance on AD's findings, the Monitor conducted meta-audits of AD's audits and findings to gain comfort with employed methodologies, analysis and conclusions.

Unlike those paragraphs addressing the formulation of the FID, during the initial five-year evaluation period and continuing through the present, the LAPD did not achieve substantial compliance with the supervisory oversight requirements relative to reviews of supervisor responses to search warrants and CUOF incidents.  In reaching this conclusion, the Monitor either requested evidence of a review of supervisory response and oversight for virtually all CUOF incidents and samples of search warrants served during specified time periods or placed reliance on similar analyses completed by Civil Rights Bureau sworn personnel or placed reliance on certain LAPD AD reports.  The illustrations below detail the level of compliance achieved by the Department for the entirety of the Consent Decree.[39]

---

[39] The Monitor deemed substantial compliance to equate to those paragraphs where the Department has been in compliance for two consecutive years.





Although the Department was adept at identifying and referring officers involved in a CUOF for counseling, the LAPD did not achieve substantial compliance in that involved officers were allowed to return to the field prior to clearance by a BSS doctor or the underlying documentation was insufficient and did not permit an assessment of compliance. The following illustrates the LAPD's compliance over the duration of the Consent Decree:



The Monitor notes that the Department issued a Notice by the Consent Decree Bureau, "*Deployment Planning System Enhancement for Categorical Use of Force Incidents,*" dated August 6, 2008. The Notice discusses a DPS enhancement that prevents "non-field certified" employees from being deployed in the field until otherwise advised by the CO of return to field status. The DPS enhancement was designed to address the documentation deficiencies previously identified by the Monitor, AD and CRID's inspections. Given the Department's performance just prior to the implementation of the DPS enhancement compared to performance subsequent to its implementation (97.6% compliance versus 90.6%, respectively), the Monitor was unable to conclude on its effectiveness.

In reviewing officer histories and recommending any disciplinary or non-disciplinary action, the LAPD's record was mixed. In virtually all CUOF incidents reviewed, the Monitor noted sufficient documentation that officer histories were reviewed and considered for non-disciplinary action.

This most frequently consisted of providing officers with varying levels of training to address tactical concerns identified either by the reviewing CO or members of the UOFRB. For those incidents in which the officers' actions were deemed administrative disapproval, the LAPD was inconsistent in documenting review. However, over the course of the Consent Decree, the LAPD was successful overall in considering officer work history and recommending discipline, and achieved substantial compliance.[40] It should be noted that for the majority of the monitoring period, the TEAMS II system was not available for officer history consideration; absent this requirement, the Monitor elected to render this paragraph inactive at the end of the initial monitoring period.

The Monitor noted that reviews of officer actions, particularly those reviews resulting in non-disciplinary action, frequently identified tactical concerns resulting in varying levels of recommended training. It was not always evident once training was ordered that sufficient follow-up occurred to ensure officers received the training. At the Monitor's recommendation, the LAPD implemented procedures to track and document training for future officer work history consideration, and the Monitor has since confirmed documentation of ordered training.

With regard to NCUOF, as mentioned above, the LAPD recognized the importance of the supervisor's role in the investigation and precluded a supervisor involved in or witness to a UOF from completing the subsequent investigation. Although the Monitor identified a handful of investigations wherein a supervisor arriving at the scene was witness to all or a portion of a UOF and conducted the investigation, the investigations were deemed sufficient and unbiased and were brought to the attention of the LAPD. By the end of the initial Consent Decree term, the LAPD and its supervisors demonstrated their ability to timely respond to and investigate the multiple less than lethal uses of force that occur on a daily basis. Therefore, the Monitor found the Department in substantial compliance with this requirement.

For CUOF investigations reviewed, the Monitor noted all were presented to a UOFRB containing appointees with varying levels of experience, expertise and perspective. On occasion, the Monitor observed the UOFRB process, noting that its structure and mandate serve the LAPD and its officers well. Over time, the OIG's role and participation has grown to the level expected at the onset of the Consent Decree. As the Department was always in compliance with this requirement, the Monitor concluded substantial compliance at the completion of the initial five-year term of the Decree.

Lastly, with the exception of two rating periods, the Monitor noted that the LAPD provided the Police Commission, via the OIG, with completed CUOF investigations in a timely fashion. For an approximate one-year period, there were delays in meeting the mandated time frame, largely attributable to the reorganization of the CIID to the FID and resource constraints. The LAPD,

---

[40] In assessing compliance with this paragraph, agreement with the appropriateness of discipline administered was not criteria for compliance. Rather, the Monitor weighed multiple variables to include the overall documentation of review.

nonetheless, enhanced FID investigative resources and self-imposed a more robust investigation completion schedule in an effort to provide completed investigations to the Commission well in advance of the mandated 60-day period.  In quick order, the LAPD was able to achieve and maintain substantial compliance.

