During a subsequent assessment in the third quarter of 2003, the Monitor noted deterioration in the quality of investigations. The Monitor identified instances in which the LAPD did not preserve evidence,[55] identify and report inconsistencies in statements, prohibit group interviews, or report possible misconduct uncovered during the course of the investigation. Indeed, the LAPD was in compliance with only one of the six subsections at the end of this reporting period. Our review of underlying supporting material identified considerable discrepancies when compared to the CIID report, a report ultimately furnished in substance to the Chief of Police and the Police Commission for review and consideration. As a result, the Monitor elected to expand its review of CUOFs during that same quarter and identified additional concerns after having reviewed only three additional investigations, two of which were ICD investigations. To the UOFRB's credit, it identified what appeared to be deficiencies in LAPD jail procedures and recommended a Board of Inquiry and an assessment of jail procedures. Although these requests dated back to mid-2001 and September 2002, neither was addressed until August 2003 following a verbal report by the Monitor to the parties.

Also of concern was the use of RHD detectives to conduct interviews of suspects and witnesses. The Monitor did not question the ability of these detectives to conduct thorough interviews but was concerned that their questioning might be skewed more toward determining whether or not the suspect committed the crime and not whether or not the officer(s) exhibited excessive or unnecessary force.

The Monitor again evaluated the merits of CUOF investigations during the quarter ended March 31, 2004, and determined that the deficiencies in CUOF investigations persisted. The Monitor continued to identify unrecorded witness interviews, insufficient documentation within investigation files, unidentified and unaddressed inconsistencies between witness and officer statements and uninitiated complaint investigations in connection with alleged misconduct identified during the course of the use of force investigation.

In response to the Monitor's findings, the PSB undertook an immediate independent review of the files and confirmed, in almost every respect, the Monitor's findings. This led to the reassignment of the CIID as a direct report to the Deputy Chief of the PSB. The Deputy Chief subsequently initiated a series of organizational and investigative changes to address the manner in which CUOF investigations were completed.

Another issue identified by the Monitor in the course of reviewing and assessing CUOF investigations involved two separate incidents in which a head strike with an impact weapon went unreported for a significant period of time. Both incidents were initially treated as NCUOFs, and the required protocol was not followed until they were upgraded to CUOFs.

---

[55] The Monitor identified and reviewed several eyewitness statements that were not transcribed and were not referenced in the CIID's report. This led to the discovery of multiple occasions in which the CIID failed to identify and report material inconsistent statements and preserve essential evidence.

Of the six requirements delineated in this paragraph of the Consent Decree,[56] the two that strike closest to the core of the integrity of the investigation involve the collection and preservation of evidence and the identification, reporting and addressing of inconsistent statements. The following chart summarizes the history of the Department's compliance with these two requirements:



**Summary of Compliance for Evidence Preservation and Inconsistent Statements Through May 2006**

In mid-2006, the Monitor noted another troubling pattern in the quality of CUOF investigations, this one concerning leading questions. The Monitor noted that FID investigators more frequently utilized leading questions during interviews, particularly officer interviews, which the Monitor noted detracts from the overall quality of the investigation. The OIG also identified the repeated use of leading questions during its independent reviews of CUOF investigations and reported such to the LAPD.

Throughout the duration of the Consent Decree, the Monitor expressed its concern over the use of the hobble restraint device during certain incidents in which the suspects either died or were hospitalized with serious injuries.[57] Although the LAPD had in place specific policy and

---

[56] Paragraph 80

[57] The Monitor's review of these incidents yielded no evidence to conclude failure to properly place the suspect in a sitting position contributed to their death or hospitalization.

procedure for dealing with suspects who are hobbled, officers in several incidents did not follow procedure. Of note, policy required that any suspect restrained with a hobble device must be immediately placed into an upright seated position as a preventative measure for asphyxia. This is particularly important if the suspect exhibits signs of being under the influence of an unknown substance. In most of the investigations, the line of questioning appropriately included querying the involved officers' knowledge of policy and procedure. However, although these incidents were reviewed by the UOFRB and the Chief of Police, contrary to Department policy, training was not required for any of the involved officers with regard to proper positioning. To the Department's credit, though, in December 2007 it issued an order requiring officers to immediately place a hobbled suspect either in a sitting position or in the left lateral position.

Up to June 2006, the Department experienced setbacks with regard to the quality of investigations and could not show consistent compliance. As a result, the Monitor continued its review of CUOF investigations during the Consent Decree extension period. It was around this June 2006 time period, and continuing for the duration of the extension period, that the Monitor noted a marked improvement in the overall quality of CUOF investigations. Although not perfect, the Monitor felt more comfortable in considering the merits of each individual CUOF investigation as a whole and whether individual items of non-compliance impacted[58] the investigation's overall quality and the ability of the reviewer to properly adjudicate officer actions. By the end of the second year of the extension, the Monitor concluded that, overall, the Department attained sustained substantial compliance with Decree requirements regarding the investigation of CUOF. The LAPD's CUOF investigations rightfully are now recognized as state-of-the-art best practices that are studied by other law enforcement agencies nationwide.

*Non-Categorical Uses of Force*

In connection with NCUOF, the Monitor, in its earlier reviews, was unable to easily determine whether or not witnesses were interviewed separately during early assessments of compliance. Although each interview was substantively reported separately, the date, time and location of interviews were not sufficiently documented. As such, the Monitor held the Department in non-compliance absent any additional information. Similarly with regard to evidence, both the Monitor and AD found the Department in non-compliance due to poor documentation procedures, particularly with regard to photographs of either the suspect or involved officers for evidence of injuries or lack thereof. Subsequently, the Monitor initiated a conversation with the CO of Risk Management, who advised the Monitor that the LAPD was aware of the deficiencies and was in the process of amending current policy to address them. The LAPD then developed and implemented Special Order No. 13, *Non-Categorical Use of Force Reporting – Revised*, dated May 26, 2004, which addressed the reporting and documentation issues.

---

[58] The Monitor excluded LAPD generated complaint alleging *Failure to Qualify, Failure to Appear* or a *Preventable Traffic Collision* from its calculation as these particular complaints are generated monthly.

During late 2003, the Monitor noticed improvements in the quality of NCUOF investigations in connection with documentation of collected evidence, time and place of the interview, and whether a group interview took place. The Monitor commended the LAPD for the marked improvement in the quality and consistency of NCUOF investigations. Much of the credit was attributable to the Department's commitment to issuing and revising policy and the Training Group's review of policy and procedures for completed NCUOF incident investigation.

During mid-2005, the UOFRS and the Department's Training Division continued to track and review all completed NCUOF investigations in order to identify deficiencies in the investigations and any training issues. If an investigative deficiency or training need was identified, either UOFRS or the Training Division would contact the appropriate manager via correspondence requesting an explanation or clarification of the issue. At times an officer involved in an NCUOF would receive remedial training from the Training Division.

As a result of these efforts, the Monitor found the Department in substantial compliance with requirements regarding NCUOF investigations at the end of the initial five-year term of the Decree. The consistent quality of the investigations and related quality control review provided the Monitor with sufficient assurance that the LAPD would continue with best practices, and additional monitoring during the Decree extension was not required. Subsequent AD assessments for the most part validated continued adherence to these best practices..

*IAG Complaint Investigations*

Beginning with the quarter ended December 2001 and continuing through the quarter ended March 2006, the Monitor, through sampling, reviewed complaint intake face sheets for evidence that the face sheet was forwarded to the PSB for review and classification within the 10-day period mandated by the Decree. As illustrated in the following chart, initially, the LAPD's compliance rate was relatively low, but over the course of time, the Review and Analysis Unit managed to steadily improve the Department's compliance with this requirement. This was accomplished despite an increasing number of complaints and an increasing number of underlying allegations. As a result of these efforts, the Monitor concluded that the Department was in substantial compliance with the requirements related to the review and classification of complaint face sheets at the end of the original five-year term of the Consent Decree. The related paragraphs were no longer actively monitored during the extension.

Case 2:00-cv-11769-GAF-RC   Document 399-2   Filed 06/11/09   Page 5 of 50   Page ID #:956



During the initial five-year term of the Consent Decree, the Department issued a number of directives providing guidance to officers and supervisors with regard to complaint investigations. Many of these practices were entrenched in LAPD complaint investigations prior to the Consent Decree, and the Department was largely faced with fine-tuning the requirements and improving overall quality.

Three requirements proved to be the most difficult for the Department and, therefore, were actively monitored during the Consent Decree extension: tape-recording interviews of the complainants, witnesses or officers; collecting and preserving evidence; and identifying and reporting inconsistencies in witness and officer statements.  Despite hiring freezes and an increasing caseload, the IAG's investigators stepped up to the challenge, completing quality complaint investigations.   Equally important, the Monitor witnessed steadily increasing improvement in the quality of manager review and related documentation, with some investigations returned to address open items.

During the quarters ended June 30, 2008 and December 31, 2008, at the request of and subsequent to an initial review conducted by the DOJ, the Monitor also reviewed complaint investigations that included an allegation of racial profiling.  During its first review, the Monitor identified significant deficiencies in approximately 25% of the completed investigations, calling into question the appropriateness of the review process and the ultimate adjudications.  The Monitor also noted disparities in the review and documentation of officer work history.

During its most recent review in December 2008, although significant issues were identified in approximately 10% of the complaint investigations, the Monitor noticed a marked improvement

in the quality of the investigations and rationale for the adjudications.  The Monitor notes that the LAPD's implementation of a revised *Biased Policing Investigation Protocol* addressed many of the concerns expressed by the Monitor and the DOJ with regard to interviewing all accused officers.

Based on its reviews and as a result of the various steps taken by the Department, the Monitor concluded that the LAPD achieved and sustained compliance with these three remaining requirements during the extension period.

*Chain of Command Complaint Investigations*

In early 2003, the Monitor began its review of COC complaint investigations completed after commencement of the Consent Decree and attempted to determine whether one could reasonably conclude that interviews were conducted separately, evidence was collected and preserved, and the area had been canvassed for witnesses.   More often than not, the investigations were not sufficiently or consistently documented with regards to the collection and preservation of evidence. As time progressed, the Department improved the quality of COC investigations, largely through the supervisory review process in which deficiencies were identified and returned to the investigator for correction.  By the second quarter of 2006, the Monitor noticed a sustained significant improvement in the quality of COC investigations, particularly with regard to the collection and preservation of evidence.  This improvement continued through June 2008, when the Monitor determined that, despite a few discrepancies, the Department had achieved substantial compliance with the requirement regarding COC investigations.  The related paragraphs were placed on inactive monitoring status.

On eight separate occasions during the term of the Consent Decree and its extension, the Monitor evaluated the LAPD's compliance with requirements related to the identification of any potential misconduct for additional investigation.   In some instances, the Monitor placed reliance on AD's audits.  In seven of the eight reviews, the Monitor concluded that the LAPD was in compliance with these requirements.  During the three-year extension period, the Monitor communicated to the LAPD all instances it identified in which there was evidence of additional misconduct on the part of an officer yet no indication that additional allegations were formulated to address the additional misconduct identified.  The Monitor concluded that these instances identified during the extension period did not impact the Department's substantial compliance with the pertinent requirements.

**Recommendations**

In order to maintain and improve the quality of complaint and use of force investigations going forward, the Monitor recommends the following:

- The LAPD should continue to train of all investigators assigned to either the FID or IAG, with such training to include many of the requirements of the Consent Decree. Although sometimes time-consuming, the Decree requirements are crucial to ensuring the overall quality of investigations. Training must emphasize the use of open-ended questions with all interviewees. For interviews of officers, investigators must strive to learn the intricacies of policy and be willing to question officers regarding their knowledge.

- The LAPD should continue to train all officers and supervisors on the definition of a CUOF and what is required of officers should a CUOF incident occur.

- The LAPD should continue to train officers and supervisors on the Hobble Restraint device and the proper treatment of individuals on whom the device is administered, particularly if they have exhibited signs of being under the influence of a substance. All officers need to understand the importance of immediately placing any hobbled individual in either the sitting or left lateral position in an effort to prevent asphyxia.

- The LAPD should regularly revisit LAPD jail procedures, particularly those identified as deficient by the UOFRB in connection with certain ICDs to ensure continued best practices when dealing with detainees with health and substance abuse issues. In sum, the Monitor believes that there has been measurable and sustained improvement in this area. The keys to success have been training and improved oversight. Those will be the keys to institutionalizing the gains made so far.

