- The LAPD should have COs continue to review complaints sustained against currently serving FTOs in order to ensure their continued fitness for training probationers.

- The LAPD should continue to track FTO training and update training to ensure that FTOs remain fully trained in their duties and can impart the most up-to-date information to their recruit officers.


## 2.    Training Content

The Christopher Commission reported that "the Department neither mandates nor monitors in-service training," and noted that "Division commanders have discretion to conduct in-service days and to design the training program" and "there is no consistency in the usefulness of these programs across the Department."  The Commission recommended that the Academy "should take responsibility for roll call and other in-service training," "develop detailed training outlines that every division would use," and "have instructors available to assist watch commanders to implement those training programs."

The BOI focused a considerable amount of time on training content and reported that "several supervisors noted the imbalance in favor of tactical training tended to perpetuate the siege mentality among the officers" in their divisions.  The *March 2000 BOI Report* included several recommendations related to ethics and integrity training, including that "the Department must develop a comprehensive training program on ethics, integrity, mentoring, and leadership, to be given annually as a supplement to Area training efforts; all Department employees should receive greatly increased training in the areas of ethics and integrity and that training should be fully integrated into our regular training programs; and classroom instruction on ethics should be reinforced through other training opportunities such as commanding officer presentations during standardized roll call training, discussion in supervisory meetings, monitoring and auditing the work environment, and workshops in divisional training days that encourage frank discussions about this issue."


**Consent Decree Solutions**

The Consent Decree required the LAPD to "continue to provide all LAPD recruits, officers, supervisors and managers with regular and periodic training on police integrity," including "the duty to report misconduct" and "cultural diversity."  The LAPD was also required to train all members of the public scheduled to serve on the Board of Rights (BOR) in police practices and procedures.  Additionally, the Decree stated that "the City may establish a plan to annually provide tuition reimbursement for continuing education for a reasonable number of officers in subjects relevant to this Agreement, including subjects which will promote police integrity and professionalism."  Lastly, the Decree required the LAPD to "establish procedures for supervisors and officers of the LAPD to communicate to the LAPD Training Group any suggestions they may have for improving the standardized training provided to LAPD officers."

**Overall Achievements of the LAPD**

Again, the Monitor finds that the LAPD has had tremendous success in this training function. As a direct result of the Consent Decree, a basic blueprint for reforming the Department was outlined. Training was a core component of bringing about organizational change, and effective training was critical to institutionalizing those reforms. In 2001, there was not one law enforcement agency in the country using e-learning as a means of disseminating consistent training. Likewise, there were no law enforcement academies in the United States using an integrated approach to training on the various disciplines. Adult learning theory was not consistently modeled by any state or federal agencies as a means of training officers. The LAPD, however, embraced the recommendations of the RAND Report and began to research best practices in training.

As a result, eight years after the inception of the Decree, the LAPD uses adult learning theory and critical-thinking/problem-solving skills in all aspects of training. The Department researched and formed an e-learning unit that is now the cutting edge in distance learning in law enforcement, producing approximately 20 courses annually. The Department also created and staffed the first curriculum design unit of its kind that standardizes all lesson plans, incorporates adult learning theory, case studies and scenario exercises wherever feasible. It is also responsible for cross-staffing for consistencies in laws, policies and procedures to ensure that all lesson plans are consistent throughout the organization.

Recently, the Department launched its first ever learning management system, which will allow completely standardized lesson plans to be available and used by all trainers in the organization and will serve as a "one-stop shop" for employees to access annual training calendars. This system will also provide the capability to design a course catalogue, so that all employees will have the ability to plan their career paths and understand the training requirements for the various paths, as well as know when courses will be presented and how to fairly apply for such training and educational opportunities.

**Consent Decree Compliance**

Although considered a permissive requirement, the Monitor found the LAPD in compliance with the requirement to establish a plan to annually provide tuition reimbursement for continuing education in subjects that promote police integrity and professionalism, as it established a tuition reimbursement program. The City announced the initiation of a tuition reimbursement program on June 28, 2001. It began receiving requests for reimbursement shortly thereafter. The Monitor found that the City approved most requests and properly denied the rest for a variety of administrative deficiencies, e.g., no proof of payment, no transcript submitted, course not completed.

As required by the Consent Decree, the Department implemented several procedures for communicating suggestions to the Training Group.  The Department was receptive to suggestions and willing to develop training based on actual needs and, in fact, integrated seven suggestions into the training curriculum.  In February 2002, the Continuing Education Division, along with the California Commission on Peace Officer Standards and Training, developed a revised Basic Supervisory School as a result of course evaluations and student interviews.  The training that resulted required each Sergeant candidate to participate in two one-day ride-alongs with an experienced Sergeant.

After early struggles in complying with requirements regarding police integrity training, the Department made significant strides in improving and enhancing it this training over the term of the Decree.   By 2003, the Department developed an interactive learning exercise that adequately addressed misconduct, the duty to report misconduct and the protections afforded to those who report misconduct and incorporated this exercise in CEDP Module VI, titled "Weapons of Mass Destruction."  An exercise in the course required the class to break into small discussion groups to discuss legality of a stop, department policy prohibiting racial profiling, duty to report misconduct, retaliation and protections afforded to those that report misconduct. The Department also took significant steps toward monitoring its own compliance and began to get ahead of schedule with regard to officer attendance at a training module.  Eventually, the Department successfully developed a training program with a comprehensive curriculum, a novel delivery plan, and measurements in place to ensure adequate attendance and consistent, quality training, and in 2005, a 90-minute web-based e-learning training module on police integrity was introduced, which enabled the Department to train greater than 95% of its personnel in six weeks.  In 2006, the LAPD continued scheduling field, supervisory and command staff training for a number of in-service training modules that included portions of or all of police integrity training requirements, including the Workplace Discrimination and Retaliation Prevention Course, Risk Management/Civil Liabilities Three-hour Course, Vehicle Stops and End of Pursuit Tactics.

Beginning in the quarter ending September 30, 2002, the Monitor found the LAPD in non-compliance with the training requirements related to civilian BOR members.  The Monitor found that the training was inadequate, especially in the area of tactics and Department policy, as it did not provide Board members with the requisite knowledge for them to fulfill their membership expectations.   As a result, prior to the extension, the Monitor found the Department in substantial compliance with all requirements in this section of the Decree except for the requirements regarding training for civilian members of the BOR.

With the Monitor's participation, Police Commission staff developed lesson plans for civilian BOR training to meet the requirements regarding the training of Board members.  An all-day training session was held on March 31, 2007, attended by 45 of the newly selected examiners, DOJ personnel and a member of the Monitoring Team.  The three hearing examiners who did not attend the training attended a separate training session presented by the Police Commission's Executive Director.  These efforts led the Department to achieve compliance with the pertinent requirements during the quarter ending March 31, 2007, and the Department

remained in compliance during subsequent assessments.  As a result, the Department achieved substantial compliance with the BOR-related training requirements during the extension.

**Recommendations**

The Monitor commends the LAPD for the accomplishments it has made in achieving compliance with the training content requirements.  With the policies and procedures in place, the oversight role of AD, the Police Commission and the OIG will ensure that the policies and procedures are followed, deficiencies corrected and recommendations implemented.  The Monitor is confident that going forward, the Department will be proactive in ensuring that training content continues to emphasize police integrity.  The Monitor offers the following recommendations regarding training content:

- The LAPD should continue to ensure that new civilian members of the BOR receive training in police practices and procedures.

- The LAPD should continue to communicate to Training Group any suggestions from supervisors and officers on how to improve training programs.

- The LAPD should continue its adult learning and scenario-based approach to police integrity training.

## 3.    Supervisory Training

The *Christopher Commission Report* stated that "sergeants, lieutenants, and captains are expected to be leaders as well as administrators and should therefore receive formal leadership training including command accountability."  The report further stated that "supervisory and command officers must learn to be role models, to recognize problems in other officers, and to assist troubled officers through such difficulties."  The commission found that "the training emphasis is on administrative skills" and "not leadership or accountability," and recommended that "command accountability and effective supervisory techniques should be the primary focus of the training of sergeants, lieutenants, and captains."

In its *May 2000 Letter Report* to the City, the DOJ wrote that "serious deficiencies in City and LAPD policies and procedures for training, supervising, and investigating and disciplining police officers foster and perpetuate officer misconduct" and that "many supervisors do not have the training necessary to perform their supervisory responsibilities and correct deficiencies."

The *2001 BOI Report* also focused a considerable amount of time on supervisory training and found that "over 230 sergeants ha[d] not attended the Supervisory Development Course" and "many of those sergeants ha[d] been in the field as supervisors for a year or longer with no

formal instruction on their duties." The BOI recommended that "consideration…be given to reorganizing the Supervisory Development Course from a four-week block of instruction to a program of smaller blocks of instruction spread out over a longer period of time." The BOI also recommended that "a one to three day introductory course…be developed for new sergeants, detectives II and non-sworn supervisors" and "no one…be permitted to work as a supervisor until he or she attends the course."

## Consent Decree Solutions

Regarding supervisory training, the Consent Decree required the LAPD to "provide all officers promoted to supervisory positions, up to and including the rank of Captain, with training to perform the duties and responsibilities of such positions." Such training was to be provided before they assumed their new supervisory positions. The Consent Decree also required the LAPD to provide regular and periodic supervisory training on reviewing the reports addressed in the Decree, incident control and ethical decision-making. Lastly, the Decree required the LAPD to "ensure that any supervisor who performs, or is expected to perform, administrative investigations, including chain of command investigations of uses of force and complaints, receive training on conducting such investigations."

## Overall Achievements of the LAPD

The first step the LAPD took in its efforts to comply with Consent Decree's supervisory requirements was to issue a notice, dated July 2, 2001, stating that members must be trained prior to assuming a new position. However, early in the term of the Decree, the Monitor found an insufficient number of officers were receiving supervisory training prior to assuming their posts, and some supervisors had last received training as far as 10 years previously. By the end of 2003, the Department had greatly improved its ability to train supervisors prior to assuming their duties.

As described in a focus issue in the Monitor's Report for the Quarter Ending June 30, 2004, both the Monitor and the DOJ attended a training session on June 8, 2004, in which snide and inappropriate comments were overheard being made by several Supervisors. The Departmental response to the complaints of the Monitor and DOJ was admirable – upon learning of these remarks, the Department sent a clear and resounding message to its members that such sentiments expressed during these classes would not be tolerated. Specifically, on June 10, 2004, two days after the incident occurred, training coordinators were retrained. It was made clear that the comments expressed by the offending Supervisors reinforced the perceptions of those on the "outside" that the culture of the LAPD had not changed. The need for trainers to take responsibility for their classrooms and establish a professional environment was reinforced. The trainers were assured that they would have the support of the command staff, training group, CRID and Office of Human Resources should they need to "take on" a difficult student, especially one of a higher rank. In addition, the Chief of Police held a meeting

with all of the Command staff on June 15, 2004, reiterating his requirement of professionalism and respect, in the field as well as in the classroom.  The Chief also circulated a letter on June 29, 2004, and a video in the beginning of August, to all members of the Department in which he stated that the behavior described to him was "unnecessary and unacceptable" and that "openness and transparency to the community must be reflected both inside the confines of our organization, including the classroom, as well in our field contacts."  This incident is an example of the attitude shift and strides the LAPD has made in the area of supervisory training.

The LAPD's *Standardized Quarterly Supervisor Training*, launched in the fourth quarter of 2003 and still in place, provides information relative to the duties of all supervisors.  To date, topics have included FDRs, UOF Reporting, Detention Log Review, Performance Evaluation Reporting Guidelines, Complaint Investigation Procedures and Police Officer Selection to FTO and GED Units.

**Consent Decree Compliance**

During the quarters ending March 31, 2002, and March 31, 2003, the Monitor found the LAPD in non-compliance with the requirement to provide supervisory officers with relevant training prior to assuming new supervisory positions.  The Monitor found that an insufficient number of the officers evaluated received supervisory training prior to assuming their posts.  The Monitor reported similar findings during the quarter ending September 30, 2003, but withheld a compliance determination due to the need to ascertain whether the officers who had not received training signed affidavits stating that they refrained from performing supervisory duties until after they had received training.  During the quarter ending December 31, 2003, the Monitor found the Department in compliance with this requirement, as 96% of promoted members received requisite training prior to promotion.  The Monitor then found the Department in non-compliance with the requirement during the quarter ending September 30, 2004, and in compliance during the quarter ending September 30, 2005.

The Monitor found the Department in compliance with the requirement to provide regular and periodic supervisory training on reviewing the reports addressed in the Decree, incident control and ethical decision-making for the first time during the quarter ending September 30, 2003, as a sufficient number of supervisors had received the appropriate training on a regular and periodic basis.  The Monitor found the LAPD remained in compliance with this requirement during subsequent assessments conducted during the remainder of the initial term of the Decree.

The Monitor found the Department in compliance with investigatory training requirements for supervisors for the first time during the quarters ending June 30, 2004, and then again during the quarter ending September 30, 2005.  In both instances, the Monitor found that a sufficient number of supervisors received the appropriate training.

