identify provisions identified pursuant to subpart (a) of this paragraph that are scheduled for implementation within 45 days.  With regard to a matter that is not a subject of mandatory bargaining, the City shall not propose or enter into any such agreement with a bargaining unit that will adversely affect the City's timely implementation of this Agreement.  With regard to all such agreements with a bargaining unit and all such unilateral actions, the City shall not make them effective before the expiration of 45 days after such proposed agreement or unilateral action is reported to the Court and DOJ. The time for implementation of any provisions of this Agreement affected by such agreement with a bargaining unit concerning a mandatory subject of bargaining or such unilateral action shall be extended for such 45-day period.  Upon receipt by DOJ of any such proposed agreement or unilateral action, the parties shall consult to determine whether, and if so to what extent, such proposed agreement or unilateral action would adversely affect the City's ability timely to implement any provision(s) of this Agreement. If the parties determine that implementation of such proposed agreement or unilateral action would not significantly impact the City's ability to implement the affected provision(s) of this Agreement, DOJ shall waive some or all of such 45-day period, and the City shall initiate such implementation.  If such determination is not made, the parties shall discuss appropriate clarifications or modifications to this Agreement.   Where the parties believe that a modification of this Agreement is appropriate, they shall present such modification to the Court for its consideration pursuant to paragraph 180, and the implementation date for the affected provision(s) of this Agreement shall be extended while the matter is before the Court unless the Court orders earlier implementation.  Any motion concerning a proposed bargaining agreement or unilateral action shall be brought during the 45-day period and shall not be governed by the notice requirements of paragraph 186.

c.      In the event that the City believes the meet and confer process, consultation, or any such proposed agreements with the applicable bargaining units or such proposed unilateral actions, resulting from the meet and confer process, will impair the City's ability timely to implement one or more provisions of this Agreement, and the DOJ and the City are unable to agree on an appropriate resolution, then the City shall so report to the Court and shall seek appropriate declaratory or injunctive relief (including specific performance) on such provision(s).  The DOJ also may seek relief from the Court in the event that DOJ believes the meet and confer process, consultation, or any such proposed agreements with the applicable bargaining units or such proposed unilateral actions will impair the City's ability timely to implement one or more provisions of this Agreement, and the DOJ and the City are unable to agree on an appropriate resolution. Any such motion shall demonstrate how the City would be so impaired.

d.      In ruling on a motion under this paragraph, paragraph 8, or in regard to any meet and confer issue identified pursuant to subpart (a) of this paragraph, the Court shall consider, *inter alia*, whether the City's proposed agreements with the applicable bargaining units or proposed unilateral actions that address provision(s) of this Agreement are consistent with the objectives underlying such provision(s) and whether the City has satisfied its labor relations obligations under state and local law.  On any such motion, if the City has engaged in good faith efforts (including consideration of the manner in which the City carried out any applicable meet and confer or consulting obligations) to be able to implement this Agreement in a timely manner, the City (i) shall not be in contempt or liable for any other penalties, and (ii) may be potentially held in breach for such provision(s) only for the limited purpose of the issuance of declaratory or injunctive remedies (including specific performance), but may not be regarded as in breach for any other purpose.

-86-

e.      In the event that DOJ believes the meet and confer process, consultation, or any such proposed agreements with the applicable bargaining units or unilateral actions resulting from the meet and confer process, will impair the City's ability to implement one or more material provision of this Agreement, the DOJ may alternatively file a motion seeking to dissolve this Agreement, which motion shall be granted if the Court finds that the meet and confer process, consultation, or such proposed bargaining agreements with the applicable bargaining units or such proposed unilateral actions will preclude meaningful implementation of one or more material provisions of this Agreement as contemplated on the date the DOJ's Complaint was filed.  Should the Court grant a motion by the DOJ to dissolve this Agreement, the DOJ may commence litigation in this case to seek relief based on its Complaint.

f.      The term "unilateral action" shall mean an action taken by the City as management at the conclusion of the meet and confer process on a mandatory subject of bargaining to implement its last, best, and final offer where (i) agreement could not be reached in the negotiations, (ii) any required impasse resolution procedure has been followed, and (iii) management has decided to make a unilateral implementation at the point of ultimate impasse.

185.    If there is a significant change in a state law that impairs or impedes the City's ability to implement this Agreement then each of the parties reserve the right to seek declaratory or other relief from the Court regarding implementation of the affected provisions of this Agreement in light of the change in state law.

186.    Before the DOJ pursues any remedy with the Court based upon the City's, Department's or LAPD's failure to fulfill an obligation under this Agreement, DOJ shall give written

-87-

notice of such failure to the City.  Except as set forth below, the City shall have 45 days from receipt of such notice to cure or cause the cure of such default.  If such default continues beyond 45 days following notice of default, DOJ may, upon three days notice to the City (excluding weekends, federal or state holidays), at its election seek a remedy from the Court.  Provided, however, that the City shall have only seven days, excluding weekends, federal or state holidays, to cure or cause the cure of any failure to fulfill an obligation that relates to the provisions of this Agreement regarding access to City or Department staff, facilities, or documents, or copies of such documents.  If such default continues beyond the seven-day period following notice of default, DOJ may, at its election, immediately seek a remedy from the Court.  The notice to be given under this paragraph shall be given by DOJ to the City Attorney on behalf of the City and the City Attorney shall provide copies to the Chief Legislative Analyst and the Chief of Staff to the Mayor.

187.    The parties agree to defend the provisions of this Agreement.  The parties shall notify each other of any court or administrative challenge to this Agreement.  In the event any provision of this Agreement is challenged in any local or state court, removal to a federal court shall be sought by the parties.

The Parties consent and seek entry of this Agreement as an Order of this Court:

FOR THE PLAINTIFF, THE UNITED STATES OF AMERICA:

JANET RENO
Attorney General

_____
BILL LANN LEE
Assistant Attorney General
Civil Rights Division

_____
STEVEN H. ROSENBAUM
Chief
Special Litigation Section
Civil Rights Division

_____
DONNA M. MURPHY
Special Counsel
Special Litigation Section
Civil Rights Division

_____
MARK A. POSNER
ROBERT J. MOOSSY
PATRICIA L. O'BEIRNE
Trial Attorneys
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
P.O. Box 66400
Washington, D.C. 20035-6400
202/307-1388

-89-

FOR THE DEFENDANTS, CITY OF LOS ANGELES, CALIFORNIA, BOARD OF  POLICE COMMISSIONERS OF  THE CITY OF  LOS ANGELES, AND THE LOS ANGELES POLICE DEPARTMENT:

APPROVED AS TO FORM
AND LEGALITY

_____
JAMES K. HAHN
City Attorney


_____
RICHARD RIORDAN
Mayor


_____
JOHN FERRARRO
President of City Council


SO ORDERED this  _____ day of _____, _____.


_____
UNITED STATES DISTRICT JUDGE

# Appendix D

**"Final Report Card"**
**(Summarizing Monitor's Quarterly Evaluations of Compliance with Consent Decree)**

**REPORT OF THE INDEPENDENT MONITOR FOR THE LOS ANGELES POLICE DEPARTMENT**

"Report Card" Summarizing the Monitor's Evaluation of Compliance
With the Consent Decree over the Life of the Consent Decree

Legend:
- ✓ = Compliant
- X = Non-compliant
- NR = Not Required at this Time
- NYE = Not Yet Evaluated

**ASSESSMENT OF COMPLIANCE**

| | INITIAL TERM | | | | | EXTENSION PERIOD | | |
|---|---|---|---|---|---|---|---|---|
| | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | YEAR 6 | YEAR 7 | YEAR 8 |
| | 01 02 03 04 | 05 06 07 08 | 09 10 11 12 | 13 14 15 16 | 17 18 19 20 | 21 22 23 24 | 25 26 27 28 | 29 30 |

**I. MANAGEMENT AND SUPERVISORY MEASURES TO PROMOTE CIVIL RIGHTS INTEGRITY**

**A. TEAMS II [Computer Information System]**

- 40  Access by Police Commission, Inspector General & Chief of Police
- 41  Information to be Contained in TEAMS II (Design Assessment)
  - a) Use of Force Reporting
  - b) Canine Bites
  - c) Officer-Involved Shootings
  - d) Other Lethal Uses of Force
  - e) Injuries and Deaths Reviewed by Use of Force Review Board
  - f) Vehicle Pursuits and Traffic Collisions
  - g) Complaint Form / 128 Investigations
  - h) Result of Adjudication of Investigations
  - i) Written Complaints
  - j) Commendations and Awards
  - k) Criminal Arrests and Investigations Against LAPD Employees
  - l) Claims and Lawsuits Against the City
  - m) Civil Lawsuits Against LAPD Officers
  - n) Arrest Reports, Crime Reports, and Citations
  - o) Personnel Information from Evaluations
  - p) Training History and Weapons Qualifications
  - q) Management and Supervisory Actions
- 42  Input of Historical Data into TEAMS II
- 43  Data Analysis Capabilities
- 44  Linking and Cross-Referencing of Data
- 45  Approved Design Document
- 46  Implementation of Protocol for Using TEAMS II (incl. for Supervision & Audit Purposes)
  - a) Supervisor Review of TEAMS II Data
  - b) Intensive Review of Officer's Performance
  - c) LAPD Managers Review of TEAMS II Data
  - d) Guidelines for Reviews
  - e) Guidelines for Managerial Actions
  - f) TEAMS II Used to Determine When an Audit is Necessary
  - g) TEAMS II Used as Tool for Selecting Officers
  - h) Actions Taken Result from Relevant and Appropriate Information
  - i) TEAMS II Implementation Included in Annual Personnel Performance Evaluations
  - j) Access for Police Officers
  - k) Review and Comparisons for At-Risk Behavior
  - l) Routine and Timely Documentation of Actions Taken
  - m) Review of Transferred Officer
- 47  Protocol Requirements
- 48  Training (re: Use of TEAMS II and Protocol Implementation)
- 49  Data Capture & Retention
- 50  a) TEAMS II Design / Approval 30 Days after Submission to DOJ
  - b) Approval of Use of Protocols 15 Months after Approval of Design

