LORETTA KING,
Acting Assistant Attorney General
Civil Rights Division
SHANETTA Y. CUTLAR, Chief, State Bar No. 169849
DANIEL H. WEISS, Deputy Chief
JE YON JUNG
LAURA COON
TIM MYGATT
KENYAN MCDUFFIE
Attorneys
UNITED STATES DEPARTMENT OF JUSTICE
Civil Rights Division
Special Litigation Section, PHB
950 Pennsylvania Avenue, NW
Washington, DC  20530
Telephone:  (202) 305-1457
Facsimile:  (202) 514-6903
jeyon.jung@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

ROCKARD J. DELGADILLO, City Attorney, State Bar No.  125465
RICHARD H. LLEWELLYN, JR., Chief Deputy, State Bar No. 105072
CARLOS DE LA GUERRA, Assistant City Attorney, State Bar No.  164046
JULIE RAFFISH, Deputy City Attorney, State Bar No. 185504
OFFICE OF THE CITY ATTORNEY
200 N. Main Street, 800 City Hall East
Los Angeles, California 90012-4131
Telephone: (213) 978-8380
Facsimile: (213) 978-8787

Attorneys for Defendants
CITY OF LOS ANGELES, THE BOARD OF POLICE
COMMISSIONERS OF THE CITY OF LOS ANGELES,
and THE LOS ANGELES POLICE DEPARTMENT

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE No. CV 00-11769 GAF (RCx) |
| Plaintiff, | ) **JOINT SUPPLEMENTAL** |
| vs. | ) **MEMORANDUM OF POINTS** |
| | ) **AND AUTHORITIES IN** |
| CITY OF LOS ANGELES, CALIFORNIA, | ) **SUPPORT OF THE JOINT** |
| BOARD OF POLICE COMMISSIONERS | ) **MOTION TO TERMINATE THE** |
| OF THE CITY OF LOS ANGELES, AND | ) **CONSENT DECREE AND TO** |
| THE LOS ANGELES POLICE | ) **TRANSITION FULL OVERSIGHT** |
| DEPARTMENT, | ) **AUTHORITY TO THE CITY** |
| | ) **DEFENDANTS; DECLARATION** |
| Defendants. | ) **OF JULIE RAFFISH; EXHIBIT** |
| | ) [Filed Concurrently With Transition |
| | ) Agreement, as Revised, and Proposed |
| | ) Order] |
| | ) |
| | ) The Honorable Gary A. Feess, |
| | ) United States District Judge |

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

The United States of America, and the City of Los Angeles, Los Angeles Board of Police Commissioners ("Commission"), and Los Angeles Police Department ("LAPD" or "Department") (collectively the "Parties") hereby submit the following Points and Authorities, Transition Agreement (as revised), and Proposed Order in response to this Court's Minute Order, dated June 15, 2009, and in support of the Parties' Joint Motion for Termination of the Consent Decree and Approval of the Transition Agreement, filed with this Court on June 1, 2009.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................. iii

PRELIMINARY STATEMENT ..............................................................1

I.      INTRODUCTION AND BACKGROUND............................................. 2

II.     THE CITY DEFENDANTS HAVE COMPLIED
        WITH THE REQUIREMENT OF PARAGRAPH
        179 OF THE DECREE ..............................................................4

III.    THE TRANSITION AGREEMENT IS A FINAL
        RESOLUTION OF THE PLAINTIFF
        UNITED STATES' COMPLAINT AND
        SUPERSEDES THE CONSENT DECREE ..............................................9

IV.     A TRANSITION AGREEMENT IS CONSISTENT
        BOTH WITH THE FINDING OF SUBSTANTIAL
        COMPLIANCE AND THIS COURT'S
        EQUITABLE POWERS ........................................................11

        A.  The City Defendants are in Substantial Compliance
            and as Such, a Transition Agreement is Appropriate.........................11

        B.  Proceeding Under a Separate Agreement is a More
            Equitable Resolution in Light of the Substantial Compliance
            Demonstrated by the City Defendants ................................14

V.      THE OPERATION OF A TRANSITION AGREEMENT
        WILL PRESERVE THE JURISDICTION OF THIS
        COURT, THE INVOLVEMENT OF MR. CHERKASKY,
        AND THE STATUS OF INTERVENORS ............................................17

        A.  The Approval of a Transition Agreement Will Permit
            the Court to Retain Jurisdiction Over the Agreement.........................17

i

B. As Responsibility for Oversight of the LAPD Transfers
to the Police Commission and its Office of the
Inspector General, Mr. Cherkasky Will Continue
to Play an Important Role ................................................................. 18

C. Intervenors Retain All Rights Under the Transition
Agreement as Possessed Under the Consent Decree ......................... 19

VI.    CONCLUSION……………………………………………………22

# TABLE OF AUTHORITIES

## CASES                                                                    Page(s)

*Board of Education of Oklahoma City Public School v. Dowell* (1991)
    498 U.S. 237.......................................................................................15

*Collins v. Thompson*
    8 F.3d 657 (9th Cir. 1993)...............................................................11

*Freeman v. Pitts* (1992)
    503 U.S. 467.......................................................................................15

*Frew v. Hawkins* (2004)
    540 U.S. 431..................................................................................14, 15

*In re Pearson*
    990 F.2d 653 (1st Cir. 1993).............................................................14