**Recommendations**

The Monitor recommends that the LAPD continue its practice of prompt notification to the Chief of Police, the Police Commission, the FID, the OIG and the DAO for all CUOF incidents. Additionally, OIG and DAO respondents should continue to be granted access to the incident scene. Although only a requirement for OIS incidents, the Monitor concurs with the LAPD's decision to expand the requirement of separation of involved and material witness officers for all CUOF incidents pending a statement, and recommends this as a continued best practice.

With regard to assessing supervisory response to the service of search warrants and CUOF incidents, the LAPD, with the oversight and assistance of AD and the OIG, should strive to achieve compliance and improve the overall quality of supervisor assessments.  As important as it is to assess officer response to certain situations, the Department must similarly assess its supervisors, namely Sergeants and Lieutenants, who typically control incident scenes.  Such assessments simply identify what individuals do right and wrong and often offer insight into situations previously not contemplated.  Similarly, when considering officer actions for officers involved in a CUOF, equally important to documenting the review is ensuring officers receive the required training.

Lastly, the Department, with the assistance of the OIG or AD must monitor those DPS enhancements designed to ensure that officers are not scheduled for field duty until all administrative obstacles have been addressed and all decision-makers are confident it is within the officer's and the Department's best interest to return to field duty.  Although an administrative step, it is nonetheless an important control procedure.  Should the DPS enhancement prove ineffective, the LAPD must reassess and devise alternative measures to ensure this requirement is met going forward.

In numerous substantial and material ways, the LAPD has adopted and implemented best police practice in the use of force area, a far cry from the practices of eight years ago.  It is crucial that the LAPD continue to police itself in this area, with the assistance of the OIG and outside governmental institutions like the Mayor, the City Council, the City Attorney, and the DA.

## 2.    Search and Arrest Procedures

For a period of time in the late 1990s, "Rampart" was a one-word symbol for out-of-control police corruption in the United States.  Lack of controls and poor oversight and training in gang

units and in connection with search and arrest procedures were often cited as facilitating the scandal. The DOJ's investigation found that the LAPD was engaging in a "pattern or practice" of, inter alia, false arrests to include improper seizures of persons, making arrests without probable cause, and improper searches of persons and property with insufficient cause. DOJ concluded that "these types of misconduct occur on a regular basis in the LAPD."

In the *March 2000 BOI Report*, the Operations work group found that the Department Manual did not require supervisory review of a search warrant affidavit before it was submitted to a magistrate, and there was no system in place to track a search warrant unless it was actually served and registered with the County Clerk's Office. The work group also reviewed guidelines for the tactical service of search warrants and found that all operational bureaus required the presence of a Lieutenant at the service of any warrant other than those that are essentially administrative, e.g., telephone records.

The BOI's findings stressed a dire need for greater control and training regarding search warrants, as the preparation, service, and execution of search warrants and probable cause arrest warrants ("Ramey" warrants) is an operational process that exposes the Department to a multitude of risk-management issues. The BOI concluded that the LAPD should ensure adequate management review and oversight, including management review of a search and "Ramey" warrant affidavits prior to submission to a magistrate and should establish a tracking system for all warrants, served or not, to facilitate audit oversight and scrutiny.

Regarding arrests, the BOI recommended that "although booking advice should be obtained from a detective or specialized unit supervisor, booking and report approvals should always be obtained from the Area watch commander who should be responsible for visually inspecting each arrestee." The BOI also recommended that "whenever possible, the supervisor approving a booking should be the same supervisor who reviews and approves the related reports" in order to "[ensure] that sufficient probable cause is articulated in the arrest report and that any evidence seized is properly recorded and booked."

## Consent Decree Solutions

### Warrants

The Consent Decree reforms in connection with search warrants, Ramey warrants, and return service documents focused primarily on their quality and compliance with procedures. Specifically, the Consent Decree required supervisory review of all search warrants and Ramey warrants, to include the following:

a. A review for completeness of the information contained therein and an authenticity review to include an examination for "canned" language, inconsistent information, and lack of articulation of the legal basis for the warrant.

b. A review of the information on the application and affidavit, where applicable, to determine whether the warrant is appropriate, legal and in conformance with LAPD procedure.

c. A review of the plan for executing the warrant and a review of the execution of the warrant after it occurs (after-action review). In addition, a supervisor was required to be present for the execution of the warrant.

In addition, the Consent Decree required each Area and specialized division of the LAPD to maintain a search warrant tracking log listing each search warrant, the case file where a copy of the warrant is maintained, the name of the officer who applied for the warrant and the name of each supervisor who reviewed the application for the warrant.

*Arrests*

The Consent Decree required the Department to "continue to require all booking recommendations be personally reviewed and approved by a watch commander as to appropriateness, legality, and conformance with Department policies." This requirement included three distinct subparagraphs:

- Subparagraph 70a required that "such reviews shall continue to entail a review for completeness of the information that is contained on the applicable forms and an authenticity review to include examining the form for 'canned' language, inconsistent information, lack of articulation of the legal basis for the action or other indicia that the information on the forms is not authentic or correct."