## 5.    Adjudicating Investigations

In line with its findings of inadequate investigations, the DOJ also concluded that poor information led to inadequate and problematic adjudication of civilian complaints. The LAPD's history includes a series of problematic events followed by insufficient investigations and a perception that the public was failed at the adjudication and discipline cycle of events. In reaching its conclusion, the DOJ reviewed LAPD policy statements, discipline reports and misconduct complaint files in which misconduct was alleged.

**Consent Decree Solutions**

In an effort to address the deficiencies identified by the DOJ in the adjudication of civilian complaints, the parties agreed to a number of procedural changes to the manner in which the LAPD must adjudicate investigations of alleged misconduct. Consistent with many other paragraphs of the Consent Decree, the agreed-upon changes served to supplement existing LAPD policy, procedures and practices. These procedural changes were intended to improve the overall quality and integrity of all complaint investigations.

Upon receipt of a completed complaint investigation, the LAPD was required to review the complainant's and accused officer's statements using standard California jury instructions. Additionally, all complaints were to be adjudicated using a preponderance of the evidence standard, and no complaint investigation could be closed without a final adjudication.[59] For complaints that were withdrawn, filed anonymously, filed by a person other than the victim of misconduct or if the complainant was unavailable to make a statement, the LAPD was required to make reasonable efforts to complete the investigation.

Taking into consideration variables that include an investigation's complexity, the availability of evidence and witnesses, and other extenuating circumstances, the LAPD was required to complete at least 51% of all complaint investigations within 150 days of the complaint initiation date.

### Overall Achievements of the LAPD

In its initial efforts to attain compliance with the investigative requirements regarding complaint investigations, the LAPD issued Administrative Order 12, "Investigating a Personnel Complaint and Evaluating Witness Credibility," on September 6, 2001. This order reiterated certain information already documented in pre-Consent Decree LAPD manuals to better align LAPD policy with Consent Decree requirements. The LAPD continued its efforts towards compliance by issuing additional policy during the first few years of the Decree, including Special Order No. 1 dated January 1, 2003, "Department Complaint Process – Revised." Special Order No. 1 was designed to, among other things, "hasten resolution of minor complaints, hasten responses to complainants, and appropriately and better utilize existing police resources."[60]

At the onset of the Consent Decree, the LAPD faced a considerable backlog of complaint investigations not yet entered into its Complaint Management System. By mid-2002, the LAPD made significant progress in reducing this backlog, recognizing that timely entry into the system was the first step toward timely completion of the investigations.

Toward the end of 2004, the LAPD proposed the use of Settlement Agreements wherein the Department and the involved officer negotiate acceptable terms and the officer agrees not to dispute certain allegations. In return, the officer, or a representative, negotiates a mutually acceptable discipline. The Monitor reviewed certain Settlement Agreements, noting that the discipline, in virtually all instances, was reasonable.

---

[59] Acceptable adjudications are *Sustained, Sustained-No Penalty, Not Resolved, Unfounded, Exonerated, Duplicate, No Department Employee, Insufficient Evidence to Adjudicate, No Misconduct* and *Withdrawn by the Chief of Police*.

[60] Other policies issued included Special Order No. 36, November 13, 2001; Chief of Staff Notice, May 9, 2002; Adjudicator's Confidential Work Sheet; and LAPD's Management Guide to Discipline, January 2002.

## Consent Decree Compliance

During 2002, the Monitor commenced selecting samples of complaint investigations for review that included assessing the LAPD's application of witness credibility, preponderance of the evidence and the final adjudication requirements. The Monitor's evaluations during the initial five-year period found that in some complaint investigations, undue preference was given to the officer against whom the complaint was alleged, and proper consideration was not given toward the civilians' or officers' histories, respectively. As such, the Department was held largely in non-compliance, and the Monitor continued to assess compliance with these requirements during the three-year extension period.

Over this same evaluation period, despite the findings of undue preference, the Monitor found that the LAPD, for the most part, adjudicated complaint investigations using the preponderance of the evidence standard and concluded that the LAPD was in compliance with the requirement to use one of the required resolutions. However, the LAPD did not demonstrate sustained compliance during the last two years of the initial term of the Decree, and the Monitor also continued to assess compliance with this requirement during the extension period.[61] This was largely the result of the use of an adjudication category denoted as *Other Judicial Review (OJR)* as reported by the Monitor during the quarter ended September 30, 2005. At that time, *OJR* was one of the agreed-upon adjudications, and it was utilized when a matter was heard in a judicial setting, during which time the underlying allegations of the complaint were ostensibly addressed. The Monitor noted that in several investigations selected for review that were adjudicated *OJR*, the LAPD did not follow its own internal policy, as the investigative files were devoid of documentation that the complainant, the complainant's attorney or the prosecuting attorney were interviewed or approached for interview. Most of the investigations reviewed also had no evidentiary hearing or any other documented review of the facts alleged in the complaint. Lastly, the complaint files were devoid of any specific court transcripts or dockets that would support whether the matter was truly addressed at any judicial proceeding.

The Monitor expressed concern that the *OJR* adjudication was a mechanism that permitted the LAPD to quickly render a decision on a complaint investigation in an effort to meet compliance requirements of the Consent Decree. In response, the LAPD issued Special Order No. 34, *Other Judicial Review as an Adjudication – Revised*, dated November 1, 2007, which rescinded the use of *OJR* as an adjudication.

Throughout the initial five-year term of the Decree, the Monitor reviewed samples of complaint investigations, some of which were initiated anonymously or by third parties. For virtually all reviewed complaints that were anonymous or filed by a third party, the Monitor concluded the Department made a good faith effort to identify the complainant and complete a thorough

---

[61] In assessing the Department's compliance with the undue preference and preponderance of the evidence requirements of the Consent Decree, the Monitor, at times, placed reliance on the AD's *Complaint Form 1.28 Investigations Audit.*

investigation. As a result, the Monitor concluded that the Department was in substantial compliance with the pertinent Consent Decree requirements, and assessment during the extension period for this particular requirement were placed on inactive status.

Beginning in the quarter ending March 31, 2003, and continuing through to the quarter ending March 31, 2006, the Monitor assessed the LAPD's compliance with requirements regarding the timely completion of complaints on five separate occasions. In assessing compliance, the Monitor analyzed reports generated by the LAPD that identified start and end dates for complaint investigations. The Monitor also completed analyses of completion rates separately for IAG-completed investigations versus COC-completed investigations. With the exception of one quarter, more often than not the LAPD completed complaint investigations within the 150-day mandated period. Understandably, IAG investigations are more complex, comprising multiple allegations lodged against multiple individuals, and require more time to collect the necessary evidence for adjudication and discipline. Additionally, IAG investigations require additional administrative mandates, such as tape-recording, not required of COC investigations. As such, the Monitor sought to determine that investigations, in aggregate, more often than not were completed within 150 days. In applying this methodology, the Monitor found the Department in substantial compliance at the end of the initial five-year period. The following chart summarizes the Department's compliance:



**Timely Completion**

## Recommendations

The LAPD should remain committed to adequately staffing and training IAG in order to ensure the continued timely completion of complaint investigations.  Supervisors must understand it is their duty to investigate and report the facts of each allegation of misconduct without bias. Equally important, reviewers of complaint investigations must take into consideration all facts and continue to reach fair conclusions that in many instances may result in an adjudication of "Not Resolved," meaning a conclusion cannot be reached whether the officer committed the alleged misconduct.

## 6.    Disciplinary and Non-Disciplinary Action

The Christopher Commission found that "the Police Commission receives summaries – prepared by the Department – of disciplinary actions against sworn officers and civilian employees involving charges of improper tactics, excessive force, discourtesy, or other significant misconduct carrying a suspension of five days or more.  The Police Commission itself cannot impose discipline on sworn officers.  By law, discipline of sworn officers is reserved exclusively for the Chief (subject to Board of Rights procedures and other limits on his discretion). Accordingly, the summaries received by the Police Commission are advisory only."

The Christopher Commission further reported that, "moreover, the summaries themselves do not encourage involvement by the Police Commission in discipline issues. They consist of a single, brief paragraph on each incident, describing the incident superficially and without any background detail. The incidents are not sorted by type, officer, or division, making it difficult for the Police Commission to spot trends or problem areas. The Police Commission does not have adequate time or resources to analyze the summaries and look for patterns." The report also indicated that "the Police Commission only receives the summaries about once a month, and they are not current. This system of reporting makes it impossible for the Police Commission to monitor systematically the discipline imposed by the Chief in use of force and other cases…But if the Police Commission cannot monitor disciplinary decisions, then it has no effective way to ensure that its policies are followed."

The DOJ's investigation concluded that "LAPD supervisors fail to supervise adequately LAPD officers carrying out their routine policing responsibilities," and supervisors do not "to the extent necessary, direct, evaluate and monitor officer performance in the field." The DOJ also found that the supervisory failures of the LAPD created an environment where officers could engage in misconduct without detection.

### Consent Decree Solutions

Under the Consent Decree, once a complaint investigation was completed, a manager was responsible for reviewing and evaluating its quality and completeness. This review included identifying underlying deficiencies and training needs. After the review and evaluation, the manager was responsible for implementing appropriate non-disciplinary action or making a recommendation to the proper LAPD entity to implement such action.[62]

After a complaint investigation was reviewed and open items or concerns resolved, the LAPD was required to inform the complainant in writing of its resolution, including the investigation's significant dates, general allegations and disposition.

The Consent Decree also required the Chief of Police to report to the Police Commission on the imposition of discipline during the previous calendar quarter no later than 45 days from the end of each quarter; a copy of the report was to be forwarded to the IG. The IG was required to review, analyze and report to the Police Commission on each Quarterly Discipline Report (QDR). The Police Commission must review the QDR with the Chief of Police and make an assessment of the appropriateness of the Chief of Police's actions, specifically with respect to CUOF.

---

[62] LAPD Manual Section 3/830.20 and the LAPD's "Department Guide to Discipline"

**Overall Achievements of the LAPD**

Prior to the Consent Decree, the LAPD had established a practice of having managers review complaint investigations for quality and completeness and to identify training needs. Sworn personnel at the rank of Sergeant I, Detective II or above received training that included complaint review, documentation of review and documenting disciplinary or non-disciplinary action. It was also the LAPD's policy to provide the complainant with a written notice of an investigation's resolution.[63] Subsequent to the Consent Decree, sworn personnel at the rank of Sergeant I, Detective II or above received training that included complaint review, documentation of review and documenting disciplinary or non-disciplinary action.

Despite having policy in place, the LAPD struggled to comply with the requirements of this section. During the summer of 2003, in an effort comply with the requirements and to address poor performance, particularly with regard to the complainant notification requirements, the LAPD implemented a policy change directed at the complaint review process. The policy change, among other things, required that a communication be forwarded to the complainant if a complaint remained open after a period of five months. Soon after the implementation of this policy change, the Monitor noticed a marked improvement in the accuracy and quality of the LAPD's communications with complainants. In the summer of 2003, the Department also implemented a requirement that complainants be notified if their complaint had not been completed within a five-month period.

Although the Consent Decree did not require that QDRs be made public, the LAPD opted to make them public documents. The Monitor commended the LAPD for this decision. The LAPD developed a revised QDR, which was generated for the first quarter of 2002, to correct deficiencies that were identified in prior reports by the IG. The Monitor viewed the revisions and additions made by the LAPD as a significant improvement over the previous report. At the end of 2002, the Department made critical modifications to its discipline report database that facilitated the inclusion of narrative summaries in the QDRs. This directly addressed early concerns expressed by the Monitor regarding the timeliness of the information presented in the QDRs and the lack of detail presented.

**Consent Decree Compliance**

*Managerial Review and Evaluation*

In order to assess the above requirements, the Monitor requested listings of completed complaint investigations and selected random samples to review. Where possible, the Monitor also placed reliance on the AD's *Complaint Form 1.28 Investigations Audit*. Over the course of

---

[63] LAPD Manual 3/820/11 and the Chief of Staff Notice "Referencing the Investigation Date for Complaint Investigations," dated May 9, 2002

the initial five-year term, the Monitor reviewed thousands of complaint investigations and the related manager reviews and letters to complainants. For the most part, manager reviews were sufficient and contained requisite rationale on the officer's actions, with consistent and appropriate recommendations for either disciplinary or non-disciplinary action.[64] This trend generally continued throughout both the initial and extension periods of the Decree.

In all but one quarter, the Monitor determined that the LAPD was in compliance with requirements regarding manager reviews of complaint investigations.

Although the Monitor concluded that the LAPD was in substantial compliance with these requirements at the end of the initial term of the Decree, during its reviews, the Monitor did note several investigations in which the manager either did not identify an incomplete investigation or did not properly document and address a pattern of behavior of misconduct. In some instances, the manager withdrew the investigation based on his or her own interpretation of the facts and knowledge of the officers against whom the complaint was alleged. This prompted the Monitor to extend its assessment of manager review into the extension period.