The Monitor concluded that the Department achieved substantial compliance with the supervisory training requirements of the Consent Decree by the expiration of the initial term of the Consent Decree. As a result, the Monitor did not actively monitor compliance with these requirements during the extension period.

**Recommendations**

The Monitor commends the LAPD for the accomplishments it has made in achieving compliance with the supervisory training requirements of the Consent Decree. Policies and procedures are in place, and the oversight role of AD, the Police Commission and the OIG will ensure that the policies and procedures are followed, deficiencies corrected and recommendations implemented. The Monitor is confident that the Department will be proactive in ensuring that quality supervisory training in the LAPD will continue to take place. The Monitor offers the following recommendations regarding supervisory training:

- The LAPD should continue to ensure that supervisors are trained on how to conduct administrative investigations.

- The LAPD should continue to track supervisory training and update training to ensure that they remain fully trained in their duties.

# G.    Internal and External Oversight/Monitoring

## 1.    Ethics Enforcement Section Integrity Audits

The DOJ's *May 2000 Letter Report* to the City of Los Angeles concluded that the LAPD "failed to supervise officers properly by failing to identify and respond to patterns of at-risk officer behavior." The DOJ continued to discuss the necessity of an adequate early warning system and the fact that the LAPD's current system was insufficient.

**Consent Decree Solutions**

In order to validate patterns of at-risk officer behavior, whether that risk is flagged by an early warning system, identified via consideration of an officer's work history, or reported by the public, the LAPD was required to establish a discrete unit responsible for conducting random and targeted ethics audits of officers. Of greatest concern were patterns of at-risk behavior that included unlawful stops, searches, seizures (including false arrests), uses of excessive force or discouraging the filing of a complaint or failing to report misconduct or complaints. The LAPD was required to develop and initiate a unit responsible for conducting such audits before July 1, 2001.

Once implemented, the LAPD was required to submit quarterly reports detailing the unit's efforts, and such reports were to be timely submitted to the Police Commission and the IG by the Chief of Police for review and consideration.

## Overall Achievements of the LAPD

At the onset of the Consent Decree, the LAPD established what is now commonly known as the EES.[99]  Within the LAPD's organizational structure, this unit reports directly to the Deputy Chief of the LAPD's PSB.

The EES was tasked with conducting both random and targeted "sting audits."[100]  Random audits assess officer conduct without any specific officer in mind whereas targeted audits are directed at officers identified through analysis, research or referrals[101] considered potentially at risk.

Prior to undertaking a targeted audit, the EES supervisor tasked with managing the audit first makes a determination whether the suspected behavior meets the defined at-risk criteria.  If so, subsequent planning and consideration determines whether a staged scenario is appropriate for capturing the results of an audit.

As outlined in the "Integrity Audit Guide," EES developed specific procedures required of all of its audits as follows:

- Final Report with conclusion signed by Lieutenant of EES.

- Integrity Audit Request documenting the topic of the audit and the audit approach.  This request requires review and approval by several levels of EES supervisors with the final approved by the CO of PSB.

- Site Survey identifying the desirable location(s) to stage an audit and the locations of the nearest police station and hospital for officer safety purposes.

---

[99] Special Order No. 22, *Ethics Enforcement Section, Internal Affairs Group – Established*, dated August 1, 2001.

[100] Initially, in order to establish a data source for conducting "sting audits," EES staff entered information contained in over 5,000 complaint face sheets in order to conduct analysis to identify possible patterns of misconduct by officers.

[101] Referrals for sting audits may be generated through several sources, including, but not limited to: prior complaints, LAPD supervisors and managers, Risk Management Group, utilizing TEAMS data, as well as directly from other officers.  Ideally the new TEAMS II system, by virtue of containing more consistent data and logic versus TEAMS, will identify officers deemed "at risk" for random or targeted audit.

- Operational Plan describing each component of the audit and the role of each EES participant. Also addresses safety concerns, the requisite equipment, as well as the briefing and staging areas.

- Video and/or audio equipment requests.

- TEAMS report(s) of the targeted and/or involved officer(s).

- History of any complaints and/or other reports that lead to the audit.

- Investigator notes, including a chronological log of the audit.

In 2002, the Monitor noted that sworn officers assigned to EES, particularly undercover officers, did not have access to counseling services of the LAPD's BSS. Undercover officers may require such support given the demands and stress placed on their performance and possible risk can be overwhelming. Also, officers completing a tour of duty with EES may encounter anxiety about re-entering the LAPD work force. The Monitor recommended that the LAPD arrange for counseling services for EES officers. In response, the LAPD provided EES personnel with access to BSS psychologists specifically assigned to PSB personnel. Recently, the Special Operations Division developed an integration/re-integration program for all EES officers working in an undercover capacity. With training and BSS assistance, undercover officers, whether transitioning into or out of the EES, are prepared for the psychological demands.

During mid-2003, the Chief of Police received information that complaints from the public were not always accepted at all the Divisions. As a result, the EES was tasked with significantly increasing the number of random complaint intake audits for all Divisions in order to determine whether employees were complying with this requirement.

Throughout the term of the Decree, the EES, the OIG and the Monitor met to discuss expectations when conducting and reviewing future complaint intake audits, whether random or targeted. The parties also discussed circumstances in which information on complaint forms contained inaccurate or incomplete information and EES' analysis and conclusions.[102] In 2005, all three parties agreed to include another audit classification, "pass-substandard." This finding acknowledged that although officer response to the audit was compliant, deficiencies were nonetheless noted requiring address. These deficiencies were typically administrative in nature.[103]

---

[102] Up to this point in time, the EES reported audits as *Pass, Fail, Administrative Fail* or *Inconclusive*.

[103] Certain audits identified officer actions that did not conform with Department Policy and Procedures outside the scope of the intended audit. For many of these instances, the EES CO contacted the officer's CO to report the findings.

EES audits of officer conduct have contributed to the overall goals and objectives of the LAPD, specifically through conducting audits designed to test the integrity and "at-risk" behavior of officers and Department employees. Numerous officers were found to be exonerated of any alleged misconduct. Conversely other audits confirmed suspected or reported at-risk behavior, and ultimately those officers were disciplined. The Monitor noted a wide range of penalties imposed as a result of sustained complaints. Lastly, in all sting audits wherein the actions of officers were determined to be criminal in nature, the matters were referred to the DAO.

**Consent Decree Compliance**

Throughout the entire monitoring process, members of the monitoring team regularly met with the CO and other personnel assigned to EES.[104] The Monitor was regularly extended tours of its facilities, demonstrations of its equipment and apprised of any developments with the unit. The Monitor also observed a targeted audit that included the pre- and post-audit briefings.

In assessing compliance, the Monitor reviewed and relied upon EES "*Risk Evaluation Reports*," video and audio tapes, complaint investigations, use of force investigations and undercover officer notes. In 2005, the Monitoring Team tasked with reviewing EES audits commenced placing reliance on the OIG's review of and reporting on the EES. In general, the Monitor and OIG were in agreement on the overall implementation, execution and scope of the EES audits.

Throughout the initial five-year term of the Decree, the Monitor held the LAPD in compliance with the Consent Decree reporting provisions for the EES. In reaching this conclusion, the Monitor reviewed quarterly *Ethics Enforcement Section Quarterly Reports* and related communications to the Police Commission and OIG.

Similarly, for the entire eight-year review period, the Monitor held the LAPD largely in compliance with regard to the unit's formation and operation. Although the Monitor did not always agree with the unit's approach to an audit or the ultimate conclusion reached, overall, the Monitor concluded that the unit was functioning as desired and designed. However, beginning in 2007, the Monitor reported a declining number of "at-risk" behavior audits conducted by the EES. Specifically, in the Monitor's report for the quarter ended December 31, 2008, the Monitor noted no audits were conducted for unlawful stops (including racial profiling) and few audits were conducted to evaluate searches, seizures and uses of excessive force.

---

[104] Many investigators have prior experience as IAG investigators as well as prior surveillance experience.

**Recommendations**

- For audits of the complaint intake process, the Monitor recommends documentation of all audit findings involving all Department employees, from the initial intake of the complaint through all supervisors responsible for documenting the complaint in logs and reports. The Monitor also recommends and encourages the EES to develop a wider array of scenarios, particularly when auditing more than one Division within the same Bureau.

- The Monitor continues to recommend that the LAPD consider assigning certain audit responsibilities, such as neglect of duty audits not specifically mandated by paragraph 97, to units other than PSB. Consideration should also be given to assigning random complaint intake audits to other Department divisions or sections.

- In designing and planning audits, EES should also consider the locales used when conducting audits designed to test misconduct, such as excessive force, unlawful searches, unlawful arrests, unlawful seizures and enforcement of immigration laws. Many times audits were staged in areas with high vehicular or pedestrian traffic, leading the Monitor to conclude that the audited officer was less likely to exhibit misconduct given the potential for witnesses in close proximity.

- When EES was initially formed, there was sufficient equipment for conducting audits; however, additional, sophisticated equipment was soon needed in order to facilitate more sophisticated and complex audits. The Monitor recommends that the Department continue to invest in additional high-tech equipment as the complexity of scenarios evolves.

- As mentioned above, the Monitor reported a recent decline in the number of "at-risk" behavior audits conducted by the EES. The Department should consider how to best use EES as a resource in conducting these types of audits, including "biased policing" audits. There may be a need to provide specialized training to EES personnel in the design, development and implementation of such audits to ensure their effectiveness.

## 2.    Audit Division Oversight

In preparing the *March 2000 BOI Report*, the Operations work group used audits to gather information, identified where the Department had failed to maintain the resources necessary to conduct these audits on an ongoing basis, and recommended that audits be used in the future to detect other failures in the Department's systems.[105] Specifically, the BOI identified that

---

[105] The BOI Report noted that "if there is one aspect that has been more discouraging than others, it is the degree to which our employees are failing to follow established Department procedures. That failure is compounded by the failure of their supervisors and managers to oversee their work." See page 347 of the *March 2000 BOI Report*.

there had been serious erosion in the quality of and emphasis on audits and inspections over the years, and recommended that the audit systems at the Department, Bureau, Area and Divisional levels had to be significantly expanded. Additionally, the BOI identified that the current practice of allowing commands to "self-audit" rarely provided meaningful data. The BOI also identified that the Department's Audit Guide must be updated and redistributed to all Department commands, a new Department audit schedule must be established, and these audits must be tracked and evaluated by the bureau inspection units. The BOI also recommended that the Operations bureaus and Areas should have well-trained and properly supervised full-time audit units to identify deficiencies in critical functions. The Board concluded that without a routine system of in-depth audits, the Department would be unable to ensure the quality of the employees' work or hold their command structure accountable for the performance of their commands.

## Consent Decree Solutions

The Consent Decree outlined very specific audit requirements that were drawn from the concerns identified and recommendations proposed by the BOI, including:

- The Chief of Police was required to submit to the Police Commission, with a copy to the OIG, an Annual Audit Plan listing all specified Consent Decree audits to be conducted by the LAPD in the upcoming fiscal year, other than sting audits;

- The LAPD was required to establish an audit unit with sufficient resources to allow it to develop the Annual Audit Plan, coordinate, schedule, conduct and complete timely audits as outlined in the Annual Audit Plan and additional audits as may be required by the Chief of Police;

- AD was required to serve as a resource to other LAPD units wishing to conduct an audit, and to perform periodic assessments of the quality of these other audits; and

- The Chief of Police was required to provide to the Police Commission and the OIG quarterly audit status reports that described the current status of the audits listed in the Annual Audit Plan, and any significant results.

The Consent Decree also required that the LAPD perform regular, periodic audits of numerous aspects of policing, including warrants, arrests, uses of force, stops, CIs, complaints, gang units, financial disclosure and police training.[106] Each audit was required to examine a variety of issues, but a common theme among them all was the requirement to assess and report on

---

[106] These audits are detailed in paragraphs 128, 129, 131, 132, 133 and 134.

compliance with other Consent Decree provisions and to identify incidents suggestive of inappropriate police behavior or a lack of supervisory oversight.

**Overall Achievements of the LAPD**

The Monitor believes that the LAPD has established and institutionalized a best police practice internal audit unit that will be a critical governor to ensure future self-correction by the LAPD.

After the inception of the Consent Decree, the Department formally established an audit unit (AD) on July 6, 2001. At that time there were 28 authorized positions, of which 11 were initially filled by sworn professionals and some administrative personnel. In July 2001, AD submitted its first audits. The Monitor concluded that these first audits had a flawed audit process, used inadequate samples and included questions that yielded imprecise results. These problems continued until September 2002, when the Monitor concluded that AD had significantly improved the planning, execution and reporting of its audits. The LAPD was able to accomplish these and future improvements by implementing various strategies to develop its resources and skills, including:

- Providing AD's staff with appropriate resources, including computer equipment and training in auditing and statistical methods.[107] AD personnel, along with personnel from the OIG and DSD, received four days of training from the Institute of Internal Auditors in 2001-02. Additionally, sworn members of AD began obtaining professional audit designations.[108]

- Hiring civilian staff with auditing, accounting and statistical experience, as recommended by the Monitor.[109] This allowed AD to develop a multidisciplinary team that combined civilian auditors who had auditing backgrounds with sworn officers who had policing backgrounds.