**REPORT OF THE INDEPENDENT MONITOR FOR THE LOS ANGELES POLICE DEPARTMENT**

"Report Card" Summarizing the Monitor's Evaluation of Compliance With the Consent Decree over the Life of the Consent Decree

Legend:
- ✓ = Compliant
- X = Non-compliant
- NR = Not Required at this Time
- NYE = Not Yet Evaluated

**ASSESSMENT OF COMPLIANCE**

| | INITIAL TERM | | | | | EXTENSION PERIOD |
| --- | --- | --- | --- | --- | --- | --- |
| | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | YEAR 6 | YEAR 7 | YEAR 8 |

Columns numbered: 01 02 03 04 05 06 07 08 09 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 29 30

Row labels:

- c) Beta of TEAMS II Available 12 Months after Approval of Design
- d) Computer Program and Hardware Operational for Beta of TEAMS II
- e) TEAMS II Fully Implemented 21 Months after Approval of Design
- 51 Use of TEAMS I Data for Decision Making
- a) Selection of Officers for Assignment to CIID or as PSB Investigators
- b) Selection of Officers as FTOs or for Gang Units
- c) Officers Transferred into New Divisions or Areas
- d) Document Consideration of Sustained Administrative Investigations, Adverse Judicial Findings or Discipline
- 52 TEAMS II Modifications Process

**B. Management and Coordination of Risk Assessment Responsibilities**
- 53 Human Resources Bureau Responsibilities re: Risk Assessments

**C. Performance Evaluation System**
- 54 Annual Performance Evaluation System Developed & Implemented

**III. INCIDENTS, PROCEDURES, DOCUMENTATION, INVESTIGATION, AND REVIEW**

**A. Use of Force**
- 55 OHB Conduct all Categorical Use of Force Admin. Investigations
- 56 a) OHB Attend / Investigate all Categorical Use of Force Incidents
- 57 LAPD Conduct Criminal Categorical Use of Force Investigations
- 58 LAPD Notify DA of Shooting Incident or Death in Police Custody
- 59 LAPD Cooperate with DA at Scene of Incident
- 60 Individual Attorneys for Officers Involved in OIS Incidents
- 61 Separate Statements of Officers Involved in OIS
- 62 a-i) Supervisory Oversight for CUOF Incidents (7 Day Requirement)
- 62 a-ii) Supervisory Conduct for CUOF Incidents Considered for Performance Appraisal
- 62 b-i) Supervisory Oversight for Search Warrants (7 Day Requirement)
- 62 b-ii) Supervisory Conduct for Search Warrants Considered for Performance Appraisal
- 63 Confidential Psychological Evaluation for Officers in Deadly Categorical UOF Incident
- 64 a) Officer History Considered for Non-Disciplinary Action in CUOF
- 64 b) Officer History Considered for Disciplinary Action in CUOF
- 65 Requirement to Report Non-Categorical Uses of Force
- 66 UOF Report Revised
- 67 Commission Review Categorical UOF
- 68 Non-Categorical Use of Force Investigations
- 69 a) Review of Categorical UOF by Review Board
- 69 b) Non-Categorical UOF Review

**B. Search and Arrest Procedures**
- 70 a) Review & Approval of Booking Recommendations/Arrests by WC for Completeness and Authenticity
- 70 b) Evaluation of Penal Code 148 et al. Incidents
- 70 c) Supervisor's Performance Evaluations Consider Quality of Supervisory Review
- 71 Supervisory Review of Search Warrants and Ramey Warrants

**REPORT OF THE INDEPENDENT MONITOR FOR THE LOS ANGELES POLICE DEPARTMENT**

"Report Card" Summarizing the Monitor's Evaluation of Compliance With the Consent Decree over the Life of the Consent Decree

Legend:
- ✓ = Compliant
- X = Non-compliant
- NR = Not Required at this Time
- NYE = Not Yet Evaluated

ASSESSMENT OF COMPLIANCE

| | INITIAL TERM | | | | EXTENSION PERIOD | | | |
|---|---|---|---|---|---|---|---|---|
| | YEAR 1 (01 02 03 04) | YEAR 2 (05 06 07 08) | YEAR 3 (09 10 11 12) | YEAR 4 (13 14 15 16) | YEAR 5 (17 18 19 20) | YEAR 6 (21 22 23 24) | YEAR 7 (25 26 27 28) | YEAR 8 (29 30) |
| a) Review for Completeness and Authenticity | | | | | | | | |
| b) Appropriate, Legal and in Conformance with Policy | | | | | | | | |
| c) Supervisory Review | | | | | | | | |
| 72 Search Warrant Log | | | | | | | | |
| 73 WC Inspection & Interview of Detainees & Arrestees | | | | | | | | |
| **C. Initiation of Complaints** | | | | | | | | |
| 74 Receipt/Maintenance of Complaints | | | | | | | | |
| a. Methods of Making Complaints | | | | | | | | |
| b. Anonymous Complaints | | | | | | | | |
| c. LAPD HQ or stations, PC, IO | | | | | | | | |
| d. Distribution of Materials (locations and languages) | | | | | | | | |
| e. Distribution of Material Upon Request | | | | | | | | |
| f. Assignment of Case Number | | | | | | | | |
| g. 24-hour Toll-free Complaint Hotline | | | | | | | | |
| h. Prohibition on requesting complainant to sign waiver | | | | | | | | |
| 75 Initiation of Complaint Form (1.28) | | | | | | | | |
| 76 Civil Lawsuits Alleging Misconduct of LAPD | | | | | | | | |
| 77 Arrest/Litigation Involving Officer | | | | | | | | |
| 78 Requirement to Report Officer Misconduct | | | | | | | | |
| **D. Conduct of Investigations** | | | | | | | | |
| 79 IAG Review of Complaints "Face Sheet" | | | | | | | | |
| 80 CUOF Investigations | | | | | | | | |
| a) Tape-Record / Videotape Interviews | | | | | | | | |
| b) Canvassing and Interviewing of Witnesses / Complainants | | | | | | | | |
| c) Group Interviews Prohibited | | | | | | | | |
| d) Not Applicable | | | | | | | | |
| e) Interview All Supervisors | | | | | | | | |
| f) Collect and Preserve Evidence | | | | | | | | |
| g) Identify and Report All Inconsistencies | | | | | | | | |
| 80i IAGPSS Investigations of Complaints | | | | | | | | |
| a) Tape-Record / Videotape Interviews | | | | | | | | |
| b) Canvassing and Interviewing of Witnesses / Complainants | | | | | | | | |
| c) Group Interviews Prohibited | | | | | | | | |
| d) Notify Involved Officers & their Supervisors | | | | | | | | |
| e) Interview All Supervisors | | | | | | | | |
| f) Collect and Preserve Evidence | | | | | | | | |
| g) Identify and Report All Inconsistencies | | | | | | | | |
| 81i Non-Categorical Uses of Force Investigations | | | | | | | | |
| a) Group Interviews Prohibited | | | | | | | | |
| b) Interview All Supervisors | | | | | | | | |
| c) Collect and Preserve Evidence | | | | | | | | |
| 81 Chain of Command Investigations of Complaints | | | | | | | | |
| a) Group Interviews Prohibited | | | | | | | | |
| b) Interview All Supervisors | | | | | | | | |
| c) Collect and Preserve Evidence | | | | | | | | |
| 82 Collateral Misconduct Investigations | | | | | | | | |
| 83 TEAMS II Access | | | | | | | | |

**REPORT OF THE INDEPENDENT MONITOR FOR THE LOS ANGELES POLICE DEPARTMENT**

"Report Card" Summarizing the Monitor's Evaluation of Compliance With the Consent Decree over the Life of the Consent Decree

Legend:
- ✓ = Compliant
- X = Non-compliant
- NR = Not Required at this Time
- NYE = Not Yet Evaluated

**ASSESSMENT OF COMPLIANCE**

Columns span INITIAL TERM (YEAR 1–YEAR 5, periods 01–20) and EXTENSION PERIOD (YEAR 6–YEAR 8, periods 21–30).