*Labor/Community Strategy Center, et al. v.*
    *Los Angeles Metropolitan Transportation Authority, et al.*
    564 F.3d 1115 (9th Cir. 2009)..........................................6, 7, 8, 15

*Local 93, International Assoc. of Firefighters, AFL-CIO, C.L.C.*
    *v. City of Cleveland, et al.* (1986)
    478 U.S. 501..................................................................................10, 19

*Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc.* (1941)
    312 U.S. 287.......................................................................................14

*O'Sullivan v. City of Chicago*
    396 F.3d 843 (4th Cir. 2005).............................................................16

*Rufo v. Inmates of the Suffolk County Jail, et al.*
    502 U.S. 367 (1992)...........................................................................14

**CASES** (Continued)                                                            **Page(s)**

*Shakman v. City of Chicago*
  426 F.3d 925 (4th Cir. 2005)...................................................................14, 16

*Thompson v. United States Dept. of Housing and Urban Development*
  404 F.3d 821 (4th Cir. 2005)...................................................................14, 18

*Toussaint v. McCarthy*
  926 F.2d 800 (9th Cir. 1990), *cert. denied,*
  116 L. Ed.2d 171 (1991) .............................................................................11

*United States v. Armour & Co.* (1971)
  402 U.S. 673.................................................................................................10

*United States v. City of Miami*
  2 F.3d 1497 (11th Cir. 1993).......................................................................18

*United States v. Ward Baking Co.* (1964)
  376 U.S. 327.................................................................................................10

**STATUTES**

42 U.S.C. Section 14141 ................................................................................16

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### **PRELIMINARY STATEMENT**

The Parties to this Consent Decree ("Decree") have moved this Court for an order terminating the provisions of the Decree, and entering a Transition Agreement as a further order of this Court superseding the Decree, for the full and complete resolution of this lawsuit.  This Court retains jurisdiction over enforcement of the Transition Agreement as it would over any order entered in furtherance of the settlement of a lawsuit pending before the Court.

As the Court recognized during the June 15, 2009, status conference, "there has been significant and substantial progress made in terms of the improvement of the operations of the Department over the past eight years."  Further, "there's very little doubt in [the Court's] mind that the LAPD is a more effective policing agency at this point.  I do think that at the same time that its policing is effective, it has had its officers conform more closely to the requirements of the Constitution." (See Transcript of Proceedings, Status Conference (June 15, 2009) at 5:17-19; 6:2-7, attached to Raffish Declaration as Exhibit G.)  Therefore, the Parties will not use this brief to discuss the Department's accomplishments in great detail.

The United States, the City Defendants, and this Court's Independent Monitor have found that the City Defendants have substantially complied with the terms of the Decree.  The Transition Agreement, as revised, represents a final resolution which is the most equitable to both Parties, as it reflects the flexibility urged in institutional reform cases, and transitions full civilian oversight of the Los Angeles Police Department back to the Police Commission and its Inspector General, while permitting the Department to benefit from current and future best practices outside the eight-year old terms of the Decree.

///

The Independent Monitor who oversaw all facets of Department operations and management under the terms of the Decree for eight years has found the City Defendants in substantial compliance.  Both Parties have requested termination of the Decree and approval of a Transition Agreement – a request supported by the Monitor, both in his Final Report and in his statement to this Court at the June 15, 2009, status conference.

The ending of the Consent Decree is important, both because it signals compliance with the terms of the order, and that the reform efforts of the Los Angeles Police Department can be fully recognized within the City and throughout the Nation.

## I.    INTRODUCTION AND BACKGROUND

On June 1, 2009, the City of Los Angeles, Board of Police Commissioners of the City of Los Angeles, and the Los Angeles Police Department (collectively "City Defendants") and the United States filed a Joint Motion and Memorandum in Support Thereof to Terminate the Original Consent Decree and to Transition Full Oversight Authority to the City Defendants ("Joint Motion").  On June 15, 2009, this Court held a status conference regarding the Consent Decree in the above-captioned matter.[1]  During this status conference, the Court heard argument from representatives of the City Defendants, the United States, the Police Protective League ("PPL"), Community Intervenors, and a private citizen.  At the request of the Court, the Independent Monitor also expressed his views regarding the status of the Consent Decree.  At the conclusion of the status conference, the Court requested further supplemental briefing from the City Defendants and the United States

---

[1]      On June 9, 2009, the Court extended the Consent Decree to June 30, 2009, to ensure proper consideration of all submitted materials and any issues raised at the June 15, 2009, status conference hearing.

(collectively "the Parties") regarding the following issues:  (1) how the Parties believe that the standard set forth under Paragraph 179 of the Consent Decree has been satisfied; (2) the authority to terminate the Consent Decree, and the efficacy of the proposed Transition Agreement as opposed to extension of the entire Consent Decree; (3) the jurisdiction of the Court under the Parties' proposed Transition Agreement; and (4) the role of Michael Cherkasky, and the rights and interests of the Intervenors with respect to the Parties' proposed Transition Agreement.

As the Court is aware, the gravamen of this lawsuit was a finding by the United States in 2000 of a "pattern or practice" of excessive force, false arrests and unreasonable searches and seizures in violation of the Fourth and Fourteenth Amendments to the Constitution.  (Final Report of the Independent Monitor (Final Report) at 2.)