- Subparagraph 70b required that "supervisors shall evaluate each incident in which a person is charged with interfering with a police officer (California Penal Code § 148), resisting arrest, or assault on an officer to determine whether it raises any issue or concern regarding training, policy, or tactics."

- Subparagraph 70c required that "the quality of these supervisory reviews shall be taken into account in the supervisor's annual personnel performance evaluations."

This section of the Decree also required that "all detainees and arrestees brought to an LAPD facility shall be brought before a watch commander for inspection...for injuries as required by LAPD procedures and, at a minimum, ask the detainee or arrestee the questions required by current LAPD procedures, which are:

1) "Do you understand why you were detained/arrested?"

2) "Are you sick, ill, or injured?"

3) "Do you have any questions or concerns?"

If a watch commander was not available, the LAPD was required to "ensure that the person [be] inspected and interviewed by a supervisor who did not assist or participate in the person's arrest or detention." The supervisor or watch commander inspecting was required to sign the related booking documentation, which was required to indicate their compliance with these procedures.

## Overall Achievements of the LAPD

### Warrants

The Department's efforts to comply with Consent Decree requirements regarding warrants began with the development and establishment of Special Order No. 25, *Search Warrant and Probable Cause Arrest Warrant Procedures*, dated August 10, 2001, which outlined procedures for tracking and monitoring the service of all search and Ramey warrants in accordance with Consent Decree requirements. Special Order No. 25's search warrant policy was a good first step in institutionalizing supervisory oversight over warrants, and it was the first time the Department had a formalized tracking system for recording and monitoring search warrants.

The Department then published and distributed Special Order No. 28, *Activation of the Warrant Service/Tactical Plan Report*, dated July 15, 2003, which included a new search warrant tactical plan with a supervisor's debriefing summary section and a CO's analysis section, as well as a new search warrant tracking log with revised fields clarifying the information necessary to properly complete this log. The new search warrant tactical plan was different from prior tactical plans in that it required the CO to complete an analysis of the incident and a comment sheet for each supervisor who had oversight during the service of the warrant to assess the appropriateness of the service of the warrant.

An additional important aspect of the Special Order No. 28 policy was that it provided the Department's supervisors and command staff with specific requirements regarding the debrief summary and CO's analysis, so that there was less ambiguity in what was required for their supervisory review and oversight of the incident and post-incident review. In addition to the CO's analysis on the tactical plan, Special Order No. 28 makes the CO responsible to ensure the following regarding warrants: presence of a supervisor during execution (Lieutenant if served by a gang unit); maintenance of a single location of warrant tracking logs in their Area or specialized division; accuracy on warrant tracking log of the warrant; provision of approval on warrant tracking log at completion of each DP; and completion of a detailed analysis of the performance of the supervisor at each scene of the service of the search or Ramey warrant on a "Comment Sheet" to be included in the supervisor's personnel file.

### Arrests

In June 2001, the LAPD issued Special Order No. 12, which established specific evaluation procedures for arrests on charges of interfering, resisting arrest, or assault on an officer. Specifically, this order required the watch commander to ask all detainees and arrestees

brought into the division the three questions required by paragraph 73. A division supervisor was required to conduct this interview, even if the arrestee was not brought directly to the division.

In December 2001, the Department issued Special Order No. 42, which revised the detention tank log, the secure detention of juveniles log, and the non-secure detention of juveniles log. The redesign of the detention tank log specifically addressed the Decree requirement that watch commanders question the detainee upon arrival at the division. The new log provided a specific box for the watch commander to document that the mandated interview has been conducted. The order described the procedures required for completing the newly revised detention logs.

The Department issued Special Order No. 18, *Detention Logs – Revised*, on May 19, 2003, in which the secure and non-secure juvenile detention logs were revised to document the arrest charge of a detained juvenile and the name and relationship of the person to whom the juvenile is being released.

## Consent Decree Compliance

*Warrants*

In the first three years of the Consent Decree, the LAPD took immediate steps to identify the problems with the service and tracking of search warrants, and began to develop procedures and guidelines to bring both search warrants and search warrant tracking logs into compliance with these Consent Decree requirements. Early on, the Monitor concluded that the Department was in compliance with requirements regarding completeness of the information on the application and affidavit and whether the warrant is appropriate, legal and in conformance with LAPD procedures. However, the Monitor found that the other requirements of this section were not being met. Specifically, the search warrant packages reviewed lacked a written execution plan when required, lacked supervisory approval or timely supervisor's approval, lacked a written debriefing critique/after-action report when required, lacked a CO's approval or timely CO's approval, lacked required forms within the search warrant package, lacked timely return of the search warrant and had inconsistent information between and among forms within the search warrant package. Regarding search warrant tracking logs, the Monitor found that the information on these logs was either missing, inconsistent with the related warrant or did not include supervisors' approval.