By the end of 2007, the Monitor concluded that the LAPD attained substantial compliance with requirements regarding manager review of complaints. The related paragraphs were no longer actively monitored during the remainder of the extension. The following graph summarizes the Department's compliance for the periods assessed:

---

[64] In most instances, non-disciplinary action consists of recommending training, whether divisional or formal, for the accused officers. Disciplinary action ranged from an Official Reprimand to a termination based on the seriousness of the offense and the officer's work and disciplinary history.



**Complaint Evaluation by Manager**

With regard to notification to the complainant once an investigation was completed, in early assessments, the Monitor determined that the policy was not necessarily followed.  The Monitor noted that although the communications were sent to the complainant, the communications either did not document all required dates or did not adequately document the general allegations of the complaint.

The implementation of the policy change described above resulted in significant improvements in the LAPD's communications with complainants, and the Monitor found that the LAPD achieved substantial compliance during the last two years of the initial five-year term of the Decree.   The following graph summarizes the Department's compliance for the periods assessed:



## Notification to Complainant

*Chief of Police and Police Commission Reviews*

Early during the term of the Decree, the Monitor expressed concerns about the timeliness of information presented in the QDRs.  The Department continued to report discipline imposed after the case was closed, rather than the quarter in which discipline was imposed, as required. The Department expressed that due to the limitations of the previous complaint tracking system, the timeliness of data entered for use in the QDR did not allow for such reporting. However, the Department represented that the planned CMS would further enhance the timeliness of information included in the QDR.

At the end of 2003, in an effort to enhance the timeliness of QDR information, the Department began closing complaint cases prior to submission to the OIG for review.  The IG supported this modification since complaint cases were being selected for review by the OIG on a sample basis, and the IG has the ability to request the Department to reopen a case if, in the IG's opinion, it was appropriate to do so.

The Monitor found that the Department's QDR for the third quarter of 2003 contained inconsistent information and was not timely approved by the Commission.  Lastly, the QDRs for the third and fourth quarters of 2004 and 2005 were submitted in a timely manner, provided appropriate statistical data to reflect the outcome of the discipline imposed during the respective quarters and were presented in an adequate format.

During its initial reviews, the Monitor found that the Commission's written assessments of the discipline imposed by the Chief of Police mentioned CUOF cases but made no specific mention of their assessment of the discipline imposed.  The IG's reviews of the QDRs for the third and fourth quarters of both 2004 and 2005 were timely, and the Police Commission received and approved the IG's review within the 75-day requirement included in a modification to the Decree.[65]

In sum, prior to the extension of the Decree, the Monitor concluded that the Department achieved substantial compliance with all requirements of this section of the Decree.  Except as noted above with respect to requirements regarding manager reviews of complaint investigations, the Monitor did not assess compliance with these requirements during the extension period.

**Recommendations**

The LAPD should continue its efforts to notify complainants after the initial five-month period of the status of their complaint investigation, whether completed or still in process.  This provision allows the complainant, as well as the community, to know that the Department is sensitive to allegations of misconduct lodged by the public.

The Monitor recommends that managers continue to receive training on the review of complaint investigations, with emphasis on rationale and the interpretation and evaluation of witness credibility.  Managers must continue to approach and review every investigation completely and impartially, no matter how familiar the facts.  Regarding training, managers should look more closely at providing officers with informal divisional or directed training in order to provide them with the skills necessary to performing their duties.

## 7.    Internal Affairs Group

In its *May 2000 Letter Report* to the City of Los Angeles, the DOJ concluded that within the LAPD there were "[s]erious deficiencies in City and LAPD policies and procedures for training, supervising and investigating and disciplining police officers," and these deficiencies "perpetuate and foster officer misconduct."  Also of concern for the DOJ was the LAPD's failure to utilize "meaningful personnel evaluations."

---

[65] In the first quarter of 2005, the Consent Decree was modified by the Court after agreement by all parties to change the length of time that the Police Commission has to review the Chief of Police's Discipline Report provided by the OIG from 45 to 75 days.

On a daily basis, the LAPD is in receipt of or is otherwise aware of potential misconduct by officers, and it had in place a set of policies and procedures to address misconduct. The Monitor's interpretation of the DOJ's letter is not that there was not a system in place to investigate officers, particularly for alleged serious misconduct, but, rather, that the system in place was not effective.

### Consent Decree Solutions

Prior to the Consent Decree, the IAG historically was tasked with investigating the more egregious allegations of misconduct. The Consent Decree set out to specifically identify those allegations of misconduct that were to be investigated solely by the IAG.[66] Similarly, recognizing the sensitivity of certain allegations involving officer credibility, the Consent Decree mandated IAG investigation of the following:

- A civilian charged with interfering with a police officer, resisting arrest or disorderly conduct and either the prosecutor or the judge dismisses the charge(s) based on officer credibility;

- Instances in which evidence was suppressed because of a constitutional violation involving potential officer misconduct;

- Instances in which an officer was arrested or charged with a crime other than a low-grade misdemeanor; or

- Initiation of a misconduct investigation by a judge or prosecutor during the course of an official proceeding.

Complaint investigations involving serious misconduct understandably require substantial resources and, in many instances, a great deal of time. While in a perfect world any applicant to the IAG would have prior investigative experience, the reality is that this is not always the case. To meet the anticipated increase in IAG responsibilities under the Decree, the LAPD was required to dedicate the necessary resources to IAG. Parallel to this, the LAPD was also was required to screen IAG applicants and, when filling positions, take into consideration prior investigative experience and, equally important, the applicant's work history.[67]

---

[66] Paragraph 93 of the Consent Decree requires IAG investigation for any of the following allegations whether in a complaint, civil suit or claim for damages: unauthorized uses of force, invidious discrimination, unlawful search, unlawful seizure, dishonesty, improper behavior involving narcotics or drugs, sexual misconduct, theft or retaliation/retribution against an officer or civilian.

[67] Officers applying for IAG positions with a sustained investigation or discipline for the use of excessive force, a false arrest or charge, or an improper search or seizure, sexual harassment, discrimination or dishonesty are disqualified unless the IAG CO justifies their hiring in writing.

Once selected and retained by the IAG, an investigator's initial term of duty was limited to three years. Reappointment was allowed only after sufficient review and documentation attesting to the investigator's competency. An investigator could be removed from their tour of duty at any point in time for acts or behavior that might have disqualified them for selection in the first instance. Investigator evaluations, assessing their competency in following policies and procedures, were to occur regularly with periodic retraining and reevaluation.

Lastly, given that the nature of complaint investigations assigned to IAG, investigators might very likely identify facts indicating criminal conduct. It was required that whenever such facts or indicators were identified, the LAPD was obligated to refer the matter to the appropriate criminal prosecutorial authority for consideration.

## Overall Achievements of the LAPD

Just prior to and during the first 18 months of the Consent Decree, the LAPD implemented a number of policies, either in the form of Special Orders, Directives or other communications, to address the structure and staffing of its existing IAG.[68] In April 2001, to address misconduct allegations that arise or occur during court proceedings or involving serious criminal allegations against an officer, the LAPD issued a number of Department-wide directives defining IAG investigative responsibilities. In March 2002, the LAPD issued its transition plan that, among other things, established the IAG's investigative responsibilities to align with the requirements of the Consent Decree.[69] From April2002 through December 2002 the LAPD orderly transferred investigative authority, pursuant to the Consent Decree, to the IAG.

Beginning with the quarter ending December 31, 2003, the Department was able to significantly reduce accumulated complaint investigations, largely through its commitment to exempt the IAG from a transfer freeze that was in place. The LAPD also continued its pre-Consent Decree practice of allowing a temporary tour of duty for supervisors to cycle through the IAG. This served many purposes, first and foremost of which was to provide the IAG with additional manpower to address accumulated complaint investigations. It also allowed the IAG a narrow time period to identify strong candidates for a permanent transfer to the IAG. These moves helped the Department overcome difficulties it had been having in complying with Decree requirements related to IAG staffing.

The LAPD required all commands, on a weekly basis, to produce a listing of all pending complaints not yet completed nearing the one-year statute deadline. This exercise, which was

---

[68] These Special Orders and Directives are referenced in the Use of Force and Conduct of Investigations sections of this report.

[69] On September 27, 2002, the LAPD issued a revised Transition Plan to address transition of claims for damages and theft and dishonesty complaints.

designed to reduce the number of matters submitted past statute, enabled the Department to achieve compliance with Decree requirements governing criminal referrals of misconduct to prosecutorial authorities.

**Consent Decree Compliance**

Commencing during the quarter ending March 31, 2003, and continuing through the quarter ending June 30, 2006, the Monitor reviewed samples of complaint intake documentation on five separate occasions and determined that the LAPD was in compliance with regard to appropriately assigning investigative responsibility either to the IAG or COC.[70] At the end of the initial five-year period of the Decree, the Monitor concluded that the LAPD was in sustained substantial compliance with this requirement, and the requirements were not actively monitored during the extension. The following graph summarizes the history of compliance for the assignment of investigations to the IAG:

---

[70] Occasionally, while assessing other complaint investigation Consent Decree paragraphs, the Monitor happened upon investigations that should have been assigned to the IAG and were improperly assigned to COC. Such instances were brought to the attention of the LAPD.



## Assignment of Complaint Investigations to the IAG

Although the LAPD fastidiously defined the IAG's investigative authority, it initially struggled to adequately staff the IAG. Through reviews of staffing documentation, personnel transfer orders and interviews of personnel, the Monitor reported staffing was in direct contravention of Consent Decree requirements. Additional assessments of staffing and complaint investigation backlog yielded predominantly non-compliance ratings through the Monitor's assessment in the quarter ended December 31, 2003. It was during this quarter the Monitor noted a material reduction in accumulated investigations, which was, as mentioned above, largely attributable to the LAPD's commitment to exempt the IAG from the transfer freeze.

Starting with its evaluation in the quarter ended December 2004 and continuing through a final evaluation in March 2006, the Monitor held the Department in compliance with regard to adequate IAG staffing. As described above, the Department's achievement of substantial compliance was, in large part, attributable to its continuation of a temporary tour of duty for supervisors to cycle through the IAG and commitment to training.

Again, starting with the quarter ending June 30, 2002, and continuing through the quarter ending March 31, 2006, the Monitor assessed the LAPD's compliance with requirements for establishing a term of duty in conformity with the requirements of paragraph 99. At the onset of the monitoring period, the LAPD implemented policy requiring an IAG investigator wishing to extent their tour of duty as an investigator to complete a Notification/Request form six months prior to the expiration of their term. In all five assessments, the Monitor noted that for those investigators whose terms exceeded three years, the LAPD maintained documentation of a complete review of the investigator's proficiency and for the entire period assessed, none of the

officers had a complaint history containing disqualifying behavior.  As such, the Monitor concluded the LAPD was in substantial compliance, and the requirements were not actively monitored during the extension.

Prior to the Consent Decree, the LAPD's practice was to evaluate supervisors assigned to the IAG.  During the assessment period, although the LAPD's goal was to annually evaluate IAG supervisors, during an earlier assessment period the Monitor noted that although the evaluation was documented, it was late.  However, during the remainder of the initial five-year assessment period, the Monitor noted evaluations were completed timely and thoroughly for most investigators.  Based on these findings, the Monitor deemed the LAPD in substantial compliance and elected not to actively monitor compliance with this requirement during the extension.[71]

As of the implementation of the Consent Decree, the Los Angeles DAO established a documented protocol for referral of alleged criminal misconduct by law enforcement personnel.[72]  During the quarter ended March 31, 2003, and continuing through the quarter ended September 30, 2005, the Monitor assessed the LAPD's compliance with regard to criminal referrals of officer misconduct on three separate occasions and found the LAPD in compliance each time.

Shortly after its initial assessment, allegations surfaced that the LAPD had a history of referring matters for prosecutorial consideration after the statute of limitations expired.  Members of the Monitoring team met with PSB representatives and quickly ascertained that the allegations related pre-Consent Decree cases.  Furthermore, as mentioned above, the LAPD's move to require all commands, on a weekly basis, to produce a listing of all pending complaints not yet completed nearing the one-year statute deadline was a significant factor in achieving compliance.  The purpose of this exercise was to reduce the number of matters submitted past statute.  For all three assessments, in the rare instances when the Monitor noted matters were referred past statute, information provided by the prosecutorial authority confirmed the matter was refused, not because of late filing, but rather because there was insufficient evidence.  All in all, the Monitor concluded the Department was in substantial compliance with regard to criminal referrals of misconduct to prosecutorial authorities.