- Implementing improvements to the audit process including: clarifying the audit matrix questions used, developing reference materials that better defined critical areas being assessed, developing work papers for tracking and reporting audit results, developing a process for reviewing completed audit work at various stages during the audits, ensuring the audits included recommendations for the Department to review and implement, and developing a management process for reporting back to the various LAPD Areas being audited.

---

[107] The Monitor recommended in February 2002 that AD contact the Institute of Internal Auditors to obtain information about audit training courses.

[108] The Captain and one of the Lieutenants in AD were the first to obtain their Certified Government Auditing Professional (CGAP) certifications from the Institute of Internal Auditors in 2003.

[109] The first civilian auditor joined AD in November 2002.

110 | Office of the Independent Monitor: Final Report
**June 11, 2009**

During 2003, the Monitor concluded that AD's audit process was continuing to improve, as many of the audits that were previously outstanding were completed and some audits met the qualitative requirements.  In December 2003, AD assumed responsibility for the gang-related audits as recommended by the Monitor in 2002 because AD's processes were better than the DSD's/DOSD's, and because many DSD/DOSD audits were either not completed or were below an acceptable standard.[110]

By June 2004, AD was submitting audits on a timely basis, each of which was a quality audit.[111] The Monitor also found that the gang audits completed by AD were quality audits, but could not conclude they were in compliance as the Consent Decree required the gang audits to be completed by DOSD.  Thus, the Monitor concluded that each of the paragraph 128, 129 and 131 audits submitted to June 2004 were quality audits.

The above improvements resulted in an increase in the number of quality audits from 2001 to 2004, as reflected in the chart below:

---

[110] This change was formalized by the court with modifications to the Consent Decree on June 2, 2005.

[111] Despite the significant improvements between 2001 and 2004, the Monitor identified some deficiencies, as a few audits due in 2003 were not completed on a timely basis; AD did not provide the support necessary for the Department to complete a quality paragraph 113 audit, resulting in excess Department time and resources used to complete the audit; and AD did not complete the quarterly status reports for the Police Commission.  Consequently, although each of AD's audits was a quality audit, the Monitor did not conclude compliance on paragraph 124.



**Quality Audits to Total Required Audits**

In light of the improvements in the timeliness and quality of AD's audits and the reliability of the audit results, commencing in September 2004, for certain audits produced by AD for which the scope of an AD audit directly addressed the requirements of a given Consent Decree paragraph, the Monitor elected to evaluate AD's audit work and findings and, if appropriate, rely on such findings in assessing compliance with that paragraph.[112]   Instances of such reliance upon AD's results were clearly indicated in the Monitor's reports.

In addition to completing timely, quality audits, AD took other steps to enhance its professional approach, reputation within the LAPD and other police services, and its effect on the Department, including:

- Offering a four-day Police Performance Auditing Course, starting in September 2004.  This program, which is one of the leading police performance auditing courses in the United States, has been offered on a quarterly basis since then.[113]   It has been attended by 414

---

[112] This is consistent with paragraph 162 of the Consent Decree, which states, "In performing its obligations as required by the Consent Decree, the Monitor shall, where appropriate, utilize audits conducted by the LAPD for this purpose."

[113] The Police Performance Audit program was certified by the California Commission on Peace Officer Standards & Training and by the Michigan Commission on Law Enforcement Standards in late 2004/early 2005.  It covers auditing standards, audit work plans, interviews, audit fieldwork and analysis, report writing and the review process.  This

LAPD employees and 251 employees from 42 other law enforcement agencies throughout the United States and Canada.  AD also developed and offered an Intermediate Law Enforcement Auditing Course in 2007.

- Performing additional non-Consent Decree audits of gang units, CAPAs, the results of which are reported to the Police Commission.  These audits review the practices of specific gang units on a quarterly basis and support the gang audit requirements of subparagraph 131a. The first CAPAs were completed in October 2004 and several have been completed on a quarterly basis since then.

- Formalizing its standards by developing an Audit Charter.  This Audit Charter outlines AD's role, the requirement for independence, the goal of complying with Generally Accepted Government Auditing Standards (GAGAS), AD's access to records, and the scope of audits.  It was originally approved by the Police Commission in January 2006 and was updated and re-approved in October 2007.

- Developing an Audit Protocol that set the standards for LAPD's audits, which was approved in April 2006.  The protocol outlines the requirements for audit staffing, audit team member responsibilities and the audit process.  It also includes direction on how AD conducts audits and covers topics such as audit planning, population identification and sampling methods, data collection and audit reporting.

- Participating as founding members of the International Law Enforcement Auditor's Association (ILEAA) and coordinating the first ILEAA conference in August 2007.

- Supporting its sworn and civilian professionals in their efforts to continue their training and improve their audit expertise.[114]   Additionally, since March 2007, AD's professionals, through the Association of Local Government Auditors (ALGA), participated in peer reviews of the audit quality control systems for the City of Phoenix, City of Dallas and the City of Richmond, Virginia.  AD is preparing to have a peer review of its audit quality control system by a team from ALGA.

---

course has been attended by 414 LAPD employees and 251 employees from 42 other law enforcement agencies throughout the United States and Canada.

[114] As of April 2009, 24 current employees of Audit Division held 41 certifications as a Certified Fraud Examiner (CFE), Certified Internal Auditor (CIA), Certified Public Accountant (CPA), Certified Governmental Auditing Professional (CGAP), Certified Fraud Specialist (CFS), Certified Government Financial Manager (CGFM), Certified Law Enforcement Auditor (CLEA), Certified Information Systems Auditor (CISA) and/or Certified Financial Crimes Investigator (CFCI).

- Responding to requests by other departments within the City Group and other external city agencies to conduct audits and provide consulting services.[115]  Additionally, representatives from other Police Departments have met with senior management of AD to gain insights regarding how to establish an audit division and how to successfully complete an audit.

The Monitor provided varying degrees of input into these developments.

Despite the significant progress made by AD up to June 2004, during the next two years, the percentage of compliant audits decreased, as only eight of the required 11 audits were timely quality audits.[116]  Although a determination of compliance was withheld with regard to one of the audits in each period, two audits in each year were found in non-compliance for a variety of reasons, including changes in how AD approached the audit, changes in Department policy resulting in greater interpretational concerns, and the Monitor's identification of new areas of concern that were not previously identified.  As a result, although most of the audits were compliant, the overall number of compliant audits to total audits completed decreased in 2005 and 2006 as shown in the chart below.

---

[115] In July 2007, audit personnel from Fiscal Operations Division were reassigned to AD to form a new team designated as the "Fiscal Audit Section."  This team is lead by a Police Performance Auditor from AD.  Additionally, AD was requested to conduct an audit that reviewed the policies and procedures for the Arson Unit of the Los Angeles Fire Department.  This report was presented to the City of Los Angeles Board of Fire Commissioners in April 2009.

[116] The audits that were not found to be in compliance by June 2005 were AD's *Confidential Informants Control Packages Audit* and *Complaint Form 1.28 Investigations Audit*.  The Monitor withheld a determination of compliance on AD's *CUOF Investigations Audit*.  The audits that were non-compliant by June 2006 were AD's *Warrant Applications and Supporting Affidavits Audit* and AD's *Complaint Form 1.28 Investigations Audit*.  The Monitor withheld a determination of compliance for AD's *GED Work Product Assessment Summary*.

## Compliant Audits to Total Required Audits



A determination of compliance was withheld for one audit in each of 2005 and 2006.

Notwithstanding that a few audits were non-compliant in 2005 and 2006, by June 2006 AD issued a total of 30 quality Consent Decree audits of which 26 had been submitted in the past three years (of the 32 total required audits). As many of the audits were in compliance for two years, the Monitor concluded that the Department had achieved substantial compliance with the pertinent paragraphs. The Monitor then revised its methodology for those areas/audits that were in substantial compliance for two consecutive years prior to the June 2006 extension. For some of these audits, the Monitor revised its methodology to perform a general review of the quality of the audit to gain assurance that the underlying areas being audited did not require active monitoring and that the quality of the audit had been maintained; for other audits, the amount of testing was reduced. For those audits that had not achieved substantial compliance, the Monitor continued with a full review of the audit report and associated documents.

Between June 2006 and June 2008, the audits that had been found in substantial compliance by June 2006 remained in substantial compliance. Additionally, by June 2008, the Monitor concluded that AD had achieved substantial compliance with three additional audit-related subparagraphs. To date, but for subparagraph 131a, AD has achieved substantial compliance with each of the Consent Decree paragraphs that require AD to conduct an audit. At the same time, AD has met all other requirements, including preparing annual audit plans and quarterly status reports for the Chief to provide to the Police Commission, and has acted as a resource to CRID and other departments to assist them in reviewing their processes and inspections so that the Department can achieve compliance. Furthermore, AD has acted as a resource for other

police departments on how to establish an audit unit.  Based on these accomplishments, AD had led the way in how performance audits should be conducted.[117]

## Consent Decree Compliance

As described in the preceding section, the LAPD's AD achieved significant professional growth as an audit team over the past eight years.  This development, which has had far-reaching effects throughout the Department, is reflected in the number of audits that were found in compliance as shown in the charts above.   While AD's overall progress towards issuing compliant audits varied depending upon the type of audit, the audits generally fell into one of the following three categories:

- Audits conducted pursuant to paragraphs with which substantial compliance was achieved by June 2006 and limited reviews or reduced monitoring was conducted thereafter;

- Audits conducted pursuant to paragraphs with which substantial compliance was not achieved by June 2006 or which had other risks and required continued active monitoring; and

- Audits that have not yet been completed, as LAPD policy has not been developed, or which were one-time audits.

This next section describes AD's progress with the audits in each of these three categories.

### *Audits That Were Substantially Compliant by June 2006*

There were five audits that the Monitor concluded were substantially compliant by June 2006: the *ABC Reports Audit, NCUOF Reports Audit, CUOF Systems Audit, Complaint Form 1.28 Systems Audit* and *GED Selection Criteria Audit*.  The Monitor concluded that the first two of these audits could be subsequently monitored during the extension of the Consent Decree using a limited review of AD's audit methodology, while the other three could be subsequently monitored using smaller sample sizes than were used by the Monitor in its testing to June 2006.

*Substantially Compliant Audits Monitored With Limited Reviews of AD's Audit Methodology*

AD first achieved full compliance with the Department-wide and gang-related requirements relative to its *ABC Reports Audits* and its *NCUOF Reports Audits* in 2004 and 2005.  Since these audits were found in compliance for two consecutive years, the Monitor concluded in June 2006

---

[117] AD's significant development over the past eight years has also been recognized by the American Society for Public Administration, Los Angeles Metro Chapter, as it awarded AD with the Henry Reining Outstanding Organization Award on May 15, 2008.

that the Department was in substantial compliance with the required subparagraphs. The Monitor further determined that subsequent audits of these topics required only limited reviews of the audit methodology during the extension of the CD, rather than active monitoring. The purpose of the Monitor's limited reviews was to determine if AD used the same methodology as it had in prior compliant audits. The limited reviews consisted of comparing the current audit report, work plan, audit matrices and population documentation with the prior year's audit report, work plan, audit matrices and population documentation to determine if any change in methodology or findings warranted further review.

In each of the three years of the extension of the Consent Decree, the Monitor's limited review of audits did not identify any concerns that suggested these audits were not of the same quality as prior compliant audits. As a result, the Monitor concluded that the Department remained in substantial compliance with these paragraphs.

### *Substantially Compliant Audits Monitored Using Reduced Testing*

In order to meet the Consent Decree requirements relative to the *CUOF Audit* and the *Complaint Form 1.28 Audit*, in June 2004 and December 2005, respectively, AD began splitting these audits into two reports: an interim audit report that covered those paragraphs that largely address specific process issues and a final audit report that assessed the quality of the CUOF investigations or the Complaint Form 1.28 investigations. By June 2006, AD's *CUOF Systems Audit* was found in compliance three times[118] and its *Complaint Form 1.28 Systems Audit* was found in compliance twice.[119]

The Monitor concluded that AD's subparagraph 131b GED *Selection Criteria Audit* was a compliant audit for the first time in December 2004 and then again in September 2005.

While each of these audits was in compliance for two consecutive years by June 2006, the Monitor concluded that it needed to monitor the audit methodology, as well as a sample of the topics tested in these audits, as these audits either reviewed paragraphs that were not in compliance or reviewed higher risk areas. Although the Monitor was confident that the audits would remain substantially compliant, to ensure this was the case, the Monitor completed a review of the report, audit work plan, audit matrices and population documentation as it did for the limited reviews and then conducted additional testing by selecting a sample of items to review AD's conclusions in relation to each item in the sample. The Monitor reduced its sample size from reviews of prior audits by using a one-tailed test and an error factor of +/-7% rather

---

[118] The Monitor assessed compliance in September 2004, June 2005 and June 2006.