Row items:

**E. Adjudicating Investigations**
- 84 Standards for Credibility Determinations
- 85 Adjudication of Complaint Form 1.28 Investigations
  - a) Adjudication Based on a Preponderance of the Evidence
  - b) Adjudication of All Allegations Prior to Complaint Closure
- 86 Withdrawal/Anonymous Complaint Investigations
- 87 Timely Complaint Investigations

**F. Discipline & Non-Disciplinary Action**
- 88 Chief's Discipline Report/Consistency of Discipline and IG
- 89 a) IG Review Discipline Report
  - b) Commission Review/Assess Discipline Report
  - c) PC Assessment Considered Part of CCP Annual Review
- 90 Manager Review Complaint Form 1.28 Investigations
- 91 Complaint Resolution Notification
- 92 Anti-Retaliation Policy

**G. Professional Standards Bureau (Internal Affairs Group)**
- 93 Complaint Investigations
- 94 Reallocate Investigations from Chain-of-Command Supervisors
- 95 Filling Investigator Positions
- 96 Chief Misconduct Complaints
- 97 Scheduled Integrity/Visiting Audits
- 98 Hiring of IAG Investigators/Supervisors
- 99 IAG Terms of Duty
- 100 IAG Evaluations
- 101 Referral of Criminal Conduct

**H. Non-Discrimination Policy and Motor Vehicle and Pedestrian Stops**
- 102 Non-Discriminatory Policy and Assessment of Discrimination in Motor Vehicle & Pedestrian Stops
- 103 Use of Discrimination in Stops/Detention
- 104 Motor Vehicle Stop Reports
- 105 Pedestrian Stop Reports

**IV. MANAGEMENT OF GANG UNITS**
- 106 a) Gang Coordination
  - b) Eligibility Criteria for Selection of Gang Non-Supervisory Officers
  - c) Eligibility Criteria for Selection of Gang Supervisors
  - d) Tour of Duty Limitations for Gang Supervisors and Officers
  - e) i) Detention, Transportation, Arrest, Booking and Charging of Gang Arrestees
    - ii) Class A or C Uniforms for Gang Officers
    - iii) Marked Police Vehicles for Gang Officers
    - iv) Gang Officers Check Out and Return Field Equipment from Area Kit Room
    - v) Gang Officers Attendance for Patrol Roll Calls
    - vi) Gang Unit Facilities at Area Station
    - vii) Gang Arrestee/Witness Interviewed at Night at Primary Area Station
  - f) Role of Gang Unit Supervisor
  - g) Role of Gang Area Managers

REPORT OF THE INDEPENDENT MONITOR FOR THE LOS ANGELES POLICE DEPARTMENT

"Report Card" Summarizing the Monitor's Evaluation of Compliance With the Consent Decree over the Life of the Consent Decree

✓ = Compliant
X = Non-compliant
NR = Not Required at this Time
NYE = Not Yet Evaluated

| | | ASSESSMENT OF COMPLIANCE | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | INITIAL TERM | | | | | | | | | | | | | | | | | | | EXTENSION PERIOD | | | | | | | |
| | YEAR 1 | | | | YEAR 2 | | | | YEAR 3 | | | | YEAR 4 | | | | YEAR 5 | | | | YEAR 6 | | | | YEAR 7 | | | YEAR 8 |
| | 01 02 03 04 | 05 06 07 08 | 09 10 11 12 | 13 14 15 16 | 17 18 19 20 | 21 22 23 24 | 25 26 27 28 | 29 30 |

**V. CONFIDENTIAL INFORMANTS**

h) Role of Bureau Gang Coordinator
107 a) Eligibility Criteria for Work in Gang Units
    b) Selection Process for Gang Unit Personnel
    c) Supervisory Review of Incidents & Impact on Eligibility to Remain in Gang Unit
108 Procedures for the Handling of Informants
109 Confidential Informants Database
110 Confidential Informant Manual

**VI. DEVELOPMENT OF PROGRAM FOR RESPONDING TO PERSONS WITH MENTAL ILLNESS**

111 Evaluation of Other Successful Programs
112 a) Report to Police Commission on Police Contact with Mentally Ill
    b) Report to City Council and Mayor on Police Contact with Mentally Ill
113 Audit of Police Contact with Mentally Ill

**VI. TRAINING**

**A. Field Training Officers Program**
114 Eligibility Criteria for FTO
115 FTO De-selection
116 FTO Training Plan

**B. Training Content**
117 Police Integrity Training Requirements
118 Public Members on Board of Rights
119 Tuition Reimbursement
120 Communication of Training Suggestions

**C. Supervisory Training**
121 Supervisory Training Requirements
122 Regular and Periodic Supervisory Training
123 Supervisory Investigations Training

**VII. INTEGRITY AUDITS**

**A. Audit Plan**
124 Audit Plan & Responsibilities

**B. Audits by the LAPD**
125 a) Warrant Applications & Affidavits Audit
    b) Arrest, Booking & Charging Reports Audit
    c) Confidential Informant Control Packages Audit
    d) Gang Unit Work Product Audit
126 Use of Force Reports Audit
127 Sting Audits Reporting Protocol
128 1) Warrant Applications & Affidavits Audit
    2) Arrest, Booking & Charging Reports Audit
    3) Use of Force Reports Audit
    4) Motor Vehicle & Pedestrian Stops Audit
    5) Confidential Informant Control Packages Audit
129 a) Categorical Use of Force Systems Audit
    b) Categorical Use of Force Investigations Audit

**REPORT OF THE INDEPENDENT MONITOR FOR THE LOS ANGELES POLICE DEPARTMENT**

"Report Card" Summarizing the Monitor's Evaluation of Compliance With the Consent Decree over the Life of the Consent Decree

✓ = Compliant
X = Non-compliant
NR = Not Required at this Time
NYE = Not Yet Evaluated

| | ASSESSMENT OF COMPLIANCE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | INITIAL TERM | | | | | | | | | | | | | | | | | | | | EXTENSION PERIOD | | | | | | | | | |
| | YEAR 1 | | | | YEAR 2 | | | | YEAR 3 | | | | YEAR 4 | | | | YEAR 5 | | | | YEAR 6 | | | | YEAR 7 | | | | YEAR 8 | |
| | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ii) Non-Categorical Use of Force Investigations Audit | | | | X | X | X | X | X | X | X | X | DW | | | DW | | | | | | | | | | | | | | X | |
| iii) Complaint Form 1.28 Systems Audit | | | | | X | X | ✓ | ✓ | NYE | X | ✓ | | | | | | | | | | | | | | | | | | | ✓ |
| iii) Complaint Form 1.28 Investigations Audit | | | | | | | | | | ✓ | | | | | | | | | ✓ | | | | | | | | | | | |
| 130 Annual Report on Complaints & Disposition | | | ✓ | | ✓ | | ✓ | ✓ | | ✓ | | | | | ✓ | | | | ✓ | DW | DW | DW | | | | | | | | |
| 131 a) Gang Unit Work Product Audit | | | | X | X | X | X | X | NYE | X | X | DW | DW | ✓ | | | X | | | | | | | NYE | X | | | X | |
| b) Gang Unit Selection Criteria Compliance Audit | | | | | X | X | NYE | NYE | X | | | DW | DW | | | | | | | | | | | | | | | | | |
| c-1) Gang Unit Warrant Applications & Affidavits Audit | | | | X | X | X | X | X | ✓ | X | NR | NYE | DW | ✓ | | ✓ | X | | | | X | | | NYE | | ✓ | | | | ✓ |
| c-2) Gang Unit Arrest, Booking & Charging Reports Audits | | | | X | X | X | NYE | NYE | X | | ✓ | DW | DW | ✓ | | | | | | | | | ✓ | | | | | | | ✓ |
| c-3) Gang Unit Use of Force Reports Audit | | | | X | X | X | X | X | X | X | NYE | NYE | NYE | ✓ | DW | ✓ | X | | ✓ | | | | ✓ | | | ✓ | | | | ✓ |
| c-4) Gang Unit Motor Vehicle & Pedestrian Stops Audit | | | | X | X | X | X | X | NYE | X | X | NYE | NYE | ✓ | | | | | ✓ | | | | DW | | | | | | | |
| c-5) Gang Unit Informant Control Packages Audit | | | | X | X | X | X | NYE | X | | ✓ | NYE | ✓ | ✓ | | | | | | | | | | | | | | | | |
| d) Gang Unit Use of Confidential Informants Audit | | | NYE | NYE | ✓ | X | ✓ | NYE | X | ✓ | | E | | X | | | | | ✓ | ✓ | ✓ | | | ✓ | | NYE | ✓ | | ✓ | |
| e) Audit of Gang Unit Supervisors | | | | X | X | ✓ | | ✓ | | | | | | ✓ | | | | | | | | | | | | | | | ✓ | |
| f) Gang Unit Assessing Supervisory Review of Incidents | | | | X | X | ✓ | | | X | | | | | | ✓ | | | | | | | | | | | | | | | |
| g) Gang Unit Conclusions/Recommendations | | | | X | NR | NR | NR | ✓ | NR | X | | DW | DW | NR | | ✓ | | | NR | ✓ | DW | NR | | NR | TBD | | ✓ | | NR | |
| 132 Financial Disclosure Requirements & Audits | | | | | NR | NR | | | | | | | | NR | | | | NR | | | | NR | | | TBD | | | | NR | |
| 133 Police Training Audit | | | | | NR | DW | X | X | | | | DW | DW | ✓ | DW | CWI | | | | | | | ✓ | | | | | | | ✓ |
| 134 Skeletal Fractures During UOF Audit | | | | | NR | DW | X | | | | | | | DW | CWI | | | | | | | | | | | | | | | ✓ |
| **C. Inspector General Reviews & Audits** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 135 a) Timeliness of Transmittal of LAPD Audits to OIG | | | | | X | X | X | X | X | X | X | X | X | ✓ | X | X | ✓ | X | X | ✓ | ✓ | ✓ | ✓ | | | | ✓ | | DW | ✓ |
| b) Evaluation of IG's Reviews of LAPD's Audits | | NYE | NYE | NYE | X | ✓ | ✓ | DW | X | X | X | X | X | X | X | ✓ | X | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | | | |
| 136 IG Review of Categorical UOF Investigations | | | | | X | | X | X | ✓ | ✓ | X | X | X | X | X | | X | NYE | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | | DW |
| i) IG Audit of Non-Categorical Uses of Force | | | NYE | ✓ | X | X | X | X | X | X | ✓ | ✓ | X | X | X | | X | NYE | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | |
| ii) IG Audit of Complaint Form 1.28 Investigations | | | | ✓ | NYE | NR | X | X | NYE | NYE | ✓ | X | | X | | X | X | NYE | NYE | ✓ | | | ✓ | | | | | | | |
| 137 IG Audit of LAPD's Use of TEAMS II Protocol (as per CD47) Phase I | | | | | NR | NR | | X | NR | NR | DW | DW | NR | NR | | NR | NR | | NR | NR | NR | NR | NR | NR | | ✓ | | | | ✓ |
| IG Audit of LAPD's Use of TEAMS II Protocol (as per CD47) Phase II | | | | | | NR | | | | | | | | | | | | | | | | | | | | | | | | ✓ |
| 138a IG to Use TEAMS II to Conduct Audits and Review LAPD Audits for At Risk Behavior; Practices or Procedures 1 for individuals | | | | | | | | | NR | | | | | | NR | | NR | | NR | | NR | | NR | | NR | | TBD | | DW | ✓ |
| 138b IG to Use TEAMS II to Conduct Audits and Review LAPD Audits for At Risk Behavior, Practices or Procedures 1 for units | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | DW |
| 139 Recording, Tracking & Investigation of Retaliation Complaints | | DW | | ✓ | ✓ | ✓ | ✓ | ✓ | NR | ✓ | | ✓ | ✓ | | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | | ✓ | | | ✓ | | | | |
| 140 Audits Initiated by the Police Commission and the IG | | DW | NYE | | X | X | ✓ | DW | | X | | X | | ✓ | DW | | | NYE | ✓ | ✓ | ✓ | TBD | | TBD | | ✓ | | | | ✓ |
| **IX. OPERATIONS OF THE POLICE COMMISSION & INSPECTOR GENERAL** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **A. Police Commission** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 141 Obligations of Commission/IG/Chief | | | | | NYE | | X | ✓ | | ✓ | ✓ | X | ✓ | | ✓ | ✓ | NYE | NYE | | ✓ | | | | | | | | | | ✓ |
| 142 a) Commission/IG Review of All Categorical UOF | | | | | NYE | | DW | | ✓ | DW | DW | ✓ | DW | DW | DW | | ✓ | ✓ | ✓ | | ✓ | | | | | | ✓ | | | |
| b) Annual UOF Report Detailing Commission's Findings | | | | | | NYE | | | DW | | DW | X | | ✓ | DW | | | ✓ | | | | | | | | | | | DW | |
| 143 a) Police Commission Review of Audits | | | | | | X | | | | | | | | DW | X | | | | | | | | | | | | | | DW | ✓ |
| **B. Inspector General** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