Today, the LAPD is a different organization.  As stated in the Final Report, "the changes institutionalized during the past eight years have made the LAPD better:  at fighting crime, at reaching out to the community, in training its officers, in its use of force, in internal and external oversight, and in effectively and objectively evaluating each of the sworn members of LAPD."  (Final Report at 1.)  The comprehensive risk management system is in place, the Department accepts and investigates all citizen complaints, and the Police Commission and its Inspector General ("OIG") have been provided the necessary resources.[2]  It is time to recognize the City Defendants' compliance with Paragraph 179 of the Decree, and as counsel for the United States stated at the June 15, 2009, hearing, it is time to "give the City, LAPD and OIG the chance to prove they can do this on their own." (See, Transcript of Proceedings, Status Conference (June 15, 2009) at 41:4-5, attached to Raffish Declaration as Exhibit G.)

///

---

[2]    The Office of the Inspector General has received additional resources during the City's budget process for the last three consecutive fiscal years.

## II.     THE CITY DEFENDANTS HAVE COMPLIED WITH THE REQUIREMENT OF PARAGRAPH 179 OF THE DECREE

The Court and the Community Intervenors have raised questions about the termination of the Consent Decree and the requirements of Paragraph 179 of the Decree.  Paragraph 179 states:

> The Court shall retain jurisdiction of this action for all purposes during the term of this Agreement.  The Agreement shall terminate five years from the effective date without further action of the Court <u>unless DOJ makes a motion to extend the term of the Agreement</u>, which motion shall extend the term of the Agreement until the resolution of such motion.  Such motion shall be made within 45 days prior to the expiration of the term of the Agreement.  If the City contests the motion, the Court shall hold a hearing at which both parties may present evidence to the Court before ruling on the DOJ's motion.  At the hearing, the burden shall be on the City to demonstrate that it has <u>substantially complied with each of the provisions of the Agreement and maintained substantial compliance for at least two years</u>.  For the purposes of this paragraph, <u>"substantial compliance" means there has been performance of the material terms of this Agreement.  Materiality shall be determined by reference to the overall objectives of this Agreement</u>.  Noncompliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure to maintain substantial compliance.  At the same time, temporary compliance during a period of otherwise sustained noncompliance shall not constitute substantial compliance.  If the Court finds that the City has not maintained substantial compliance for at least two years, the Court shall extend the term of this Agreement until such time as the City has been in substantial compliance with this Agreement for a period of two years including that period of time that the City had been in compliance prior to DOJ's motion. (Emphasis added.)

By the very terms of Paragraph 179 of the Consent Decree, the Decree terminates unless the United States makes a motion to extend the term of the Decree. The United States has made no motion because it does not believe extension of the term of the entire Consent Decree is warranted. Instead, the United States joins the City Defendants in a motion to end the Consent Decree, as the Parties agree that the overall objectives of the Decree have been met, as required by Paragraph 179.

Paragraph 179 is not as narrow as Community Intervenors argue. Paragraph 179 must be read as a whole, wherein "'substantial compliance' means there has been performance of the material terms" of the Consent Decree, and where "materiality" is "determined by reference to the overall objectives" of the Consent Decree. (Consent Decree, ¶ 179.) The language of Paragraph 179 is sufficiently clear to show that the test is not complete compliance with each provision. Even if the language was not clear on its face, the Court should be guided by the unequivocal agreement by the Parties that the standard set forth in Paragraph 179 has been met. While Intervenors may present evidence and arguments concerning enforcement of the Consent Decree (See, Discussion, *infra.*), they do not step into the shoes of the parties who negotiated the terms of the Decree, and their interpretation of the meaning of "substantial compliance" should not supersede or otherwise take precedence over the Parties' own representations concerning what was intended.

While there are some subparagraphs of the Consent Decree for which compliance has not been achieved for two years, consistent with Paragraph 179, the City Defendants may still be found in compliance as the overall objectives of the Consent Decree have been met. In fact, the Monitor recognized that, "there remain a few paragraphs of the Consent Decree which have not achieved the >94% compliance . . . ." The Monitor made clear, his interpretation of the standard for termination of the Decree: "[F]or the most part, those paragraphs which have not

reached this level of compliance were administrative in nature,[3] and the Department has made significant strides toward compliance over the life of the Consent Decree," and "[a]s such, and subject to the terms of the Transition Agreement, [the Monitor] recommend[s] that the Consent Decree be terminated." (Final Report at 7 (footnote 12).)

The interpretation of Paragraph 179 advanced by the Parties is neither novel nor unique.  Just last month, the Ninth Circuit Court of Appeals was called upon to determine whether the district court had abused its discretion in determining that there had been substantial compliance with the terms of a consent decree in the context of institutional reform litigation involving the Metropolitan Transportation Authority ("MTA").[4] (Labor/Community Strategy Center, et al. v. Los Angeles Metropolitan Transportation Authority, et al., 564 F.3d 1115 (9th Cir. 2009).)  On the eve that the decree was to expire by its own terms, the plaintiff Bus Riders Union ("BRU") moved for an extension of the decree on the grounds that the MTA had failed to implement an important decree provision. (MTA, supra, at 1117.)

In affirming the district court's denial of the plaintiff's request for an extension, the Ninth Circuit stated that its decision "is consistent with the principle that federal court intervention in state institutions is a temporary measure and may extend no longer than necessary to cure constitutional violations." (Id. at 1123.) Notably, both the Consent Decrees in MTA and in this case contain an express expiration date for the court's retention of jurisdiction, in the absence of motion by

---

[3]      For example, in his Final Report, the Monitor includes in his discussion regarding the supervision of gang units, that "the Department's gang units have struggled to comply with the Consent Decree's more technical requirements regarding arrest, booking and charging procedures." (Final Report at 80.)  However, the Monitor acknowledges that the LAPD has met the overall objective of these provisions:  "While the Department has struggled with some of these requirements, the Monitor has not identified any individual in recent years who was selected for a gang assignment but should not have been selected."  (Final Report at 80.)