In early 2005, the Monitor reviewed and relied on AD's February 2005 *Warrant Applications and Supporting Affidavits Audit,* after conducting its own meta-audit of AD's audit and findings. AD had findings similar to the Monitor's earlier reported findings that search warrants had incomplete information, lacked documentation of required information for conformance with LAPD procedures and lacked supervisory oversight for approving warrants and post-incident review requirements. However, AD's findings differed from the Monitor's regarding search

warrant tracking logs, as AD found that the tracking logs reviewed were both complete and accurate in terms of their search warrant information. In 2006, the Monitor reviewed AD's subsequent February 2006 *Warrants Audit* and concurred with AD's findings that the Department had achieved compliance with the completeness requirement but was still not in compliance with other requirements, including underlying actions, conformance with LAPD procedures, supervisory oversight and post-incident review. In this audit, AD also found that the completeness and accuracy requirements related to the warrant tracking log were not being met.

The Department did not achieve substantial compliance with the Consent Decree's requirements related to search warrants and the search warrant log at the expiration of the original term of the Decree. As a result, the Monitor continued to assess the Department's compliance with these requirements during the extension to the Consent Decree. The Monitor's first review during the extension was based on AD's December 2006 *Warrant Applications and Supporting Affidavits Audit*. The Monitor concurred with AD's findings that the Department was not meeting the requirements regarding completeness, canned language, inconsistent information, appropriateness, legality and conformance with LAPD procedures, and supervisory oversight of application/affidavit, incidents and post-incident review. In addition, the warrant tracking logs were again *non-compliant* with requirements regarding completeness and accuracy. The Monitor reported that the Department continued to struggle with documentation requirements, as search warrant packages – in varying degrees – continued to fall short of complying with documentation requirements regarding completeness, authenticity, and the appropriateness and legality of officers' actions,[41] as well as requirements regarding supervisory oversight of applicable incidents and post-incident reviews and the completeness and accuracy of the Warrant Tracking Log.

The Monitor reviewed AD's December 2007 and December 2008 *Warrant Applications and Supporting Affidavits Audit*, both of which reported that, similar to the prior audits, the Department was struggling with search warrant and search warrant tracking log requirements. In both years' audits, the Department did not comply with requirements regarding completeness of information, inconsistent information, conformance with LAPD procedures, supervisory oversight of the application/affidavit and post-incident review for search warrants. In addition, the search warrant tracking logs were not meeting the requirements regarding completeness and accuracy of information. The Monitor recognized that although the Department did not meet the requirements regarding supervisory oversight of the application/affidavit and post-incident review, as indicated above, these compliance rates did increase significantly in the 2008 audit from the previous year's audit.

---

[41] The Monitor notes that although there were concerns in relation to the documentation of the officers' actions, AD concluded that the Department was in 100% compliance with the articulation of the legal basis for the warrants.

In sum, the Monitor believes that substantial progress has been made on the most material aspects of these provisions, and recognizes that these warrants meet the specific requirements regarding legality.   While there is work to be done, the Monitor is confident that the Department can remedy these additional deficiencies in the future with the assistance and oversight of AD and the OIG through, among other things, their continuing quality audits and reviews.

*Arrests*

In its initial review of compliance with the requirements regarding the watch commanders' inspections of detainees and arrestees (paragraph 73) and requirements regarding supervisors' evaluation of incidents involving specified charges (subparagraph 70b), the Monitor found the LAPD in non-compliance.   Regarding the watch commander inspections, the Monitor recommended that the Department reconsider how interviews and inspections are conducted, since the inspections/interviews taking place in the divisions were occurring in the presence of the arresting officer.[42]   Regarding subparagraph 70b, the Department interpreted the requirement to mean that the watch commander review was only necessary on cases where these charges are the sole booking charge.  The Monitor recommended that Special Order No. 12 be revised to instruct watch commanders to review all cases where the facts make up the elements of these charges and reported that regardless of the final interpretation of this requirement, this revision would not only provide better supervisory oversight but it would assist the Department in its own internal audit process.

In its first review of compliance with subparagraph 70a in 2002, the Monitor found the Department in overall non-compliance.  The Monitor found that Special Order No. 13 sufficiently explained the supervisors' responsibilities during the arrest process.   However, the Monitor found that the training for Basic Supervisor School and Watch Commander School was unsatisfactory, since neither curricula specifically addressed when and how supervisors should conduct their reviews.  The Monitor also relied on AD's September 2002 *ABC Audit*, and agreed with the finding that only 55.5% of the arrest packages reviewed were in compliance.  It was clear from this audit that Supervisors were either not adequately reviewing the arrest packages or unable to identify significant issues in the paperwork.   The Monitor endorsed AD's recommendation to remind personnel of existing protocol for the completion of documents associated with arrest packages.   The Monitor further recommended that this topic be addressed in formal training for both supervisors and the officers.