---

[71] The Monitor also reviewed listings of training sessions attended by investigators for reasonableness and listings of training topics covered that, in the Monitor's opinion, were relevant.

[72] *Protocol for the Referral of Allegations of Criminal Misconduct by Law Enforcement Personnel to the Los Angeles County District Attorney*

### Recommendations

The importance of thorough complaint investigations, particularly of those complaints involving serious allegations, cannot be overemphasized. Such investigations provide the reviewer(s) the necessary information to make important judgment calls that, in some instances, lead to more difficult disciplinary decisions. The LAPD must continue its commitment to adequately staff the IAG and train and mentor its investigators. In many respects the adequacy of complaint investigations, the foundation of which is the investigator's competency, is the catalyst of public trust and the deterrent of unacceptable behavior.

## 8.    Non-Discrimination Policy and Motor Vehicle and Pedestrian Stops

One of the major findings of the Christopher Commission was that "the problem of excessive force is aggravated by racism and bias within the LAPD." In the background section of its report, the Commission noted that in August 1965, the Governor's Commission on the Los Angeles Riots said in its report that there is "a deep and longstanding schism between a substantial portion of the Negro community and the Police Department" and recommended that the LAPD hire more minority officers. The Commission also noted the Blake Consent Decree of 1981, in which the LAPD agreed to settle discrimination suits by setting hiring goals for women, African-Americans and Latinos. In its review of patrol car transmissions, the Commission found a significant number of offensive remarks based on the race, gender and sexual orientation of both suspects and fellow officers. Additionally, the Commission found that female officers were having a difficult time being accepted on a full and equal basis. In its interviews, the Commission heard complaints of how African-Americans and Latinos were placed in the "prone-out" position "under circumstances that did not present any risk or harm to the officers and that did not involve a felony warrant." It recounted complaints of being "stopped in parts of the City where they might be considered out of place" and noted "the frequency and manner of use of police dogs in minority neighborhoods." The Christopher Commission made seven recommendations in this area, including that the Chief of Police should seek tangible ways to "establish the principle that racism and ethnic and gender bias will not be tolerated within the Department" and that the LAPD had to "establish a program of cultural awareness training to eliminate stereotypes for all officers."

The *March 2000 BOI Report* noted that "Rampart Area's demographics played a significant role in this corruption incident," as Rampart is "densely populated with predominantly Spanish-speaking people who have immigrated to the United States from Central American countries." It continued that many are "undocumented aliens who fear they will be deported by the police."

### Consent Decree Solutions

The Consent Decree required the LAPD to "continue to prohibit discriminatory conduct on the basis of race, color, ethnicity, national origin, gender, sexual orientation, or disability in the conduct of law enforcement activities." It also required the Department to "continue to require that, to the extent required by federal and state law, all stops and detentions, and activities following stops or detentions, by the LAPD...be made on the basis of legitimate, articulable reasons consistent with the standards of reasonable suspicion or probable cause." The Consent Decree further mandated that "LAPD officers may not use race, color, ethnicity, or national origin (to any extent or degree) in conducting stops or detentions, or activities following stops or detentions, except when engaging in appropriate suspect-specific activity to identify a particular person or group," and they "may not give race, color, ethnicity or national origin undue weight."

The Decree also mandated that the Department require LAPD officers to complete a written or electronic report each time an officer conducts a motor vehicle or pedestrian stop by November 1, 2001. The data collected was required to include information such as the officer's serial number; driver's apparent race, ethnicity, or national origin; driver's gender and apparent age; reason for the stop; and whether the driver was required to exit the vehicle. This information was also required to be collected if a warrantless search was conducted.

### Overall Achievements of the LAPD

While the Department has fallen short of substantial compliance with the Consent Decree requirements in this area, this is clearly not reflective of a lack of effort on the part of the City or the Department. The major problem in determining compliance has rested with the difficulty, despite best efforts, in determining whether biased policing is occurring and, if so, to what extent, if any, it is systemic as opposed to isolated misconduct.

As described below, great strides have, in fact, been made by the City and Department to address biased policing during the eight years under the Decree. Training has been tremendously enhanced, and new rules have been promulgated relating to the investigation of biased policing complaints. In addition, the City and Department have committed to the installation of video cameras in patrol vehicles. It should be noted that there are significant indications that biased policing that may have been occurring at the inception of the Consent Decree has been significantly reduced. Specifically, opinions of minority communities about the LAPD have steadily improved under the Consent Decree.[73] Likewise, the minority composition of the Department has steadily increased.[74] Because substantial compliance was not achieved during the Consent Decree, biased policing is addressed in the Transition Agreement.

---

[73] See *Harvard Kennedy School Report*.

[74] *Ibid.*

**Consent Decree Compliance**

The Department issued Special Order No. 23 in August 2001, which prohibits all forms of invidious discrimination.  Training on field data collection began in October 2001, and the LAPD began collecting motor vehicle and pedestrian stop (MV&PS) data in November 2001, on FDRs. At first, there was a significant backlog of FDRs that had not been entered into the system.  The Department released six months of field data to the public.  This data was collected from July 1, 2002, to December 31, 2002, on its website, the first such data to be posted.

On its own initiative, the Department committed resources to the development of a Portable Officer Data Device System (PODDS) in the hopes of streamlining the reporting process required by the Decree.  The LAPD began using the PODDS device to collect stop data in May 2004.

The Department released a Request for Proposal (RFP) for analysis of the stop data collected from the field by officers completing FDRs[75] on May 14, 2003, with a response date of no later than July 15, 2003.

Training on the new FDR, implemented July 1, 2003, incorporated a significant non-discrimination component.  This served to further the Department's commitment to prevent discriminatory practices.  The Department incorporated interactive problem-solving training exercises in both CEDP Module VI, "Weapons of Mass Destruction," and Tools for Tolerance II trainings.  This thoroughly addressed issues involving discrimination, with a particular emphasis on race.  The Module VI training demonstrated to the Monitor that the LAPD is capable of creating and properly executing training that effectively instructs officers about biased policing and the Department's commitment to prevent such practices.

In July 2003, the LAPD redesigned its FDR form to correct design flaws and issued Special Order No. 29, *Data Collection for Motor Vehicle and Pedestrian Stops*.  The LAPD began Department-wide training on the new form, as well as training on the Department's non-discrimination policy and the Fourth and Fourteenth Amendments to the U.S. Constitution.  All of these were in secondary compliance with the requirements of these paragraphs.

AD completed its first *Motor Vehicle and Pedestrian Stop Data Collection Audit* in August 2003.[76]

---

[75] The Department is required to collect specific field data for specified discretionary stops according to paragraphs 104 and 105 of the Consent Decree.

[76] AD also conducted *Motor Vehicle and Pedestrian Stop Audits* and follow-up reviews in 2004, 2005, 2006 and 2007. AD did not conduct a Motor Vehicle and Pedestrian Stop Audit during Fiscal Year 2007-08 due to the City's request and does not plan on conducting one until the fourth quarter of Fiscal Year 2008-09.  A more detailed discussion of AD's work on this audit can be found in the audit section of this report under Paragraph 128(4).

The City, working through the Analysis Group, Inc.[77] prepared and released the "Final Pedestrian and Motor Vehicle Stop Data Analyses Methodology Report," dated December 8, 2005.  In developing the methodologies contained in the report, the City reviewed the "Proposed Pedestrian and Motor Vehicle Stop Data Analyses Methodology Report," dated January 19, 2005.  Public comments were solicited on that report, and responses to the public comments received.  The City also posted the Report on its website.[78]

The Analysis Group, Inc. prepared and released the "Pedestrian and Motor Vehicle Post-Stop Data Analysis Report" on July 7, 2006.  The report was also posted on its website.[79]  The report analyzed the LAPD's stop data collected from July 1, 2003, through June 30, 2004.  The analysis performed indicated that while controlling for characteristics of the stop generally reduces the racial disparity in post-stop outcomes, significant disparities remain.  Specifically, unexplained racial differences occurred most frequently for non-gang officer requests to exit the vehicle, pat-downs/frisks, and higher discretion searches.  The report suggested that variables not considered by the study could possibly account for such differences.  Still the report ultimately did not fully explain the disparity of the raw numbers or determine to what extent, if any, LAPD police officers were engaging in racial profiling.

On October 20, 2008, the ACLU of Southern California released a report prepared by Professor Ian Ayres of Yale University titled "A Study of Racially Disparate Outcomes in the Los Angeles Police Department."  The report consisted of an analysis of the same data that was analyzed by the Analysis Group in 2006.  The study found substantial racial disparities in post-stop action.  Based on the report, the ACLU made the following recommendations:

- The Department should continue to collect data on stops through TEAMS II.  In addition, the Department should make better use of the data to identify officers or units with significant racial disparities by analyzing the data on at least an annual basis.

- The Department must further reform the racial profiling complaint process.

- IG should be given powers and resources to review the complaint investigations in real time.

- The Department should adopt additional anti-bias training focused on helping officers identify and eliminate even latent bias in policing decisions.

---

[77] The Analysis Group, Inc. was the vendor selected by the Department to develop a methodology to analyze the field data in order to determine if the disparity can be explained and, if so, what those explanations are.

[78] The Report can be viewed at **www.lacity.org/lapdstops**.

[79] The Report can be viewed at **www.lapdonline.org/consent_decree/content_basic_view/32822**.

- The Department should reduce the disparate impact of consensual searches by requiring officers to inform subjects who they request to search that they have the right to refuse the search.

The Police Commission dedicated a large part of its August 19, 2008 meeting to the topic of racial profiling. Presentations were made by the PSB command staff, the Police Commission Executive Director and an expert on racial profiling. The Commission concluded that disparate treatment exists among different racial and ethnic groups nationwide for both stops and after-stop actions. The Commission noted that law enforcement agencies across the country reported no sustained profiling complaints, primarily because they are virtually impossible to prove. However, the Commission agreed that it would be incorrect to believe that racial profiling is not occurring. Based on that conclusion, the Commission approved the following recommendations:

- The Department must provide a quarterly report to the Commission on the number of complaints of racial profiling received and adjudicated by Bureau and Area.

- The IG must prepare an audit of racial profiling complaints that have been investigated and adjudicated since training has been provided to all Internal Affairs (IA) investigators. This training dealt with utilization of the Racial Profiling Investigation Protocol and Racial Profiling Investigation Check List.

- The Department must include a review of the Digital In-Car Video System (DICVS), if available, in the Racial Profiling Investigation Protocol and Racial Profiling Investigation Check List.

- The Department must revise the Alternative Complaint Resolution (ACR) process to allow some complaints of racial profiling to be resolved through mediation.

- The Department must change the term from "Racial Profiling" to "Biased Policing," The concern was to be more inclusive of other biases, including religion and sexual orientation. Also, the Department must refine complaints of Discourtesy to the specific nature of the misconduct alleged.

As requested by the Police Commission, the LAPD responded to the ACLU's report at the Commission's meeting of January 13, 2009. The Department reiterated its commitment to eliminating biased policing by outlining the steps it has taken in this area:

- Focusing recruiting efforts on all areas of the City in order to reflect the diversity of the City.

- Exploring bias in hiring caused by questions in the polygraph portion of background checks.

- Integrating the topic into more than 200 courses for both Recruit and In-Service Training.

- Promoting minorities to command-level positions as more are hired.

- Recording stops through the use of in-car video.

Additionally, IAG updated the *Biased Policing Investigative Protocols*, and the Police Commission approved them at its meeting of December 9, 2008. The protocols, which took effect on January 1, 2009, require officers to articulate their complete reasons for conducting traffic and pedestrian stops. Under the IAG's November 2007 protocols, racial profiling cases were not allowed to be approved for closeout unless the protocols were followed. Additionally, the IAG implemented the following strategies:

- Amended the Complaint Investigation Checklist to include fields that query whether the protocols were followed and whether the Racial Profiling Checklist was included.

- Conducted four Internal Investigations courses that include a four-hour block of instruction on investigating racial profiling allegations.

- Designated an auditor to coordinate review of racial profiling cases to ensure consistency and adherence to the protocols. This individual also compiles information in an ad hoc database to further evaluate racial profiling investigations.

- Conducted occasional undercover surveillance to probe specific allegations of racial profiling.

At the end of March 2009, in an effort to achieve compliance with the data collection requirements of the Consent Decree, the Department developed and implemented Citywide an automated reporting system at the Area level. This system incorporates the collection of stop data as approved by DOJ and provides for its storage in TEAMS II. This system was devised as a result of the Department's inability to analyze and draw conclusions from the aggregate data and the significant expense of replacing the data collection devices, or PODDS. Data collection capability had diminished due to the degradation of the existing hardware at the time, although the Department continued to collect stop data.