[119] The Monitor concluded that these were compliant audits in March 2005 and March 2006. The Monitor also concluded in June 2004 that AD's *Complaint Form 1.28 Audit*, which assessed both the systems and the quality of the investigations, was also compliant.

than using an error factor of +/-4%. This significantly reduced the size of the Monitor's samples from those used in prior reviews of these audits.

Based on the Monitor's reviews of these audits during the extension, the Monitor concluded that the Department remained in substantial compliance with these subparagraphs.

### Audits That Were Not Substantially Compliant by June 2006 or Audits with Other Risks

There were four audits that the Monitor concluded were not substantially compliant by June 2006 and one audit which had other risks associated with it. The four audits which had not achieved substantial compliance consisted of AD's *Warrant Applications and Supporting Affidavits Audit*, *Confidential Informant Control Packages Audit*, *Categorical Use of Force Investigations Audit* and the *Complaint Form 1.28 Investigations Audit*. The Monitor concluded in June 2006, that although AD's *Motor Vehicle and Pedestrian Stops Audit* had achieved substantial compliance, there were other risks associated with this audit; accordingly, the Monitor concluded that this audit should continue to be actively monitored.

#### Warrant Applications and Supporting Affidavits Audit

AD's July 2002 *Warrant Applications and Supporting Affidavits Audit* was the first audit report issued by the LAPD that the Monitor concluded was a compliant audit. Although another *Warrant Applications and Supporting Affidavits Audit* was not issued until March 2004, the Monitor found this audit and the subsequent audit issued in February 2005 in compliance. However, the Monitor concluded that the February 2006 *Warrants Application and Supporting Affidavits Audit* was not in compliance, as the Monitor identified numerous instances of non-compliance within the packages that were not identified by AD. Consequently, the Monitor could not conclude that the Department was in substantial compliance by June 2006, and the Monitor continued to actively review subsequent audits.

The Monitor concluded that AD's December 2006 *Warrant Applications and Supporting Affidavits Audit* was non-compliant, as it contained numerous anomalies within the individual warrants, as well as packages in which the COs' analyses or the supervisors' debriefing summaries were insufficient. In its next two reviews, the Monitor concluded that AD's December 2007 and 2008 *Warrant Applications and Supporting Affidavits Audits* were compliant notwithstanding some concerns identified regarding supervisory oversight.[120] While these concerns would not have changed AD's overall conclusions, in light of the concerns expressed by the BOI regarding supervisory oversight, the Monitor recommends that AD continues to ensure in its assessment of supervisory oversight that the comments in the supervisor's debrief, CO's analysis and the comment card are specific to the search warrant and the supervisor in charge

---

[120] Although AD had appropriately concluded the Department was not compliant with supervisory oversight, in some packages the Monitor identified other concerns in relation to the quality of the supervisors' debrief summaries and a lack of specificity in relation to the commanding officer's analysis and comment cards.

of the warrant and that they address the Department's policy requirements.  Since this audit has been in compliance for two years in a row, the Department is now in substantial compliance.

### Motor Vehicle and Pedestrian Stops Audit

The Monitor found AD's 2005 and early 2006 *Motor Vehicle and Pedestrian Stops Audits* in full compliance with the requirements of the Consent Decree to review the general population of stops and gang officers' stops.  As a result, the Department achieved substantial compliance with the relevant subparagraphs by June 2006.  However, since the Department was reviewing how the stops data were collected and whether or not the data could be used to assess if this Department's officers were racially profiling, the Monitor concluded that subsequent *MV&PS Audits* should continue to be actively monitored.

AD's first audit of this topic issued during the extension, the December 2006 *MV&PS Audit*, was in compliance with the requirements relating to Department-wide stops, but the Monitor withheld a determination of compliance in relation to the gang officers' stops, as AD's findings were based on a review of only one GED officer.  AD did not submit a subsequent *MV&PS Audit* in December 2007 or December 2008 as the Department was changing how it collected the data needed to complete this audit.  Going forward, once the Department has finalized the procedures for collecting data related to motor vehicle and pedestrian stops, AD will need to review the procedures and design an audit to test if they are being followed.

### Confidential Informant Control Package Audit

The Monitor concluded that AD's June 2003 and June 2004 *Confidential Informant Control Packages Audits* were compliant audits.  However, AD's June 2005 *Confidential Informant Control Packages Audit* was not in compliance, as the Monitor disagreed with how AD assessed and reported compliance for several substantive paragraphs, and AD did not identify various anomalies within individual CI packages.  Consequently, the Department had not achieved substantial compliance with the required subparagraphs by June 2006, and the Monitor continued to actively review subsequent audits during the extension. The Monitor determined that AD's June 2006 and September 2007 *Confidential Informant Control Packages Audits* were in compliance; as a result, the Department achieved substantial compliance and the Monitor conducted a limited review of this audit in September 2008, concluding that the Department continued to be in compliance.

### CUOF Investigations Audit and Complaint Form 1.29 Investigations Audit

The Monitor found AD's 2004 *CUOF Investigations Audit* and its 2004 *Complaint Form 1.28 Investigations Audit* compliant, but these were the only audits of these topics that were compliant through June 2006.  Other audits of these topics prior to this date were non-compliant for a variety of reasons, including incomplete scope and issues that were not

identified by AD.    Consequently, by June 2006, the Department was not in substantial compliance with the Consent Decree paragraphs requiring these investigative audits.

The Monitor found AD's *CUOF Investigations Audit* in compliance in September 2006 and 2007 and, as a result, conducted only a limited review of the subsequent audit in September 2008. The Monitor found AD's *Complaint Investigations Audit* in compliance in June 2007 and June 2008.    As a result, the Department achieved substantial compliance with the Decree requirements relative to these audits.

### GED Work Product Assessment Summary

In September 2003, December 2003 and March 2004, the Monitor found AD's *GED Work Product Assessment Summaries* were quality audits, but could not conclude they were compliant audits because they were conducted by AD rather than DOSD, contrary to the requirements of the Consent Decree.    The Monitor concluded that AD's June 2004 audit was compliant after it was determined that the Court would approve a change in the Consent Decree to allow such audits to be completed by AD.    In each of these four audits, AD assessed four or five GED units at a time.[121]

Subsequent to this, AD changed its approach to this audit by using its CAPAs as the primary source of information for these audits, which reviewed one or two Areas' gang officers' work product each quarter.    Although the Monitor generally agreed that AD could use its CAPAs for its *GED Work Product Assessment Summary*, the Monitor identified a number of concerns and weaknesses with AD's approach since 2004.    During this period, the Monitor, AD and the OIG met on numerous occasions to discuss the intent of the pertinent Consent Decree requirements and the findings that should be included in audits conducted pursuant to them.    While AD made significant progress with this audit, there were two Areas about which the Monitor and AD were unable to agree, primarily relating to what information needs to be included and analyzed in this audit.[122]    As a result, the Monitor found the Department in non-compliance with Consent Decree requirements relative to this audit in December 2005, March 2008 and December 2008 and withheld a determination of compliance between December 2005 and December 2007 either because AD was going to submit a second phase of the report or was due to issue a new report with new methodologies.

In its quarterly reports, in light of the inconsistencies in AD's approach to this audit, the Monitor has provided the following guidance regarding the basic requirements for the *GED Work Product Assessment Summary*:

---

[121] At that time, the Monitor understood that AD would be submitting a summary report that pulled the results of each of these quarterly reports together, as well as assess other requirements of paragraph 131a.

[122] AD believes this disagreement is due to philosophical differences regarding what this Consent Decree paragraph requires.

- This audit must assess and report on the work product of all gang units, including an analysis of trends or patterns among officers, supervisors and/or areas whose work product appears to contain indicia of untruthfulness or other forms of misconduct, including breaches of the law, LAPD policies and procedures or the Consent Decree, or whose work product otherwise merits further review;

- This audit must assess and report on the work product of the BGCs, specifically their subparagraph 106h inspections; and

- This audit must assess and report on the findings from any paragraph 128 audits or BGC inspections that appear to contain indicia of untruthfulness or other forms of misconduct by any GED units or individuals.

Although the *GED Work Product Assessment Summaries* conducted over the past four years have addressed one or more of these requirements, they have not addressed all of these requirements at the same time.

*Other Audit Paragraphs*

*Audit of Police Officer Training*

The Consent Decree required the Department to conduct audits within 18 months of the effective date of the Consent Decree of police officer and supervisor officer training, using independent consultants to determine how the LAPD training could be improved to reduce incidents of excessive use of force, false arrests and illegal searches and seizures and make greater use of community-oriented policing training modes that take into account factors such as cultural diversity.

The Department hired RAND as the independent consultant to complete the training audit. After evaluating RAND's review, the Monitor concluded that RAND's report was not specific enough to the LAPD, despite comments from both the Monitor and the LAPD. However, subsequent to this, the Monitor worked with the LAPD to define the training requirements and found the LAPD in compliance with Consent Decree requirements in December 2004.

*Audit of Skeletal Fractures*

The Consent Decree required the Department to conduct audits within 18 months of the effective date of the Consent Decree of all uses of force resulting in skeletal fractures known to the LAPD, including the frequency of occurrence of skeletal fractures, medical care provided and quality, thoroughness, disposition and timeliness of the chain of command investigation and review of uses of force resulting in fractures.

The Monitor initially found the Department's *UOF-Skeletal Fractures Audit* non-compliant in March 2003, as it did not address many of the criteria required by the Consent Decree. The

Monitor next reviewed compliance with this paragraph in March 2005 in connection with a request by the DOJ that the Monitor perform an additional review to determine if skeletal fractures that occurred as a result of a NCUOF were subjected to sufficient oversight by the Department. The Monitor withheld its determination of compliance due to the small number of incidents that occurred after the issuance of Special Order No. 13, *Non-Categorical UOF Reporting – Revised*, which prevented the Monitor from determining if the investigations met the intent of paragraph 134. Subsequently, the City and the DOJ requested that the Monitor determine whether the intent of this paragraph and its one-time audit requirement had been met. In September 2005, the Monitor concluded that the intent of this paragraph was to determine whether sufficient scrutiny was provided by the Department of uses of force involving skeletal fractures. The Monitor concluded that with the introduction of Special Order No. 13 and the higher level of scrutiny it requires, the intent of this paragraph was met.[123]

> *Audit of Financial Disclosure*

As described in section 5, below, the Financial Disclosure Audit was not completed and financial disclosure is subject to the Transition Agreement.

## Recommendations

The Monitor commends AD for all of its accomplishments over the past eight years. AD's highly professional audit team has not only worked to make the LAPD a better department through its audits, training and reviews, it has also assisted numerous other police agencies and community organizations to develop their own audit resources. While the Monitor is confident that AD has the processes and the people in place to ensure that it will continue to maintain the quality of its audits going forward, AD will be facing new challenges when the Department is no longer under the Consent Decree. As it faces these challenges, AD will need to address a number of significant areas as it transitions to conducting audits required by the Department. These issues include reviewing its audit standards, the standards it uses to evaluate LAPD's policing practices, revisiting its audit plan, maintaining an independent mindset and addressing any potential conflicts that may arise as a result of combining AD with the Inspections group.

*Standards Used to Conduct the Audits*

AD has indicated in its audit reports that it has been using Generally Accepted Government Auditing Standards (GAGAS) since January 2007.[124] Additionally, as described earlier in this

---

[123] In September 2005, the Monitor introduced a new report card category "Compliance with Intent," which was utilized in situations where the Consent Decree requires a one-time effort that upon initial review did not meet the requirements, but has since been found to meet the functional intent of the paragraph.

[124] The Monitor's reviews did not address whether AD conformed to GAGAS, as the Monitor's reviews were confined to assessing whether the audits complied with Consent Decree requirements.

report, AD developed an Audit Charter and Audit Protocol which codifies AD's role within the Department, its overall audit standards, documentation access, staff requirements and responsibilities.

During the past eight years, the Consent Decree mandated that AD complete its audits in accordance with the specific requirements of paragraphs 128, 129 and 131 of the Consent Decree. AD therefore used these requirements to define the framework for its audit objectives. AD may wish to continue to use this framework for its audit objectives in future audits. Either way, AD should codify the specific standards that it intends to follow in the conduct of its audits, ideally within their Audit Protocol. In this way, its audits will be governed by GAGAS, by its Audit Protocol and by its Audit Charter, which will form the framework by which AD conducts its audits and will help to ensure that AD continues to issue quality audit reports that assess whether or not the Department is compliant with its policies and procedures.

*Standards Used to Evaluate the LAPD's Policing Practices*

The framework for AD's audits to date has been based primarily on an evaluation of the LAPD's policing practices compared to the standards described in the Consent Decree and further clarified by the Department's policies. In other words, the Consent Decree represented "the standard" for AD's Consent Decree-mandated audits. Although AD has referred to the Department's policies and procedures in its audits, historically it has generally reported a breach in policy as an "Other Related Matter" rather than as a compliance issue.