REPORT OF THE INDEPENDENT MONITOR FOR THE LOS ANGELES POLICE DEPARTMENT
"Report Card" Summarizing the Monitor's Evaluation of Compliance
With the Consent Decree over the Life of the Consent Decree

✓ = Compliant
X = Non-compliant
NR = Not Required at this Time
NYE = Not Yet Evaluated

**ASSESSMENT OF COMPLIANCE**

| | INITIAL TERM | | | | | | | | | | | | | | | | EXTENSION PERIOD | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | YEAR 1 | | | | YEAR 2 | | | | YEAR 3 | | | | YEAR 4 | | | | YEAR 5 | | | | YEAR 6 | | | | YEAR 7 | | | | YEAR 8 | |
| | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 147 a) Notification and Observation of CUOF "Roll-outs" | | | | | DW | | | ✓ | | | | ✓ | | | | ✓ | | | | | | | | | | | | | | ✓ |
| b) Notification to the PC of Non-Conformance | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 148 UOF Review Board Meetings | | | | | | ✓ | ✓ | | | ✓ | | ✓ | | | ✓ | | | | | | | | | | | | | | | |
| 149 Promptly Providing Documents & Information to IG | | | | | | ✓ | | | | | | | | | ✓ | | | | | | | | | | | | | | | |
| 150 a) IG Acceptance of Complaints from LAPD Officers | | | | | ✓ | | | | ✓ | | | ✓ | | | ✓ | | | | | | | | | | | | | | | |
| b) Disclosure of Complainant's Identity | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 151 Officer Obligations to Investigate | | | | | | ✓ | | | | ✓ | | ✓ | | ✓ | | | | ✓ | | | | | | | | | | | | |
| 152 a) Complaint Intake Information Provided to IG within One Week of IAG's Receipt | | | | | | | ✓ | | | | | | | ✓ | | | | | | | | | | | | | | | | |
| b) Complaint Intake Information Consistent with LAPD Policies and Procedures | | | | | | | | | | | ✓ | | | | | | | | | | | | | | | | | | | |
| 153 Informing the Police Commission of Pending Investigations & Audits | | | | | NYE | | ✓ | | X | | | | NYE | | | | ✓ | | | | ✓ | | | | | | ✓ | | | ✓ |
| **C. General** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 154 Recommendations Implemented to Improve Deficiencies | | | | NYE | NR | X | X | X | X | | | | | | | | | | | | | | | | | | | | | NR |
| **X. COMMUNITY OUTREACH AND PUBLIC INFORMATION** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 155 i) Public Meeting in First Year of CD | | | | ✓ | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ii) Public Meetings Annually | | | | X | X | NR | ✓ | ✓ | ✓ | | | | ✓ | | | | | | | | | | | | | | | | | |
| 156 Website Reports | | | | X | X | | DW | | X | ✓ | | | ✓ | | | | ✓ | | | | ✓ | | | | | | | | | |
| 157 Meeting with Community Advisory Groups | | | | | | | | | X | | | | | | | | | | | | | | | | | | | | | |

# Appendix E

## Constitutional and Effective Policing:  Crime Statistics

# Appendix E:
# Constitutional and Effective Policing:
# Crime Statistics

## Homicides

From the time that the Rampart Corruption Task Force was established in 1998 to the start of the Consent Decree in June 2001, homicides rates were slowly rising throughout the City of Los Angeles.  As shown in Table 1, in 1998 homicides were at 419 and by 2001 they had increased 29% to 591, and then increased again in 2002 to 647 total homicides.  After the selection of William J. Bratton as Chief of Police in October of 2002, the homicide rate began to decrease, with 480 homicides in 2005 and 381 homicides in 2008.



Appendix E

2 | Office of the Independent Monitor: Final Report
**June 11, 2009**

## Rape

Similarly, rape rates decreased significantly over the same period of time. By the end of 2008, there were a total of 786 reported rapes, as opposed to over 1,300 in 2000.



## Aggravated Assault

Likewise, aggravated assaults dramatically decreased from a high of 32,804 in 2001 to 11,993 in 2008, a decrease of 63%.



4 | Office of the Independent Monitor: Final Report
| **June 11, 2009**

## Robbery

While not as dramatic, robberies decreased from a high of 17,049 in 2001 to 13,354 in 2008, a 21% decrease.



# Appendix F

## Timeline of Significant Events

# Appendix F:
# Timeline of Significant Events

| | |
|---|---|
| **March 2, 1991** | George Holliday captures LAPD officers beating Rodney King on tape. |
| **April 1, 1991** | Mayor Tom Bradley forms the Independent Commission on the Los Angeles Police Department (also known as the Christopher Commission) to study the excessive use of force in the LAPD; the Commission's findings are released later in the year. |
| **April 29, 1992** | Jurors acquit three of four LAPD officers of excessive force charges in Rodney King case; civil unrest related to the verdict begins in South Los Angeles, spreads to other parts of the city and lasts for almost a week (55 people died, over 2,000 were injured and damage is estimated at $1 billion); the DOJ brings charges of federal civil rights violations against the four officers in the aftermath. |
| **June 27, 1992** | Chief Daryl F. Gates resigns from the LAPD. |
| **June 30, 1992** | Mayor Bradley appointee Willie L. Williams begins serving as Chief of Police, the first African-American chief in LAPD history. |
| **July 1, 1993** | Richard J. Riordan begins serving as mayor of Los Angeles. |
| **April 17, 1993** | Jurors convict two of the four officers of federal civil rights violations. |
| **April 1995** | Citizens of Los Angeles vote to amend the City Charter, paving the way for the creation of an Office of the Inspector General to monitor the LAPD. |
| **May 1996** | Report commissioned by the Police Commission titled "Five Years Later: A Report to the Los Angeles Police Commission on the Los Angeles Police Department's Implementation of Independent Commission Recommendations" is released. |
| **July 1, 1996** | Office of the Inspector General becomes operational with Katherine Mader serving as the first Inspector General. |