[4]      Specifically, as described by the Ninth Circuit, the district court concluded that "extension of the decree was unnecessary because the 'Decree did not require perfection,'" and the decree "'has served its purpose….'" (MTA, supra, at 1125.)

the plaintiff. (See, e.g., MTA, supra, at 1120; LAPD Consent Decree, ¶ 179.)  Rather than making such a motion in this case, the United States, along with the City Defendants, has made a Joint Motion for the Court to retain jurisdiction over the United States' cause of action for those purposes set forth in the proposed Transition Agreement.

Moreover, the City Defendants have achieved substantial compliance with the Consent Decree.  Here, as in MTA, ". . . perhaps every last wish and hope of the decree was not achieved, but the decree accomplished its essential purposes and the situation improved greatly." (Id. at 1123.)  Specifically, and strikingly similar to the instant case, BRU relied upon compliance standards written into the decree for load factor targets, the monitoring of which were included as provisions within the decree. (Id. at 1122.)  The Ninth Circuit was quick to observe that the measurements advanced by BRU did not measure "compliance with the decree overall."  The Court explained:

> "That coarse-grained metric is useful for certain types of analyses, such as determining whether there has been full and absolute compliance (MTA concedes there has not been), but it is not particularly helpful in measuring levels of compliance below 100%, and it fails to accurately capture the extent to which MTA did meet the targets during the relevant time period.
>
> …[T]he question is whether there was substantial compliance, a less precise standard that cannot be satisfied by reference to one particular figure, while ignoring alternative information.  Our analysis requires we do more than simply count the numbers of technical deviations from the decree.  Instead, we must determine, using a holistic view of all the available information, whether MTA's compliance with the Decree overall was substantial, notwithstanding some minimal level of noncompliance."

(MTA, supra, at 1122 (emphasis added).)  The Parties' rationale is consistent with the Ninth Circuit's ruling in MTA. (564 F.3d 1115 (9th Cir. 2009).)

Paragraph 1 of the Consent Decree states that the parties "share a mutual interest in promoting effective and respectful policing," and that they join together in entering the Consent Decree "to promote police integrity and prevent conduct that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States."   The implementation of the steps to meet these objectives has been met, as has been described by the Parties, the Independent Monitor, and others.[5]  Neither the Parties, the Court, the Monitor, nor the Consent Decree, itself, can guarantee that the objectives of the Consent Decree are failsafe. However, the Parties appear before this Court, after eight years of federal court oversight, agreeing that the Decree has served its purpose and that the federal court is no longer necessary in the day-to-day operations of the Los Angeles Police Department. (See, MTA, supra at 1122 (reference to district court's finding that the decree had served its purpose and it was no longer necessary to involve the federal courts in the day-to-day operation of the Los Angeles County bus system).)

Over the past eight years, the LAPD has focused its efforts on transparency, community outreach, proper treatment of all members of the community, quality investigations, thorough auditing, consistent training, proper supervisory oversight, and strengthening the role of the Police Commission and OIG.  Over the past eight years, the Monitor has thoroughly tracked and reported on this progress.

///

///

---

[5]      See, Christopher Stone, Todd Foglesong and Christine M. Cole, *Policing Los Angeles Under a Consent Decree: The Dynamics of Change at the LAPD*, Harvard University Kennedy School (May 2009)(attached as Exhibit A to Raffish Declaration) (Providing strong academic support for ending the Decree, and concluding that "Both the management and the governance of the LAPD have also changed for the better…In terms of governance, the Police Commission and the Inspector General have, in particular, enhanced the scrutiny of the Department's use of force, and of its handling of civilian complaints"; See also, Exhibits B through F, attached to Raffish Declaration.

In his Final Report, the Monitor states:

> We are pleased to report that the LAPD <u>has substantially complied with the requirements of the Consent Decree</u>. We believe the changes institutionalized during the past eight years have made the LAPD better: at fighting crime, at reaching out to the community, in training its officers, in its use of force, in internal and external oversight, and in effectively and objectively evaluating each of the sworn members of LAPD. More specifically, the LAPD has become the national and international policing standard for activities that range from audits to handling of the mentally ill to many aspects of training to risk assessments of police officers and more. (Emphasis added.)
>
> These past eight years have clearly shown that with the right impetus, with goodwill and with a good plan, institutional reformation can be, and in Los Angeles has been, achieved. Most importantly, the past eight years have shown that constitutional policing can effectively coexist with and, indeed, foster the primary role of the police: ensuring the public safety.

(Final Report at 1.)

## III.   THE TRANSITION AGREEMENT IS A FINAL RESOLUTION OF THE PLAINTIFF UNITED STATES' COMPLAINT AND SUPERSEDES THE CONSENT DECREE

On June 15, 2001, this Court entered a Consent Decree resolving the United States' claims in the aforementioned Complaint. As represented by the Transition Agreement, the Parties mutually agree that the Transition Agreement represents the understanding of the Parties and, if entered, supersedes the Consent Decree entered in this case on June 15, 2001.