In 2003, the Monitor withheld a compliance determination with subparagraph 70b, as a final interpretation of the subparagraph's requirements had only recently been made.  The Monitor

---

[42] The Monitor noted that one of the fundamental purposes of this effort is for the watch commanders to interview the detainees in order to discover if any abuse had taken place at the hands of the arresting officers.

recommended that Special Order No. 12 and the revised training explicitly state the actual charges that fall under the umbrella of subparagraph 70b and clearly indicate that in any instance in which such a charge could be appropriately applied, the requirements of 70b would need to be met.  Additionally, the Monitor recommended that the Department develop a means by which to identify all cases in which a 70b offense could be charged in order to allow for a more generous sample to measure compliance.

The Monitor concurred with AD's findings in its 2004 *ABC Reports Audit*, and found the LAPD in compliance with subparagraph 70a but in non-compliance with subparagraph 70b.  The Monitor noted that the LAPD developed and implemented a new NCUOF policy and training that, while not developed to specifically address subparagraph 70a, focused on proper completion and oversight of the booking process.  Following a review of the new policy, which was finalized on June 11, 2004, and attendance at the training sessions, the Monitor was satisfied that the training adequately addressed secondary compliance requirements with this subparagraph.  The Monitor relied on AD's 2005 *ABC Reports Audit*, and found the LAPD in compliance with both paragraph 73 and subparagraphs 70a and 70b during the quarter ending December 31, 2005.

At the end of the initial term of the Consent Decree, the Monitor found the LAPD in substantial compliance with subparagraph 70a and paragraph 73; these paragraphs were no longer actively monitored.  The Monitor continued to actively monitor compliance with subparagraph 70b during the extension period.

Based on the findings in successive *ABC Reports Audits* from 2006 through 2008, the Monitor found the LAPD in compliance with subparagraph 70b in 2006, and in non-compliance in 2007 and 2008.  The 2008 audit found that 88% of packages it reviewed were in compliance with the requirements of subparagraph 70b.  The remainder either contained no documentation of the incidents on the watch commander's daily reports or did not include the watch commander's evaluation of the incident on the Watch Commander's Log.  While compliance did not reach the level of >94%, the Department is close to compliance, and the Monitor hopes that the combination of AD, OIG and Police Commission oversight can ensure that the Department retains a process to evaluate California Penal Code § 148  type incidents.

## Recommendations

The LAPD has made substantial progress in its oversight of the mainly administrative processes governing search warrants.  There remain areas that need strengthening.  With the policies and procedures put in place by the Department, and the oversight role of AD and the OIG to ensure that the policies and procedures are followed, the Monitor believes that, going forward, search warrants and warrant tracking logs will be properly prepared, reviewed, served and tracked under these strict guidelines and subject to adequate supervisory oversight.  The Monitor offers the following recommendations regarding search warrants and warrant tracking logs.

- The documentation of supervisory oversight in connection with the debriefing summary, CO's analysis and Comment Sheet should include all outlined components of the Department policy and the Consent Decree and be sufficiently specific to ensure that proper supervisory oversight of each individual search warrant and the evaluation of the supervisor's actions are achieved.[43]  AD and the OIG should continue their stringent practice of review, but consider the need for more specifics surrounding this supervisory oversight documentation, rather than general nonspecific statements of circumstances in such evaluations.

- The LAPD should provide refresher training to watch commanders and supervisors in order to ensure that all 70b incidents are documented appropriately.

The Department should continue to ensure that the watch commander inspecting a detainee or arrestee be uninvolved with the arrest or detention.

## 3.    Initiation of Complaints

During the course of its investigation, the DOJ determined that the LAPD had in place policy and procedures for the acceptance of complaints.  However, the DOJ's investigation also raised serious concerns that not all complaints lodged by civilians or sworn personnel were documented, preventing any investigation and resolution.

**Consent Decree Solutions**

This section of the Consent Decree mandated the methods by which the LAPD must receive complaints and maintain complaint materials.  The requirements served to enhance the policies and practices already established by the LAPD.  Specifically, the LAPD was required to have the capacity to accept any complaint in virtually any form,[44] anonymously, and at various locations.[45] Complaint material must include pre-addressed postage-paid envelopes in easily accessible Los

---

[43] The Monitor often found generic statements from supervisors indicating that there were no problems during the service; such statements do not address specifics regarding a particular warrant's execution or the supervisor's oversight.  By requiring the inclusion of specifics, the Department will cover any risk management issues that may arise, ensure that supervisors and COs are reviewing each individual search warrant, and allow the search warrants and the personnel files to adhere to both Decree requirements and best police practices.

[44] Receipt must be accommodated whether in writing, in person, by mail, by telephone, facsimile transmission or by electronic mail.

[45] LAPD headquarters, any LAPD station or substation, the offices of the Police Commission and the OIG.

Angeles locations in seven mandated languages.[46]   Additionally, complaint materials must be readily available at the request of community groups and public and private centers.  Lastly, the public must have continued access to the LAPD's 24-hour toll-free telephonic complaint hotline, and calls to this line must be recorded.

Another route for an individual to claim misconduct by an officer or other employee of the LAPD is to file a civil lawsuit on or claim against the City.  All lawsuits and claims filed were required to be communicated to the LAPD so that the underlying allegations could be investigated.