Additionally, the City and Department have continued to move toward Department-wide implementation of cameras in cars (DICVS), which the Monitor has strongly endorsed and recommended as a best practice in monitoring potential bias in stops. The DICVS will help protect against biased policing while enhancing officer safety and risk management analysis, and mitigating liability claims. The first phase of the project will deploy cameras in South Bureau patrol vehicles by late summer 2009. All of the hardware and servers are installed in City Hall East and the Southeast, Southwest and 77th Area stations. Cameras have been installed in all patrol cars for Southeast, Southwest, 77th and Harbor Areas. The field testing of cameras by LAPD for functionality began in March 2009. Upon completion of the field tests and verification that the system is operating correctly, Southeast Area will be the first to have complete installation, followed by Southwest, 77th and Harbor Areas shortly thereafter. The Department plans on taking the following steps once the DICVS is in operation:

- Conduct regular audits of the audio and video, in addition to periodic inspections by supervisors.

- Bookmark and review the DICVS data from any incident involving vehicle pursuits, uses of force, incidents resulting in personnel complaints or other significant events.

- Review DICVS data relative to lawsuits or claims for damages.

- Conduct quality of service audits.

- Use DICVS data to identify and/or monitor at-risk officers who are subject to the Risk Management Executive Committee's oversight.

- Afford the OIG unfettered access to the DICVS data.

As mentioned above, the Department has not achieved substantial compliance with the requirements of this section of the Consent Decree, which are included in paragraphs 102-105. As noted in the Reports for the quarters ending September 30 and December 31, 2008, the Monitor is confident that the steps envisioned by the City to enhance the process and provide alternatives to the current method of data collection will, when fully implemented, sufficiently satisfy the requirements of the Consent Decree.


## Recommendations

The Monitor commends the City and the LAPD for the significant steps they have taken and the accomplishment they have achieved in their efforts to comply with the Consent Decree requirements regarding biased policing.  With new policies and procedures in place, and the continued oversight role of AD, the Police Commission and the OIG to ensure that the policies and procedures are followed, deficiencies corrected and recommendations implemented, the Monitor is confident that the Department is on track to comply with these requirements.  In addition to the Police Commission requirements noted above, the Monitor offers the following recommendations regarding biased policing:

- The LAPD has plans to equip all patrol cars with in-car video cameras.  This initiative is critical and will protect against biased policing while enhancing officer safety and risk management analysis, and mitigating liability claims.

- The Police Commission and/or OIG should conduct a periodic evaluation to assess the effectiveness of the biased policing investigative protocols in order to enhance public confidence in investigations of biased policing complaints.

- The Police Commission should continue to direct the LAPD to provide quarterly updates on efforts to address biased policing.

# C.    Management of Gang Units

The Consent Decree reforms in connection with the management of gang units grew out of the Rampart corruption scandal.  The LAPD's internal probe into the administrative and operational failures that came to light during the internal investigation into wide-ranging misconduct identified the lack of supervisory oversight of the CRASH units as a significant problem within the Department.

The *March 2000 BOI Report* identified the need for the Department to focus on monitoring and reducing gang activity and establishing a closer working relationship between detectives and gang officers in order to develop a truly investigative gang operation with adequate responses to gang activity.  The findings also stressed that a Department-wide audit of gang units should continue, but needed to be more comprehensive in terms of the depth of both subject matter and sampling.  Specifically it was recommended that each gang unit's work product be audited to determine responsiveness to gang problems and supervisory practices including the span of control between gang supervisors and officers.

**Consent Decree Solutions**

Regarding the management of gang units, the Consent Decree required that each gang unit was to be assigned to an Area or bureau, and managed and controlled by the Area or bureau command staff.  The Citywide and Bureau Gang Coordinators (BGCs) were to direct the Bureau-wide and Citywide activities of these units, provide training and technical assistance, and help coordinate and provide information for the audits of these units.

The Consent Decree also established eligibility criteria for the selection of non-supervisory and supervisory officers in these units, and mandated that non-supervisory and supervisory officers were not to be reassigned to a unit until 13 LAPD Deployment Periods had lapsed since their previous gang assignment as an officer or supervisor.  In addition, supervisors were required to document in writing their consideration of any sustained complaint, adverse judicial finding, discipline for use of excessive force, false arrest or charge, improper search and seizure, sexual harassment, discrimination and/or dishonesty in determining selection of an officer in these units.  The procedures for the selection of all officers to the gang units was to include a formal, written application process, oral interview(s), and the use of TEAMS II and annual performance evaluations to assist in evaluating the application.

The Consent Decree also addressed tour limitations for gang personnel.  Both supervisors and officers in the gang units were required to have limited tour assignments not to exceed 39 LAPD Deployment Periods.  An extension of such assignment for up to three LAPD Deployment Periods was allowed with written approval of the bureau CO, and any longer extension required written approval by the Chief of Police.

Unit supervisors and non-supervisory officers in a gang assignment were to be subject to existing procedures regarding detention, transportation, arrest, processing and booking of arrestees. In addition, a variety of reforms which had been initiated after the *March 2000 BOI Report* were to continue. These included: the wearing of Class A or C uniforms; the use of marked police vehicles for all activities; the requirement to check out and return all field equipment from the Area kit room on a daily basis; the requirement to attend scheduled patrol roll calls; and the requirement to base unit activities out of Area stations and the prohibition against holding arrestees or interview witnesses at off-site locations.

Additionally, gang unit supervisors were required to perform specific daily activities, including providing a daily field presence and maintaining an active role in unit operations. Supervisors were also required to brief the Area watch commander regularly regarding the activities of their units and coordinate unit activities with other Area supervisors. Area managers were required to ensure that supervisors exercise proper control over these units and provide oversight over planned tactical operations.

Lastly, BGCs were required to monitor and assess the operation of all units that address gang activity in their respective bureaus. They were required to inspect and audit at least one Area unit per month and submit audits to bureau, Area, OHB and Detective Support Division (DSD) COs and to the LAPD's AD.

## Overall Achievements of the LAPD

The Department has made substantial strides toward a better trained and supervised gang unit and toward compliance. However, the Department has not met the >94% level of compliance for many aspects of the gang unit mandates, and more work needs to be done.

Over the course of the original term of the Consent Decree and its extension, the Department successfully put into place various policies and procedures that established best police practices for the management of gang units, many of which were initiated prior to the formal implementation of the Consent Decree. Those requirements which were met during the initial term included Citywide and Bureau-wide gang unit coordination, some of the minimum selection criteria requirements for gang officers and supervisors, uniform and vehicle requirements, Area kit room procedures, attendance of patrol roll call, keeping base activities in Area stations and not holding arrestees at off-site locations at night.

In addition, during the initial term of the Decree, the Department met challenges which arose. Before the Consent Decree became operative, the review of the Rampart scandal caused the LAPD to reorganize the units that police gang-related crime. These new gang units, called Special Enforcement Units (SEUs), reported to command staff in their respective stations and were supported by the DSD. The Department also established new monitoring procedures and requirements of selection of gang personnel, as well as tour limitations and operational procedures, as required by the Consent Decree.

As a result of the new unit being staffed entirely in March 2000, the Consent Decree's mandate of term limits for these officers became problematic with most personnel scheduled for cycling out during the summer of 2003. Based on the Monitor's recommendation, the LAPD devised a strategy of staggering its deployment periods and prepared an SEU Transition Plan, dated August 16, 2002, which was approved by the Police Commission.

The Department established two additional significant policies related to gang units during the course of the Consent Decree. First, Special Order No. 27, *Selection and Assignment to Gang Enforcement Details*, dated July 10, 2003, established procedures for selection and assignment to a gang unit and tour limitations, per the Consent Decree. Second, Special Order No. 7, *Gang Impact Teams-Established*, dated February 25, 2004, sought to facilitate the development of long-term gang and narcotics enforcement units with increased supervisory oversight and accountability. The units, called Gang Impact Teams (GIT), included GEDs, formerly known as SEUs.

Training for these gang units was also a significant part of the progress made by the Department over the course of the Consent Decree. The Monitor found that the training sessions which had been developed addressed both the Consent Decree requirements related to the gang units and best police practices, and were well-organized, useful and well-executed by the trainers and command staff.

During the term of the Decree, the Department also made significant strides in its management of the gang units. The Department utilized COMPSTAT to hold supervisors accountable for the deficiencies found in BGC Inspections, AD's audits and reviews conducted by the OIG. During these COMPSAT sessions, supervisors are asked to describe actions they are taking to correct identified deficiencies and to report, at the following meeting, the results from those actions taken. In addition, in their audits and reviews of gang-related activities, AD and the OIG have worked with command staff to remedy deficiencies identified.

## Consent Decree Compliance

Early on, the Department struggled significantly with the selection process requirements of the Consent Decree.[80] Improvements were seen in some area with the Department's establishment of Special Order No. 27 in July 2003, which outlined the specific criteria required for the selection process. This policy provided the Department with specific guidelines that helped the Department achieve compliance with the requirements regarding minimum selection criteria for

---

[80] Some of the Monitor's early findings included selection packages not being completed, selection packages not including the required forms (i.e., TEAMS record, PER or oral interview), lack of documentation (i.e., written consideration of complaint history, approval signatures or oral interview notes) and a general lack of standardization and uniformity regarding selection procedures.

gang officers and supervisors.   However, the Monitor and AD found that the Department continued to struggle with other selection requirements.[81]

By the inception of the extension in 2006, the Department had achieved substantial compliance with several additional selection requirements, including minimum criteria and written consideration of any complaint or adverse judicial finding for use of excessive force, a false arrest or charge, an unreasonable search or seizure, sexual harassment, discrimination or dishonesty, during the gang officer's assignment in the unit.   During the extension period, the Department achieved substantial compliance with several other requirements, including the mandate that eligibility for selection into the gang unit include a position evaluation of the officer's TEAMS record and written consideration of sustained complaint, adverse judicial findings for the high risk areas, as mentioned above.   As of the end of the Consent Decree extension period, the Department has not yet achieved compliance with the selection requirements regarding prompt review of any transferred officer's TEAMS I record;[82] and the implementation of a formal, written application process, oral interview(s) and the use of TEAMS II and annual performance evaluations to assist in evaluating the application.[83]   AD continues to find these same concerns in its annual GED Selection Criteria Audit; the Monitor hopes that AD's findings can guide the Department into achieving these best police practices in the near future.

---

[81] At the end of 2004, the Monitor began reviewing and placing reliance on AD's *Gang Selection Criteria Audit*, the first of which was issued in June 2004.  This first audit found, as the Monitor did, that the minimum selection criteria for officers and supervisors were being achieved, but the Department was not yet in compliance with the other selection requirements.

[82] The Consent Decree required a prompt review of a transferred officer's TEAMS I record under one paragraph, but required the review of a transferred officer's TEAMS II record after inception of the TEAMS II risk management system.  Therefore, the Monitor reviewed the TEAMS I record requirement initially and then reviewed and reported on the TEAMS II record requirement under that appropriate paragraph after the inception of TEAMS II. Please see the TEAMS II section for further discussion of the progress of this requirement.

[83] In its audit of this area of the Decree, AD found compliance with some of the selection procedures, including documentation regarding contacting UOFRD and inclusion of TEAMS II records and transfer applications.  However, AD had concerns with some requirements concerning the formal, written application process, oral interview(s), and the use of TEAMS II and annual performance evaluations considered and documented in their selection packages as required.  Issues included lack of written application, lack of current TEAMS II records, lack of performance evaluations, CO approval after selection or lack of approval, no documentation of oral interview, lack of evidence that the UOFRD was contacted and selections approved prior to the oral interview taking place. The Monitor concurred with AD's assessment.

Regarding limited tours in gang units, the Consent Decree mandates that officers cannot exceed 39 DPs, except by written approval from the Chief of Police for any longer period.[84] The Department did not achieve compliance with these requirements during the original term or the extension period.  The Monitor found that there were gang officers who exceeded their time limit of 39 DPs in these units and did not have either proper extensions or transfers as required.[85]  While the Department has struggled with some of these requirements, the Monitor has not identified any individual in recent years who was selected for a gang assignment but should not have been selected.