When the Department is no longer governed by the Consent Decree, the Department's policies and procedures will represent "the standard." As AD makes this shift in its audits, AD will need to update its audit matrix questions and compliance reporting structure so that it evaluates the Department's policing practices based on the LAPD's policies and procedures.[125] In this way, AD's audits will address the BOI's recommendation that audits be conducted to determine whether the Department is following established policies and procedures. Furthermore, as AD will now have a choice as to what parts of a policy will be tested in its audit objectives, the Monitor recommends that if AD elects to not test certain parts of a policy,[126] this information

---

[125] AD could continue to use the Consent Decree as the standard for any topics that are not fully addressed in a policy.

[126] In some cases, in particular with AD's *Warrants Application and Supporting Affidavits Audit*, the Monitor identified areas within the policy that AD does not test, as it does not believe there are risks associated with these areas. For example, whether the supervisor's debrief is prepared within 24 hours of the search warrant service and whether the warrant tracking log contains all the information required by policy.

should be included in the audit report so that management is aware of this fact and can assess the implications.[127]

*Audit Plan*

Currently AD plans to continue with the same audits that were required by the Consent Decree, as well as the CAPAs, through to June 2011.  During this period, AD should assess if it is appropriate to continue with these same audits or if there are other audits that should be considered.  In conducting this assessment, the Monitor suggests that AD look at various risk-based models to decide which audits to conduct.  Some of the factors that AD may want to consider include:

- Are there audits in which the Department is fully compliant with the requirements tested and which AD could consider reducing the frequency of the audits, e.g., every second year rather than every year?

- Should AD focus on other areas of risk that may be identified in other audits, through complaints (either from the public or within the Department), or through other activities of the LAPD that are identified by the Department, the OIG, the Police Commission, the City or the public?

- Are there other entities, including the inspections area, that review related topics that provide additional oversight, which may allow AD to divert its resources to areas that do not receive additional review?

- Can AD provide insight into other areas, as recommended in this report, that AD has not previously reviewed, e.g., the LAPD performance appraisal process?

- Can AD make further use of TEAMS II in its audits?

*Independent Mindset*

One of the greatest challenges for any audit team is that it continues to remain independent and skeptical in thought and action.  To ensure AD maintains an independent mindset when conducting its audits, AD has introduced a robust analysis that covers different points of view.  Since AD must serve as an independent body that will test whether the Department is complying with its own policies, it is particularly important for AD personnel to continue to remain skeptical and challenge reasons for substandard actions by Department personnel.

---

[127] While AD's risk assessment may result in a decision by AD to only audit higher risk areas, AD should clearly describe the scope of their audits and should inform management regarding those sections of the policies that are not being tested.  Currently, AD only defines the parts of the policy that are tested.

*AD's Structure*

AD is now operating under a new structure, having merged with the inspections area into one combined division. There are advantages to this arrangement, as all audits and inspections are to be coordinated out of one division, allowing for standardization and consistency and the elimination of duplicate audits/inspections; however, the structure may also produce conflicts if AD is tasked with assessing the inspections, as is the case with the BGC Inspections. The Department will need to address this apparent conflict. The Department will also need to ensure that AD remains independent of investigative bodies such as FID and IAG so that it can continue to evaluate the work of these divisions.

Given the success of AD during the past eight years, the Monitor is confident that it will appropriately address these challenges going forward.

## 3.    Inspector General Reviews and Audits

The BOI concluded that the IAG, the IG, Department staff and command officers share responsibility to monitor and detect corruption within the LAPD. The BOI also concluded that the OIG should be provided sufficient staff to augment and support IAG's risk management monitoring efforts. Lastly, the BOI noted that the IG's role in the review of OIS cases needed to be defined and this role may include periodic audits of the process of investigating an OIS.

**Consent Decree Solutions**

The Consent Decree addressed the responsibilities of the OIG in a number of areas, with a particular emphasis on the requirement to review and conduct various audits. It required the Department to provide to the IG copies of various audits required under the Decree,[128] so that the IG could review and evaluate each audit's quality, completeness and findings, and provide its evaluation of the audit to the Police Commission. In addition, the OIG was required to conduct its own audits of CUOF, NCUOF and Complaint Form 1.28 investigations.

In relation to TEAMS, the Consent Decree required the OIG to audit the quality and timeliness of the LAPD's use of TEAMS II to perform specific tasks required by the Consent Decree. It also required the OIG to periodically use TEAMS II to conduct audits of the LAPD and to review LAPD

---

[128] This included all reports of specified audits prepared by the LAPD (which included those audits required under paragraphs 128, 129, 131,132, 136, 137 and 138) and audits prepared in compliance with paragraphs 111, 113, 125, 126, 133 and 134. The IG was also authorized to request a copy of any other LAPD audit and evaluate it, at its discretion or at the direction of the Police Commission.

unit-specific and officer-specific audits,[129] as well as examine or identify at-risk practices as determined by trends within a unit or between and among units using the same criteria.

The Decree also required that the OIG be notified in a timely manner of all CUOF, and authorized OIG personnel to be present as an observer on CUOF roll-outs and at any UOFRB meeting.

Lastly, the Consent Decree required the OIG to receive, record and track complaints from LAPD employees alleging retaliation for reporting possible misconduct or at-risk behavior.

## Overall Achievements of the OIG

At the commencement of the Consent Decree, the OIG was a marginalized and thus ineffective operation that had little relevancy to how the LAPD performed.  Today, the OIG is a respected partner in reform.

As the term of the Consent Decree began, the OIG set out to develop the policies and protocols that would enable it to fulfill its mandate to review UOF and complaint investigations[130] However, during the first two years of the Consent Decree, the OIG struggled with the requirements to review the Department's audits and conduct its own audits.  As a result, the Monitor concluded that the OIG did not meet the requirements of the Consent Decree.  In making this conclusion, the Monitor noted numerous issues: the OIG's audit samples were selected independently from the audit samples used by AD; the OIG's conclusions that the Department's audits were "generally thorough and complete" or "adequately addressed the issues set forth in the Consent Decree" were not supported or were inconsistent with findings in its reports; the OIG did not identify numerous deficiencies in the Department's audit reports, nor did it perform any population completeness tests; and, lastly, the OIG did not complete its reviews of the Department's audits and its own reviews of CUOF and NCUOF incidents and complaints on a timely basis.

By December 2003, although the OIG had achieved compliance with certain Consent Decree paragraphs related to its reviews of the Department's audits, resource constraints caused the OIG to be several months behind in its evaluations of many audits submitted by the Department, and more than a year behind in completing its own independent audits.  This

---

[129] These audits are to review officers demonstrating at-risk behavior as determined by their history of administrative investigations, (ii) misconduct complaints, (iii) discipline, (iv) uses of lethal and non-lethal force, (v) criminal or civil charges or lawsuits, (vi) searches and seizures, (vii) racial bias, (viii) improper arrests, or (ix) any other matter requested by the Police Commission or, subject to Charter section 573, any other improper conduct or at-risk behavior the IG has reason to believe exists.

[130] The OIG's Use of Force section developed a protocol on rollouts to UOF incidents.  The LAPD also produced Special Order No. 17, which requires IAG to provide the IG with all complaint intake information.

pattern continued through to September 2004, when the Monitor expressed concern that the OIG had not yet effectively performed some of its mandated functions and questioned the OIG's ability to effectively oversee the LAPD given its inadequate resources.

In response to the issues raised by the Monitor, starting in 2004, the OIG began to develop tools to assist its staff in reviewing the Department's audits, conducting their own audits, and reviewing use of force investigations and complaint investigations. These tools consisted of matrices with questions that guided the auditor/reviewer through the documents they were looking at and a manual for conducting reviews, which was issued in the spring of 2005. In addition, in late 2004, the OIG commenced a reorganization of its entire office. This process involved converting existing "Management Analyst" positions into "Special Investigators" and "Police Performance Auditors," and recruiting candidates with the necessary legal, auditing and/or policy backgrounds to directly address the expertise issues that were preventing the OIG from achieving compliance in each area of oversight. Once an appropriate team of professionals was in place, the OIG developed a plan to approach the required reviews. For the OIG's audit team, this involved first issuing timely quality reviews of LAPD audits, and then addressing the requirements for completing its own reviews of NCUOF incidents and complaints. At the same time, the OIG's Use of Force section implemented the use of a matrix in conducting reviews of UOF incidents.

During the same period that the OIG was developing its resources and restructuring its team, the OIG worked in conjunction with the Monitor and the DOJ to change paragraph 136 to require the OIG to review rather than audit CUOF incidents, NCUOF incidents and complaints. Additionally, the focus of these reviews was changed to provide the OIG with more latitude in what the reviews would consider.

With the implementation of the changes described above, the OIG's compliance levels improved dramatically. The OIG achieved compliance with both the timeliness and quality criteria of its requirement to review the Department's audits in September 2005. After this, the OIG made significant strides in 2005 and 2006 in successfully implementing its role, and completed 16 timely reviews of the audits completed by AD and the EES. Additionally, the OIG conducted its first compliant reviews of complaints and CUOF and NCUOF incidents starting in March 2006 and June 2006. Each of these reviews and audits provided insightful comments, conclusions and recommendations to the Police Commission. By June 2006, the Monitor concluded that the OIG had developed a professional audit team that included police performance auditors and special investigators with the expertise to ensure that the OIG meets its mandate.

By June 2007, the OIG had completed a total of 30 quality reviews of Department audits. The OIG also continued to conduct quality reviews of CUOF, NCUOF and complaints. By July 2008, as a result of the number of compliant reviews, the Monitor concluded that the OIG had achieved substantial compliance with pertinent Consent Decree requirements and elected to conduct only limited reviews of selected OIG reports to ensure that the Department's compliance was maintained during the remainder of the extension period.

**Consent Decree Compliance**

As described above, the OIG's transition to a team that consistently produced quality reviews and audits was achieved through a number of major initiatives and the development of a plan to address problems identified by the Monitor and to achieve compliance with Consent Decree requirements. This plan was implemented in various stages, starting first with its review of the Department's audits, then with the requirement to conduct its own reviews of UOF and complaints, and, lastly, once TEAMS II was implemented, with the requirements for the OIG to review the Department's use of TEAMS II and to use TEAMS II to conduct audits of the LAPD or to review LAPD unit-specific and officer-specific audits conducted by the LAPD.

*Requirement to Provide Timely Reviews of AD's and the EES' Audits*

The Monitor concluded that the OIG's review of the Department's audits was in compliance for the first time in December 2002.[131] Although compliance was achieved based on the quality of the reviews conducted, the OIG did not submit quality reviews on a timely basis until June 2005. Subsequent to September 2005, although there were a few quarters in which the OIG did not submit its review on a timely basis, the Monitor consistently found that the OIG's reviews were quality reviews. From June 2006 onwards, the OIG submitted timely quality reviews of audits conducted by both AD and the EES.

*Requirement for the OIG to Conduct Reviews of Complaints and CUOF and NCUOF Incidents*

As indicated above, the OIG completed its first compliant review of complaint investigations in March 2006. This occurred after the OIG implemented its restructuring strategy described in the preceding section. In June 2006, the OIG submitted a quality NCUOF review and the OIG's reviews of each CUOF incident, which were provided to the Police Commission, were determined to be quality reviews. Since that time, the Monitor concurred with most of the OIG's findings and concluded that the OIG continued to submit quality reviews of CUOF incidents, NCUOF incidents and complaints, notwithstanding significant disagreement from the Department regarding the findings from these reviews, both prior to the OIG issuing its reports and afterwards.[132] This ability to remain independent of the Department is a cornerstone of the OIG's future success.

*Requirement to Review the LAPD's Use of TEAMS II Protocol*

---

[131] This finding was based on the OIG's October 2002 review of AD's *Search Warrants and Supporting Affidavits Audit*, the OIG's November 2002 review of the Criminal Intelligence Group's *Confidential Informant Control Packages Audit* and the OIG's August 2002 review of DSD's *Gang Unit Use of Confidential Informants*.

[132] In some instances, during the closeout meetings and when the OIG's reports became public reports, the OIG has received substantial criticism for its findings from areas that were dissatisfied with the findings. This is to be expected given the OIG's oversight role.

Once TEAMS II was fully implemented in the spring of 2007, the OIG commenced its audit of TEAMS II, which requires the OIG to audit the quality and timeliness of the LAPD's use of TEAMS II to perform the tasks identified in paragraph 47. In this audit, the OIG split its review into two reports: a Phase I report, which covered system-generated action items, and a Phase II report, which covered supervisor-generated action items and routine system-generated action items.[133] The Monitor agreed with this approach and similarly split its evaluation of paragraph 137 into two separate evaluations.

The OIG submitted its TEAMS II Phase I audit in November 2007, its Phase II audit in June 2008 and another Phase I audit in October 2008. The Monitor concluded that each of these audits were compliant, and the Monitor provided input to the OIG regarding areas in which the OIG could improve its reviews. The Monitor anticipates that the OIG will address these requirements in the OIG's future TEAMS II audits.