| | |
|---|---|
| **May 18, 1997** | Bayan Lewis begins serving as interim chief for LAPD. |
| **July 1, 1997** | Mayor Riordan begins serving second term as mayor of Los Angeles. |
| **August 12, 1997** | Mayor Riordan appointee Bernard C. Parks begins serving as Chief of Police. |
| **November 6, 1997** | Bank robbery of $722,000 takes place in Los Angeles in which Officer David Mack is implicated as orchestrating it; his girlfriend was the bank manager and had $722,000 delivered to the branch 10 minutes before the robbery. |
| **February 26, 1998** | LAPD Rampart CRASH Officer Brian Hewitt allegedly beats handcuffed 18th Street gang member Ismael Jimenez in the chest and stomach, causing him to vomit blood; Hewitt was subsequently fired and Officer Ethan Cohan was fired for knowing about but not reporting the beating. |
| **March 27, 1998** | LAPD officials discover that six pounds of cocaine evidence are missing from the property room. |
| **May 1998** | Chief Parks establishes the Rampart Corruption Task Force; it is discovered that another pound of cocaine is missing, which had been booked on a prior arrest made by Detective Frank Lyga. |
| **August 25, 1998** | Rampart CRASH Officer Rafael Perez is arrested for stealing cocaine from an LAPD property room. |
| **November 10, 1998** | Katherine Mader announces resignation as Inspector General effective January 1, 1999; Police Commission appoints Deirdre Hill as interim Inspector General to begin serving on January 1, 1999. |
| **May 28, 1999** | Police Commission appoints Jeffrey C. Eglash as the new Inspector General. |
| **June 8, 1999** | Citizens of Los Angeles vote to enact a new City Charter, which gives the OIG the authority to initiate any audit or investigation pertaining to the Police Department, without the prior approval of the Police Commission, subject to the Commission's authority to direct that investigation be discontinued; guaranteed access to all information and documents of the Police Department, to the same extent as the Police Commission itself; and the power to subpoena witnesses. |
| **September 8, 1999** | Officer Perez pleads guilty to cocaine theft in exchange for providing prosecutors with information on other Rampart CRASH officers |

| | engaged in misconduct. |
|---|---|
| September 16, 1999 | District Attorney's Office has Javier Ovando's conviction overturned and has him released after Perez recants testimony related to a 1996 shooting; Perez told investigators of how he and his partner, Officer Nino Durden, handcuffed and shot Ovando in the chest, left him paralyzed, planted a gun on him and used the information to secure a 23-year prison sentence. |
| September 21, 1999 | Chief Parks forms a Board of Inquiry to investigate the depth of the Rampart corruption scandal and analyze management's failures. |
| February 2000 | Perez begins serving a five-year prison sentence. |
| March 1, 2000 | LAPD releases "LAPD Board of Inquiry into the Rampart Area Corruption Incident" report. |
| March 6, 2000 | LAPD activates Special Enforcement Units (now known as Gang Enforcement Details) and replaces Community Resources Against Street Hoodlums (CRASH) units. |
| April 2000 | Los Angeles Police Commission forms the Rampart Independent Review Panel. |
| May 8, 2000 | DOJ writes letter telling the City it has "determined that the LAPD is engaging in a pattern or practice of excessive force, false arrests, and unreasonable searches and seizures." |
| July 28, 2000 | Durden is arrested and charged with attempted murder in the Ovando shooting; he is also charged with perjury, filing false police reports and robbery. |
| September 11, 2000 | USC law professor Erwin Chemerinsky publishes "An Independent Analysis of the Los Angeles Police Department's Board of Inquiry Report on the Rampart Scandal" at the request of the LAPPL. |
| September 19, 2000 | L.A. City Council votes to accept the Consent Decree with DOJ. |
| September 26, 2000 | Former Detective Russell Poole files a federal civil rights lawsuit against the City of Los Angeles and Chief Bernard Parks for obstructing his efforts to fully investigate the extent of corruption within the LAPD. |
| October 4, 2000 | Four Rampart CRASH officers (Sergeant Edward Ortiz, Brian Liddy, Paul Harper and Michael Buchanan) are convicted of perjury, |

| | fabricating arrests and filing false police reports. |
|---|---|
| **November 2000** | **Community panel publishes "Report of the Rampart Independent Review Panel."** |
| **November 2, 2000** | L.A. City Council votes to approve the Consent Decree. |
| **November 15, 2000** | Ortiz, Liddy and Buchanan are convicted of conspiracy to obstruct justice and filing false police reports; Harper is acquitted of these charges. |
| **November 21, 2000** | L.A. City Council votes to settle with Ovando for $15 million; an additional 29 civil suits were settled for nearly $11 million. |
| **December 22, 2000** | Convictions of Ortiz, Liddy and Buchanan are overturned in L.A. Superior Court. |
| **March 23, 2001** | DA's office brings felony indictments against three former Rampart CRASH officers (Ethan Cohan, Manuel Chavez and Shawn Gomez) for allegedly assaulting two gang members and filing false police reports. |
| **March 30, 2001** | Durden agrees to plead guilty to charges including fabricating evidence, false arrest and presenting false testimony for a seven- to eight-year prison sentence in exchange for fully cooperating with federal prosecutors. |
| **May 18, 2001** | L.A. City Council votes to enter into contract with Kroll as the Independent Monitor. |
| **June 12, 2001** | LAPD establishes the Consent Decree Task Force (later known as the Civil Rights Integrity Division). |
| **June 15, 2001** | Judge Feess signs an order approving the Consent Decree and Kroll as the Independent Monitor. |
| **July 1, 2001** | James K. Hahn begins serving as mayor of Los Angeles; Rockard J. Delgadillo begins serving as City Attorney. |
| **July 6, 2001** | LAPD establishes Audit Division per special order; Audit Division submits first audits later that month. |
| **July 11, 2001** | Mayor Hahn reappoints Herbert "Bert" Boeckmann II and appoints Rick Caruso, Rose Ochi, David S. Cunningham III and Silvia Saucedo to the Board of Police Commissioners. |

| | |
|---|---|
| July 24, 2001 | Perez is released from prison after three years and placed on parole. |
| July 2001 | Mayor Hahn appoints Roberta M. Yang to be Deputy Mayor of Public Safety. |
| August 1, 2001 | LAPD establishes the Ethics Enforcement Section within Internal Affairs Group. |
| August 21, 2001 | Rick Caruso is elected President of the Police Commission. |
| November 1, 2001 | LAPD begins collecting stop data. |
| November 9, 2001 | L.A. City Council approves 3/12 work week. |
| November 15, 2001 | Independent Monitor files first quarterly report with the Court. |
| December 11, 2001 | LAPD establishes Critical Incident Investigation Division (CIID). |
| December 17, 2001 | Perez pleads guilty to charges of conspiracy to violate Ovando's civil rights and firearms violations, and serves five years in federal prison. |
| December 19, 2001 | L.A. City Council approves creation of Risk Management Bureau. |
| January 2002 | LAPD creates Management System Reengineering Project (MSRP) Unit to develop TEAMS II. |
| April 9, 2002 | L.A. Police Commission votes against a second term for Chief Bernard C. Parks. |
| April 15, 2002 | Monitor publishes the "Methodologies to Aid in the Determination of Compliance." |
| May 7, 2002 | L.A. Police Commission selects Martin Pomeroy as Interim Chief. |
| October 1, 2002 | Judge Feess grants intervenor status to ACLU and attorney Stephen Yagman. |
| October 2, 2002 | Mayor Hahn selects William J. Bratton to be next Chief of Police (City Council confirms him on October 11, 2002, and he is sworn in on October 28, 2002). |
| October 24, 2002 | Jeffrey C. Eglash announces resignation as Inspector General effective the end of November 2002. |

Appendix F

6 | Office of the Independent Monitor: Final Report
**June 11, 2009**

| November 2002 | First civilian auditor joins AD. |
|---|---|
| January 6, 2003 | LAPD releases first stop statistics. |
| January 7, 2003 | Police Commission votes to prohibit LAPD officers from most vehicle pursuits – those prompted by traffic infractions such as speeding or running a stop sign. |
| February 25, 2003 | Police Commission approves, in concept, Chief Bratton's reorganization, which elevates Consent Decree responsibilities to the Consent Decree Bureau and internal affairs functions to Professional Standards Bureau. |
| March 2003 | Chief Bratton appoints Deputy Chief Michael Berkow to head Internal Affairs. |
| April 29, 2003 | Police Commission appoints Dan Koenig as its Executive Director. |
| May 13, 2003 | Police Commission appoints Andre Birotte as its Inspector General. |
| June 25, 2003 | Detective Abiel Barron is killed in automobile accident while returning from a homicide investigation. |
| July 1, 2003 | Herbert "Bert" Boeckmann II steps down as Police Commissioner due to term limits and is replaced by Alan Skobin. |
| July 9, 2003 | L.A. City Council agrees to settle a lawsuit filed by dozens of homeless people who claim they were improperly arrested during controversial LAPD sweeps of Skid Row. |
| July 29, 2003 | Rick Caruso steps down as President of the Police Commission and is replaced in that post by David S. Cunningham III. |
| August 14, 2003 | RAND Institute releases report on LAPD training. |
| December 2003 | AD assumes responsibility for Consent Decree gang audits. |
| February 20, 2004 | Officer Ricardo Lizarraga is shot and killed while responding to a domestic dispute. |
| March 8, 2004 | Silvia Saucedo resigns from the Board of Police Commissioners. |
| April 15, 2004 | Corina Alarcon is appointed by Mayor Hahn to replace Silvia Saucedo on the Police Commission. |

| May 2004 | LAPD begins using PODDS to collect stop data. |
| --- | --- |
| May 5, 2004 | Dan Koenig resigns as Executive Director for the Police Commission. |
| May 27, 2004 | Police Commission appoints Richard Tefank as its Executive Director. |
| June 23, 2004 | LAPD officers beat Stanley Miller with flashlight after pursuit. |
| August 2004 | LAPD installs video cameras in all patrol cars in Rampart Area (VHS). |
| September 2004 | AD offers Basic Law Enforcement Performance Auditor Course for the first time. |
| November 9, 2004 | Consent Decree Bureau assumes responsibility for anti-retaliation policy from Professional Standards Bureau; LAPD deactivates CIID and establishes Force Investigation Division (FID). |
| January 2005 | AD's Basic Law Enforcement Performance Auditor Course achieves POST certification in California and Michigan. |
| February 6, 2005 | LAPD officers shoot and kill 13-year-old Devin Brown after pursuit. |
| February 16, 2005 | Police Commission adopts new policy on shooting at moving vehicles. |
| March 2005 | Relatives of Notorious B.I.G. file a wrongful death lawsuit against the City of Los Angeles; mistrial declared in July 2005. |
| May 17, 2005 | Los Angeles residents elect Antonio R. Villaraigosa as mayor. |
| June 2, 2005 | Judge Feess approves joint request to modify the Consent Decree for many paragraphs. |
| July 1, 2005 | Rick Caruso resigns from the Police Commission. |
| July 7, 2005 | David S. Cunningham III resigns from Police Commission and as its president. |
| July 10, 2005 | SWAT bullet kills 17-month-old Suzie Pena after standoff. |
| July 14, 2005 | Mayor Villaraigosa reappoints Alan Skobin and appoints John W. Mack, Anthony Pacheco, Shelley Freeman and Andrea Sheridan Ordin to the Board of Police Commissioners; Commissioners Ochi and Alarcon step down at the beginning of the new administration. |