The Parties agree to termination of the Consent Decree and for the Court to retain jurisdiction over the matter during the Transition Agreement period. The fact that the Consent Decree sets an averment that the Consent Decree "resolves all

claims in the United States' Complaint filed in this case," does not prohibit the Parties from entering into a subsequent agreement that supersedes the earlier agreement.  Indeed, as the Supreme Court noted in <u>Local Number 93, International Association of Firefighters, AFL-CIO C.L.C., v. City of Cleveland, et al.</u>, 478 U.S. 501, 522 (1986), "it is the parties' agreement that serves as the source of the court's authority to enter . . . judgment. . . ." (<u>See</u> <u>also</u>, <u>United States v. Armour & Co.</u>, 402 U.S. 673, 681-682 (1971) (emphasis in original) (footnote omitted).)  This is not a situation where one party is unilaterally imposing additional obligations against another party, irrespective of a prior resolution of the party's claims. (<u>See</u>, <u>e.g.</u>, <u>United States v. Ward Baking Co.</u>, 376 U.S. 327 (1964).)

The United States identified a similar situation in a case filed in the United States District Court for the Northern District of Georgia, Rome Division, <u>United States v. CBOCS, Inc. f/k/a Cracker Barrel Old Country Store, Inc.</u>, Civ. No. 4:04-CV-109-HLM,[6] wherein the parties agreed to an "Agreed Order" that superseded the Consent Order entered in the case on May 4, 2004. (Attached as Exhibit 1.)  As in the instant case, the defendants in <u>CBOCS</u> had substantially complied with the majority of the provisions in the original Consent Order.  Accordingly, the <u>CBOCS</u> parties agreed that the Consent Order expired contemporaneously with the entry of the revised Agreed Order.  The <u>CBOCS</u> District Court Judge entered the Agreed Order as an order of the court on May 18, 2009.

///
///
///
///
///
///

---

[6]     Because the facts and circumstances of each case are unique, this case is provided only as a procedural example wherein a consent decree was replaced by a subsequent Order.

## IV.    A TRANSITION AGREEMENT IS CONSISTENT BOTH WITH THE FINDING OF SUBSTANTIAL COMPLIANCE AND THIS COURT'S  EQUITABLE POWERS

### A. The City Defendants are in Substantial Compliance, and as Such, a Transitional Agreement is Appropriate.

As discussed above, the Parties and the Independent Monitor agree the City Defendants are in substantial compliance with the Consent Decree.  In essence, the Decree is no longer required or necessary to affect the type of changes within the LAPD contemplated under the United States' lawsuit.  (See, Collins v. Thompson, 8 F.3d 657 (9th Cir. 1993) (Court affirmed district court order vacating consent decree where no ongoing constitutional violations observed); Toussaint v. McCarthy, 926 F.2d 800, 802 (9th Cir. 1990), *cert. denied*, 116 L. Ed.2d 171, 112 S. Ct. 213 (1991).)

However, the Parties do agree that a transition period is appropriate to address three subject areas and to complete the transition of oversight responsibility to the OIG and Police Commission, thus ensuring full performance in these three areas. This will allow the City Defendants to reaffirm to the Court and the United States that the Police Commission and OIG can continue their strong and independent civilian oversight of the LAPD, while still allowing for the Court to retain jurisdiction and the case to remain open.  This understanding appropriately belongs in a separate instrument that covers only the activities to be reviewed within the transition period.[7]  As such, the Parties, with agreement from the Monitor, have submitted herewith a Revised Transition Agreement which focuses on the following three subject areas:  TEAMS II, Financial Disclosure, and Biased Policing.

---

[7]     The Consent Decree and the 200+ pages of Methodologies required the Independent Monitor and his team to conduct comprehensive and detailed audits of nearly every substantive Decree provision for the past eight years.  Conversely, the purpose of the transfer of oversight authority to the OIG by way of the Transition Agreement is to enable that Office to continue performing the daily duties and responsibilities under the direction of the Police Commission, as well as the additional reviews described in the Agreement.

1. <u>TEAMS II</u>

TEAMS II has been operational for two years, and the Monitor has found the LAPD in compliance with all system requirements.  In fact, the Monitor moved 14 of the 15 TEAMS II paragraphs to "inactive" monitoring status approximately one year ago, meaning they are no longer monitored.  The one remaining actively monitored TEAMS II paragraph (¶ 46) pertains to managers and supervisors' use of the system.  The LAPD has achieved compliance with all but two of the 13 subsections, which pertain to the timing of supervisor reviews of subordinate employees.  (<u>See</u> Final Report, Appendix D, Final Report Card re Paragraph 46 (l and m) at 1.)

The Parties agree that TEAMS II has been integral to ensuring proper supervision within the LAPD.  As such, the Parties agree that the OIG should focus its reviews on supervisors' use of TEAMS II in accordance with the Transition Agreement, and report its findings to the Police Commission, United States, Mr. Cherkasky, and the Court.

2. <u>Financial Disclosure</u>

On February 26, 2009, the Ninth Circuit issued its decision upholding this Court's decision to deny preliminary injunctive relief to the PPL.  Thereafter, on March 30, 2009, the LAPD implemented the approved Financial Disclosure Program Department-wide.  However, because the Financial Disclosure Program was implemented so close to the end of the extension period of the Decree, the Parties agree that the OIG should conduct reviews of the Program's implementation in accordance with the Transition Agreement, and report its findings to the Police Commission, United States, Mr. Cherkasky, and the Court.