Once a complaint was completed and presented to the LAPD, it had to be assigned a unique complaint number.   Any complaint presented had to be accepted without requiring the complainant to sign any form that in any manner limited or waived his or her ability to file a complaint or a civilian lawsuit in court.

The LAPD was required to initiate a complaint against any officer who failed to assist any civilian from filing a complaint, such as refusing to provide complaint material, refusing to accept a complaint or attempting to dissuade the filing of a complaint.

Officers were also required to notify without delay the LAPD whenever they are arrested or criminally charged for any conduct, or named as a party in any civil suit involving their conduct while on duty.  Additionally, an officer was required to immediately notify the LAPD if named as a defendant in a civil suit resulting in a temporary, preliminary or final adjudication in favor of a plaintiff complaining of off-duty violence, threats of physical violence or domestic violence by the officer.

Lastly, recognizing that misconduct, in certain situations, might be observed solely by another officer and that officers might be hesitant to report misconduct, the Consent Decree mandated that officers continue to report without delay certain misconduct they witness.[47]   Witness officers were required to report alleged misconduct directly to the IAG or a supervisor for completion of a complaint form.[48]

---

[46] English, Spanish, Japanese, Cantonese, Korean, Tagalog and Vietnamese

[47] Excessive use of force or improper threat of force; false arrest or filing of false charges; an unlawful search or seizure; invidious discrimination; an intentional failure to complete forms required by LAPD policies and in accordance with procedures; an act of retaliation for complying with any LAPD policy or procedure; or an intentional provision of false information in an administrative investigation or in any official report, log or electronic transmittal of information.

[48] This requirement applies to all officers, including supervisors and managers who learn of evidence of possible misconduct through their review of an officer's work.

**Overall Achievements of the LAPD**

The LAPD issued Special Order No. 1, dated January 1, 1998, *Revised Definition of Personnel Complaint, Modification of Personnel Complaint Procedures and Revision of Complaint Related Forms*, that, among other things, mandated the reporting of any misconduct, regardless of significance, for investigation.  The LAPD subsequently issued Special Order No. 8, dated February 24, 2000, *Complaint Reporting Procedures – Revised*.  This policy superseded Special Order No. 1 and simply clarified the difference between public and Department complaints and further defined certain administrative requirements for the complaint intake process.  During 2000, the LAPD experienced a significant jump in reported alleged misconduct, which placed a strain on its existing complaint investigation infrastructure, both COC and the IAG.  The following chart reports, by year, the number of complaints received by the LAPD and the number of underlying allegations per closed complaint investigation:



Prior to the DOJ's investigation, the LAPD had established a thorough complaint intake process that included requirements to accept a complaint in virtually every required method and locale and to assign a unique case intake number, or CF number, for tracking and referral.

Within short order, the LAPD coordinated the production of complaint material and informative posters in the seven mandated languages and made such information available to the public and community groups.  Posters were prominently displayed in all Divisions in all Bureaus.[49]

In July 2001, the LAPD issued Special Order No. 18, *Risk Management Group – Established*.  This Special Order centralized the Department's risk management under the Human Resources Bureau and specifically mandated maintaining liaison with the Office of the City Attorney to, among other things, reduce risk.

With respect to an officer's duty to report misconduct, the LAPD issued Special Order No. 30, *Duty to Report Misconduct – Revised*, dated September 10, 2001.  It, among other things, stipulates that employees "shall continue to report misconduct to a supervisor without delay" and added the provision allowing employees to report misconduct directly to the IAG.  This special order also requires an investigating supervisor during the course of a complaint investigation to formulate additional allegations of misconduct if there is reason to believe additional misconduct occurred.

## Consent Decree Compliance

As described above, early on during the term of the Decree, the LAPD coordinated the production of complaint material and informative posters and made information available to the public and community groups.  On many occasions the Monitor conducted unannounced verifications of complaint materials at various locations, primarily Divisions, and noted that, for the most part, the LAPD was in compliance.[50]

During the term of the Decree, the Monitor reviewed thousands of complaint investigations and not once did it identify any indications that officers asked or required a civilian in any way to execute documentation waiving or limiting their ability to file a complaint with the LAPD or any other entity, or file a lawsuit in court.  Officers rightfully informed complainants that it was against the law to knowingly file a false complaint against an officer.

In the course of reviewing Ethics Enforcement Section (EES) audits of the complaint intake process, the Monitor noted instances in which complaints initiated by EES personnel were not always documented on a complaint intake form or, if documented, were not accurate, and the LAPD was held in non-compliance.  In those instances where a complaint was not generated, the EES initiated a complaint against the involved officer(s).  Similarly, for EES complaint intake

---

[49] Special Order No. 19, *Complaint Information Provided in Additional Languages,* dated July 20, 2001.