During the entire term of the Consent Decree, the Department's gang units have struggled to comply with the Consent Decree's more technical requirements regarding arrest, booking and charging procedures.   For the first three years, the Monitor's reviews concluded that the Department lacked arrest documentation and supervisory approval, and the Monitor identified discrepancies among supervisory logs and arrest and detention documentation.  In 2004, the Monitor began reviewing and placing reliance on AD's *ABC Reports Audits*, which had findings similar to the Monitor's.   Prior to and through the first two years of the extension, the Department did not achieve substantial compliance with the requirements regarding gang unit arrest, booking and charging procedures, nor did they achieve compliance with these requirements in the first two years of the extension.   During the last assessment of these requirements, the Monitor reviewed and placed reliance on AD's *September 2008 ABC Reports Audit*, in which AD found overall compliance with all requirements except post-incident review. Although the Monitor continued to have concerns regarding supervisory oversight of arrest procedures due to the Department's continued non-compliance with the supervisory oversight objective, the Monitor commended the Department for achieving much higher compliance ratings over the years and concluded that the LAPD is in overall compliance with the arrest, booking and charging requirements in this final assessment.

---

[84] In order to clarify this requirement, the parties agreed that reassignment of an additional 26 DPs was appropriate if the officers met the same eligibility criteria required for initial assignment into the unit and the reevaluation process must include review of the officers' most current TEAMS and performance evaluation reports.

[85] Specific findings were related to lack of approval signatures, missing deadlines and lack of proper documentation (i.e., TEAMS II records and PERs) or appropriate reevaluation.  AD's June 2004 *Gang Selection Criteria Audit* identified these same issues, as did subsequent audits.   However, AD often reported overall compliance with the tour limitations requirement when the Monitor concluded non-compliance, primarily because AD reported issues regarding appropriate or timely TEAMS II records and PERs under "other related matters."  The Monitor has always disagreed with this approach and encourages AD to test entire policies and report accordingly.  With the one non-compliant instance related to the supervisor's signature prior to the TEAMS report, and four non-compliant instances related to current TEAMS II or performance evaluation records, the Monitor calculated a compliance rate of 87.2% (34 of 39).

Regarding requirements for uniforms, vehicles, Area kit room, roll call, Area station-based activities and interview locations, the Department quickly achieved compliance with all of these requirements except for Area kit room procedures.  Although the Department had early issues with the Area kit room logs, including documentation and inconsistencies, it achieved substantial compliance with these requirements by June 2004 and has remained in substantial compliance with these and all other aforementioned requirements, and compliance with these requirements was not reviewed during the extension period.

In the early years of the Decree, specific issues identified by the Monitor included inadequate chain of command supervision and control; lack of adequate in-the-field supervision; inconsistent and inadequate record keeping in connection with required information, such as officers' daily reports indicating specific activities and supervisor signatures indicating oversight; and inadequate periodic audits of gang units' work product.  AD also cited a lack of supervisory oversight of GED warrants and arrests as early as June and October 2004, respectively.

In October 2006, the Monitor began utilizing a new methodology agreed upon by the parties to review gang supervisory oversight.  The Monitor began measuring gang supervision by reviewing daily supervisors' logs, audits completed by AD[86] and GED Supervisory Oversight Inspections conducted by CRID, rather than by reviewing gang supervisory logs alone.  Prior to the extension, the Department did not achieve substantial compliance with the Consent Decree requirements regarding daily field presence, maintaining an active role, supervisors exercising proper control and oversight over planned tactical operations of the gang units, nor did they achieve compliance with these supervisory oversight requirements during the extension period.

During the extension period, the Department continued to fall short of complying with supervisory oversight requirements based on reviews conducted under the new methodology.  AD's *ABC, NCUOF, SW, and GED Work Product Assessment Summaries* in 2005, 2006 and 2007 identified various oversight issues related to post-incident reviews, proper documentation and other inconsistencies with supervision.[87]  The *GED Work Product Assessment Summary* in 2005 also identified various issues in regards to supervisory oversight.  In 2007, the Monitor found that supervisory approval of daily logs was not present and supervisors' daily field presence was either not properly documented and/or included inaccuracies between the available field time and what was reflected in the supervisors' log narrative.

Although the Department had early struggles complying with requirements regarding the Citywide and Bureau-wide coordination of activities, training, technical assistance and audits of

---

[86] These particular audits reviewed include *ABC Audits, NCUOF Audits, Search Warrant Audits, Confidential Informant Audits* and *GED Work Product Assessment Summaries*.

[87] The Monitor also reviewed the *GED Work Product Assessment Summary Audits*, for 2006 and 2005, AD reviewed its own audit reports and *Command Accountability and Performance Audits (CAPAs)* audits and identified numerous issues in regards to supervisory oversight.

gang units, it achieved compliance with these requirements prior to the end of the Consent Decree. However, the Department has consistently struggled with the requirements regarding the BGCs' monitoring and assessing the operations of all units that address gang activity. In the early years of the Decree, not all BGCs were conducting inspections of the Areas for the monthly audits, and those BGCs that were conducting inspections were not aware of the methodologies employed in the audits. The Monitor conducted a review of the BGC audits from all four bureaus for April and May 2002 (eight audits total) found a lack of uniformity in establishing a standards.

After this, steps were taken to improve the gang units' audit function. BGCs outlined the procedures to be used for the bureau gang audits, with AD assisting in the development of audit plans and methodologies, DSD reviewing completed audits and providing feedback and BGCs following up with Area COs regarding problems identified in monthly gang audits. However, the Monitor found that some bureaus did not use the audit matrices, while others used these matrices ineffectually. Although the LAPD continued to improve the quality of these inspections, the Monitor reported in 2005 that there were still deficiencies regarding the sampling and methodology, which the Department acknowledged, and the Monitor recommended that Special Operations Support Division confer with AD prior to each BGC inspection.

Since the Department did not achieve compliance with requirements regarding BGC inspections enduring the initial term of the Consent Decree, the Monitor continued to assess BGC inspections during the extension period. At the end of January 2008, the Department revised the BGC inspection process to review and train the BGCs to address deficiencies. In June 2008, Gang and Operations Support Division (GOSD) had been working directly with the Department Gang Coordinator (DGC), CRID and AD in connection with monthly inspection topics, training, sampling, methodology and inspection matrices for future inspections. GOSD had also developed its own inspection team, the Inspection Coordination and Assessment Unit (ICAU); after the BGC inspection team completes its inspection, ICAU conducts its own review of this sample to ensure the BGC inspection team is completing the inspection correctly. ICAU then follows up with the command staff and the BGC inspectors to discuss any deficiencies found.

By the end of the extension period, although the Monitor indicated that this new process was well-structured, the execution of the process was not yet adequate, as the Monitor continued to identify inconsistencies regarding the execution of the methodology, the answering of matrix questions, reporting and findings. The Monitor has reviewed the work product of the new GOSD staff and ICAU inspection team, including their methodology, instructions and follow-up documentation, as well as CRID's oversight in this process, and is pleased with the improvements that are being made.

Overall, the Monitor concluded that the Department has put into place policy and training that complies with the Consent Decree provisions related to gang units, and the implementation of such procedures has improved over the course of the Decree. While there are deficient areas

left, the Monitor is confident that the Department can remedy these deficiencies in the future with the assistance and oversight of AD and the OIG through among other things, their continuing quality audits and reviews.

**Recommendations**

The Monitor offers the following recommendations regarding the management of the gang units and supervisory oversight:

- Going forward, the selection process of gang unit members should adhere to the requirements set out in the Consent Decree, which the Monitor believes are best practices. This includes a formal, written application process and oral interview(s), and consideration of TEAMS II and annual performance evaluations. The Department should continue to guard against insularity of the gang units by reasonably limiting tours for gang unit personnel. Any reappointment to the gang unit must be carefully evaluated and should include a review of all available information regarding the history of the officer.

- The Monitor encourages the Department to continue its focus on achieving appropriate and consistent supervisory oversight in the gang units. This includes supervisory oversight of arrest reports, search warrants, uses of force, CIs, daily operations, field presence and tactical plans, and the utilization of the TEAMS II early warning system. The Monitor also recommends that AD and the OIG continue to closely audit, review and monitor gang supervision, as they currently do in their CAPA and Consent Decree-related audits, and to assist the Department in resolving issues identified. The Monitor recommends that AD's audits closely consider what is risk assessment-based when testing to the related Department policy, as some policies not previously tested are essential to the accountability and oversight aspects of the operations of the Department.[88]

- The Monitor recommends that the Department continue to use BGC Inspections, as well as the CAPAs, in COMPSTAT meetings in order to hold supervisors and command staff accountable for deficiencies identified and to require follow-up in the form of remedies. The Monitor recommends that the BGC Inspections pay particular attention to gang supervision; in monitoring this area, GOSD should identify a better way to assess the quality of gang supervision regarding field presence than their current method of adding up the self-reported hours in supervisory logs. This may require on-site inspections, as well as further review into the supervisors' log narratives, and comparing them with related reports, such as Daily Field Activity Reports (DFARs).

---

[88] This is true, for example, in AD's *GED Selection Audit* regarding tour limitation requirements, as agreed to by the parties regarding extensions, as well as its *SW Audit* regarding timeliness and the accuracy of the search warrant tracking log.

# D.    Confidential Informants

The *March 2000 BOI Report* identified the improper use of informants as a significant problem within the Department.[89]  The BOI found that former LAPD officer Rafael Perez, his partner and other officers in the CRASH gang unit were using informants inappropriately, putting informants in danger and seldom registering their CIs, as required by Department policy.  The BOI further found that informant files were kept in various locations in each command, there were no guidelines mandating where the files were to be maintained, and there was no uniform system to track inquiries into those packages.  They also found no clear guidelines specifying when an informant file was active or when it became inactive, and each file differed from the next as to content.

Interviews conducted during the BOI showed that the Department supervisors responsible for approving arrest reports lacked an understanding of the Department's policy on the use of informants and failed to recognize and appreciate the legal, risk management, supervisory, training and management issues inherent in the use of informants.

The BOI's findings stressed a dire need for greater control and training on the use and management of informants, for an informant manual which would establish uniform procedures for the use of informants Department-wide, for adequate training for both the officers who use informants and those responsible for their supervision, for supervisory oversight over those CI files on a regular basis and a centralized database for maintaining information on each informant.

**Consent Decree Solutions**

The Consent Decree limited the use of informants to non-uniformed personnel[90] and required the submission of the informant control package for review and approval by the CO prior to utilizing any individual as an informant.  Such informant control packages were required to be maintained in a secure location with restricted access and required a strict sign-out record and policy for approval by the watch commander.

The Consent Decree also required close supervision of all informant contacts.  This included requiring a supervisor to meet with the informant at least once prior to the informant control package being submitted for approval by the commanding officer and requiring investigating

---

[89] In the *March 2000 BOI Report*, then-Chief Bernard C. Parks stated that there was "near-universal ignorance" of the LAPD's rules for using informants and "even less comprehension of the dangers inherent in the use of informants."

[90] In 2005, the Consent Decree was modified to allow uniformed officers, under the strict guidelines of the Consent Decree, to utilize informants.

officers to confer with their supervisor prior to meeting with the informant. These investigating officers were mandated to document all meetings, significant contacts and information received from an informant in the control package, and to inform their supervisors of any contact with an informant. The Consent Decree also required the LAPD to establish a permanent Department-wide confidential database listing all LAPD informants and containing their CI numbers, names, aliases and dates of birth. There was also a requirement for the LAPD to publish a Confidential Informant Manual that further defined and expanded the procedures for identifying and utilizing informants, including all of the previously mentioned requirements.

Lastly, the Consent Decree required the LAPD to develop a CI policy that reflected these requirements, to train all appropriate personnel on the policy, to implement such policy requirements in the utilization and handling of all CIs, and to conduct audits of these control packages to ensure such policy and Consent Decree requirements were met.

## Overall Achievements of the LAPD

The use of informants is among the more sensitive areas of police work, and the Consent Decree requires the LAPD to use strict controls in the use and handling of CI information, the Monitor commends the LAPD for its achievements in this area. At the inception of the extension period, the Department made substantial strides in its use of informants and the related policies and procedures, although it had not achieved compliance with the >94% requirement in all areas. However, the Department achieved substantial compliance with the utilization and handling of informants during the extension period and over the course of the original term and the extension successfully put into place various policies and procedures that established best police practices for the utilization and handling of informants.

The Department released a Confidential Informant Manual in 2002 that incorporated all of the requirements of the Consent Decree. In 2008, the Department developed a new CI manual, discussed in detail below, that specifically outlines the Consent Decree requirements and provides a best practices approach to the handling of informants. This most recent manual provides specific protocols and improved informant forms that eliminate vagueness and ambiguity found in previous manuals, which resulted in confusion among officers handling informants. Based on a recommendation by the Monitor, the Department consolidated the Active Informant Database and the Undesirable Informant Database and updated the system to allow automated queries of information, eliminating the need for manual searches. This also facilitated a more coordinated tracking of all Department informants, and allowed the centralized personnel at Narcotics Division who are responsible for maintaining two databases to report informant information in a single database environment.