*Requirement for the OIG to Use TEAMS II to Conduct and Review Audits*

The Monitor withheld a determination of compliance with requirements for the OIG to use TEAMS II to conduct and review audits in September 2008. In December 2008, the Monitor found the OIG in compliance with the requirement to examine and identify officers with at-risk behavior, but withheld a determination of compliance with the requirement to examine and identify trends. The Monitor and the OIG subsequently met and the OIG outlined a strategy for approaching the trending requirements which the Monitor concurs with.[134] Going forward, the OIG and Department will need to implement this strategy and the DOJ will need to confirm that the OIG has conducted sufficient review of at-risk practices or trends within units or between units. The Monitor is of the opinion that if the OIG implements this strategy, it will meet these requirements.

---

[133] At the time the OIG issued its first TEAMS II report, it originally intended to include only supervisor-generated action items in the Phase II report. However, after the OIG issued its Phase I report, increased automation of TEAMS II significantly reduced the number of supervisor-generated action items but increased the number of system-generated action items. These new system-generated action items are not generated as a result of an officer exceeding a threshold, but as a result of a promotion or transfer. As a result, they are routine and involve less risk. These lower risk action items were also assessed in Phase II, along with any supervisor-generated action items.

[134] The strategy involves the OIG obtaining and reviewing action item reports on a semi-annual basis to identify areas that appear to be at risk for one of the criteria listed in paragraph 138a. After preparing a report of their findings, the OIG will submit this report along with suggested areas for discussion to RMEC for review and follow-up with the appropriate Department Captain or other senior management who should respond to the report in a reasonable time.

**Recommendations**

Over the past eight years, the OIG has developed into a team of professionals that continues to
consistently conduct quality reviews of Department audits and audits of the Department's
CUOF, NCUOF and complaints.  The OIG has also taken on other special projects, including
reviews of specific incidents such as the MacArthur Park May Day incident that occurred in
2007.  The Monitor believes the OIG is well-positioned to continue its role of civilian oversight of
the Department and to take on further responsibilities previously held by the Monitor.  At the
same time, the Monitor worries about the independence of the OIG under a different Police
Chief or a different Police Commission.  The City family needs to look at potential structural
changes that can ensure independence in the future.

In order to be successful at this role, it is critical that the OIG remain independent and challenge
the findings of FID, AD, IAG and other groups within the Department.  For the most part, the OIG
has accomplished this task in the past three years, notwithstanding significant feedback from
the Department in response to reports that are less than favorable.  This has ensured that the
Department has addressed shortcomings in how it conducts internal investigations and audits of
various areas.

Going forward, like AD, in order to ensure the best use of its resources, the OIG will need to
assess which reviews it should continue to conduct and its approach to these reviews.  The OIG
may wish to maintain the same reviews, or it may be appropriate to take on additional reviews.
As recommended above in relation to the OIG's reviews and use of TEAMS II, the OIG is still fine-
tuning its approach to reviewing these requirements.  The Monitor recommends that the OIG
continues to challenge itself and the Department in how they use TEAMS II as a tool to improve
the Department's ability to recognize at-risk officers and units.  The Monitor commends the OIG
for its progress and supports the OIG in continuing to develop as one of the primary oversight
bodies of the LAPD.

# 4.    Police Commission Oversight

The *Christopher Commission Report* dedicated an entire chapter to the status and role of both
the Police Commission and Chief of Police, and their relationship with each other and other City
entities.  The Christopher Commission identified numerous systemic problems in relation to how
the Police Commission functions and provides oversight.  These included the inability of the
Police Commission to review and monitor disciplinary matters, failure to provide sufficient
information to the Police Commission so that it could effectively monitor the Department's uses
of force or make policy recommendations.  The Christopher Commission also reported that
"although the Police Commission is responsible for reviewing and approving the Department's
annual budget, it has insufficient resources to participate meaningfully in the budget

process,"[135] and cited a lack of ability on the part of the Police Commission to ensure that a recommended policy change was implemented by the Department. Overall, the Christopher Commission concluded that "the Police Commission – while given broad authority over the Department and its Chief – has neither the resources nor the real power to perform effective oversight and control."[136]

The BOI focused on the role of the Police Commission in reviewing OIS incidents in order to ensure a complete, thorough and impartial examination of how these incidents are reviewed. This process includes reviewing the Chief of Police report[137] and issuing a report of the incident.

Although the DOJ's *May 2000 Letter Report* did not specifically refer to the role of the Police Commission, the DOJ indicated that they interviewed members of the Police Commission as part of its investigation, which cited deficiencies in LAPD policies and procedures that resulted in multiple concerns regarding supervisory oversight and an overall failure to implement a system that would identify and respond to patterns of at-risk officers. Since the Police Commission is the ultimate oversight body for the LAPD, these concerns suggested problems with the oversight provided by the Police Commission.

## Consent Decree Solutions

The Consent Decree required the Police Commission to review and evaluate all CUOF to determine conformance with LAPD policies and procedures, and the requirements of the Consent Decree. The Commission's findings were to be included in a publicly available annual report.

The Police Commission was also charged with reviewing various audits to determine whether changes in LAPD policies were necessary; all such changes were to be approved by the Police Commission. In addition, the Police Commission was required to conduct annual reviews of the Chief of Police and was also charged with investigating complaints against the Chief of Police. While conducting its annual review of the Chief of Police, the Police Commission was required to consider the Chief's responses to UOF incidents, complaints of officer misconduct, assessment and imposition of discipline, and other specified matters.

The Commission was also required to continue to review and approve the LAPD's budget requests.

---

[135] See page 192 of the Report of the Independent Commission on the Los Angeles Police Department, 1991.

[136] See page 207 of the Report of the Independent Commission on the Los Angeles Police Department, 1991.

[137] For each CUOF incident, the Chief issues a report analyzing the incident and assessing whether or not there are concerns with the officers' tactics.

## Overall Achievements of the Police Commission

On March 20, 2001, the Police Commission passed an Action specifically requiring that the review of CUOF investigations must include a determination that the officer acted in compliance with the Consent Decree and report its findings to the Chief of Police regularly.  After review of each CUOF, the IG prepares an analysis of the incident and forwards it to the Commission as their independent review.  The IG's analysis, the Chief's recommendations and the FID report are presented to the Police Commissioners for their review and adjudication.   Discussions regarding the incidents are held with the Chief of Police in closed session.    Overall, disagreements concerning the ultimate outcome of an incident are rare.

The Police Commission's Annual CUOF Reports have contained a great deal of informative information.  The first report reviewed by the Monitor was for incidents which occurred and/or reviewed by the IG and Police Commission during 2001.  The Monitor found that report to be especially informative when discussing gender, ethnicity and age of both the suspects and officers involved in the CUOF incidents.

The OIG noted that it was difficult to track training for officers involved in CUOFs when it had been recommended by the Chief of Police.    As a result, the Commission directed the Department to develop a process to ensure that all directed training was tracked.[138]  The OIG also began to track that officers had actually received the training and requested that the Department report the status of the training to the Commission on a monthly basis.

The Police Commission initially had problems developing a system to track audits conducted by the LAPD and reviews or audits conducted by the OIG.  The Monitor provided assistance in developing a process to track these audits in September 2003, and the Police Commission presented its system to the Monitor in September 2004.  By September 2005, the Police Commission had successfully implemented this system so that it could track all audits and reviews.  Since that time, the Police Commission has continued to refine its system to ensure that it reviews all audits, considers if any changes in policy are needed as a result of the audits, and receives feedback from the Area command staff explaining any deficiencies identified in the audits and the steps taken to resolve these deficiencies.

Early in the Consent Decree, the Monitor also found that there was no tracking system at the Police Commission that could be compared with the records maintained by the IG to determine if all complaints received by the Police Commission were forwarded to the OIG.  During the quarter ending December 31, 2002, the Monitor recommended that a record-keeping system be put in place at the Police Commission to track all misconduct complaints filed against the Chief of Police in order to allow for comparison with records maintained by the Inspector General and

---

[138] Implementation of Special Order No. 17, *Training Update Subsequent to a CUOF*, provides officers with training for issues raised during the initial stages of CUOF investigation. Training is required to be provided within 21 days of the incident.

contained on the Chief's TEAMS Report. Early in 2003, the Police Commission established a log for the purpose of tracking complaints filed with the Commission against the Chief of Police.

## Consent Decree Compliance

*Police Commission's Review of Categorical Use of Force Incidents*

The Monitor reviewed CUOF packets that were submitted to the Police Commission on several occasions during the term of the Decree. In all instances, the packets were complete, containing all the necessary and appropriate documentation in order to evaluate the incident. As a result, in March 2006, the parties to the Consent Decree agreed that the Department had achieved substantial compliance with this requirement.

During most reviews conducted during the Decree, the Commission's Annual CUOF Report was found to address most Consent Decree requirements with regards to the publication of the report; however, there were delays in the publications of the 2002 and 2003 Annual Reports due to staffing problems of the OIG. Although these reports were of a quality nature once published, the delays resulted in a determination of non-compliance. As a result the Monitor continued to audit this requirement during the extension. The Monitor found that subsequent Annual Reports were in compliance with requirements regarding timing and content. As a result, the Monitor concluded that the Department was in substantial compliance with Decree requirements by the quarter ending March 31, 2008.

*Police Commission's Review of Consent Decree Audits*

Up to September 2004, the Police Commission had either not developed a process to track the LAPD's and OIG's audits or the resulting analysis was missing several LAPD audits and OIG audits and reviews. Consequently, the Police Commission and its staff were unaware of the status of many of the audits/reviews expected to be issued. As a result, the Monitor found the Department in non-compliance with requirements regarding the Commission's reviews of Decree audits.

In September 2005, the Monitor determined that the Police Commission had developed a system for tracking the audits that contained most of the required information. Upon reviewing additional information in December 2005, the Monitor determined that the Police Commission had reviewed and approved all appropriate audit reports and considered if any changes in policy were needed. As a result, the Monitor concluded for the first time that the Department was in compliance with the audit review requirements.

The Monitor continued to review compliance with these requirements during the Consent Decree extension, as the Department had only achieved compliance once prior to the extension. In September 2006, the Monitor identified that the Police Commission had refined its system for tracking audits and again found the Department in compliance. By September 2007, in addition

to tracking the audit and review reports, the Police Commission instituted a system whereby command staff was required to appear before the Police Commission to explain any deficiencies and provide progress reports of actions taken to resolve the deficiencies.  Based on these successes, in July 2008 the Monitor concluded that the Police Commission was effectively performing its oversight role relating to the recommendations from the audits and the Department was in substantial compliance with these requirements; the Monitor further concluded that active monitoring of compliance with these requirements was no longer required during the balance of the extension.

*Police Commission's Inclusion of Audit Results in Its Evaluation of the Chief of Police*

The Monitor first concluded the Department was in compliance with the requirement to include the audit results in the evaluation of the Chief of Police in December 2003.  In June 2005, the Monitor withheld a determination of compliance as there was no specific indication that the Police Commission had considered the results of the audits in its evaluation, but the Monitor was informed that this information had been considered.  The Monitor found the Department in compliance again in December 2005, as the Chief's review specifically considered the results of the audit.  As a result, in June 2006, the Monitor concluded the Commission was in substantial compliance with this requirement, and did not actively monitor compliance with the requirement during the extension.

*Police Commission's Review and Approval of New/Changed Policies and Procedures*

In March 2003, the Monitor found the Commission was not in compliance with this paragraph, as the review of the policies and procedures was not completed on a timely basis.  However, in September 2003, December 2004 and December 2005, the Monitor determined that the Commission was in compliance, in that they had reviewed and approved all new policies and that all special Orders and Procedures adopted by the Police Commission were date-stamped as approved by the Board of Police Commissioners.   As a result, in June 2006, the Monitor concluded the Commission was in substantial compliance with this requirement, and did not actively monitor compliance with the requirement during the extension.

*Police Commission's Annual Review of the Chief of Police*

The Police Commission's annual review of the Chief of Police for the period covering July 1, 2002 through June 30, 2003, encompassed six distinct areas of performance, considered the requirements of the Consent Decree and included consideration of the Police Commission's assessment of the appropriateness of discipline imposed by the Chief.  The Monitor concluded that this annual review was compliant with the Decree requirements.  The Police Commission subsequently completed compliant annual reviews of the Chief of Police covering the periods

July 1, 2003 through June 30, 2004, and July 1, 2004 through June 30, 2005.[139]  As a result, the Monitor concluded that the Department achieved substantial compliance with these requirements prior to the extension of the Decree, and the Monitor did not actively assess compliance with these requirements during the extension period.

*Police Commission's Investigation of All Misconduct Complaints Against the Chief*

Due to the sensitive nature of complaints filed with the IG[140] against the Chief of Police, the City only provided documentation directly to the Chief Monitor or his Deputy.