8 | Office of the Independent Monitor: Final Report
**June 11, 2009**

| August 1, 2005 | Mayor Villaraigosa appoints Maurice Suh as Deputy Mayor for Public Safety and Homeland Security. |
|---|---|
| August 16, 2005 | Mayor Villaraigosa announces that Chief Bratton has formed a Board of Inquiry to study the LAPD's Special Weapons and Tactics Team (SWAT) in the wake of the death of Suzie Peña. |
| August 23, 2005 | John W. Mack is elected President of the Police Commission. |
| September 2005 | Deployment Period System component of TEAMS II is rolled out Department-wide. |
| January 2006 | Audit Charter is approved by the Police Commission which describes AD's role and authority, and officially adopts the standards promulgated by the Comptroller General of the United States, commonly referred to as Generally Accepted Government Auditing Standards, as the standards applicable for AD's audits. |
| January 10, 2006 | LAPD begins rolling out the Risk Management Information System (RMIS) portion of TEAMS II; Police Commission approves first Audit Charter. |
| January 25, 2006 | Police Commission begins posting online summaries of use-of-force reviews. |
| March 21, 2006 | Judge Feess denies joint motion to modify financial disclosure requirement. |
| April 14, 2006 | Federal appeals court rules the LAPD cannot arrest people for sitting, lying or sleeping on Skid Row sidewalks. |
| May 10, 2006 | Independent Monitor files motion to extend Decree by two years. |
| May 12, 2006 | LAPD launches first Internet blog. |
| May 15, 2006 | Judge Feess orders extension of Consent Decree for three years and denies joint motion to extend certain provisions for two years. |
| May 23, 2006 | Police Commission approves policy banning officers from moonlighting as private investigators. |
| June 2006 | Use of Force System component of TEAMS II is implemented Department-wide. |
| July 11, 2006 | Analysis Group releases "Pedestrian and Motor Vehicle Post-Stop |

| | |
|---|---|
| | Data Analysis Report." |
| July 13, 2006 | Blue Ribbon panel headed by Connie Rice releases "Rampart Reconsidered: The Search for Real Reform Seven Years Later." |
| August 16, 2006 | L.A. City Council agrees to a plan for installing digital video cameras in patrol cars in all Areas in South Bureau by the start of 2007. |
| August 31, 2006 | California Supreme Court rules that the public may not have access to police discipline records filed during administrative appeals unless the officers waive their rights to privacy. |
| September 2006 | LAPD begins Safer City Initiative on Skid Row. |
| September 22, 2006 | Mayor Villaraigosa appoints Arif Alikhan as Deputy Mayor for Public Safety and Homeland Security. |
| October 10, 2006 | Chief Bratton appoints Sandy Jo MacArthur as Commander for Training Group, the first woman in the LAPD's history to oversee training. |
| October 22, 2006 | Officer Landon Dorris is struck by vehicle and killed while conducting a traffic investigation. |
| November 17, 2006 | LAPD bans use of the term "distraction strike." |
| January 9, 2007 | LAPD announces that Chief Bratton has appointed an advisory group to help implement reforms recommended after the Rampart scandal. |
| January 30, 2007 | Police Commission orders a review of racial profiling complaints. |
| February 27, 2007 | LAPD notifies Police Commission that TEAMS II will be fully operational in mid-March 2007. |
| March 2007 | TEAMS II Risk Management Information System Action Items are implemented Department-wide. |
| March 27, 2007 | Police Commission votes to begin negotiating a contract with IBM for first phase of Digital In-Car Video System (DICVS) program. |
| April 2007 | Phase I of Complaint Management System component of TEAMS II is rolled out Department-wide. |

| April 16, 2007 | Relatives of Notorious B.I.G. file a second wrongful death lawsuit against the City of Los Angeles and name Rampart officers as being involved. |
|---|---|
| April 24, 2007 | Judge rules that some LAPD tactics on Skid Row are unconstitutional. |
| May 1, 2007 | Skirmish between LAPD officers and demonstrators occurs during May Day rally at MacArthur Park. |
| May 8, 2007 | Chief Bratton promotes Commander Sergio Diaz to Deputy Chief in charge of Central Bureau after demotions and reassignments related to May Day. |
| May 15, 2007 | Police Commission adopts racial profiling investigative protocols. |
| May 17, 2007 | ACLU files motion requesting that Judge Feess investigate whether use of force at LAPD rally violated the Consent Decree. |
| May 29, 2007 | LAPD issues preliminary report on May Day incident. |
| May 30, 2007 | LAPD announces creation of Incident Management and Training Bureau to manage major events and protests. |
| June 19, 2007 | Police Commission approves a second five-year term for Chief Bratton; he is sworn in October 25, 2007. |
| July 2007 | AD assumes responsibilities of LAPD's Fiscal Operations Division in newly created Fiscal Audit Section. |
| July 10, 2007 | LAPD begins crowd control training in response to May Day incident. |
| July 31, 2007 | Anthony Pacheco is elected President of the Police Commission, replacing John W. Mack. |
| October 9, 2007 | LAPD issues report on May Day incident. |
| October 10, 2007 | City settles lawsuit with homeless advocates over a law that prohibits people from sleeping on the sidewalk on Skid Row. |
| Early November 2007 | LAPD launches mapping program to identify Muslim enclaves across the city and aid antiterrorism unit and subsequently decides to scrap the program on November 14, 2007. |
| November 13, 2007 | Police Commission approves contract with IBM for first phase of |

|  | DICVS. |
|---|---|
| November 21, 2007 | Mayor Villaraigosa appoints Robert M. Saltzman to the Police Commission to replace outgoing commissioner Shelley Freeman. |
| December 20, 2007 | Police Commission approves financial disclosure policy; LAPPL sues to block implementation that same day. |
| January 15, 2008 | L.A. City Council asserts jurisdiction over financial disclosure policy. |
| January 23, 2008 | Chief Bratton promotes Commander Terry Hara to Deputy Chief for West Bureau, making him the first Asian-American officer to rise to that rank. |
| February 6, 2008 | Councilmember Jack Weiss announces drop in plans to object to financial disclosure policy. |
| February 7, 2008 | Officer Randal Simmons becomes the first LAPD SWAT member to fall in the line of duty. |
| February 19, 2008 | LAPD releases report showing that Latinos are now the largest group of officers. |
| March 25, 2008 | Police Commission approves DICVS pilot program (April 2 – City Council approves program and contract). |
| April 2, 2008 | City Council approves DICVS program and contract. |
| April 15, 2008 | LAPD releases findings from SWAT panel's report. |
|  |  |
| May 15,  2008 | AD receives the Henry Reining Outstanding Organization Award from the American Society for Public Administration, Los Angeles Metro Chapter. |
| June 13, 2008 | Judge Feess grants temporary restraining order on implementation of financial disclosure policy. |
| July 22, 2008 | Police Commission approves changes in training and discipline policy for officers involved in use of force incidents; emphasis is on character development rather than punishment. |
| August 19, 2008 | Police Commission orders LAPD to develop mediation process for |

| | racial profiling complaints. |
|---|---|
| September 12, 2008 | Officer Spree Desha is killed while aboard Metrolink train that collides with a freight train. |
| September 12, 2008 | Ninth Circuit Court of Appeals puts financial disclosure policy on hold pending appeal. |
| September 16, 2008 | Chief Bratton announces plans to discipline officers involved in May Day incident. |
| October 20, 2008 | ACLU releases "A Study of Racially Disparate Outcomes in the Los Angeles Police Department." |
| December 18, 2008 | LAPD settles lawsuit by agreeing not to unduly detain and search people on Skid Row. |
| January 13, 2009 | LAPD responds to and rejects ACLU findings at Police Commission meeting. |
| January 30, 2009 | LAPPL files grievance demanding that officers be required to wear safety equipment while trying to control crowds in street marches and other gatherings. |
| February 4, 2009 | L.A. City Council agrees to settle most of May Day lawsuits. |
| February 6, 2009 | LAPD posts a confidential report on the Internet that contained the names of hundreds of officers accused of racial profiling and other misconduct; the LAPPL subsequently files a claim for damages on February 19, 2009. |
| February 10, 2009 | Police Commission approves change of term from "racial profiling" to "biased policing." |
| February 27, 2009 | Ninth Circuit Court of Appeals rejects LAPPL bid to block financial disclosure. |
| March 1, 2009 | Audit Division and Civil Rights Integrity Division combine to form the Internal Audits and Inspections Division. |
| March 2, 2009 | LAPD announces that it is employing 9,895 officers, the most in its history. |
| March 3, 2009 | Mayor Villaraigosa is elected to a second term. |
| April 2009 | AD publicly presents to the Board of Fire Commissioners an audit it |

| | |
|---|---|
| | conducted per request of the Los Angeles Fire Department (LAFD) Arson Unit. |
| May 5, 2009 | Police Commission votes to establish LAPD Purple Heart Medal for officers killed or seriously injured in the line of duty. |
| May 18, 2009 | Harvard University's Kennedy School of Government releases report titled "Policing Los Angeles Under a Consent Decree: The Dynamics of Change at the LAPD." |
| May 26, 2009 | Police Commission President Anthony Pacheco announces his resignation effective July 1, 2009; a replacement has not been named. |

# Appendix G

## Monitoring Team Members' Biographies

# Appendix G:
# Monitoring Team Members' Biographies

## Michael G. Cherkasky – Chief Executive Officer, US Investigations Services, Inc. (USIS)

Michael G. Cherkasky was appointed the Independent Monitor of the Los Angeles Police Department along with Kroll Inc. in June of 2001.  In that role, Mr. Cherkasky oversaw the selection of team members, team assignments and has been responsible for the overall operation of the Monitoring team over its eight years.