///
///
///

3.  <u>Biased Policing</u>

The City Defendants continue to improve upon policies and measures to prohibit biased policing.  Prohibitions against biased policing have been reiterated and incorporated into aspects of recruitment, the hiring and selection process, recruit training, Department-wide in-service training, and the promotional process. (<u>See</u> Report of the Independent Monitor for Quarter Ending December 1, 2008, pp. 25-26.)

The Department's commitment to an environment free from biased policing is evident in its continued collection of stop data, significant improvements to the quality and thoroughness of investigations of racial profiling allegations, by recent actions taken by the Police Commission to ensure quality investigations and reviews are conducted, and the implementation of in-car video systems.[8]  The City Defendants and its Mayor are committed to the installation of digital in-car video cameras in marked police vehicles, due to their usefulness in the investigation of allegations of biased policing and for their value in the area of risk management. Currently, the first phase is being implemented in 300 marked police vehicles in Operations South Bureau, and funds have been allocated in the 2009/2010 City budget to begin the second phase in two geographic policing areas within Operations Central Bureau.  As additional funds become available from either the City General Fund or federal grants, cameras will ultimately be installed in all marked police vehicles.

///

///

---

[8]    The United States' position respecting an in-car video program was explained at the June 15, 2009, status conference, where it was acknowledged that while such a program is an important tool to be used to address biased policing and allegations of wrongdoing against officers, it "[does] not believe that's the panacea to biased policing…the important issues are the substantive reviews and investigations of biased policing complaints, and that's where [it] sees the OIG focusing his reviews during this Transition Agreement." (<u>See </u>Transcript of Proceedings, Status Conference (June 15, 2009) at 20:20-25; 21:1-7, attached to Raffish Declaration as Exhibit G.)

However, because some of these actions have recently occurred and because of the importance of this piece of the Consent Decree, the Parties agree that the OIG should conduct reviews regarding biased policing in accordance with the Transition Agreement, and report its findings to the Police Commission, the United States, Mr. Cherkasky, and the Court.

      B.  <u>Proceeding Under a Separate Agreement is a More Equitable Resolution in Light of the Substantial Compliance Demonstrated By the City Defendants</u>.

Courts enforcing institutional reform judicial decrees or settlements, such as the one governing the City Defendants, are encouraged to apply a flexible standard in determining any changes thereto. (<u>See</u>, <u>generally</u>, <u>Rufo v. Inmates of the Suffolk County Jail, et al.</u>, 502 U.S. 367, 381 (1992); <u>Frew v. Hawkins</u>, 540 U.S. 431, 441 (2004); <u>Shakman v. City of Chicago</u>, 426 F.3d 925 (4th Cir. 2005); <u>In re Pearson</u>, 990 F.2d 653, 658 (1st Cir. 1993) ("[N]otwithstanding the parties' silence or inertia, the district court is not doomed to some Sisyphean fate, bound forever to enforce and interpret a preexisting decree without occasionally pausing to question whether changing circumstances have rendered the decree unnecessary, outmoded, or even harmful to the public interest").)  This is true, partly because in institutional reform litigation, the court sits in equity, and must determine whether a change either advanced by a party or by the court itself will provide an equitable remedy to the parties involved in the litigation and others impacted by the wrongs which initially gave rise to the lawsuit. (<u>Thompson v. United States Dept. of Housing and Urban Development (HUD)</u>, 404 F.3d 821 (4th Cir. 2005) (Hallmark of equity is its flexibility); <u>Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc.</u>, 312 U.S. 287, 298 (1941) ( "An injunction so adjusted to a particular situation is in accord with the settled practice of equity…." and "[F]amiliar equity procedure assures opportunity for modifying or vacating an injunction when its continuance is no longer

warranted"); <u>Frew</u>, <u>supra</u>, at 442 ("The federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials").)  In fact, in <u>Thompson</u>, <u>supra</u>, the Fourth Circuit found support for this principle from the Supreme Court:

> "The essence of a court's equity power lies in its inherent capacity to adjust remedies in a feasible and practical way to eliminate the conditions or redress the injuries caused by unlawful action.  Equitable remedies must be flexible if these underlying principles are to be enforced with fairness and precision."

(<u>Thompson</u>, <u>supra</u>, at 830, quoting <u>Freeman v. Pitts</u>, 503 U.S. 467, 487 (1992).)

Extension of the Consent Decree is not an equitable resolution when there is unanimity by the Parties and the Monitor over the City Defendants' compliance with the Decree.  During the June 15, 2009, hearing, a question was raised whether an extension wouldn't be easier than a new and different agreement.  The Parties think not, but in any event, the "easier" course is not the most equitable, nor is it consistent with the established principle that federal supervision is temporary and should exist no longer than necessary to cure the constitutional violations which drove the litigation. (<u>Labor/Community Strategy Center v. MTA</u>, <u>supra</u>, at 21, citing <u>Bd. of Ed. Of Okla. City Pub. Sch. V. Dowell</u>, 498 U.S. 237, 248 (1991).)

Proceeding under a different agreement allows the Department the flexibility to improve many of the processes set "frozen in time" eight years ago within the Consent Decree.  While the Decree requirements, in many areas, establish the minimum necessary to advance reform, those same areas describe processes which are eight years old and may not reflect current best practices to address the particular issue.  Similarly, the current Decree does not permit *future* changes, even where the policing community might identify a particular change as a best practices approach.