[50] In some instances complaint material or pre-addressed postage-paid envelopes were not available in the public area of the location assessed.  Typically it was a matter of bringing the deficiency to the attention of the Watch Commander who either immediately corrected the deficiency with material on hand or submitted requests for the additional material.

audits wherein the information suggested that an officer was reluctant to take a complaint or used language suggesting an attempt to dissuade, either a complaint was generated against the officer, or the EES concluded another audit was warranted at some point in the near future. Other than those instances identified during the course of EES' work, as well as the Monitor's overall review of complaints (in which a relatively small number included allegations of failing to accept a complaint), the Monitor is confident that the Department is making every effort to accept all complaints and in virtually all instances is doing so.

During early 2003, at a point in time when the LAPD received an allegation that officers were not documenting all complaints received, the Chief of Police directed the EES to significantly increase the number and frequency of intake audits to substantiate or refute this allegation. Although subsequent assessments noted some instances in which officers did not document a complaint, the LAPD's overall performance improved, and ultimately the Monitor held the Department in substantial compliance.

One requirement that the Department struggled with until just recently was its 24-hour toll-free complaint hotline, which was established for the receipt of complaints. The hotline was staffed with sworn personnel to receive complaints during normal business hours, and the system would default to voicemail in the event the call could not be taken. In assessing this requirement, the Monitor often placed reliance on AD's systems audit of the complaint intake process. In these audits, AD often found that the hotline was adequately staffed, but AD identified instances in which complaint forms were not initiated.

During early 2005, the responsibilities of the hotline were transitioned from the PSB to the DCP. At that time, the DCP was not capable of automatically recording all incoming calls. More recently, AD personnel, in the course of conducting their audit, telephonically contacted the hotline, noting that approximately 17% of the time their calls went unanswered or the voicemail system failed to engage and record the call. Analysis of the system identified a card error that was corrected, and subsequent testing by CRID found that the system performed flawlessly.

In order to track civil lawsuits on or claims against the City alleging misconduct by an LAPD officer, the LAPD established an efficient liaison between the RMD and the City Attorney's office, who regularly reconciled the LAPD's Claims/Litigation Information System Report (CLIS) with the City's report. The Monitor found the LAPD fully in compliance with the related requirements on six separate occasions between the quarters ended June 30, 2002 and March 30, 2006.

During the same time period, on five separate occasions the Monitor assessed the Department's compliance with the requirement that officers notify the Department, without delay, any time an officer is arrested or criminally charged for any conduct, named as a party in any civil lawsuit involving their conduct while on duty, or named as a defendant in certain civil suits. The Monitor found the Department in compliance in all five assessments after reviewing complaint

investigations, comparing randomly selected officers with various court indices, and querying claims and lawsuits filed with the City.

In assessing whether officers reported certain types of alleged misconduct by other officers, the Monitor reviewed completed complaint and use of force investigations for indicators that officers knew or should have known, and therefore reported, such misconduct. The Monitor's review spanned the quarter ended June 30, 2003, through to the quarter ended March 31, 2006. Toward the beginning of this assessment period, the Monitor identified some investigations containing information or officer statements suggesting knowledge of misconduct not subsequently reported; however, overall, the Monitor concluded that the investigations were complete and did not contain indicators of officers not reporting misconduct.

## 4.    Conduct of Investigations

During the course of its investigation of the LAPD, the DOJ found evidence of a pattern or practice of police misconduct and civil rights violations. DOJ allegations included the improper use of force and insufficient investigation into use of force incidents. The DOJ concluded that the LAPD's pattern or practice of police misconduct included, among other things, the unconstitutional use of force by LAPD officers. Also cited were "serious deficiencies" in training and supervision of officers.

The DOJ also noted that the LAPD failed to respond properly to citizen complaints of officer misconduct and conducted inadequate investigations of civilian complaints. As a result, officers were not deterred from engaging in misconduct. Similarly, poorly trained officers were not identified for retraining or counseling. These two factors, when combined, created an environment for misconduct to occur.

In reaching its conclusion, the DOJ reviewed LAPD policy statements, reports on OIS incidents in which nonlethal force was used, misconduct complaint files in which serious misconduct was alleged, information on civil suits filed against the LAPD and its officers, information on criminal charges filed against LAPD officers, information relating to police training, and reports and memoranda prepared by the LAPD, the Board of Police Commissioners and the OIG.

### Consent Decree Solutions

This section of the Consent Decree mandated a number of procedural changes to the manner in which the LAPD was required to conduct investigations of alleged misconduct, NCUOF and CUOF. Consistent with many other paragraphs of the Consent Decree, the mandates served to supplement policy, procedures and practices of the LAPD that preexisted the Consent Decree period. These procedural changes were intended to improve the overall quality and integrity of all complaint and use of force investigations.