Based on the Monitor's recommendation, the Department developed and included in each informant package an instruction sheet with a checklist to remind officers of their documentation obligations. This system serves not only to remind officers of that which needs to be done but also provides a relatively quick method for supervisory review.

In addition, one of the early concerns of both the Department and the Monitor regarding informants was related to the small number of CIs maintained by the LAPD. The Monitor reported in its second quarterly report (Report for the Quarter Ending December 2001) that it noted a dramatic decrease in the number of available active informants.[91] Over the course of the Consent Decree, the Department has since increased its overall number of CIs while at the same time adhering to Consent Decree requirements.

The Department has developed sound policies and has trained on the implementation of those policies to provide officers and supervisors with the knowledge and tools to properly utilize and handle informants.

The Department now maintains all informant packages centrally at Narcotics Division, allowing for stricter supervisory oversight of these informant packages to ensure that Consent Decree requirements and LAPD procedures are met. Supervisory approval is received regularly on all package submissions and contacts with informants, and contacts with informants and documentation of information received are timely filed.

## Consent Decree Compliance

In the first three years of the Consent Decree, the LAPD took immediate steps to identify the problems associated with CIs and their control packages, and to develop procedures and guidelines to bring both new and existing packages into compliance with Consent Decree requirements. First, the LAPD Criminal Intelligence Group completed an audit of the CI packages in July 2001 and found that there was no standardized method to maintain informant packages. Although the Department issued a policy in January 2000 regarding the use of informants, which outlined standardized procedures to monitor informant files, and another policy in September 2001 regarding the establishment of a CI tracking system database for all CIs, neither policy was effectively implemented by the Department.

In February 2002, the Department attempted to address the lack of standardization by establishing a new policy regarding the use of informants and implementing a new Informant Manual. Shortly thereafter, the Monitor conducted a review of all CI packages maintained Department-wide and found a very low compliance rate with the requirements related to utilizing and maintaining informants. Although the Department had not yet achieve compliance with many of the requirements, it did achieve compliance with a few fundamental and important procedures, including establishing a CI number and an informant control package for each informant, admonishing each informant that he or she may not violate any laws in the

---

[91] The Monitor identified a number of factors that may have contributed to the decline in numbers, including the diversion of resources as a result of the need to respond to terrorism threats post-9/11; shortage of experienced, trained gang officers during this time period; and officers in uniform being restricted from maintaining informants.

gathering of information, maintaining all CI packages in a locked and secure location, and ensuring no informants were maintained by unauthorized uniformed officers.

During this same time, the Monitor also conducted a review of the CI database and the Undesirable Informant database and found that the databases contained inaccuracies in the informant information and were missing required information for the informants. The Monitor recommended that all active informant packages be brought up to the standards of both the Consent Decree and the Department's Informant Manual dated February 26, 2002, and that supervisors throughout the ranks be held accountable for failures in this area.

Over the next few years, although the Department slowly improved in its efforts at complying with Consent Decree requirements, the Monitor continued to express concerns that compliance with various fundamental requirements in this area was not yet where it needed to be. Although no substantive failures were uncovered relating to misuse of CIs or other impropriety, the informant control packages continued to be deficient, many packages were missing relevant documentation, and the CI Manual needed revision to clarify requirements and procedures for maintaining informant control packages and the handling of informants. Training on the Informant Manual was occurring in only two Department courses, and the Monitor recommended that training be offered and made mandatory for all officers permitted to manage informants. The Monitor also recommended that the CI and Undesirable Informant databases be properly maintained and all required information captured. The Department worked hard to rectify the deficiencies in the informant packages and databases, but problems with documentation and accuracy of information continued to persist throughout 2003.

By the middle of 2004, the LAPD had made considerable improvements in supervisory oversight and maintenance of CI packages, and relevant training had taken place in March and April 2004 on the LAPD's newly revised Informant Manual dated June 2003. During this same time, the LAPD's AD was in the process of auditing Departmental compliance with the various components of the Consent Decree. In September 2004, the Monitor reviewed AD's *Confidential Informant Control Package Audit*, dated June 28, 2004, and found that AD identified the same issues with the informant packages and the informant databases that the Monitor had previously reported, including lack of documentation and supervisory approval of informant meetings and information and inaccuracies with the database information. In short, the Department had improved greatly but still fell slightly short of substantial compliance with Consent Decree requirements in this area.

Throughout 2005, the Monitor, AD and the OIG all noted that the Department continued to struggle in the area of supervisory oversight of CIs. Issues identified included lack of supervisory approval on payment forms, contact forms and sign-out cards; lack of supervisory approval prior to meeting with an informant; and missing forms and inconsistencies with regard to payments made to informants. However, the Monitor determined that the Department achieved substantial compliance with requirements related to the CI database, since the database's information and the informant packages were now both inclusive and accurate.

At the end of 2006, the Monitor, concurring with AD's findings in its *Confidential Informant Control Package Audit*, dated June 29, 2006, reported that although there was a significant delay in filling out contact forms in informant packages, overall, the maintenance and documentation of the CI packages had significantly improved from the prior years' reviews.

Another requirement regarding CIs was that supervisors who manage officers who handle informants be evaluated for this task on their annual performance evaluation.   In CRID's Supervisory Performance Evaluations Audits for 2006, 2007 and 2008, they found that this requirement was not taking place appropriately, and the Monitor concurred.

The LAPD issued a revised Informant Manual in March 2008, which further outlines specific requirements regarding informants and helps to ensure adherence to these requirements, and also provides a best practices approach to the handling of informants that will carry the Department forward after the term of the Consent Decree extension expires.  In addition to the development of a new manual, the Department also addressed the Monitor's and AD's findings regarding the delay in filing contacts with informants in the control packages.  In June 2007, the Department, specifically Narcotics Division, put a procedure in place for sending interdepartmental correspondence to commanders and controlling officers to follow up on contact sheets not received within 30 days of a contact with a CI.  The Department also adhered to requirements regarding documentation of contacts with informants, information provided by informants and the results of investigations conducted pursuant to the information provided; supervisory approval of such contacts with informants and the information provided; and maintaining access to such control packages.

By the end of 2008, the Monitor, AD and the OIG all concurred that the Department had achieved substantial compliance with all Consent Decree requirements relating to CI.

### Recommendations

The Monitor, as stated above, commends the LAPD for the accomplishments it has made in achieving compliance with Consent Decree requirements regarding the utilization and handling of CIs, the CI database and the CI Manual.  With the policies and procedures in place, and the oversight role of AD and the OIG to ensure that the policies and procedures are followed, deficiencies corrected and recommendations followed up, the Monitor is confident that going forward CIs will be properly maintained under these strict guidelines and subject to adequate supervisory oversight.  The Monitor offers the following recommendations regarding CIs, which are applicable to the Department, AD and/or the OIG where noted, or all three if not specified.

- The Department should consider training on the Informant Manual for other Department personnel who may encounter the need to understand the strict guidelines surrounding informants.  These informant requirements should also be offered annually in Roll Call training.

- The Monitor urges that any policy changes, including the issuance of a new CI Manual, be approved and distributed prior to implementation, and that AD and the OIG ensure this takes place in their own future reviews.

- The Department needs to ensure that supervisors and managers overseeing officers who handle informants are getting evaluated on this task in their annual performance evaluation. AD and the OIG need to review and report on this process taking place.

- The Monitor commends the Department for ensuring that NCIs are appropriately managed in accordance with the same policies and guidelines as CIs, and recommends that this continue.

# E.    Development of Program for Responding to Persons with Mental illness

Calls for reform in the way that the Department dealt with the mentally ill were made in the wake of a high-profile LAPD shooting incident that occurred in May 1999, involving a mentally ill 55-year-old homeless woman. The woman was stopped by two LAPD bicycle officers in Wilshire Area to determine if she was pushing a stolen shopping cart, and one of the officers shot and killed her after she had allegedly lunged at him with a 12-inch screwdriver. Chief Bernard Parks found the incident in policy notwithstanding Inspector General Jeffrey Eglash's conclusion that the woman did not pose a lethal threat to the officer and his partner. The Board of Police Commissioners voted 3-2 in finding the shooting out of policy. Department critics wanted to know why the officers had not used nonlethal means to subdue her. Her family subsequently filed a wrongful death lawsuit, and the City Council approved a $975,000 settlement of that litigation.

**Consent Decree Solutions**

In order to improve the LAPD's dealings with the mentally ill, the Consent Decree required the LAPD to evaluate best practices from other law enforcement agencies in the United States, including training, policies and procedures for dealing with persons who may be mentally ill. The requirement extended to reviewing specific incidents in other jurisdictions. The LAPD was also required to report the results of these evaluations to the Police Commission, including proposed changes to training, policies and procedures for dealing with persons who may be mentally ill. Lastly, the Decree required the Department to complete an audit to evaluate LAPD handling of calls and incidents involving persons who appear to be mentally ill and to incorporate the findings and recommendations.

**Overall Achievements of the LAPD**

The LAPD achieved success in reaching substantial compliance with all Consent Decree requirements during the initial term of the Decree. Specifically, the Department, through a contract with Lodestar Management Research, thoroughly researched best practices throughout the United States and responded to recommendations of the DOJ and the Monitor relative to proposals for new policies and procedures. In addition, with the launch of a number of successful initiatives in this area, the specifics of which are detailed in the next section, the Department now has the recognized best practice in law enforcement for this subject area.

**Consent Decree Compliance**

The LAPD submitted a RFP in July 2001 seeking a contractor to evaluate successful programs in other jurisdictions and study the procedures and training in place at the LAPD. In December 2001, the LAPD selected Lodestar Management Research (Lodestar) to prepare a report of their findings, which was to be forwarded to the Chief of Police who would then make recommendations to the Police Commission and then forward the report to the City Council and the Mayor. Lodestar was also tasked with reviewing the LAPD's training, policies, practices and procedures, and conducting a review of select incidents involving the LAPD's contacts with persons who may have been mentally ill.

On July 15, 2002, the LAPD submitted its report on the Consent Decree Mental Illness Project (CDMIP) to the Police Commission, containing the Department's findings and recommendations. The report and related funding requests were approved by the Police Commission on October 8, 2002. The Department's findings included a judgment that LAPD's incident tracking systems, including UOF, did not readily identify incidents that involved persons who may be mentally ill. As a result, the ability to evaluate the effectiveness of the LAPD's response and to identify trends or training issues was limited. The Department also found that there "may be better methods of training to ensure a greater understanding and sensitivity regarding persons who may be mentally ill," and issued a number of recommendations. These recommendations included centralizing authority for the Mental Health Crisis Response Program (MHCRP) under the supervision of the CO, Detective Services Group (DSG); expanding the System-wide Mental Assessment Response Team (SMART)[92] citywide; and expanding the Crisis Intervention Team Pilot Program (CIT), which was then located in the Central Area, to include the Van Nuys Area. The LAPD then requested Lodestar to provide additional analysis to assist in the development of evaluation criteria and an "evaluation tool" for expansion of the CIT program citywide, in the

---

[92] SMART was a collaborative effort between the Department of Mental Health (DMH) and the LAPD to respond to calls involving persons who may be mentally ill.

light of concerns expressed by the DOJ and the Police Commission's request that the LAPD respond to the DOJ's concerns.[93]

During the first quarter of 2003, a four-hour Department-wide training session was provided to all field personnel at the level of Lieutenant and below in connection with the Department's philosophy and new policies and procedures concerning encounters with persons who may be mentally ill.  The training included assessment and de-escalation skills specific to those encounters.  A Mental Illness Update was provided in 2006 for all personnel who attended this course in 2003.  During the summer of 2003, the Department adopted the MHCRP title in centralizing its programs and an MHCRP Coordinator was appointed.   Additionally, a Department-wide philosophy/mission statement was developed; the CIT Program was extended from Central Bureau to Van Nuys, West Los Angeles and Harbor divisions; and the related 40-hour training course was implemented in these three Areas.  Also in 2003, a new database was established by the Mental Evaluation Unit (MEU) to document encounters by CIT Officers with persons who may be mentally ill.  Communications Division Order No. 10 was issued to implement procedures for handing calls involving persons with mental illness.