The LAPD was found to be in non-compliance with these requirements during the quarter ending June 30, 2003, due to discrepancies between the Chief's TEAMS Report and databases maintained by IAG and the OIG, and between documentation kept by the Police Commission and OIG.  The Monitor found the complaint investigations to be thorough and of good quality, although one complaint was terminated due to the Chief's retirement.  The Monitor found no policy or procedure in effect concerning the termination of complaint investigations upon the retirement of a Chief of Police.  The IG represented to the Monitor that all future investigations will continue regardless of the Chief's employment status.  The Monitor again found the Department in non-compliance during the quarter ending September 30, 2004, because the OIG had no written protocol for the investigation of, and reporting on, complaints against the Chief of Police.

The Monitor found the LAPD in compliance with requirements regarding the Police Commission's investigation of misconduct complaints against the Chief during the quarter ending June 30, 2005.  The Deputy Monitor reviewed the status of OIG complaint investigations against the Chief of Police and determined that the OIG put into place written protocols for the investigation of, and reporting on, complaints against the Chief.  The Deputy Monitor also reviewed the pending complaints against the Chief of Police and found them to be compliant with those protocols and with appropriate standards of investigation.

---

[139] In the review covering July 1, 2003 through June 30, 2004, there was no specific indication that the Police Commission considered its assessment of the appropriateness of discipline imposed by the Chief in its evaluation. The Executive Director of the Police Commission indicated that he believed that this was considered, even if it was not specifically declared in its written evaluation.  The Commission's next review for the period July 1, 2004 through June 30, 2005 specifically considered the Chief's responses to UOF incidents and complaints of officer misconduct, assessment and imposition of discipline.

[140] The OIG conducts investigations concerning misconduct complaints filed against the Chief of Police and maintains files pertaining to each investigation.  At the conclusion of each investigation, the IG makes a recommendation to the Police Commission as to the appropriate disposition of the complaint.  The Commission may adopt the recommendation of the IG or determine a different disposition.

At the end of the initial term of the Consent Decree, the Monitor found the Department in substantial compliance with these requirements, and compliance with them was not actively monitored during the extension period.

*Police Commission's Review and Approval of the LAPD's Budget*

The Monitor found during 2002, 2003, 2004 and 2005 that the Police Commission reviewed and approved LAPD budget requests before submission to the City. Each year, the Monitor noted the requested amount, the size of the increase from the prior year and date the approved budget request was forwarded to the City. As a result, the Monitor concluded that the Department achieved substantial compliance with this requirement prior to the extension of the Decree, and the Monitor did not actively assess compliance during the extension period.

### Recommendations

The Monitor commends the Police Commission for assuming a larger oversight role in the LAPD operations. In moving forward, the Monitor offers the following recommendations:

Since the Police Commission is the final authority on all activities related to the LAPD, the Police Commission must remain independent and impartial, but at the same time remain involved at a supervisory level in the activities of the LAPD and the COP. The current Police Commission has consistently shown the level of review and involvement needed. The Monitor encourages the Mayor and City Council to ensure that the future members they appoint and confirm to the Police Commission have the necessary skills, training and interest in the activities of the LAPD and the Chief of Police to maintain this level of review.

## 5.    Financial Disclosure

The Consent Decree required regular and periodic financial disclosures by all LAPD officers and other LAPD employees who routinely handle valuable contraband or cash and periodic audits of such disclosures. In addition, the LAPD was required to periodically audit a random sample of such disclosures to ensure their accuracy.

On January 17, 2006, the issue of financial disclosure came before the Court in the form of a motion filed jointly by the City and DOJ to amend the Decree as allowed by the "Meet and Confer" process required by California law. The City indicated that the proposed amendment to the Consent Decree was the product of that Meet and Confer process. The Monitor opposed the amendment in its February 16, 2006 filing because, in the Monitor's judgment, it did not fulfill the intent of the paragraph, which as written represents best practice with the potential of preventing corruption in susceptible positions in ways that the proposed amendment did not. The Court denied the motion to amend at a March 21, 2006 hearing, leaving the paragraph as unfulfilled and in non-compliance.

At the end of the initial period of the Consent Decree, the Monitor, with the approval of the parties, planned to actively monitor paragraph 132 during the extension period pending the full implementation of appropriate financial disclosure.  Subsequent to the Court's decision, the City was unfortunately unable to reach an agreement with the Police Protective League on the appropriate parameters of financial disclosure, which led to the unilateral adoption by the Police Commission of the current policy.

On December 20, 2007, the issue moved forward with the proposal by the Police Commission of a policy intended to appropriately address the requirements of the paragraph.  The Police Protective League took the position that the proposal violated California law and various meet and confer provisions, and filed suit in State Superior Court that same day seeking judicial intervention to prevent the adoption of the policy.  The policy allows a two-year grace period for officers currently serving in affected units, thereby allowing officers who so object to the requirements to seek assignments in other units of the Department.  The Monitor wrote at the time that "because of this grace period, it will not be possible to meet the requirement of two years of substantial compliance during the term of the current extension of the Decree. Accordingly, it is possible that the Court will require an extension of this provision to ensure two years of substantial compliance."

On January 15, 2008, the Los Angeles City Council asserted jurisdiction over the financial disclosure policy approved by the Police Commission but dropped its objection to the plan on February 6, 2008.  Judge Feess granted a temporary restraining order on the implementation of the financial disclosure policy on June 13, 2008, and then decided on August 22, 2008 not to block the plan.  The Police Protective League appealed the decision and on September 12, 2008, the 9th Circuit Court of Appeals put the financial disclosure policy on hold pending appeal.  On February 27, 2009, the 9th Circuit rejected the Police Protective League's bid to block financial disclosure, and the LAPD vowed to implement the plan within 30 days.

As a result of the activity described above, substantial compliance with financial disclosure requirements has not been achieved, and the requirements are one of the subjects of the Transition Agreement.

## 6.    General

In addition to identifying the need to establish the AD and conduct audits on a regular basis, the BOI report identified that it was critical to track the implementation of recommendations from previous audits so that command staff do not make the same mistakes over and over again.

## Consent Decree Solutions

The Consent Decree required the City and the Department to take appropriate, timely and reasonable steps to implement recommendations and remedy deficiencies noted in reviews, audits and reports issued by the Police Commission, the IG, and the Department under the Consent Decree.

## Overall Achievements of the LAPD

Initially, the City disagreed that this paragraph required any action by the LAPD. Notwithstanding this, CRID developed a Recommendations Tracking System (RTS), which was used to generate an *Audit Recommendations Status Report* for the Police Commission.  This report listed each of over 500 recommendations from the LAPD and OIG's audits and reviews, tracked the steps undertaken to address such recommendations and identified which recommendations were to be implemented.  Additionally, the OIG implemented a separate system in early 2005 to track the audit recommendations made from its confidential reviews of the EES quarterly reports.  Over the term of the Decree, the LAPD has continued to update and improve the system, first by creating a more sophisticated database to better track the extensive number of recommendations generated by AD and the OIG and then by enhancing the information within the system to ensure that the relevant parties were aware of who was responsible for ensuring each recommendation was addressed by the Department.

## Consent Decree Compliance

In December 2002, the Monitor reported that there were numerous recurring deficiencies identified in successive audits that were not yet addressed, and neither the City nor the Department had developed a process to track the LAPD's implementation of recommendations emanating from audits and other reviews and reports required by the Consent Decree.

The Monitor reported in September 2003 that the LAPD had developed a system to track recommendations and to correct deficiencies identified in the LAPD's audits, but this process was incomplete, as there was not yet a process to track the OIG's audit recommendations and actions thereon.

The Monitor found the Department in compliance with paragraph 154 for the first time in December 2004 and again in December 2005, after reviewing CRID's *Audit Recommendations Tracking Reports* for each of the four preceding respective quarters and printouts from the OIG's recommendations tracking system for the EES audits.  By December 2006, the Monitor identified that CRID had expanded the system to include other non-Consent Decree audits.  The Monitor continued to find the Department in compliance with paragraph 154 in December 2007 and December 2008.  As a result, the Department achieved substantial compliance with this requirement.

**Recommendations**

CRID and the OIG have each created a database and system for ensuring that recommendations from reports are assigned, tracked, reviewed and assessed as to whether or not they should be implemented. The Monitor commends CRID and the OIG for creating these systems and encourages both bodies to maintain these systems.

# H.  Community Outreach and Public Information

The Christopher Commission reported that the LAPD's approach to policing was a "professional approach" that emphasizes crime fighting and "isolated the police from the communities and the people they serve." The Commission wrote that although "this style of policing produces results," it "does so at the risk of creating a siege (we/they) mentality that alienates the officer from the community." The commission recommended that the LAPD move toward a community policing model that "treats service to the public and prevention of crime as the primary function of police in society." The commission wrote that "using a community-based style of policing, LAPD officers can continue to be active and energetic in preventing crime, as well as reacting to it, without unnecessarily aggressive confrontations with the public."

The *March 2000 BOI Report* noted a need for a community police approach, and noted that CRASH operations appeared to be lacking community involvement and community outreach. Due to the demographics of Rampart Area, the BOI wrote that the predominantly Spanish-speaking Central American immigrants, many of whom are undocumented aliens who fear deportation by the police, were "inherently reluctant or fearful of making complaints," thus allowing "corrupt officers [to be] freer to operate without the fear of being caught." A common theme in the report was that "officers must be reminded of the community problem-solving goal, especially those working in 'elite assignments' where the culture is viewed as more aggressive and seems to work under a different set of rules."

**Consent Decree Solutions**

The Consent Decree required the Department to conduct a Community Outreach and Public Information program for each LAPD geographic Area. This program was to consist of open public meetings to inform the public about the provisions of the Decree and the methods of filing a complaint against an officer, and to provide information on the LAPD and LAPD operations in order "to enhance interaction between officers and community members in daily policing activities." These meetings were to be held each quarter in each of the 18 geographic Areas in the first year of the Decree, and one meeting in each Area held annually thereafter. The City was also required to publish notice of the meetings.

The Department was also required to prepare and publish on its website semiannual public reports. These reports were to contain aggregate arrest, stops and UOF statistics broken down by each LAPD geographic Area and for the OHB and by the race/ethnicity/national origin of the citizens involved. The LAPD was also required to post results of Consent Decree specified audits, a summary of all discipline imposed during the period reported by type of misconduct, and any new policies or changes in policies made by the Department to address the requirements of the Decree, as well as the City's semiannual status reports to the Court and the Independent Monitor's quarterly reports.

Lastly, the LAPD was required to continue to utilize community advisory groups in each geographic Area and to meet quarterly with the communities they serve, and to establish a media advisory working group to facilitate information dissemination to the predominant ethnicities and cultures in the city.

## Overall Achievements of the LAPD

At the outset of the Decree, the LAPD took immediate steps to comply with Consent Decree's community outreach requirements. First, the LAPD issued Administrative Order 8, dated July 25, 2001, which organized the Department's outreach programs and established new procedures that compliance with the Decree's requirements. Significantly, before the end of the first quarter of the Decree (September 30, 2001), all 18 LAPD geographic Areas scheduled and held their first Consent Decree-required community meetings, in which they presented all required information. The Department continued to hold the required community meetings during the remainder of the original term of the Decree.

On October 2, 2001, the first semiannual LAPD report was published on the Department's website, documenting the time period January 1 through June 1, 2001. In this report, the Department complied with the following publication requirements:

- Aggregate statistics by geographic Area;

- Report of specified audits and any corrective actions taken;

- Summary of all disciplinary actions; and

- New policies and procedures.

The Media Relations Group met in October 2001 and again in November 2001; the group included seven members from the various council districts and three members of the LAPD.

During the quarter ending December 31, 2001, the LAPD's Community Affairs Group published meeting schedules both on the City's and the Department's website well in advance of the actual meeting dates. Schedules were also posted in 11 citywide newspapers in the following languages: English, Farsi, Japanese and Spanish. Some divisions augmented the City's list of

publications and advertised in additional publications that were representative of their community.  For example, the Southeast Division advertised their meeting in *New Times LA*, *African Times*, *LA Weekly*, *Herald Dispatch*, *LA Watts Times* and *Para Ti*.  The Monitor found that although some divisions were thorough in documenting their efforts to comply with the Consent Decree, other divisions did not document where and when they placed flyers or who had presented at their meetings.  Although meeting content was to focus on LAPD operations, each Division determined the subject matter to be covered.  The Wilshire Division's meeting titled "Racial Profiling or Data Collection? Find out what the Consent Decree requires of the LAPD" was especially timely with the beginning of data collection in November 2001.[141]

The Media Advisory Group met on March 22, 2002, and again on November 22, 2002.  The Monitor noted that only four people attended the latter meeting.  The LAPD also successfully publicized and held quarterly Media Advisory Group meetings during the quarter endings March 31, 2003, and June 30, 2003.

Although the LAPD continued to post on its website much of the information required by the Consent Decree, not all of the required information was included.  Information collected from pedestrian and vehicle stops was not posted, preventing the LAPD from complying with pertinent requirements during the quarters ending March 31, 2002; June 30, 2002; September 30, 2002; and December 31, 2002.  The Monitor recommended that the Department organize all required reports/postings under one hyperlink to simplify access to this information.  The Monitor found the LAPD in compliance with these requirements during the quarter ending March 31, 2003, as by that point the LAPD's website now contained all the required information, including: pedestrian and traffic stop data for the period evaluated, a summary of all discipline imposed during this period, reports of audits completed during the period, and new policies or changes in policies made by the Department to address the Consent Decree for the relevant six-month period.  The Monitor found that the website continued to contain all of the required information during all subsequent assessments made during the remainder of the original term of the Decree.