Mr. Cherkasky is currently the Chief Executive Officer (CEO) for US Investigations Services, Inc., (USIS) and its subsidiaries.  In 1994, Mr. Cherkasky joined Kroll, Inc., and founded and led Kroll Monitoring Services. His success in this role allowed him to attain progressive leadership positions. While in charge of Kroll Monitoring Services, he was appointed by various U.S. Federal Courts to oversee Federal Consent decrees with organizations such as the Long Island Carting industry and the International Brotherhood of Teamsters. Mr. Cherkasky was named President of Kroll in 1997 and served in that capacity until 2004 when Kroll was acquired MMC Companies. Immediately after that acquisition, Mr. Cherkasky was appointed President of MMC.

Prior to joining Kroll, Mr. Cherkasky was an Assistant District Attorney in New York County. While in the District Attorney's office, Mr. Cherkasky served as a trial attorney, Trial Bureau Chief, Chief of the Rackets Bureau, and Chief of the Investigations Division. In this capacity, he led the division's investigations on fraud, corruption, money laundering, organized crime figures such as John Gotti, and the state investigation of the 1993 bombing of the World Trade Center.

In May 2009, Mr. Cherkasky was appointed Chairman of the New York State Commission on Public Integrity by the governor of New York. The commission is charged with overseeing the enforcement of New York state ethics and lobbying laws while also helping restore public confidence in government.

Mr. Cherkasky earned his Bachelor of Arts degree in History from Case Western Reserve University in Cleveland, Ohio, in 1972 and his Juris Doctorate from Case Western Reserve University in 1975.

## Jeff Schlanger – President and CEO, KeyPoint Government Solutions (formerly known as Kroll Government Services)

Jeff Schlanger has served as the Deputy Primary Independent Monitor for the LAPD from the inception of the Monitorship and as such has been responsible over the last eight years for the day to day operation of the Monitor's team.

Mr. Schlanger is currently the President and CEO of KeyPoint Government Solutions, formerly known as Kroll Government Services. Prior to his current position, which he has held for the past six years, Mr. Schlanger was the Chief Operating Officer of Kroll's Security Services Group. In these two capacities Mr. Schlanger has been directly responsible for Kroll monitorships with both the LAPD and the Detroit Police Department as well as Kroll's other work for federal, state and local governments. Mr. Schlanger has personally led independent police practice inquiries conducted on behalf of the San Francisco Police Department, the Austin Police Department and the Tennessee Highway Patrol.

Prior to joining Kroll, Mr. Schlanger was in the private practice of law and owned and operated a private investigation firm which was purchased by Kroll in 1998. Before that, Mr. Schlanger was an Assistant District Attorney in New York County. While in the District Attorney's office, Mr. Schlanger served as a trial attorney, and a Senior Trial and Senior Investigative Counsel in both the Narcotics and Rackets Bureaus. In this capacity, among other notable cases Mr. Schlanger investigated and prosecuted the Westies, a notorious Irish American organized crime family operating out of Manhattan's west side. In addition, Mr. Schlanger, along with Michael Cherkasky, led the state investigation and prosecution of John Gotti.

Mr. Schlanger graduated from the State University of New York at Binghamton and New York University School of Law.

## Joseph S. Buczek, CPA, CFE, CFF – Chief Compliance Officer, Kroll (New York)

Mr. Buczek, an original team leader since 2001, was responsible for the review and assessment of the complaint investigation and use of force requirements of the Consent Decree.  Mr. Buczek and his team regularly worked closely with the LAPD's CRID, AD, Use of Force Review Division, Professional Standards Bureau and Office of the Inspector General, reviewing complaint and use of force investigations, and observing and meeting with sworn personnel.

Mr. Buczek is the currently Kroll's Chief Compliance Officer and is responsible for ensuring that it operates in accordance with laws, regulations, and self-mandated policies and procedures as well as conducting internal investigations.  Mr. Buczek is also an original team leader of the Detroit Police Department monitoring team, responsible for the review and assessment of arrest and detention requirements.  Previously, he was a Managing Director in Kroll's Consulting Services Group responsible for managing complex investigations involving fraud, financial misconduct, employee misconduct, inventory theft, kickback schemes, and procurement and bid-rigging schemes.  Prior to joining Kroll, Mr. Buczek served as a Special Agent in the New York office of the Federal Bureau of Investigation.  There, he gained broad experience in federal white-collar criminal investigations and trials. Mr. Buczek was successful in infiltrating the spot foreign currency market and investigating "bucket" shops, Ponzi schemes, and trader and broker collusion.   He developed and managed a major undercover foreign currency and money laundering investigation.  Prior to being a Special Agent, Mr. Buczek worked as an auditor in the FBI's Inspection Division and assisted with investigations completed by the Office of Professional Responsibility.  Before joining the FBI, Mr. Buczek worked in public accounting, auditing casinos, financial institutions, real estate development companies and utility companies.

## Penny Cookson, CA.IFA, CFE – Director, Kroll (Toronto)

Penny Cookson first started reviewing the LAPD's and OIG's audits in November 2003. In September 2005, Ms. Cookson assumed responsibility for the day-to-day management of the Kroll audit team that reviewed the various Consent Decree required audits/reviews. She also supervised the review of the use of these audits by the Police Commission and the Department's system for tracking the audit recommendations to ensure each recommendation was either implemented or appropriately closed. Ms. Cookson actively coached members of AD and the OIG to ensure their audits continued to improve. Ms. Cookson also provided feedback to management of the LAPD areas subject to the audits to assist them in achieving compliance.

Ms. Cookson is a member of the Detroit Police Department's Monitor's team reviewing their audits. Her career involving the Police started in 1991 when she provided forensic accounting expertise to the Ontario Provincial Police fraud investigators on a three year secondment. In addition to her Monitoring experience, Ms. Cookson has extensive experience in providing investigative and litigation support for criminal and white-collar investigations on behalf of corporations and governments and has testified as an expert witness on some of these investigations. Ms. Cookson has developed and led numerous presentations on forensic accounting and investigations to corporate clients, the Institute of Chartered Accountants of Ontario, the Ontario Police College and the Jamaican Constabulary Force. Ms. Cookson obtained her CA in 1988, her CFE in 1995 and the Canadian Institute of Chartered Accountant's designation as a specialist in Investigative and Forensic accounting in 2002.

# Hazel de Burgh, CA.IFA – Managing Director, Kroll (Toronto)

Starting in early 2002, Hazel de Burgh became responsible for independent oversight of the audit functions mandated by the Consent Decree. In this role, she established the standards for compliance with the audit-related requirements of the Consent Decree, and provided oversight and guidance to AD, the OIG and the Police Commission to help them meet such standards, and, more importantly, to guide each of these groups in their respective oversight roles of the LAPD.

Ms. de Burgh holds a similar role as a leader on the Detroit Police Department's Independent Monitor's team, which she has held for the last six years since the inception of that monitorship.

Ms. de Burgh's professional experience includes over four years as a Senior Compliance Director of Marsh & McLennan Companies, in the heavily-regulated insurance broking industry, and 20 years as a forensic accountant for Kroll and before that, Lindquist Avey, where she led and conducted over 200 investigations involving allegations of corruption and resolving financial issues in commercial litigation and other disputes relating to problems ranging in size from $10,000 to $300 million. Ms. de Burgh ultimately testified as an expert witness in several of these cases. Before becoming a forensic accountant, Ms. de Burgh worked for three years as an auditor for Thorne Riddell, a predecessor firm of KPMG.

Ms. de Burgh had a leadership role in developing standards for the forensic accounting profession in Canada. She also designed and taught several advanced courses in the University of Toronto's Rotman School of Management, 2-year Diploma in Investigative and Forensic Accounting program, which is the only accredited program for forensic accountants in Canada.

Ms. de Burgh obtained her CA designation in 1985 (the Canadian equivalent of a CPA), her CFE in 1992 and the Canadian Institute of Chartered Accountant's designation as a specialist in Investigative and Forensic Accounting in 2000. Ms. de Burgh holds an Honors Bachelor of Mathematics degree from the University of Waterloo (in Canada).