As observed by the Fourth Circuit regarding the reversal of the district court's denial of the city defendants' motion to vacate a consent decree:

> "The public interest and considerations based on the allocation of powers within our federal system require that the district court defer to local government administrators who have the primary responsibility for elucidating, assessing, and solving the problems of institutional reform, to resolve the intricacies of implementing a decree modification (citation omitted)… In short, concerns of federalism should factor strongly into the court's analysis."

(Shakman, supra, at 932, quoting O'Sullivan v. City of Chicago, 396 F.3d 843, 868 (4th Cir. 2005).)

Additionally, should the Court extend the Decree, every provision of the Decree would remain subject to objection by Intervenors, irrespective of whether the City Defendants had demonstrated compliance therewith and whether the provision at issue was active or passive, under the oversight of the Monitor, the Commission or its Inspector General. That is highly inequitable to the Parties when there is agreement that the standard for substantial compliance under Paragraph 179 has been satisfied.

Moreover, deference to United States' interpretation of Paragraph 179 that the Consent Decree should be terminated protects the ability of the United States to continue meaningful dialogue with other municipalities and agencies concerning the benefits of settlement versus litigation brought pursuant to 42 U.S.C. Section 14141. Extension of this Consent Decree, against the urging of the United States, the City Defendants and the Independent Monitor, all intimately involved in the process, sends a powerful message that even where reform has occurred, and even some expectations exceeded, these municipalities may not be released from their consent decrees even where all the parties agree the requirements have been fulfilled. Such a result would clearly be inequitable to the City Defendants and the United States.

Finally, the Court should consider the comments of its Independent Monitor and the United States related to the effect of an extension of the existing Consent Decree on the membership of the LAPD and the leadership of the City of Los Angeles.  For some, the Decree came during their tenure with the Department; for the nearly half of the current sworn membership who entered the Department within the last eight years – they have only known employment for an agency operating under federal monitorship.  While the Consent Decree represents reform, the Decree as everyone has come to know it also represents a time when the Department was unable to manage itself or its membership in a constitutionally permissible manner.  An extension of *that* Consent Decree, following all of the hard work and commitment to reform achieved by the men and women of the LAPD, would be, to many, a repudiation of all of that good work.  In response to this Court's question, to terminate the Decree as requested by the Parties is, as represented by the Monitor, "symbolic."  It represents and affirms that the City Defendants have "performed the material terms" of the Agreement and "the overall objectives" of the Agreement, and that this Court recognizes that fact.

## V.   THE OPERATION OF A TRANSITION AGREEMENT WILL PRESERVE THE JURISDICTION OF THIS COURT, THE INVOLVEMENT OF MR. CHERKASKY AND THE STATUS OF INTERVENORS

### A.   The Approval of a Transition Agreement Will Permit the Court to Retain Jurisdiction Over the Agreement.

As discussed, *supra*, the Transition Agreement serves as a further order of this Court for the full and complete resolution of this lawsuit.  As such, this Court retains jurisdiction over enforcement of the Transition Agreement as it would over any order entered in furtherance of the settlement of a lawsuit pending before the court.

(See, Thompson, supra, at 830 (Court's ability to change its orders springs from inherent equitable power over own judgments); See also, United States v. City of Miami, 2 F.3d 1497, 1509 (11th Cir. 1993) ("[A] district court's decision on a request to terminate or modify a consent decree is an exercise of that court's equitable power….").)

The Parties jointly agree that the Court will retain jurisdiction over the Transition Agreement.  To ensure there is no ambiguity as to the Court's jurisdiction, the Parties have added the language from Paragraph 179 of the Consent Decree to the Transition Agreement, which states:  "[t]he Court shall retain jurisdiction of this action for all purposes during the term of this Agreement." (See, Transition Agreement, Section II.G.)  It is not the intent of the Parties to attempt to limit the jurisdiction or role of this Court.

> B.  As Responsibility for Oversight of the LAPD Transfers to the Police Commission and its Office of the Inspector General, Mr. Cherkasky Will Continue to Play an Important Role.

There is consensus among the Parties, as well as the Intervenors and the Monitor, that oversight and monitoring should be returned to the Police Commission and its Inspector General.  Consistent with that belief, the proposed Transition Agreement focuses on the obligations of the Inspector General.

At the hearing on this matter, the Court requested clarification regarding Mr. Cherkasky's role during the term of the proposed Transition Agreement.  In consultation with Mr. Cherkasky, the Parties have agreed to the addition of the following language to the Transition Agreement:

> In addition to submitting copies of the reviews to the Court, as outlined below, the City Defendants shall also submit copies of any such reviews to Michael Cherkasky.  Mr. Cherkasky has

agreed to serve as a consultant to the United States, LAPD and the Court, and will review any such submissions on a *pro bono* basis. Mr. Cherkasky shall have full and direct access to the LAPD and its employees, and may submit his own recommendations to the Department, Police Commission, OIG, United States, or Court as he deems necessary.  (See, Transition Agreement, Section II.G.)