Specifically, the LAPD was required to review all complaint face sheets within 10 days of receipt to determine whether they require investigative assignment to the IAG or COC supervisors.[51] For those investigations that included allegations requiring assignment to the IAG, and for all CUOF investigations, the assigned investigator(s) were required to ensure that:

- All interviews were tape recorded or videotaped;[52]

- The scene was canvassed and that complainants and witnesses were interviewed at convenient locations and times that might include their residence or place of business;

- Group interviews were prohibited;

- Involved officers and their supervisors were notified;[53]

- All supervisors were interviewed with respect to their conduct at the scene during the incident;

- All appropriate evidence was collected and preserved with the burden of collection on the LAPD; and

- All inconsistencies in officer and witness interview statements were identified and reported in writing.

For those complaint investigations assigned to the COC, i.e., any investigation not including allegations delineated by paragraphs 93 and 94 of the Consent Decree and for all NCUOF investigations, the LAPD was required to ensure that:

- group interviews were prohibited;

- all supervisors were interviewed with respect to their conduct at the scene during the incident; and

---

[51] Paragraphs 93 and 94 of the Consent Decree define certain allegations that must be investigated by the LAPD's IAG. Please refer to the *Internal Affairs Group* section of this report for additional information on investigations requiring assignment to the IAG.

[52] This is required of all complainants, involved officers and witnesses. For certain CUOF investigations LAPD investigators elected to document statements of "heard only" witnesses that in some instances were not recorded. The Monitor concluded this was not a compliance issue.

[53] This requirement applies only to complaint investigations for purposes of paragraph 80. If the complaint is deemed confidential under law, notification will not take place.

- all appropriate evidence was collected and preserved with the burden of collection on the LAPD.

Lastly, if at any time during the course of any investigation of alleged misconduct or use of force the investigating officer had reason to believe misconduct occurred other than that already alleged, the investigator was required to notify his or her respective supervisor and an additional complaint investigation of the additionally identified misconduct must occur.[54]

## Overall Achievements of the LAPD

The following policies relevant to complaint and use of force investigations were issued by the LAPD during the Decree's term in an effort to attain compliance with the investigative requirements for complaint investigations and use of force investigations:

- Human Resources Bureau Notice *Categorical and Non-Categorical Use of Force Classifications and Investigative Responsibility,* dated July 30, 2001;

- Administrative Order 12, *Investigating a Personnel Complaint and Evaluating Witness Credibility,* approved by the Police Commission on September 25, 2001;

- HRB Notice, "Administrative Investigation Training," approved by the Police Commission on October 9, 2001;

- Special Order No. 36, *Complaint Reporting Procedures – Revised,* approved by the Police Commission on November 13, 2002;

- Special Order No. 1, *Department Complaint Process – Revised,* dated January 1, 2003;

- *Categorical Use of Force Classifications and Investigative Responsibility,* July 30, 2001;

- Special Order No. 27, *Investigation of Non-Categorical Use of Force Incidents,* approved by the Police Commission on September 25, 2001;

- Special Order No. 18, *Revision to Special Order No. 27, 2001 – Investigating and Adjudicating Non-Categorical Use of Force Incidents;*

- Human Resources Bureau Notice, *Consent Decree Required Information on Non-Categorical Use of Force Investigations,* approved by the Police Commission on January 28, 2003;

---

[54] In most instances, this results in the formulation and addition of an allegation or allegations to the existing open complaint investigation.

- Human Resources Bureau Notice, *Non-Categorical Use of Force Reporting Where an Arrest Is Made,* published February 24, 2003; and

- Special Order No. 13, *Non-Categorical Use of Force Reporting – Revised*, dated May 26, 2004.

Despite the promulgation of these policies and procedures, as described below, there were some significant issues in the Department's road to compliance in this area of the Consent Decree. However, the Monitor found the Department in substantial compliance with Consent Decree requirements regarding NCUOF investigations at the end of the initial five-year term of the Decree. As described in more detail below, improvements in NCUOF investigations and the Department's ability to comply with the relevant requirements was due in large part to the Department's commitment to issuing and revising policy and the efforts of its Training Group.

In addition, the PSB continues to randomly audit complaint investigations conducted by IAG investigators in an effort to identify and address deficiencies, similar to the process used for CUOF Investigations, which has proven useful in improving the quality of those investigations.

In December 2008, the LAPD implemented a revised *Biased Policing Investigation Protocol*, which addressed concerns expressed by the Monitor and the DOJ with regard to interviewing all accused officers. The protocol requires investigators to gather and include all documents related to an incident, includes questions that should be asked of the complainant and officers, and requires any complaint that includes an allegation of biased policing to be reviewed by either the LAPD's Criminal Investigation Division or the PSB prior to distribution to the concerned CO. In addition, the PSB continues to randomly audit complaint investigations conducted by IAG investigators in an effort to identify and address deficiencies, similar to the process used for CUOF Investigations, which has proven useful in improving the quality of those investigations.

**Consent Decree Compliance**

*Categorical Uses of Force*

Although the Monitor noted some deficiencies in CUOF investigations during its initial review, which occurred during the third quarter of 2002, the Monitor concluded that the overall quality of investigations was sufficient. This trend carried through the Monitor's evaluation that occurred during the first quarter of 2003.