The Department's Mental Illness Program Implementation Plan was completed in November 2003.  It addressed and reported on the status of all the Department's Mental Illness Project recommendations approved by the Police Commission in 2002 and the *Mental Illness Program Audit* required under Consent Decree paragraph 113.  By December 2003, the Department implemented a review of all completed NCUOF and CUOF investigations involving persons who may be mentally ill and the UOF Form (face sheet) was modified to include additional indicators of impairment.

The LAPD's Information and Technology Division (ITD) received and installed a new computer server for MEU's database and tracking system, which became operational in April 2004.  On May 10, 2004, the Board of Police Commissioners directed the Department to expand MEU/SMART to provide coverage 20 hours a day, seven days a week[94].  Beginning in November 2005, the MEU developed a SMART Pilot Program in which a SMART Unit[95] was assigned to Central Division three days a week during the hours of 7 a.m. to 3 p.m.  The program's goal was to provide assistance to Central Division's Patrol[96] in its daily encounters with persons who may

---

[93]  In July 2002, the DOJ informed the City of its concerns with the LAPD report based in a comparison of that report to the analysis and recommendations contained in Lodestar's report.

[94]  The MEU/SMART does not have coverage between 0200 and 0600. In 2005, there were 499 involuntary holds on individuals with suspected mental illness between these hours.

[95]  SMART Units include both LAPD and Los Angeles County DMH personnel.

[96]  Central Division was selected since it has the highest number of calls for service that involve persons suffering from mental illness.

have a mental illness.   When such a person is identified, the SMART Unit conducts an assessment of the individual and then seeks appropriate care.

As of early 2005, the CDMIP team implemented a new proactive program designed to identity and deal with those persons who had a high volume or pattern of repeated LAPD calls for service, and coordinate their access to available mental health services.   The DMH, DAO, City Attorney and other entities were involved in this program.   Once those individuals were identified, the various Departments and agencies engaged in a "full court press" to proactively seek out and get help for them, including getting the person confined for treatment.   In January 2005, the CDMIP coordinator reviewed the MEU database and identified 67 individuals who have been placed in at least six involuntary holds.   These individuals had also been the subject of numerous arrests and/or radio calls, which resulted in a significant drain on patrol resources.   The initial estimate indicated that these individuals represented 5,000 hours of lost patrol resources.   By developing the Crisis Assessment and Management Program (CAMP), which addressed the needs of these individuals, the Department sought to create a system to better track these individuals and direct them to the appropriate mental health services instead of the criminal justice system.   The CAMP Pilot Program began operating on September 18, 2005.   The most significant success of the CAMP Program has been the reduction of time spent by patrol officers handling repeat calls for service involving persons with suspected mental illnesses.   In mid-2008, CAMP became a permanent Unit within the Crisis Response Support Section.

The Monitor commends the Department for integrating SMART to the extent it has.   As recently as 2006, SMART would arrive at the scene of crisis calls, such as suicides in progress or a barricaded suspect, and would be dismissed by the Incident Commander as "not needed."   As the program evolved, watch commanders and incident commanders learned the value of SMART Teams.   SMART Teams have proven to be an invaluable tool for providing information and helping to develop strategies for reducing the potential for violent encounters between law enforcement and persons with suspected mental illnesses.   SMART personnel also monitor dispatch calls and often respond to calls for service involving persons with suspected mental illnesses without being requested.   This provides SMART the ability to assist patrol personnel and Incident Commanders at the early stages of critical incidents and may reduce injury to an individual who is taken into custody, while providing them with  the appropriate mental health services, as opposed to being incarcerated.

As of December 31, 2008, the LAPD has expanded its MEU-related training.   On a quarterly basis, MEU conducts CIT Training, a 24-hour POST certified course, which is open to outside law enforcement agencies.   Several e-learning courses were completed during 2008 and 2009 and distributed Department-wide.   A segment on supervisor responsibilities regarding handling calls for service involving the mentally ill was added to the Supervisor and Watch Commander Schools.   Courses geared toward SWAT officers, as well as detention and dispatch personnel were provided late in 2008 in order to enhance their respective understanding of mental illness. MEU in partnership with the Autism Society of America has provided training to over 1,000 Department personnel on Autism Awareness.   MEU has continued to carry out regular Roll Call

training to patrol personnel with an overview of MEU functions and patrol officer responsibilities.

The MEU has made significant advances in its program during the full term of the Consent Decree, and the LAPD continues to be in the national forefront of this important policing issue. The Monitor commends the Department and the dedication of those individuals who have been involved and associated with the LAPD's Mental Health Project.

**Recommendations**

Simply put, the LAPD should continue to do what it has been doing.

# F.   Training

## 1.   FTO Program

In regards to training, the Christopher Commission reported that there was "disturbing evidence that many FTOs openly perpetuate the siege ('we/they') mentality that alienates patrol officers from the community."  The Commission also found that absent a requirement of one-and-a-half years experience and passing a test, "there were no other formal criteria for eligibility for FTO positions" or FTO "disqualification based on officers' disciplinary records."  Among the Commission's recommendations were that "uniform criteria for selection of FTOs should be established" and that "successful completion of FTO School should be required before an FTO begins training probationers."

The *March 2000 BOI Report* focused considerably more time on supervisory training.  The BOI noted that officers newly assigned to FTO duty should be given priority to attend FTO School. This was to ensure that they would not conduct their duties without being trained on them.

**Consent Decree Solutions**

The Consent Decree required the LAPD to continue to implement formal eligibility criteria for FTOs, including demonstrated analytical skills, demonstrated interpersonal and communication skills, cultural and community sensitivity, diversity and commitment to police integrity, as well as a positive evaluation on the officer's TEAMS II record.  The Consent Decree also stated that "FTOs may be removed during their tenure for acts or behaviors that would disqualify the officer from selection as an FTO."  Lastly, the Decree required the LAPD to continue to implement a plan to ensure that FTOs receive adequate training and regular and periodic retraining to carry out their duties.  This training must include training to be an instructor and training in LAPD policies and procedures.

**Overall Achievements of the LAPD**

Training is an investment in the future of any police department.  The LAPD has been tremendously successful in its effort to improve its training function. The Monitor is very optimistic that this success will build a great base for LAPD's future excellence.  Field training is a crucial topic in the Consent Decree, as recruit training has far-reaching implications for the future of the LAPD.

On February 26, 2004, the Police Training and Education Division (PTE) assumed responsibility for FTO update school from Training Division.  At this time the attendance rate for FTO update school was less than 30%.  Upon assuming responsibility, PTE immediately organized the training list and contacted the training coordinators to get the officers into the classroom.  Based on these efforts, in less than two months, PTE was able to raise attendance to 94%.  As a result of PTE's extraordinary effort, the Department achieved compliance with certain FTO training requirements during the quarter ending March 31, 2004.

As a result of deficiencies identified, during the quarter ending September 30, 2005, the Monitor recommended that the LAPD centralize the administration of the FTO program so that LAPD management could more effectively identify, supervise and train FTOs.  By the quarter ending December 31, 2005, the Monitor noted significant improvements.  All of the FTO selection packages reviewed contained references that indicated TEAMS I reports had been reviewed prior to selection, and none of the officers selected as FTOs during the period reviewed had a sustained administrative investigation, adverse judicial finding or instance of discipline that fit the requirements of this subparagraph.  As a result, the Monitor concluded that all of the officers reviewed were qualified to serve as training officers and found the LAPD in compliance with all related requirements.

During the quarter ending March 31, 2006, the Monitor found the LAPD in compliance with additional requirements, as FTOs found non-compliant in previous testing had either sufficiently rehabilitated their work performance to a satisfactory level and were qualified to perform as FTOs, or were prohibited from serving as FTOs through internal Departmental processes.  During this period, the LAPD created a centralized FTO Unit at the Training Academy, commanded by a Lieutenant.  The centralization of selection, training and record keeping of FTOs was a major step forward in management of the FTO Program.

As an extension to the FTO program, exchange and interaction with senior lead officers (SLOs) is introduced when the field training probationary period begins.  The exposure to SLOs is very beneficial in combination with the FTO, as the new probationer learns how to apply policing procedures, including community policing skills.  Currently in 2009, all SLOs attend the FTO course so they meet the State of California standards to allow SLOs to train recruit officers.  Generally, new probationary officers are assigned and partnered during their probation with SLOs after their first 24 weeks of field training.

Although the Department had not achieved substantial compliance with all requirements regarding FTOs during the initial term of the Consent Decree, as a result of the efforts of the FTO Unit and the improvements implemented by the Department, the Department was able to achieve substantial compliance with all requirements during the extension.

## Consent Decree Compliance

The Monitor originally had difficulty evaluating these paragraphs because the Department's computer system did not identify FTOs to distinguish them from P-IIIs not serving as FTOs. This made sample selection impossible. In its Report for the Quarter Ending September 30, 2002, the Monitor reported that the Department would apply a new identifying code to existing and future records so FTOs could be identified.

Early assessments of compliance with Consent Decree requirements regarding FTOs revealed that the Department needed to make significant improvements in order to comply with those requirements. The Monitor found that selection files were not documenting that candidates were selected because they possessed the skills required, the Department had not developed a curriculum to fulfill the full number of hours required for FTO update training, FTO attendance at available courses was inadequate, annual performance evaluations were insufficient for some FTOs, and serious sustained complaints should have, but did not, disqualify some FTOs from the program. The Department subsequently developed the final eight hours of FTO update training, which began in January 2003, though it still reported insufficient officer attendance.

As described above, the PTE assumed responsibility for FTO update school in February 2004 and the Department soon achieved it first finding of compliance with requirements in this area. The Monitor also found the LAPD in compliance with additional requirements during the quarter ending June 30, 2004, as all FTO selection packages reviewed contained references that indicated TEAMS I reports had been reviewed prior to selection.

Despite these achievements, the Department continued to struggle with many of the requirements in this area. Significantly, the Monitor determined candidates possessed the necessary skills required of an FTO in 17 of 22 selection packages reviewed, and the Monitor identified a considerable number of FTOs who should not have been training probationary officers, as the officers in question were found administratively responsible for, among other things, fraud, domestic violence, inappropriate touching of a co-worker, false statement, inappropriate use of position for personal gain and enlisting a probationary officer to lie in an investigation.[97]   Furthermore, although the LAPD was able to identify the total number of officers who were serving or had once served as FTOs, it was unable to identify the officers selected to serve as FTOs for the period requested for the Monitor's testing.

---

[97] Some of these offenses resulted in significant suspensions, including 60 days and 88 days. In addition, the Monitor learned that at least two of the officers in a sample selected for review had never attended the 40-hour FTO School.

During the quarter ending March 31, 2005, the Monitor found the LAPD in noncompliance with requirements regarding FTO de-selection, as the Monitor identified a considerable number of FTOs who should not have been training probationary officers.[98]  The Monitor then found the LAPD in compliance with this requirement during the quarter ending March 31, 2006.  As described above, the Department's efforts to centralize selection, training, and record keeping of FTOs significantly improved the management of the FTO Program, which led to the Department achievement of compliance with the various requirements of this section of the Decree.

Since the LAPD had not achieved substantial compliance with all requirements during the initial term of the Consent Decree, the Monitor continued to actively monitor the pertinent paragraphs during the extension period.

During the extension, the Monitor found the Department in compliance with requirements regarding formal eligibility criteria for FTOs during the quarters ending December 31, 2006, and December 31, 2007; with requirements regarding the FTO de-selection during the quarters ending June 30, 2007, and June 30, 2008; and with requirements regarding an FTO training plan during the quarters ending September 30, 2007, March 31, 2008, and September 30, 2008.  As a result, the Department achieved substantial compliance with the requirements of these paragraphs, and the Monitor discontinued active monitoring of them during the remainder of the extension period.

**Recommendations**

The Monitor, as stated above, enthusiastically commends the LAPD for the accomplishments it has made in achieving compliance with the field training requirements.  Policies and procedures are in place, and the oversight roles of AD, the Police Commission and the OIG clearly ensure that policies and procedures are followed, deficiencies are corrected and recommendations are implemented.  The Monitor is confident that going forward, the Department will ensure that field training by the LAPD follows the "best practices" of law enforcement.  The Monitor offers the following recommendations regarding the FTO program:

- The LAPD should ensure that FTOs are evaluated annually using the new Standards Based Assessment.

---

[98] The officers in question were found administratively responsible for, among other things: fraud, domestic violence, inappropriate touching of a co-worker, false statement, inappropriate use of position for personal gain and enlisting a probationary officer to lie in an investigation.  Some of the above-mentioned offenses resulted in significant suspensions, including 60 days and 88 days.  In addition, the Monitor learned that at least two of the officers in the sample had never attended the 40-hour FTO School.