The LAPD publicized and successfully held a Media Advisory Group during the quarter ending September 30, 2003, which focused on outreach to the city's Korean community.  Two

---

[141] During the quarter ending March 31, 2002, the Monitor discovered alarming evidence that certain officers were making negative statements at community meetings about the Consent Decree and the Monitor.  They portrayed the Decree as a frivolous exercise imposed from outside that the LAPD must endure for the next five years, rather than an opportunity for substantive reform.  In striking contrast, the Monitor noted that an officer responsible for a meeting in the Foothill division made a thorough and quite professional presentation, explaining that the Consent Decree had been imposed as a result of the Rodney King and the Rampart scandals, and because the government believed the Department had engaged in racial profiling.  He told the audience that "all of the points included were good and it would not hurt the Department to implement them."

representatives from Councilmember Jan Perry's office attended.  However, no meeting was
held during the quarter ending December 31, 2003, due to a lack of response from Media
Advisory Group members.

## Consent Decree Compliance

As described above, within the first six months of the Decree, the Department enacted new
policies to provide for the required community meetings and publishing of information to the
Department's website.  And, by the first quarter of 2003, all of the requirements of the Decree,
including the posting of all required information on the Department's website were in
compliance.

The Monitor found the Department in compliance with requirements regarding community
advisory groups and a media advisory working from December 2002 to September 2003, but
found the Department in non-compliance in December 2003, as a meeting was not held due to
the lack of response from Media Advisory Group members.  However, the parties requested an
amendment to this requirement, among others, in their Joint Request to Amend the Consent
Decree Pursuant to Paragraph 180 of the Consent Decree, filed with the Court on April 15,
2005.[142]  On June 2, 2005, the Court approved the amendment, which added "through the third
year of the Consent Decree" to the original text in order to read, "The Department shall
establish a media advisory working group to facilitate information dissemination to the
predominant ethnicities and cultures in Los Angeles through the third year of the Consent
Decree."

As a result, the Department achieved substantial compliance with all requirements of this
section of the Decree by the expiration of its original term, and the Monitor did not actively
monitor compliance with these requirements during the extension period.

## Recommendations

The Monitor commends the LAPD for the accomplishments it has made in achieving compliance
with the requirements in the area of community outreach.  Policies and procedures are in place,
and the oversight role of AD, the Police Commission and the OIG continues to ensure that the
policies and procedures are followed, and that deficiencies are corrected and recommendations

---

[142] The parties wrote in their filing that "the media advisory group was appropriate during the first year of Decree
implementation" and that "the media group has served its purpose, as illustrated by the media's unwillingness to
attend meetings."  As "efforts to work with the media to facilitate delivery of information to all Los Angeles
communities are now better served by other LAPD public relations efforts," they wrote, "the requirement for a media
advisory group should sunset at this time."

Case 2:00-cv-11769-GAF-RC   Document 399-3   Filed 06/11/09   Page 46 of 50   Page ID #:1047

are implemented.  The Monitor is confident that the Department will continue to be proactive in the area of community outreach, and offers the following recommendations in this regard:

- The LAPD should continue posting all required information on its website.  The Department may consider having the information available for those members of the public who do not have Internet access.

- The LAPD should maintain its partnership with Community Police Advisory Boards (CPABs) for all Areas and continue to report to the Police Commission on their activities.

# III.  Conclusion

Over the past eight years, the Monitor has approached the oversight of LAPD as being controlled by the specific mandates of the Consent Decree and the overall intent of the Decree.  The mandates of the Decree, as found in its 90 pages, were operationalized in a 200-plus page methodology that required hundreds of specific actions by the LAPD, and described the metrics by which the Monitor was to statistically measure progress toward >94% compliance.  This disciplined and technical approach was at times frustrating for all parties, but the granularity was necessary in order to ensure that real reform was taking hold across the Department.  At the same time, the Monitor never lost sight of the overall intent of the Decree: to help transform the LAPD into a department that effectively fights crime while honoring and protecting the rights of the residents of Los Angeles.

In the areas of officer-involved shootings and use of force investigations, training, auditing, handling of the psychologically disturbed, complaint acceptance and investigations, the use of Early Warning Systems and risk assessments, and the role of an Inspector General, Los Angeles is a model for best practice policing in the United States and abroad.  But these areas of improvement may still be too granular if it causes us to miss the more subjective changes in attitude and realization of responsibility that we have seen over the past eight years.  Eight years ago, respect for civil rights by the LAPD was, at times, viewed as a reason for non-policing. We heard, for example, how officers would not make stops if they were required to complete Field Data Reports on stops they were making.  We saw, while on ride-alongs, the mentality of an occupying force on the part of the officers and a not unsurprising resentment and distrust of police on the part of those being occupied.  Today, there is not just general acceptance of the best practice policing that the Consent Decree has fostered but, for the most part, a willing adoption and understanding of the importance of these practices in fighting crime effectively by creating goodwill in the community.  Today, communication with, respect for and caring about the community is the standard practice of a new LAPD.

With this Final Report, the Monitor recommends to the Court that the City of Los Angeles and its Police Department be found in substantial compliance with the Consent Decree and, consistent with the Transition Agreement, be released from its strictures.  Our recommendation to the Court is made not because every paragraph has been fully complied with, or because there is no need for continued reform, or that there is absolute certainty about the future of LAPD.  Rather, the Monitor recommends the finding of substantial compliance because we believe that the City and Department have complied with the material intent of the Consent Decree.  While there is still room for additional reform, as required by the Transition Agreement, we believe that the significant accomplishments to date have brought us to the point where, with oversight provided by the Police Commission and Office of Inspector General, the LAPD can, itself, effectively maintain and advance reform while at the same time ensuring the public's safety.

Our recommendation does not come without reservations.   We believe the Transition Agreement is crucial to complete the work on three important initiatives: Teams II, biased policing and financial disclosure.   In addition, we are mindful that, inevitably, changes in the factors and personalities that have brought about reform will occur.   The consistency of the oversight of the Federal Court, the Department of Justice and the Monitor will end, and there will, at some point, be a new Police Commission, a new Police Chief and a new Mayor.   The question is: Will the institutions of Los Angeles, under new management, be able to protect and enhance the reforms that have been achieved?   The City and its stakeholders must give careful and continuing consideration to the question of how to best perpetuate the changes that have been made.  How can a vigorous and independent Inspector General and Police Commission be assured?  What steps can be taken to further promote the institutionalization of internal audit, training, non-biased policing and the use of TEAMS II?  While these are issues outside the scope of the Consent Decree, they are challenges that must be met in order to make the past eight years meaningful and the reforms achieved enduring.

# Acknowledgments

The Monitor would like to extend its thanks to the staff of the DOJ's Special Litigation Section: Shanetta Cutlar, Chief; Daniel Weiss, Deputy Chief; Steven Rosenbaum, former Chief; Donna Murphy, former Deputy Chief; Staff Attorneys Je Yon Jung, Laura Coon, Jeffrey Murray, Timothy Mygatt; and former Staff Attorneys Patricia O'Beirne and Mark Posner.

The Monitor would like to thank Mayors Riordan, Hahn and Villaraigosa, who dedicated the City's full support to the Consent Decree and its objectives.  In addition, the Monitor would like to thank the Deputy Mayors for Homeland Security and Public Safety who served during the Consent Decree period, Arif Alikhan, Maurice Suh and Roberta Yang, for their dedication to reform and general assistance.  From the Office of the City Attorney, the Monitor would like to thank City Attorney Rockard "Rocky" Delgadillo and Deputy City Attorneys Carlos de la Guerra, Julie Raffish and Mark Burton for their dedication to reform and general assistance.

From the Office of the Chief Legislative Analyst, the Monitor would like to thank Chief Legislative Analyst Gerry Miller, staff member June Gibson and former staff member Brence Culp for their assistance.  In addition, we would like to thank former Chief Legislative Analyst Ron Deaton and former staff member Barb Garrett for their dedication and assistance.

The Monitor would like to thank the City Council Presidents during the Consent Decree term, Alex Padilla and Eric Garcetti.  In addition, we thank Public Safety Committee chairs during the term, Cindy Miscikowski and Jack Weiss.

The Monitor thanks the Commission members during the term of the Decree:  Herbert F. Boeckmann II, David Cunningham III, Rick Caruso, Rose Ochi, Silvia Saucedo, Shelley Freeman, Anthony Pacheco, John Mack, Andrea Ordin, Alan Skobin and Robert Saltzman.  The Monitor also thanks the current Executive Director, Richard Tefank and previous Executive Directors Joe Gunn and Daniel Koenig.

That which has been achieved could not have been done without the dedication of the vast majority of the men and women of the LAPD.  Specifically, the Monitor extends its thanks to the following police personnel who were most intimately involved in bringing reform to LAPD:  In addition to Chief Bratton, former Chief Bernard C. Parks and former Interim Chief Martin Pomeroy.  From the LAPD Consent Decree Bureau (with rank at the time):  Police Administrator III Gerald Chaleff, Executive Secretary Armida Lomeli, former secretary Sally Greer, Lt. Scott Sargent, Lt. Brian Pratt and Lt. Rosa Moreno.  From the LAPD Audit Division (with rank at the time): Capt. Ron Sanchez, Capt. Walt Schick, Capt. Jodi Wakefield, Lt. John Baronowski, Lt. Tina Nieto, Lt. Kelly Muldorfer, Lt. Art Sandoval and Police Performance Auditor IV Erin Kenney and all of AD's project managers and other audit team members.  From the Civil Rights Integrity Division and Consent Decree Bureau (with rank at the time): Capt. Scott Kroeber, Capt. Sandy Jo MacArthur, Capt. Kevin McClure, Lt. Jeff Greer, Lt. Len Hundshamer, Lt. Robert Lopez, Sgt II Alex

Baez, Sgt Chris Waters, Sr. Management Analyst II Alex Nuno and Sr. Clerk Typist Esther Acuna and other staff members of CRID who assisted with coordinating the Monitor's reviews and providing documentation required by the Monitor. From the TEAMS II Unit (with rank at the time): Deputy Chief David Doan, Police Administrator III Maggie Goodrich and Assistant General Manager Kamton Joe and the other staff members of TEAMS II. From the Incident Management and Training Bureau and former Training Group: Deputy Chief Mike Hillmann, Deputy Chief Sandy Jo MacArthur, Dr. Robin Greene and Dr. Luann Pannell. From the Professional Standards Bureau: Deputy Chief Michael Berkow, Deputy Chief Mark Perez; Commander Rick Webb, Commander Eric Lilo, Commander James Voge, Captain James Bower, Captain Rigoberto Romero and the staff of PSB who assisted with providing information. From CIID: Capt. Sean Kane. And from FID: Capt Chris Pitcher.

The Monitor would like to thank former Inspector General Jeffrey Eglash as well as the current Inspector General Andre Birotte. Additionally, the efforts of Assistant Inspectors General Nicole Bershon, Django Sibley, and Susan Hutson, former Assistant Inspectors General Terry Martin and Beth Alonso, and the OIG staff have been invaluable.

A number of members of the Monitor's team, in addition to Mr. Cherkasky and Mr. Schlanger have served for the entire eight years of the Consent Decree. These include Tom Frazier, our designated policing expert and former Commissioner of the Baltimore Police Department; Joe Buczek, a former agent with the Federal Bureau of Investigation, who headed our Use of Force and Complaints Team; and Christi Gullion, who ultimately led the TEAMS II, Search Warrant, Gang Unit and Confidential Informants teams. Hazel de Burgh served for all but the first six months of the Consent Decree as head of the Monitor's Audit Team. In addition, Penny Cookson served for more than five years as one of the core members of our Audit team and, for more than three years, assumed responsibility for managing the day-to-day operations of the team. Meg Reiss served for four years leading our Training and Biased Policing Teams, before leaving to become Executive Assistant District Attorney in Nassau County, New York. In addition there were many members of the team whose stays were relatively short, but whose contributions were significant: Edward Nagel, David Horner, Terry Penney and Andrew Shin on the Audit Team; and Lee Curtis, Daryk Roland and Kelly McBride on TEAMS II. A special thanks to Rene Salazar, who has served the team extremely well in a variety of both administrative and substantive capacities, and to Kathy Grillo who worked closely with Joe Buczek on the Use of Force and Complaints aspects of the Decree. Lastly, Ron Filak has worked tirelessly, mostly behind the scenes, and has provided invaluable assistance in the editing of this Final Report and the vast majority of our quarterly reports. Biographies of the current members of the Monitoring team appear in Appendix G.

Most importantly, the Monitor would like to thank the residents of Los Angeles whose quest for true reform throughout this process has been our driving force.