Appendix G

## Ronald A. Filak, J.D., C.P.A. – Kroll (New York)

Ronald Filak assumed primary responsibility for the monitorship's report writing and related analysis during the second year of the Decree. Throughout the term of the decree, he also provided substantive and administrative oversight of the engagement, and assisted the Monitor's audit team in its reviews of various Consent Decree audits.

Mr. Filak has held a similar role on the Detroit Police Department's Monitor's team since the inception of that monitorship. He has a background in both law and accounting, and a broad range of investigative and consulting experience. As a Managing Director at Kroll, he provided business consulting, fraud investigation, forensic accounting, business intelligence, and due diligence services to clients. He has also served as Director of Operations for Kroll Associates' largest practice unit, in which he took part in financial oversight, budgeting, strategic planning, and human resource management and as Project Manager for the company's implementation of a new billing and accounting system, which was rolled out to domestic and international offices without a single unscheduled hour of business interruption.

Prior to joining Kroll in 1996, Mr. Filak was an auditor and litigation consultant with Price Waterhouse in New York City, where he engaged in investigations, litigation support, and bankruptcy consulting. Mr. Filak received a Juris Doctor degree from Fordham University, where he concentrated in business law. He holds a Bachelor's degree in Business Administration from Georgetown University, where he majored in Accounting and minored in Psychology. He is a Certified Public Accountant and an admitted attorney in New York and New Jersey.

## Thomas C. Frazier – President, Frazier Group LLC

Mr. Thomas C. Frazier has served as the designated policing expert for the Office of the Independent Monitor since the inception of the monitorship.  As President of the Frazier Group LLC; he leads a consortium of America's leading law enforcement and homeland security leaders.  He also serves as Executive Director of the Major Cities Police Chiefs Association, representing the Chiefs of the 64 largest police agencies in the United States and Canada.  Prior to creation of Frazier Group, he was Director of the United States Department of Justice's Office of Community Oriented Policing, an eight billion dollar grant program created to put 100,000 police officers on the streets of America.

Mr. Frazier served as Police Commissioner of Baltimore, Maryland from 1994-1999.  Signature programs included 3-1-1, Departmental Reorganization, and CrimeStat.  Prior to 1994, he served in every rank through Deputy Chief in the San Jose, California Police Department.  He was Chief of Patrol, Chief of Detectives, Chief of Administration, Chief of Technical Services, Director of Communications, and Tactical Division Commande,r among others.  He managed departmental responses to floods, earthquakes, hostage and sniper incidents, and was engaged in a number of mutual-aid responses throughout northern California. During his career he has served in Internal Affairs, Special Weapons and Tactics, Planning and Research, and Criminal Intelligence.

Mr. Frazier holds a Masters in Criminal Justice Administration from San Jose State University, and has instructed internationally in Command and Control of Hostage Incidents. He currently serves on a number of advisory boards to the Department of Justice and the Department of Homeland Security.  He served in Viet Nam as a Military Intelligence officer, and was awarded the Combat Infantryman's Badge, the Bronze Star, and the Air Medal.

## Kathryn Grillo – Director, Los Angeles

Ms. Grillo joined the LAPD Monitoring Team in 2002, and has been involved in reviewing uses of force and complaints audits. She has worked closely with other Team members in conducting fieldwork on audits and reviews, and has attended several officer involved shooting scenes, Use of Force Review Boards, and Boards of Rights hearings.

Ms. Grillo's professional experience includes a wide array of investigative and audit experience. She has worked with international companies on engagements involving due diligence, intellectual property, counterfeiting, product diversion, and background investigations throughout the U.S, Central America and Asia. She has also conducted internal corporate investigations related to fraud and embezzlement and has conducted and staffed compliance reviews and audits for major banks regarding their loan portfolios. Ms. Grillo was the Vice President for Student Lending for a major bank in central Massachusetts, where she was responsible for managing a $20 million student loan portfolio and ensuring that all loans complied with state and federal student loan lending regulations. Ms. Grillo attended Christopher Newport College in Virginia where she obtained her Associates Degree in Business. Ms. Grillo is a member of the National Association for Civilian Oversight of Law Enforcement. She is a licensed private investigator in California.

## Christi L. Gullion – KeyPoint Government Solutions (formerly known as Kroll Government Services) Los Angeles

Ms. Christi L Gullion joined the LAPD Monitoring team in 2001, assisting in oversight of Consent Decree requirements related to the gang units, search warrants and confidential informants. In 2003, Ms. Gullion became the team leader in these areas, as well as for TEAMS II. This involved providing oversight and guidance to the gang units, TEAMS II staff, and other areas in the LAPD to help them ensure adherence to the Consent Decree requirements related to policy, training, implementation and audit, and to help each group develop their oversight of their units and the TEAMS II system.

Ms. Gullion was also a member of the Detroit Police Department's Monitoring team, reviewing areas of the Consent Judgment related to use of force and conditions of confinement. Starting in 1996, she worked closely with the Phoenix Police Department for the National Institute of Justice as the team leader of a two-year national homicide study. In addition to her Monitoring experience, Ms. Gullion has extensive experience in providing investigative and litigation support for a wide array of cases involving fraud investigations, investigative due diligence, business intelligence and litigation support, as well as working on various government contracts. This included conducting quality control audits of bankruptcy cases for the Office of United States Trustees. Ms. Gullion has taught several advanced courses for Wright and Los Angeles Community Colleges in their Criminal Justice and Law programs. Ms. Gullion obtained her M.S. in Criminal Justice in 1996 from the University of North Carolina at Charlotte.

Appendix G

## Rene Salazar – KeyPoint Government Solutions (formerly known as Kroll Government Services) (Los Angeles)

Mr. Rene Salazar has served in several capacities within the Office of the Independent Monitor since joining the team in January 2004.  He started with an administrative role in which he made document requests, distributed documents, handled correspondence and inquiries, maintained the team's databases, and filed quarterly reports with the Court.  Later on, Mr. Salazar assisted with fieldwork on audits and reviews conducted by all teams covering all areas of the Consent Decree, and ensured the timely posting of the Monitor's quarterly reports on the Kroll website.  In addition, Mr. Salazar is a member of the Detroit Police Department Monitoring Team and has assisted with fieldwork on reviews for the audit section.

Mr. Salazar has a background in local government.   Prior to joining Kroll, Mr. Salazar was a management aide in the Office of the City Manager with the City of Torrance, California, where he assisted with research for labor negotiations with different employee groups including the Torrance Police Officers Association and served as the City's main contact in an energy conservation program.  While with the Office of the Chief of Police within the West Covina Police Department, Mr. Salazar assisted with the preparation of the department's annual budget, wrote articles for a community newspaper, and researched grant opportunities.  Mr. Salazar holds a Bachelor's degree in Public Policy and Management from the University of Southern California.

## PROOF OF SERVICE

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California; I am over the age of 18 and not a party to the within action; my business address is 777 S. Figueroa St., Suite 2400, Los Angeles, California, 90017.

On June 11, 2009, at the direction of a member of the Bar of this Court, I served the within:

## INDEPENDENT MONITOR FINAL REPORT

on the interested parties in this action, by delivering a copy thereof in a sealed envelope addressed to each of said interested parties at the following address(es):

### SEE ATTACHED LIST

☐ (BY MAIL)  I am readily familiar with the business practice for collection and processing of correspondence for mailing with the United States Postal Service. This correspondence shall be deposited with the United States Postal Service this same day in the ordinary course of business at our Firm's office address in Los Angeles, California. Service made pursuant to this paragraph, upon motion of a party served, shall be presumed invalid if the postal cancellation date of postage meter date on the envelope is more than one day after the date of deposit for mailing contained in this affidavit.

☒ (BY OVERNIGHT DELIVERY SERVICE) I served the foregoing document by Federal Express, an express service carrier which provides overnight delivery, as follows. I placed true copies of the foregoing document in sealed envelopes or packages designated by the express service carrier, addressed to each interested party as set forth above, with fees for overnight delivery paid or provided for.

☒ (BY PERSONAL SERVICE) I caused such envelope to be delivered by hand to the offices of the above named addressee(s).

☐ (BY FACSIMILE) I caused such documents to be delivered via facsimile to the offices of the addressee(s) at the following facsimile number:

Executed on June 11, 2009 at Los Angeles, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Rene Salazar

## SERVICE LIST

Robin M. Kramer
Chief of Staff
Office of the Mayor
200 N. Main Street, Room 306
Los Angeles, CA 90012

Gerry F. Miller
Chief Legislative Analyst
200 N. Spring Street, Room 255
Los Angeles, CA 90012

Arif Alikhan, Deputy Mayor
Office of the Mayor
200 N. Spring Street, Room 303
Los Angeles, CA 90012

June Gibson
Office of the Chief Legislative Analyst
200 N. Spring Street, Room 255
Los Angeles, CA 90012

Rockard J. Delgadillo
City Attorney
1800 City Hall East
200 North Main Street
Los Angeles, CA 90012

Chief William J. Bratton
Los Angeles Police Department
Parker Center
150 N. Los Angeles Street, Room 619
Los Angeles, CA  90012

Enrique Hernandez, Esq.
Diane Marchant, Esq.
Los Angeles Police Protective League
1308 West Eighth Street - Suite 206
Los Angeles, California 90017

Stephen H. Silver, Esq.
Elizabeth Silver Tourgeman, Esq.
Silver, Hadden, Silver, Wexler & Levine
1428 Second Street, Suite 200, P.O. Box 2161
Santa Monica, CA 90407-2161

Shanetta Y. Cutlar
Chief, Special Litigation Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530