C.  <u>Intervenors Retain All Rights Under the Transition Agreement as Possessed Under the Consent Decree</u>.

This Court has, consistent with the law, invited the participation of the Intervenors, both through submission of written briefs and participation during hearings.  Such participation is both appropriate and not disputed by the Parties. However, participation is not without limitation. (<u>Local No. 93, International Assoc. of Firefighters, AFL-CIO, C.L.C. v. City of Cleveland, et al.</u>, <u>supra</u>, 478 U.S. at 529 ("…while an intervenor is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree, it does not have power to block the decree merely by withholding its consent").)  In the instant case, the positions advanced by Community Intervenors should not be *expanded* to prevent the Parties from entering into an agreement which would complete the resolution of the Plaintiff's claims brought in the underlying lawsuit.  Such an expansion would effectively serve as a "veto" by the Intervenors of such a proposed settlement, which is disallowed. (<u>Local 93</u>, <u>supra</u>, at 529 "[I]t has never been supposed that one party – whether an original party, a party that was joined later, or an intervenor – could preclude other parties from settling their own disputes….")

As represented by counsel for the United States during the June 15, 2009, hearing, the lawsuit would remain open until such time as Defendants satisfactorily performed under the terms of the agreement.  (See, Transcript of Proceedings, Status Conference (June 15, 2009) at 18:15-19, attached to Raffish Declaration as Exhibit G.)  In that respect, the Parties agree that the Intervenors would retain the same

rights and level of involvement as they possess under the Decree, limited to the scope of such agreement.

To avoid any ambiguity, the Parties have agreed to explicitly include a number of provisions in the Transition Agreement addressing the Intervenors' rights. Specifically, the Parties added the following provision:

> Nothing in this Transition Agreement is intended to: (a) alter the existing collective bargaining agreement between the City Defendants and the LAPD bargaining units; or (b) impair the collective bargaining rights of employees in those units under state and local law.  Moreover, nothing in this Transition Agreement is intended to alter the rights of the organizations and individuals currently identified as Intervenors in the above-captioned matter.  The PPL and Community Intervenors shall continue to retain any and all rights and interests in the matter that existed during the pendency of the Consent Decree, including the right to present its views on the Transition Agreement and to have them fully considered by the Court in conjunction with the Court's decision regarding the entry of this Transition Agreement. (See, Transition Agreement, Section II.D.)

In addition, to the extent the PPL argues that the financial disclosure provisions of the Transition Agreement affect its rights and interests in its separate cause of action against the City Defendants in PPL v. City of Los Angeles, et al., Case No. 2:08-cv-00784 GAF-RC, the Parties have agreed to add the following provision to the Transition Agreement:

> The Parties recognize and acknowledge that the matter of PPL v. City of Los Angeles, et al., Case No. 2:08-cv-00784 GAF-RC, specifically relates to the City Defendants' implementation of the financial disclosure program required under Paragraph 132 of the Consent Decree and proposed under Section III.C. of the Transition Agreement.  To the extent that the PPL action results in a substantive change to the current financial

disclosure program, the Parties agree to modify the Transition Agreement accordingly. (See, Transition Agreement, Section III.C.3.)

Further, to the extent that the PPL raises concerns about the confidentiality of information disclosed under the terms of the Transition Agreement, the Parties have agreed to add the following provision to the Transition Agreement:

All documents provided to any person or Party under the terms of this Agreement shall be maintained in a confidential manner, and shall not be disclosed to any person or entity other than the Court, either under seal or in a manner which would not otherwise constitute a disclosure of privileged information, as protected under either State and/or federal law. (See, Transition Agreement, Section IV.D.)

Because the Transition Agreement does not impair, limit, or change the rights and interests of the Intervenors as they existed during the pendency of the Consent Decree, the Parties request the entry of the Transition Agreement.

///
///
///
///
///
///
///
///
///
///
///
///

## VI.  CONCLUSION

For the reasons stated herein, the Parties respectfully request that the Consent Decree be terminated, as provided in the Order filed herewith, and that the (Revised) Transition Agreement also submitted herewith be entered as an Order of the Court.

DATED: June 22, 2009          Respectfully submitted,

FOR THE PLAINTIFF, THE UNITED STATES OF AMERICA:

LORETTA KING
Acting Assistant Attorney General
Civil Rights Division

/s/ Shanetta Y. Cutlar
SHANETTA Y. CUTLAR
State Bar No. 169849
Chief

/s/ Shanetta Y. Cutlar
DANIEL H. WEISS
Deputy Chief

/s/ Je Yon Jung
JE YON JUNG
LAURA COON
TIM MYGATT
KENYAN MCDUFFIE
Attorneys

United States Department of Justice
Civil Rights Division
Special Litigation Section, PHB
950 Pennsylvania Avenue, NW
Washington, DC  20530
(202) 305-1457
(202) 514-6903 (fax)
jeyon.jung@usdoj.gov

FOR THE DEFENDANTS, CITY OF LOS ANGELES, CALIFORNIA, BOARD OF  POLICE COMMISSIONERS OF  THE CITY OF  LOS ANGELES, AND THE LOS ANGELES POLICE DEPARTMENT:

ROCKARD J. DELGADILLO
City Attorney

/s/ Richard H. Llewellyn, Jr.
RICHARD H. LLEWELLYN, JR.
State Bar No. 105072
Chief Deputy

/s/ Carlos De La Guerra
CARLOS DE LA GUERRA
State Bar No. 164046
Assistant City Attorney

/s/ Julie S. Raffish
JULIE S. RAFFISH
State Bar No. 185504
Deputy City Attorney
Los Angeles City Attorney's Office
200 North Main Street, Suite 800
Los Angeles, California  90012
(213) 978-8380
(213) 978-8787 (fax)
Julie.Raffish@lacity.org

23